Nos. 2024-2081

# United States Court of Appeals
# for the Federal Circuit

IN RE ECOFACTOR, INC.,

*Appellant,*

_____

Appeal from the United State Patent and Trademark Office, Patent Trial and Appeal Board in *Ex Parte* Reexamination Control No. 90/014,916

_____

**CORRECTED APPENDIX**

_____

January 22, 2025

Reza Mirzaie
rmirzaie@raklaw.com
Kristopher R. Davis
kdavis@raklaw.com
James N. Pickens
jpickens@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd.,12th Floor
Los Angeles, CA 90025
Tel: (310) 826-7474
Fax: (310) 826-6991

*Attorneys for Plaintiff-Appellant EcoFactor, Inc.*

# APPENDIX TABLE OF CONTENTS

*In re EcoFactor, Inc.*
**Nos. 2024-2081**

**Materials Required Pursuant to Fed. Cir. R. 30.**

The materials included in this appendix did not have an identifying docket number or designation in the reviewed tribunal. Fed. Cir. R. 30(6)

| Page No. | Date | Description |
|---|---|---|
| Appx1-Appx20 | 5/10/2024 | Final Written Decision in Appeal 2024-001366 (Reexamination Control 90/014,916) |
| Appx21-Appx37 | 4/2/2013 | U.S. Patent No. 8,412,488 |
| Appx38-Appx63 | 8/23/2024 | Certified List for Reexamination Control No. 90/014,916 |
| **Chronological Record in Reexamination Control No. 90/014,916** | | |
| Appx466-Appx475 | 12/03/2021 | Rosen, U.S. Patent No. 6,789,739 |
| Appx478-Appx527 | 12/03/2021 | Ehlers et al., U.S. Pat. Pub. No. 2004/0117330 |
| Appx545-Appx551 | 12/03/2021 | Van Ostrand et al., U.S. Pat. Pub. No. 2005/0159846 |
| Appx631 | 12/09/2021 | Notice of reexamination request filing date |
| Appx635-Appx638 | 01/28/2022 | Excerpt from Determination -- Reexam Ordered |
| Appx668-Appx680 | 07/14/2022 | Reexam - Non-Final Action |

| Appx683 | 09/13/2022 | Amendment/Request for Reconsideration-After Non-Final Rejection |
|---|---|---|
| Appx684-Appx686 | 09/13/2022 | Claims |
| Appx687-Appx700 | 09/13/2022 | Applicant Arguments/Remarks Made in an Amendment |
| Appx704-Appx718 | 10/05/2022 | Reexam - Final Rejection |
| Appx719 | 10/05/2022 | Reexam - Final Rejection |
| Appx720 | 10/05/2022 | Paper Reexam File Jacket is scanned |
| Appx721 | 10/05/2022 | Search information including classification, databases and other search related notes |
| Appx740 | 01/05/2023 | Reexam Response to Final Rejection |
| Appx741-Appx744 | 01/05/2023 | Claims |
| Appx745-Appx762 | 01/05/2023 | Applicant Arguments/Remarks Made in an Amendment |
| Appx763-Appx766 | 02/02/2023 | Reexam proceeding - Advisory Action |
| Appx769-Appx770 | 03/03/2023 | Notice of Appeal Filed |
| Appx776, Appx783-Appx805 | 05/02/2023 | Excerpt from Appeal Brief Filed |
| Appx811-Appx818 | 11/16/2023 | Examiner's Answer to Appeal Brief |

| Appx819-Appx819 | 11/16/2023 | Paper Reexam File Jacket is scanned |
|---|---|---|
| Appx826-Appx827 | 01/16/2024 | Request for Oral Hearing |
| Appx832-Appx833 | 02/15/2024 | Excerpt from Notification of Appeal Hearing - California |
| Appx854-Appx866 | 05/08/2024 | Patent Trial and Appeal Board (PTAB) Oral Hearing Transcript |
| Appx887-Appx888 | 07/09/2024 | Excerpt from Notice of Appeal Filed |

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465          7590          05/10/2024

Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/10/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Appx1

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* ECOFACTOR, INC.
Patent Owner and Appellant

———————

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2
Technology Center 3900

———————

Before ERIC B. CHEN, SCOTT B. HOWARD, and MICHAEL J. ENGLE, *Administrative Patent Judges.*

CHEN, *Administrative Patent Judge.*

DECISION ON APPEAL

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Pursuant to 35 U.S.C. §§ 134(b) and 306, Patent Owner[1] appeals from the final rejection of claims 1–16. Independent claims 1 and 9 have been amended during the reexamination proceeding.

A video oral hearing was held on April 18, 2024. The record will include a written transcript of the oral hearing

We AFFIRM.

STATEMENT OF THE CASE

*Reexamination Proceedings*

A request for *ex parte* reexamination of U.S. Patent No. 8,412,488 B2 ("the '488 patent") was filed on December 3, 2021, and assigned Reexamination Control No. 90/014,916. The '488 patent, entitled "SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION," issued April 2, 2013 to John Douglas Steinberg and Scott Douglas Hublou, based on Application No. 13/409,697, filed March 1, 2012, which is part of a series of multiple continuing applications going back to an application filed on July 31, 2008, based on (1) provisional Application No. 60/963,183, filed on August 3, 2007, and (2) provisional Application No. 60/994,011, filed on September 17, 2007.

---

[1] Patent Owner identifies the real party in interest as EcoFactor, Inc. (Appeal Br. 3.)

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

*Claimed Subject Matter*

The claims are directed to estimating the rate of change in temperature inside of a structure, in particular, using the relationship between the inside temperature and the outside temperature to determine whether the climate control system is "on" or "off." (Abstract.)

*Related Litigation*

The '488 patent has been asserted in at least the following district court proceedings: (i) *EcoFactor, Inc., v. Alarm.com Inc.*, No. 1:20-cv-11007 (D. Mass. May 26, 2020) (dismissed); (ii) *EcoFactor, Inc., v. Google, LLC*, No. 6:20-cv-00075 (W.D. Tex. Jan 31, 2020); (iii) *EcoFactor, Inc., v. Ecobee, Inc.*, No. 6:20-cv-00078 (W.D. Tex. Jan. 31, 2020); (iv) *EcoFactor, Inc., v. Vivint, Inc.*, No. 6:20-cv-00080 (W.D. Tex. Jan. 31, 2020); and (v) *EcoFactor, Inc. v. Alarm.com Inc.*, No. 6:20-cv-00076 (W.D. Tex. Jan. 31, 2020).

The '488 patent was also subject to *inter partes* review in *Google, LLC v. EcoFactor, Inc.*, IPR2021-00409 (PTAB Jan. 11, 2021) (institution denied).

*The Claims*

Claim 1, reproduced below, is illustrative of the claimed subject matter, with disputed limitations in italics and underlining to illustrate claim amendments:

1.   A system for monitoring the operational status of an HVAC system comprising:

3

Appx4

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

> at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

> one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

> wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

> *wherein said one or more processors compare an <u>actual rate of change in</u> inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.*

REFERENCES

| Name | Reference | Date |
|---|---|---|
| Ehlers et al. | US 2004/0117330 A1 | June 17, 2004 |
| Van Ostrand et al. | US 2005/0159846 A1 | July 21, 2005 |
| Rosen | US 6,789,739 B2 | Sept. 14, 2004 |

*The Rejections*

Claims 1–16 stand rejected under 35 U.S.C. § 305 as enlarging the scope of the claims being reexamined.

Claims 1, 3–9, and 11–16 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Ehlers and Van Ostrand.

4

Appx5

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Claims 2 and 10 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Ehlers, Van Ostrand, and Rosen.[2]

## OPINION

### *§ 305 Rejection*

We are unpersuaded by Patent Owner's arguments (Appeal Br. 11–14) that independent claims 1 and 9, which have been amended from "an inside temperature" to recite "an actual rate of change in inside temperature" does not enlarge the scope of the claims being reexamined.

The Examiner concluded that Patent Owner's amendments to independent claims 1 and 9 enlarge the scope of the claims being reexamined under 35 U.S.C. § 305 because "[c]laims 1 and 9 have been amended such that its scope no longer requires a comparison of the actual inside temperature recorded inside the first structure with the estimation for the rate of change" and "[i]t is therefore improperly broadening in scope." (Final Act. 4.) In particular, the Examiner stated that "the scope of the claimed invention would now encompass systems or methods that could be practiced without using a recorded inside temperature for this comparison, as it would only require a rate of change in the inside temperature, which, although related, is not the same measurement." (Ans. 3.) We agree with the Examiner's conclusions.

Claim 1 of the '488 patent, as issued, recites "compare [i] *an inside temperature recorded* inside the first structure with [ii] *said estimation for*

---

[2] Patent Owner does not present any arguments with respect to the rejection of dependent claims 2 and 10 under 35 U.S.C. § 103(a). Thus, any such arguments are deemed to be waived.

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

*the rate of change in inside temperature*" (emphases added). However, during the current reexamination proceeding, claim 1 was amended to recite "compare [i] *an actual rate of change in inside temperature recorded inside the first structure* with [ii] *said estimation for the rate of change in inside temperature.*" Accordingly, claim 1 was amended to compare: (i) "an actual rate of change in inside temperature recorded inside the first structure," rather than "an inside temperature recorded" with (ii) the "estimation for the rate of change in inside temperature." Thus, because amended claim 1 changes the scope of the comparison in the measured data—rate of change in temperature, rather than solely temperature—the amended claim "contains within its scope any conceivable apparatus . . . which would not have infringed the original patent." *In re Ruth*, 278 F.2d 729, 730 (CCPA 1960). In other words, independent claim 1 of the '488 patent, as issued, would not necessarily be infringed by comparing: (i) an actual rate of change in inside temperature with (ii) the estimation for the rate of change in inside temperature, whereas the amended claim would.

Patent Owner argues

> Given that the known construction of "a" or "an," as used in the original claim language, i.e., "an inside temperature," is amendable to a construction of "at least one" or "one or more" inside temperature, the original claim language could be infringed by comparing a one or more inside temperature to the estimated rate of change in inside temperature. An "actual rate of change in inside temperature recorded inside the first structure" is necessarily derived from at least two inside temperatures recorded inside the structure. The scope of the amended claims is thus necessarily narrower than the scope of the original claims.

6

Appx7

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

(Appeal Br. 11–12 (emphasis omitted).)  Even if we adopt Patent Owner's
claim construction that "an inside temperature" as recited in claim 1 of '488
patent means "one or more" inside temperatures, comparing one or more
*temperatures* to a rate of change is not equivalent to comparing *a rate of
change* to a rate of change.

> Patent Owner further argues that
>
> the [Final Office Action] . . . do[es] not appear to make any
> attempt to address the "scope" of the proposed amended claim
> feature as opposed to the "scope" of the original claims, as is
> required, and do not even use the precise claim language from
> the 488 patent, or of the amendments . . . .  Rather, the [Final
> Office Action] clearly bases its conclusion on an interpretation
> of the claim language that is not supported by either the original
> claim language or the amended claim language, and does not
> account for the full details of the amendments to claims 1 and 9
> that were expressly made to narrow the scope of the claims . . . .

(Appeal Br. 13.)  In particular, Patent Owner argues that "[t]he fact that any
such analysis here starts with a misinterpretation of the claim language" and
"any analysis as to the scope of the claims is fatally flawed and cannot
provide any reasonable basis for the conclusions regarding the application of
35 U.S.C. § 305." (*Id.* at 14.)  Contrary to Patent Owner's arguments, the
Examiner stated that amended claim 1 "would only require a rate of change
in the inside temperature, which, although related, is not the same
measurement" as claim 1 of the '488 patent.  (Ans. 3.)  Regardless of the
sufficiency of the Examiner's claim construction, the Examiner has provided
an adequate explanation as to why Patent Owner's amendment to claim 1
enlarges the scope.  Accordingly, the Examiner has met the burden of a
general prima facie notice requirement.  *See In re Jung*, 637 F.3d 1356, 1363
(Fed. Cir. 2011) ("[A]ll that is required of the [Patent] [O]ffice to meet its

7

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

prima facie burden of production is to set forth the statutory basis of the rejection and the reference or references relied upon in a sufficiently articulate and informative manner as to meet the notice requirement of [section] 132.").

Thus, we agree with the Examiner that independent claims 1 and 9, which have been amended to recite "an actual rate of change in inside temperature," enlarge the scope of the claims being reexamined under 35 U.S.C. § 305.

Accordingly, we sustain the rejection of independent claims 1 and 9 under 35 U.S.C. § 305.  Claims 2–8 and 10–16 depend from claims 1 and 9, and Patent Owner has not presented any additional substantive arguments with respect to these claims.  Therefore, we sustain the rejection of claims 2–8 and 10–16 under 35 U.S.C. § 305, for the same reasons discussed with respect to independent claims 1 and 9.

### § 103 Rejection—Ehlers and Van Ostrand

We are unpersuaded by Patent Owner's arguments (Appeal Br. 18–23) that the combination of Ehlers and Van Ostrand would not have rendered obvious independent claim 1, which includes the limitation "compare an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off."

The Examiner found that the thermal gain characteristics of home 2.18, as illustrated in Figure 3D of Ehlers, corresponds to the

8

Appx9

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

limitation "compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature." (Final Act. 5.) The Examiner further found that central control 12 of Van Ostrand, which monitors the rate of change of a room temperature before and after activation of another stage, as illustrated in Figures 4 and 5, correspond to the limitation "compare an actual rate of change in inside temperature recorded inside the first structure . . . to determine whether the first HVAC system is on or off." (*Id.*; *see also* Ans. 4–5.) The Examiner concluded that "it would have been obvious . . . to have modified the invention of Ehlers by turning on and off an HVAC system in the case where the expected temperature, based on indoor and outdoor measurements" (Final Act. 6) and in particular, "when modified by the teachings of Van Ostrand, gains the ability to adjust distribution and usage in light of an HVAC system being found to be operating less than optimally" (Ans. 5). We agree with the Examiner's findings and conclusions.

Ehlers relates to "delivery of energy from a distribution network to one or more sites." (Abstract.) Figure 3B of Ehlers, reproduced below, illustrates a block diagram for temperature and environmental sensing and control system 3.08. (¶¶ 28, 231.)

9

Appx10

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2



*Figure 3B*

*Figure 3B illustrates a block diagram for temperature and environmental sensing and control system 3.08.*

In reference to Figure 3B, Ehlers explains the following:

> In a first embodiment of the present invention, the temperature and environmental sensing and control system 3.08 will manage indoor air temperature. In a second embodiment, using the sensor data and/or external information, the temperature and environmental sensing and control system 3.08 will manage the air quality and humidity in the site 1.04 by controlling the operation of the appropriate heating, filtration, conditioning and cooling equipment in conjunction with damper and fresh air input ducts, electrostatic filters and ionization.

(¶ 231.) Figure 3D of Ehlers, reproduced below, illustrates the thermal rate of gain in site 1.04 for different outside temperatures. (¶ 253.)

10

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2



*Figure 3D*

*Figure 3D illustrates a thermal rate of gain in site 1.04 for different outside temperatures.*

In reference to Figure 3D, Ehlers explains that "the system 3.08 tracks the thermal gain rate of the home 2.18 for each set point selected over time by the customer," including: (i) "[t]he first set point for which data is available is 72 degrees F" with "three trends illustrated as lines 3.12A, 3.12B, and 3.12C plot the thermal rate of gain in the site 1.04 for different outside temperatures"; and (ii) "[t]he next set point for which data is illustrated is the set point of 76 degrees F" with "[t]he three trends shown as lines 3.14A, 3.14B, and 3.14C illustrate the thermal rate of gain in the home 2.18." (¶ 253.) Because Figure 3D of Ehlers illustrates the thermal gain rate of home 2.18 for different set points and different outside temperature, Ehlers teaches the limitation "compares the inside temperature of said first structure

11

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature."

Van Ostrand relates to "an HVAC system, and more particularly to bypassing a failed HVAC system component and/or stages to assure at least partial system capacity." (¶ 2.) In the "BACKGROUND OF THE INVENTION" section, Van Ostrand acknowledges that "[t]ypical HVAC systems include multiple stages of heating and/or cooling capacity," such that "[a]t the lowest demand, the first (lowest capacity) stage is activated" and "[a]s demand increases past the capacity of the lowest stage, the next higher capacity stage is activated." (¶ 4.)

Figure 4 of Van Ostrand, reproduced below, illustrates a graphical representation of temperature vs. time curve for an operational HVAC component. (¶ 14.)



*Figure 4 illustrates a temperature vs. time curve for an operational HVAC.*

12

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

In reference to Figure 4, in the context of a heat pump, Van Ostrand explains that, "the central control 12 detects the failed stages and/or components by monitoring a temperature of a controlled area to determine if any particular stage is operating properly," in particular, "[a] higher stage, having more capacity, will create a more positive slope to the controlled environment temperature vs. time curve than the stage below it." (¶ 29.)

Figure 5 of Van Ostrand, reproduced below, illustrates a graphical representation of temperature vs. time curve for an HVAC component with a malfunction stage. (¶ 15.)



*Figure 5 illustrates a temperature vs. time curve for an inoperative HVAC.*

In reference to Figure 5, in the context of a heat pump, Van Ostrand explains that "[i]f there is a change in the rate of change of room temperature, it can be inferred that the component is operating" and "[i]f there is no change in the rate of change, the component can be assumed to be inoperative." (¶ 31.) Because Van Ostrand explains that inoperability of an HVAC can be determined by comparing the two rates of change of room temperature, Van

13

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Ostrand teaches the limitation "compare an actual rate of change in inside temperature recorded inside the first structure . . . to determine whether the first HVAC system is on or off."

The combination of Ehlers and Van Ostrand is nothing more than incorporating the known method of Van Ostrand for measuring change of room temperature to determine if the HVAC systems is operable, with the known HVAC thermostat monitoring and control system of Ehlers, to yield predictable results. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). In particular, referring to Figures 4 and 5 of Van Ostrand, one of ordinary skill in the art would have recognized that the rate of change of room temperature can be used to determine inoperability—i.e., an "off" state—of an HVAC system.  Moreover, in combining the teachings of Ehlers and Van Ostrand, one of ordinary skill in the art would further recognize that an "on" or "off" state of the HVAC can be determined by comparing:  (i) the rate of change of room temperature while the HVAC is "on"; with (ii) the thermal rate of gain for site 1.04, as illustrated in Figure 3D Ehlers—i.e., rate of change of room temperature while the HVAC is "off."  Thus, the combination of Ehlers and Van Ostrand teaches the limitation "compare an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off." Therefore, we agree with the Examiner (Final Act. 6) that modifying Ehlers with Van Ostrand would have been obvious.

14

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

> Patent Owner argues the following:

> At the cited portion of Van Ostrand, and otherwise throughout
> the entire reference, the disclosed methodology of Van Ostrand
> detects "failed stages and/or components" with a stated objective
> of removing such stages or components from the sequencing of
> an otherwise operating HVAC system. This does not result in a
> determination as to whether the HVAC system is on or off, as is
> required by the claims.

(Appeal Br. 18.) However, as discussed previously in reference to Figure 5,
Van Ostrand explains that "[i]f there is a change in the rate of change of
room temperature, it can be inferred that the component is operating" and
"[i]f there is no change in the rate of change, the component can be assumed
to be inoperative." (¶ 31.) As such, one of ordinary skill in the art would
have recognized that the HVAC of Van Ostrand being "inoperative" teaches
or at least suggests the HVAC being in an "off" state.

Patent Owner argues that "[n]owhere does Van Ostrand reference
deriving an estimation of a rate of change, or a change in a rate of change,
by referencing the temperatures inside the structure with the outside
temperature of the structure." (Appeal Br. 19 (citations omitted).) However,
the Examiner relied upon Ehlers, rather than Van Ostrand, for teaching the
limitation "compares the inside temperature of said first structure and the
outside temperature over time to derive an estimation for the rate of change
in inside temperature of said first structure in response to outside
temperature." (Final Act. 5.) The rejection of claim 1 is based on the
combination of Ehlers and Van Ostrand, and Patent Owner cannot show
nonobviousness by attacking references individually. *See In re Keller*, 642
F.2d 413, 426 (CCPA 1981).

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Patent Owner further argues that "the [Final Office Action] . . . provide[s] no supportable basis for combining Ehlers and Van Ostrand in a continued effort to render obvious the subject matter of the claims in this Reexam, and as amended, particularly given the express and disparate teachings of the Ehlers and Van Ostrand references." (Appeal Br. 20.) In particular, Patent Owner argues that (i) "[t]he fact that Ehlers and Van Ostrand are generally directed at disparate methodologies for controlling HVAC systems in some manner does not more broadly render those references combinable" (*id.* at 22); and (ii)

> Nowhere does Van Ostrand suggest that its methodology could, or would predictably, be expanded in the manner that appears to be suggested by the [Final Office Action] to incorporate an externally generated estimation of a rate of change in inside air temperature in response to outside air temperature that is derived from comparing the inside temperature of a structure and the outside temperature over time

(*id.* at 23 (emphasis omitted)).  However, as discussed previously, the combination of Ehlers and Van Ostrand is based on combining known elements—i.e., the known method of Van Ostrand for comparing rate of change of room temperature as applied to the known temperature control system 3.08 of Ehlers—to achieve predictable results.

Thus, we agree with the Examiner that the combination of Ehlers and Van Ostrand would have rendered obvious independent claim 1, which includes the limitation "compare an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off."

16

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Accordingly, we sustain the rejection of independent claim 1 under 35 U.S.C. § 103(a). Claims 3–8 depend from claim 1, and Patent Owner has not presented any additional substantive arguments with respect to these claims. Therefore, we sustain the rejection of claims 3–8 under 35 U.S.C. § 103(a), for the same reasons discussed with respect to independent claim 1.

Independent claim 9 recites limitations similar to those discussed with respect to independent claim 1, and Patent Owner has not presented any additional substantive arguments with respect to this claim. We sustain the rejection of claim 9, as well as dependent claims 11–16 for the same reasons discussed with respect to claim 1.

CONCLUSION

The Examiner's decision rejecting claims 1–16 under 35 U.S.C. § 103(a) is affirmed.

DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1–16 | 305 | Claim Broadening | 1–16 | |
| 1, 3–9, 11–16 | 103(a) | Ehlers, Van Ostrand | 1, 3–9, 11–16 | |
| 2, 10 | 103(a) | Ehlers, Van Ostrand, Rosen | 2, 10 | |
| **Overall Outcome** | | | 1–16 | |

17

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this *ex parte* reexamination proceeding are governed by 37 C.F.R. § 1.550(c) (2022).  *See* 37 C.F.R. § 41.50(f) (2022).

## <u>AFFIRMED</u>

18

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

PATENT OWNER:

TANNER IP, PLLC
149 WEST GILPIN AVENUE
NORFOLK, VA 23503

THIRD PARTY REQUESTER:

SMITH BALUCH LLP
376 BOYLSTON ST., SUITE 401
BOSTON, MA 02116

19

Appx20



US008412488B2

(12) **United States Patent**
Steinberg et al.

(10) **Patent No.:**     **US 8,412,488 B2**
(45) **Date of Patent:**     *Apr. 2, 2013

(54) **SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION**

(75) Inventors: **John Douglas Steinberg**, Millbrae, CA (US); **Scott Douglas Hublou**, Redwood City, CA (US)

(73) Assignee: **EcoFactor, Inc.,** Millbrae, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/409,697**

(22) Filed: **Mar. 1, 2012**

(65) **Prior Publication Data**

US 2012/0221294 A1     Aug. 30, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 13/037,162, filed on Feb. 28, 2011, now Pat. No. 8,131,506, which is a continuation of application No. 12/183,949, filed on Jul. 31, 2008, now Pat. No. 7,908,116.

(60) Provisional application No. 60/963,183, filed on Aug. 3, 2007, provisional application No. 60/994,011, filed on Sep. 17, 2007.

(51) **Int. Cl.**
**G01B 15/00**     (2006.01)

(52) **U.S. Cl.** ........ **702/182**; 702/176; 702/183; 702/184; 700/276; 700/278; 236/1 C; 236/46 A; 236/46 R; 165/238; 165/239

(58) **Field of Classification Search** .................. 702/176, 702/182–184; 700/276, 278; 236/1 C, 46 A, 236/46 R; 165/236, 239

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,136,732 A     1/1979   Demaray et al.

| | | | |
|---|---|---|---|
| 4,341,345 | A | 7/1982 | Hammer et al. |
| 4,403,644 | A | 9/1983 | Hebert |
| 4,475,685 | A | 10/1984 | Grimado et al. |
| 4,655,279 | A | 4/1987 | Harmon |
| 4,674,027 | A | 6/1987 | Beckey |
| 5,244,146 | A | 9/1993 | Jefferson et al. |
| 5,270,952 | A | 12/1993 | Adams et al. |
| 5,314,004 | A | 5/1994 | Strand et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| EP | 0415747 | 3/1991 |
|---|---|---|
| KR | 10-1994-0011902 | 6/1994 |
| KR | 10-2000-0059532 | 10/2000 |

OTHER PUBLICATIONS

Arens, et al., "How Ambient Intelligence Will Improve Habitability and Energy Efficiency in Buildings", 2005, research paper, Center for the Built Environment, Controls and Information Technology.

Bourhan, et al., "Cynamic model of an HVAC system for control analysis", Elsevier 2004.

Comverge SuperStat Flyer.

(Continued)

*Primary Examiner* — Sujoy Kundu
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57)     **ABSTRACT**

The invention comprises systems and methods for estimating the rate of change in temperature inside a structure. At least one thermostat located is inside the structure and is used to control an climate control system in the structure. At least one remote processor is in communication with said thermostat and at least one database stores data reported by the thermostat. At least one processor compares the outside temperature at least one location and at least one point in time to information reported to the remote processor from the thermostat. The processor uses the relationship between the inside temperature and the outside temperature to determine whether the climate control system is "on" or "off".

**16 Claims, 10 Drawing Sheets**



US 8,412,488 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,462,225 | A | 10/1995 | Massara et al. |
| 5,544,036 | A | 8/1996 | Brown et al. |
| 5,555,927 | A | 9/1996 | Shah |
| 5,572,438 | A | 11/1996 | Ehlers et al. |
| 5,682,949 | A | 11/1997 | Ratcliffe et al. |
| 5,717,609 | A | 2/1998 | Packa et al. |
| 5,818,347 | A | 10/1998 | Dolan et al. |
| 5,977,964 | A | 11/1999 | Williams et al. |
| 6,115,713 | A | 9/2000 | Pascucci et al. |
| 6,145,751 | A | 11/2000 | Ahmed |
| 6,178,362 | B1 | 1/2001 | Woolard et al. |
| 6,260,765 | B1 | 7/2001 | Natale et al. |
| 6,351,693 | B1 | 2/2002 | Monie |
| 6,400,996 | B1 | 6/2002 | Hoffberg et al. |
| 6,437,692 | B1 | 8/2002 | Petite et al. |
| 6,478,233 | B1 | 11/2002 | Shah |
| 6,480,803 | B1 | 11/2002 | Pierret et al. |
| 6,483,906 | B1 | 11/2002 | Lggulden et al. |
| 6,536,675 | B1 | 3/2003 | Pesko et al. |
| 6,542,076 | B1 | 4/2003 | Joao |
| 6,549,130 | B1 | 4/2003 | Joao |
| 6,574,537 | B2 | 6/2003 | Kipersztok et al. |
| 6,580,950 | B1 | 6/2003 | Johnson |
| 6,594,825 | B1 | 7/2003 | Goldschmidt et al. |
| 6,595,430 | B1 | 7/2003 | Shah |
| 6,598,056 | B1 | 7/2003 | Hull et al. |
| 6,619,555 | B2 | 9/2003 | Rosen |
| 6,622,097 | B2 | 9/2003 | Hunter |
| 6,622,115 | B1 | 9/2003 | Brown et al. |
| 6,622,925 | B2 | 9/2003 | Carner et al. |
| 6,622,926 | B1 | 9/2003 | Sartain et al. |
| 6,628,997 | B1 | 9/2003 | Fox et al. |
| 6,633,823 | B2 | 10/2003 | Bartone et al. |
| 6,643,567 | B2 | 11/2003 | Kolk et al. |
| 6,671,586 | B2 | 12/2003 | Davis et al. |
| 6,695,218 | B2 | 2/2004 | Fleckenstein |
| 6,726,113 | B2 | 4/2004 | Guo |
| 6,731,992 | B1 | 5/2004 | Ziegler |
| 6,734,806 | B1 | 5/2004 | Cratsley |
| 6,772,052 | B1 | 8/2004 | Amundsen |
| 6,785,592 | B1 | 8/2004 | Smith |
| 6,785,630 | B2 | 8/2004 | Kolk |
| 6,789,739 | B2 | 9/2004 | Rosen |
| 6,853,959 | B2 | 2/2005 | Ikeda et al. |
| 6,868,293 | B1 | 3/2005 | Schurr |
| 6,868,319 | B2 | 3/2005 | Kipersztok et al. |
| 6,882,712 | B1 | 4/2005 | Iggulden et al. |
| 6,889,908 | B2 | 5/2005 | Crippen et al. |
| 6,891,838 | B1 | 5/2005 | Petite et al. |
| 6,912,429 | B1 | 6/2005 | Bilger |
| 6,991,029 | B2 | 1/2006 | Orfield et al. |
| 7,009,493 | B2 | 3/2006 | Howard et al. |
| 7,031,880 | B1 | 4/2006 | Seem et al. |
| 7,039,532 | B2 | 5/2006 | Hunter |
| 7,061,393 | B2 | 6/2006 | Buckingham et al. |
| 7,089,088 | B2 | 8/2006 | Terry et al. |
| 7,130,719 | B2 | 10/2006 | Ehlers et al. |
| 7,130,832 | B2 | 10/2006 | Bannai et al. |
| H2176 | H | 12/2006 | Meyer et al. |
| 7,167,079 | B2 | 1/2007 | Smyth et al. |
| 7,187,986 | B2 | 3/2007 | Johnson et al. |
| 7,205,892 | B2 | 4/2007 | Luebke et al. |
| 7,215,746 | B2 | 5/2007 | Iggulden et al. |
| 7,216,015 | B2 | 5/2007 | Poth |
| 7,231,424 | B2 | 6/2007 | Bodin et al. |
| 7,232,075 | B1 | 6/2007 | Rosen |
| 7,242,988 | B1 | 7/2007 | Hoffberg et al. |
| 7,260,823 | B2 | 8/2007 | Schlack et al. |
| 7,356,384 | B2 | 4/2008 | Gull et al. |
| 7,483,964 | B1 | 1/2009 | Jackson et al. |
| 7,644,869 | B2 | 1/2010 | Hoglund et al. |
| 7,784,704 | B2 | 8/2010 | Harter |
| 7,848,900 | B2 | 12/2010 | Steinberg et al. |
| 7,894,943 | B2 | 2/2011 | Sloup et al. |
| 7,908,116 | B2 | 3/2011 | Steinberg et al. |
| 7,908,117 | B2 | 3/2011 | Steinberg et al. |
| 8,010,237 | B2 | 8/2011 | Cheung et al. |
| 8,019,567 | B2 | 9/2011 | Steinberg et al. |
| 8,090,477 | B1 | 1/2012 | Steinberg |
| 8,131,497 | B2 | 3/2012 | Steinberg et al. |
| 8,131,506 | B2 * | 3/2012 | Steinberg et al. ............ 702/182 |
| 8,180,492 | B2 | 5/2012 | Steinberg |
| 2003/0040934 | A1 | 2/2003 | Skidmore et al. |
| 2004/0176880 | A1 | 9/2004 | Obradovich et al. |
| 2005/0222889 | A1 | 10/2005 | Lai et al. |
| 2005/0288822 | A1 | 12/2005 | Rayburn |
| 2006/0045105 | A1 | 3/2006 | Dobosz et al. |
| 2006/0214014 | A1 | 9/2006 | Bash et al. |
| 2007/0043477 | A1 | 2/2007 | Ehlers et al. |
| 2007/0045431 | A1 | 3/2007 | Chapman et al. |
| 2007/0146126 | A1 | 6/2007 | Wang |
| 2008/0083234 | A1 | 4/2008 | Krebs et al. |
| 2008/0198549 | A1 | 8/2008 | Rasmussen et al. |
| 2008/0281472 | A1 | 11/2008 | Podgorny et al. |
| 2009/0052859 | A1 | 2/2009 | Greenberger et al. |
| 2009/0099699 | A1 | 4/2009 | Steinberg et al. |
| 2009/0125151 | A1 | 5/2009 | Steinberg et al. |
| 2009/0240381 | A1 | 9/2009 | Lane |
| 2009/0281667 | A1 | 11/2009 | Masui et al. |
| 2010/0019052 | A1 | 1/2010 | Yip |
| 2010/0070086 | A1 | 3/2010 | Harrod et al. |
| 2010/0070089 | A1 | 3/2010 | Harrod et al. |
| 2010/0070093 | A1 | 3/2010 | Harrod et al. |
| 2010/0156608 | A1 | 6/2010 | Bae et al. |
| 2010/0162285 | A1 | 6/2010 | Cohen et al. |
| 2010/0211224 | A1 | 8/2010 | Keeling et al. |
| 2010/0235004 | A1 | 9/2010 | Thind |
| 2010/0282857 | A1 | 11/2010 | Steinberg |
| 2010/0289643 | A1 | 11/2010 | Trundle et al. |
| 2010/0308119 | A1 | 12/2010 | Steinberg et al. |
| 2010/0318227 | A1 | 12/2010 | Steinberg et al. |
| 2011/0031323 | A1 | 2/2011 | Nold et al. |
| 2011/0290893 | A1 | 12/2011 | Steinberg |
| 2011/0307103 | A1 | 12/2011 | Cheung et al. |
| 2012/0065935 | A1 | 3/2012 | Steinberg et al. |
| 2012/0086562 | A1 | 4/2012 | Steinberg |
| 2012/0158350 | A1 | 6/2012 | Steinberg et al. |
| 2012/0221151 | A1 | 8/2012 | Steinberg |
| 2012/0221294 | A1 | 8/2012 | Steinberg et al. |

## OTHER PUBLICATIONS

Control4 Wireless Thermostat Brochure.
Cooper Power Systems Web Page.
Emerson Climate Technologies, "Network Thermostat for E2 Building Controller Installation and Operation Manual," 2007.
Enernoc Web Page.
Enerwise Website.
Honeywell Programmable Thermostat Owner's Guide, www.honeywell.com/yourhome.
Honeywell, W7600/W7620 Controller Reference Manual, HW0021207, Oct. 1992.
Johnson Controls, "T600HCx-3 Single-Stage Thermostats", 2006.
Johnson Controls, Touch4 building automation system brochure, 2007.
Kilicotte, et al., "Dynamic Controls for Energy Efficiency and Demand Response: Framework Concepts and a New Construction Study Case in New York", Proceedings of the 2006 ACEEE Summer Study of Energy Efficiency in Buildings, Pacific Grove. CA, Aug. 13-18, 2006.
Lin, et al., "Multi-Sensor Single-Actuator Control of HVAC Systems", 2002.
Pier, Southern California Edison, Demand Responsive Control of Air Conditioning via Programmable Communicating Thermostats Draft Report.
Proliphix Thermostat Brochure.
Wang, et al., "Opportunities to Save Energy and Improve Comfort by Using Wireless Sensor Networks in Buildings," (2003), Center for Environmental Design Research.
Wetter, et al., A comparison of deterministic and probabilistic optimization algorithms for nonsmooth simulation-based optimization., Building and Environment 39, 2004, pp. 989-999.
Written Opinion and Search Report for PCT/US2011/032537, dated Dec. 12, 2011.

* cited by examiner



FIG. 1



*FIG. 2*



*FIG. 3*



*FIG. 4*



*FIG. 5*



*FIG. 6A*



*FIG. 6B*



FIG. 7



FIG. 8



*FIG. 9*

US 8,412,488 B2

**1**

## SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/037,162, filed Feb. 28, 2011, now U.S. Pat. No. 8,131,506 which is a continuation of U.S. patent application Ser. No. 12/183,949, filed Jul. 31, 2008, now U.S. Pat. No. 7,908,116, issued on Mar. 15, 2011, which claims the benefit of priority under 35 U.S.C. §119(e) to both U.S. Provisional Application 60/963,183, filed Aug. 3, 2007; and U.S. Provisional Application No. 60/994,011, filed Sep. 17, 2007, the entireties of which are incorporated herein by reference and are to be considered part of this specification.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the use of thermostatic HVAC controls that are connected to a computer network as a part of a system for offering peak demand reduction to electric utilities. More specifically, the present invention pertains to use of communicating thermostat combined with a computer network to verify that demand reduction has occurred.

2. Background

Climate control systems such as heating and cooling systems for buildings (heating, ventilation and cooling, or HVAC systems) have been controlled for decades by thermostats. At the most basic level, a thermostat includes a means to allow a user to set a desired temperature, a means to sense actual temperature, and a means to signal the heating and/or cooling devices to turn on or off in order to try to change the actual temperature to equal the desired temperature. The most basic versions of thermostats use components such as a coiled bi-metallic spring to measure actual temperature and a mercury switch that opens or completes a circuit when the spring coils or uncoils with temperature changes. More recently, electronic digital thermostats have become prevalent. These thermostats use solid-state devices such as thermistors or thermal diodes to measure temperature, and microprocessor-based circuitry to control the switch and to store and operate based upon user-determined protocols for temperature vs. time.

These programmable thermostats generally offer a very restrictive user interface, limited by the cost of the devices, the limited real estate of the small wall-mounted boxes, and the inability to take into account more than two variables: the desired temperature set by the user, and the ambient temperature sensed by the thermostat. Users can generally only set one series of commands per day, and to change one parameter (e.g., to change the late-night temperature) the user often has to cycle through several other parameters by repeatedly pressing one or two buttons.

As both the cost of energy and the demand for electricity have increased, utilities supplying electricity increasingly face unpleasant choices. The demand for electricity is not smooth over time. In so-called "summer peaking" locations, on the hottest days of the year, peak loads may be twice as high as average loads. During such peak load periods (generally in the late afternoon), air conditioning can be the largest single element of demand.

Utilities and their customers generally see reductions of supply (brownouts and blackouts) as an unacceptable outcome. But their other options can be almost as distasteful. In

**2**

the long term, they can build additional generating capacity, but that approach is very expensive given the fact that such capacity may be needed for only a few hours a year. And this option is of course unavailable in the short term. When confronted with an immediate potential shortfall, a utility may have reserve capacity it can choose to bring online. But because utilities are assumed to try to operate as efficiently as possible, the reserve capacity is likely to be the least efficient and most expensive and/or more polluting plants to operate. Alternatively, the utility may seek to purchase additional power on the open market. But the spot market for electricity, which cannot efficiently be stored, is extremely volatile, which means that spot prices during peak events may be as much as 10x the average price.

More recently, many utilities have begun to enter into agreements with certain customers to reduce demand, as opposed to increasing supply. In essence, these customers agree to reduce usage during a few critical periods in exchange for incentives from the utility. Those incentives may take the form of a fixed contract payment in exchange for the right to cut the amount of power supplied at specified times, or a reduced overall price per kilowatt-hour, or a rebate each time power is reduced, or some other method.

The bulk of these peak demand reduction (PDR) contracts have been entered into with large commercial and industrial customers. This bias is in large part due to the fact that transaction costs are much lower today for a single contract with a factory that can offer demand reduction of 50 megawatts than they would be for the equivalent from residential customers—it could take 25,000 or more homes to equal that reduction if these homes went without air conditioning.

But residential air conditioning is the largest single component of peak demand in California, and is a large percentage in many other places. There are numerous reasons why it would be economically advantageous to deploy PDR in the residential market. Whereas cutting energy consumption at a large factory could require shutting down or curtailing production, which has direct economic costs, cutting consumption for a couple of hours in residences is likely to have no economic cost, and may only result in minor discomfort—or none at all if no one is at home at the time.

Residential PDR has been attempted. But there have been numerous command and control issues with these implementations. The standard approach to residential PDR has been to attach a radio-controlled switch to the control circuitry located outside the dwelling. These switches are designed to receive a signal from a transmitter that signals the compressor to shut off during a PDR call.

There are a number of technical complications with this approach. There is some evidence that "hard cycling" the compressor in this manner can damage the air conditioning system. There are also serious issues resulting from the fact that the communication system is unidirectional. When utilities contract for PDR, they expect verification of compliance. One-way pagers allow the utility to send a signal that will shut off the A/C, but the pager cannot confirm to the utility that the NC unit has in fact been shut off. If a consumer tampers with the system so that the A/C can be used anyway, the utility will not be able to detect it, absent additional verification systems.

One way in which some utilities are seeking to address this issue is to combine the pager-controlled thermostat with so-called advanced metering infrastructure (AMI). This approach relies on the deployment of "smart meters"—electric meters that are more sophisticated than the traditional meter with its mechanical odometer mechanism for logging only cumulative energy use. Smart meters generally include a means for communicating instantaneous readings. That com-

US 8,412,488 B2

**3**

munication may in the form of a signal sent over the power lines themselves, or a wireless communication over a data network arranged by the utility. These meters allow utilities to accomplish a number of goals, including offering pricing that varies by time of day in order to encourage customers to move consumption away from peak demand hours. These smart meters can cost hundreds of dollars, however, and require both a "truck roll"—a visit from a trained service person—and most likely the scheduling of an appointment with the occupants, because swapping the meter will require turning off power to the house.

If the utility installs a smart meter at each house that contracts to participate in a PDR program, it may be possible to verify that the A/C is in fact switched off. But this approach requires two separate pieces of hardware, two separate communications systems, and the ability to match them for verification purposes.

It would be desirable to have a system that could both implement and verify residential peak demand reduction with reduced expenses.

SUMMARY OF THE INVENTION

At least one embodiment of the invention that includes system for predicting the rate of change in temperature inside a structure comprising at least one thermostat located inside the structure and controlling an HVAC system in said structure; at least one remote processor that is in communication with said thermostat; at least one database for storing data reported by said thermostat; at least one processor that compares outside temperature at least location and at least one point in time to information reported to said remote processor from said thermostat, and wherein said processor uses the relationship between the inside temperature and the outside temperature over time to derive a first prediction for the rate of change in inside temperature assuming that the operating status of the HVAC system is "on"; and said processor uses the relationship between the inside temperature and the outside temperature over time to derive a second prediction for the rate of change in inside temperature assuming that the operating status of the HVAC system is "off"; and said processor compares at least one of the first prediction and the second prediction to the actual inside temperature recorded inside the structure to determine whether the actual inside temperature is closer to the first prediction or the second prediction.

In one embodiment, the invention comprises a thermostat attached to an HVAC system, a local network connecting the thermostat to a larger network such as the Internet, one or more additional thermostats attached to the network and to other HVAC systems, and a server in bi-directional communication with the thermostats. The server logs the ambient temperature sensed by each thermostat vs. time and the signals sent by the thermostats to the HVAC systems to which they are attached. The server preferably also logs outside temperature and humidity data for the geographic locations for the buildings served by the connected HVAC systems. Such information is widely available from various sources that publish detailed weather information based on geographic areas such as by ZIP code. The server also stores other data affecting the load upon the system, such as specific model of HVAC system, occupancy, building characteristics, etc. Some of this data may be supplied by the individual users of the system, while other data may come from commercial sources such as the electric and other utilities who supply energy to those users.

**4**

By using these multiple data streams to compare the performance of one system versus another, and one system versus the same system at other times, the server is able to estimate the effective thermal mass of the structure, and thereby predict the expected thermal performance of a given structure in response to changes in outside temperature. Thus, for example, if the air conditioning is shut off on a hot afternoon, given a known outside temperature, it will be possible to predict how quickly the temperature in the house should rise. If the actual temperature change is significantly different from the predicted rate of change, or does not change at all, it is possible to infer that the air conditioning has not, in fact been shut off.

This and other advantages of the present invention are explained in the detailed description and claims that make reference to the accompanying diagrams and flowcharts.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an example of an overall environment in which an embodiment of the invention may be used.

FIG. **2** shows a high-level illustration of the architecture of a network showing the relationship between the major elements of one embodiment of the subject invention.

FIG. **3** shows an embodiment of the website to be used as part of the subject invention.

FIG. **4** shows a high-level schematic of the thermostat used as part of the subject invention.

FIG. **5** shows one embodiment of the database structure used as part of the subject invention

FIGS. **6**A and **6**B show a graphical representation of the manner in which the subject invention may be used to verify that a demand reduction event has occurred.

FIG. **7** is a flow chart illustrating the steps involved in generating a demand reduction event for a given subscriber.

FIG. **8** is a flow chart illustrating the steps involved in confirming that a demand reduction event has taken place.

FIG. **9** is a representation of the movement of messages and information between the components of the subject invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **1** shows an example of an overall environment **100** in which an embodiment of the invention may be used. The environment **100** includes an interactive communication network **102** with computers **104** connected thereto. Also connected to network **102** are one or more server computers **106**, which store information and make the information available to computers **104**. The network **102** allows communication between and among the computers **104** and **106**.

Presently preferred network **102** comprises a collection of interconnected public and/or private networks that are linked to together by a set of standard protocols to form a distributed network. While network **102** is intended to refer to what is now commonly referred to as the Internet, it is also intended to encompass variations which may be made in the future, including changes additions to existing standard protocols.

When a user of the subject invention wishes to access information on network **102**, the buyer initiates connection from his computer **104**. For example, the user invokes a browser, which executes on computer **104**. The browser, in turn, establishes a communication link with network **102**. Once connected to network **102**, the user can direct the browser to access information on server **106**.

US 8,412,488 B2

5

One popular part of the Internet is the World Wide Web. The World Wide Web contains a large number of computers **104** and servers **106**, which store HyperText Markup Language (HTML) documents capable of displaying graphical and textual information. HTML is a standard coding convention and set of codes for attaching presentation and linking attributes to informational content within documents.

The servers **106** that provide offerings on the World Wide Web are typically called websites. A website is often defined by an Internet address that has an associated electronic page. Generally, an electronic page is a document that organizes the presentation of text graphical images, audio and video.

In addition to the Internet, the network **102** can comprise a wide variety of interactive communication media. For example, network **102** can include local area networks, interactive television networks, telephone networks, wireless data systems, two-way cable systems, and the like.

In one embodiment, computers **104** and servers **106** are conventional computers that are equipped with communications hardware such as modem or a network interface card. The computers include processors such as those sold by Intel and AMD. Other processors may also be used, including general-purpose processors, multi-chip processors, embedded processors and the like.

Computers **104** can also be handheld and wireless devices such as personal digital assistants (PDAs), cellular telephones and other devices capable of accessing the network.

Computers **104** utilize a browser configured to interact with the World Wide Web. Such browsers may include Microsoft Explorer, Mozilla, Firefox, Opera or Safari. They may also include browsers used on handheld and wireless devices.

The storage medium may comprise any method of storing information. It may comprise random access memory (RAM), electronically erasable programmable read only memory (EEPROM), read only memory (ROM), hard disk, floppy disk, CD-ROM, optical memory, or other method of storing data.

Computers **104** and **106** may use an operating system such as Microsoft Windows, Apple Mac OS, Linux, Unix or the like.

Computers **106** may include a range of devices that provide information, sound, graphics and text, and may use a variety of operating systems and software optimized for distribution of content via networks.

FIG. **2** illustrates in further detail the architecture of the specific components connected to network **102** showing the relationship between the major elements of one embodiment of the subject invention. Attached to the network are thermostats **108** and computers **104** of various users. Connected to thermostats **108** are HVAC units **110**. The HVAC units may be conventional air conditioners, heat pumps, or other devices for transferring heat into or out of a building. Each user is connected to the servers **106**a via wired or wireless connection such as Ethernet or a wireless protocol such as IEEE 802.11, a gateway **110** that connects the computer and thermostat to the Internet via a broadband connection such as a digital subscriber line (DSL) or other form of broadband connection to the World Wide Web. In one embodiment, the electric utility server **106**a and demand reduction service server **106**b are in communication with the network **102**. Servers **106**a and **106**b contain the content to be served as web pages and viewed by computers **104**, as well as databases containing information used by the servers. Also connected to the servers **106**a via the Internet are computers located at one or more electrical utilities **106**b.

6

In the currently preferred embodiment, the website **200** includes a number of components accessible to the user, as shown in FIG. **3**. Those components may include a means to store temperature settings **202**, a means to enter information about the user's home **204**, a means to enter the user's electricity bills **206**, means to calculate energy savings that could result from various thermostat-setting strategies **208**, and means to enable and choose between various arrangements **210** for demand reduction with their electric utility provider as intermediated by the demand reduction service provider.

FIG. **4** shows a high-level block diagram of thermostat **108** used as part of the subject invention. Thermostat **108** includes temperature sensing means **252**, which may be a thermistor, thermal diode or other means commonly used in the design of electronic thermostats. It includes a microprocessor **254**, memory **256**, a display **258**, a power source **260**, a relay **262**, which turns the HVAC system on and off in response to a signal from the microprocessor, and contacts by which the relay is connected to the wires that lead to the HVAC system. To allow the thermostat to communicate bi-directionally with the computer network, the thermostat also includes means **264** to connect the thermostat to a local computer or to a wireless network. Such means could be in the form of Ethernet, wireless protocols such as IEEE 802.11, IEEE 802.15.4, Bluetooth, or other wireless protocols. (Other components as needed) The thermostat **250** may also include controls **266** allowing users to change settings directly at the thermostat, but such controls are not necessary to allow the thermostat to function.

The data used to generate the content delivered in the form of the website is stored on one or more servers **106** within one or more databases. As shown in FIG. **5**, the overall database structure **300** may include temperature database **400**, thermostat settings database **500**, energy bill database **600**, HVAC hardware database **700**, weather database **800**, user database **900**, transaction database **1000**, product and service database **1100** and such other databases as may be needed to support these and additional features.

The website will allow users of connected thermostats **250** to create personal accounts. Each user's account will store information in database **900**, which tracks various attributes relative to users of the site. Such attributes may include the make and model of the specific HVAC equipment in the user's home; the age and square footage of the home, the solar orientation of the home, the location of the thermostat in the home, the user's preferred temperature settings, whether the user is a participant in a demand reduction program, etc.

As shown in FIG. **3**, the website **200** will permit thermostat users to perform through the web browser substantially all of the programming functions traditionally performed directly at the physical thermostat, such as temperature set points, the time at which the thermostat should be at each set point, etc. Preferably the website will also allow users to accomplish more advanced tasks such as allow users to program in vacation settings for times when the HVAC system may be turned off or run at more economical settings, and set macros that will allow changing the settings of the temperature for all periods with a single gesture such as a mouse click.

In addition to using the system to allow better signaling and control of the HVAC system, which relies primarily on communication running from the server to the thermostat, the bi-directional communication will also allow the thermostat **108** to regularly measure and send to the server information about the temperature in the building. By comparing outside temperature, inside temperature, thermostat settings, cycling behavior of the HVAC system, and other variables, the system

US 8,412,488 B2

7

will be capable of numerous diagnostic and controlling functions beyond those of a standard thermostat.

For example, FIG. 6a shows a graph of inside temperature, outside temperature and HVAC activity for a 24 hour period. When outside temperature 302 increases, inside temperature 304 follows, but with some delay because of the thermal mass of the building, unless the air conditioning 306 operates to counteract this effect. When the air conditioning turns on, the inside temperature stays constant (or rises at a much lower rate) despite the rising outside temperature. In this example, frequent and heavy use of the air conditioning results in only a very slight temperature increase inside o the house of 4 degrees, from 72 to 76 degrees, despite the increase in outside temperature from 80 to 100 degrees.

FIG. 6b shows a graph of the same house on the same day, but assumes that the air conditioning is turned off from noon to 7 PM. As expected, the inside temperature 304a rises with increasing outside temperatures 302 for most of that period, reaching 88 degrees at 7 PM.

Because server 106a logs the temperature readings from inside each house (whether once per minute or over some other interval), as well as the timing and duration of air conditioning cycles, database 300 will contain a history of the thermal performance of each house. That performance data will allow the server 106a to calculate an effective thermal mass for each such structure—that is, the speed with the temperature inside a given building will change in response to changes in outside temperature. Because the server will also log these inputs against other inputs including time of day, humidity, etc. the server will be able to predict, at any given time on any given day, the rate at which inside temperature should change for given inside and outside temperatures.

As shown in FIG. 3, website 200 will allow the users to opt 210 into a plan that offers incentives such as cash or rebates in exchange for reduced air conditioning use during peak load periods.

FIG. 7 shows the steps followed in order to initiate air conditioner shutoff. When a summer peak demand situation occurs, the utility will transmit an email 402 or other signal to server 106a requesting a reduction in load. Server 106a will determine 404 if the user's house is served by the utility seeking reduction; determine 406 if a given user has agreed to reduce peak demand; and determine 408 if a reduction of consumption by the user is required or desirable in order to achieve the reduction in demand requested by the utility. The server will transmit 410 a signal to the user's thermostat 108 signaling the thermostat to shut off the air conditioner 110.

FIG. 8 shows the steps followed in order to verify that the air conditioner has in fact been shut off. Server 106a will receive and monitor 502 the temperature readings sent by the user's thermostat 108. The server then calculates 504 the temperature reading to be expected for that thermostat given inputs such as current and recent outside temperature, recent inside temperature readings, the calculated thermal mass of the structure, temperature readings in other houses, etc. The server will compare 506 the predicted reading with the actual reading. If the server determines that the temperature inside the house is rising at the rate predicted if the air conditioning is shut off, then the server confirms 508 that the air conditioning has been shut off. If the temperature reading from the thermostat shows no increase, or significantly less increase than predicted by the model, then the server concludes 510 that the air conditioning was not switched off, and that no contribution to the demand response request was made.

For example, assume that on at 3 PM on date Y utility X wishes to trigger a demand reduction event. A server at utility X transmits a message to the server at demand reduction

8

service provider Z requesting W megawatts of demand reduction. Demand reduction service provider server determines that it will turn off the air conditioner at house A in order to achieve the required demand reduction. At the time the event is triggered, the inside temperature as reported by the thermostat in house A is 72 degrees F. The outside temperature near house A is 96 degrees Fahrenheit. The inside temperature at House B, which is not part of the demand reduction program, but is both connected to the demand reduction service server and located geographically proximate to House A, is 74 F. Because the A/C in house A has been turned off, the temperature inside House A begins to rise, so that at 4 PM it has increased to 79 F. Because the server is aware of the outside temperature, which remains at 96 F, and of the rate of temperature rise inside house A on previous days on which temperatures have been at or near 96 F, and the temperature in house B, which has risen only to 75 F because the air conditioning in house B continues to operate normally, the server is able to confirm with a high degree of certainty that the A/C in house A has indeed been shut off.

In contrast, if the HVAC system at house A has been tampered with, so that a demand reduction signal from the server does not actually result in shutting off the A/C in house A, when the server compares the rate of temperature change at house A against the other data points, the server will receive data inconsistent with the rate of increase predicted. As a result, it will conclude that the A/C has not been shut off in house A as expected, and will not credit house A with the financial credit that would be associated with demand reduction compliance, or may trigger a business process that could result in termination of house A's participation in the demand reduction program.

FIG. 9 illustrates the movement of signals and information between the components of the subject invention to trigger and verify a demand reduction response. In step 602 the electric utility server 106b transmits a message to demand reduction service server 106a requesting a demand reduction of a specified duration and size. Demand reduction service server 106a uses database 300 to determine which subscribers should be included in the demand reduction event. For each included subscriber, the server then sends a signal 604 to the subscriber's thermostat instructing it (a) to shut down at the appropriate time or (b) to allow the temperature as measured by the thermostat to increase to a certain temperature at the specified time, depending upon the agreement between the homeowner and the demand reduction aggregator. The server then receives 606 temperature signals from the subscriber's thermostat. At the conclusion of the demand reduction event, the server transmits a signal 608 to the thermostat permitting the thermostat to signal its attached HVAC system to resume cooling, if the system has been shut off, or to reduce the target temperature to its pre-demand reduction setting, if the target temperature was merely increased. After determining the total number of subscribers actually participating in the DR event, the server then calculates the total demand reduction achieved and sends a message 610 to the electric utility confirming such reduction.

Additional steps may be included in the process. For example, if the subscriber has previously requested that notice be provided when a peak demand reduction event occurs, the server will also send an alert, which may be in the form of an email message or an update to the personalized web page for that user, or both. If the server determines that a given home has (or has not) complied with the terms of its demand reduction agreement, the server will send a message to the subscriber confirming that fact.

US 8,412,488 B2

9

It should also be noted that in some climate zones, peak demand events occur during extreme cold weather rather than (or in addition to) during hot weather. The same process as discussed above could be employed to reduce demand by shutting off electric heaters and monitoring the rate at which temperatures fall.

It should also be noted that the peak demand reduction service can be performed directly by a power utility, so that the functions of server **106***a* can be combined with the functions of server **106***b*.

The system installed in a subscriber's home may optionally include additional temperature sensors at different locations within the building. These additional sensors may we connected to the rest of the system via a wireless system such as 802.11 or 802.15.4, or may be connected via wires. Additional temperature and/or humidity sensors may allow increased accuracy of the system, which can in turn increase user comfort, energy savings or both.

While particular embodiments of the present invention have been shown and described, it is apparent that changes and modifications may be made without departing from the invention in its broader aspects and, therefore, the invention may carried out in other ways without departing from the true spirit and scope. These and other equivalents are intended to be covered by the following claims:

What is claimed is:

**1**. A system for monitoring the operational status of an HVAC system comprising:

at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

wherein said one or more processors compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

**2**. A system as in claim **1** in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

**3**. A system as in claim **1** in which said HVAC system is located within a single family dwelling.

**4**. A system as in claim **1** in which said HVAC system comprises a programmable thermostat.

10

**5**. A system as in claim **1** in which said HVAC system comprises a programmable thermostat that communicates with a mesh networking protocol.

**6**. A system as in claim **1** in which said HVAC system comprises a programmable thermostat that communicates with a network.

**7**. A system as in claim **1** in which said one or more processors communicate with said HVAC system using a network that includes an electricity meter.

**8**. A system as in claim **1** in which said estimation is a prediction about the future rate of change in temperature inside said structure.

**9**. A method for monitoring the operation of an HVAC system comprising:

receiving temperature measurements from at least one HVAC control system associated with a first structure conditioned by at least one HVAC system;

receiving at one or more processors, measurements of outside temperatures from at least one source other than said HVAC system;

comparing with said one or more processors the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

comparing with said one or more processors, an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

**10**. A method as in claim **9** in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

**11**. A method as in claim **9** in which said HVAC system is located within a single family dwelling.

**12**. A method as in claim **9** in which said HVAC system comprises a programmable thermostat.

**13**. A method as in claim **9** in which said HVAC system comprises a programmable thermostat that communicates with a mesh networking protocol.

**14**. A method as in claim **9** in which said HVAC system comprises a programmable thermostat that communicates with a network.

**15**. A method as in claim **9** in which said one or more processors communicate with said HVAC system using a network that includes an electricity meter.

**16**. A method as in claim **9** in which said estimation is a prediction about the future rate of change in temperature inside said structure.

\* \* \* \* \*

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| **In re: EcoFactor, Inc.,** | ) | |
| | ) | |
| | ) | **Appeal No. 2024-2081** |
| | ) | |
| **Reexamination Control No. 90/014,916** | ) | |
| | ) | |

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal

Circuit was timely filed on July 9, 2024, in the United States Patent and Trademark

Office in connection with the above-identified proceeding. Pursuant to 35 U.S.C.

§ 143 and Federal Circuit Rule 17(b)(1), a Certified List is this day being

forwarded to the Federal Circuit.

Fahd H. Patel is the attorney representing the Director in this appeal.

Appellant must contact Mr. Patel at 571-272-9035 to arrange for designating the

record pursuant to Federal Circuit Rule 30.

August 21, 2024                     Respectfully submitted,

                                    Under Secretary of Commerce for Intellectual
                                    Property and Director of the
                                    United States Patent and Trademark Office

                                    By: /s/ *Candice Kilby*
                                        Candice Kilby
                                        Paralegal Specialist
                                        Office of the Solicitor
                                        Mail Stop 8, P.O. Box 1450
                                        Alexandria, Virginia 22313-1450
                                        571-272-9035

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 21st day of August, 2024, a

true and correct copy of the foregoing Notice Forwarding Certified List was served

on counsel for appellant:

Reza Mirzaie
Kristopher R. Davis
James N. Pickens
rmirzaie@raklaw.com
kdavis@raklaw.com
jpickens@raklaw.com

/s/ *Candice Kilby*
Candice Kilby
Paralegal Specialist
U.S. Patent and Trademark Office
Office of the Solicitor
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313-1450

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

August 21, 2024

**THIS IS TO CERTIFY** that the attached document is a list of the contents of the electronic file of the Patent Application identified below; said contents being a list of the papers comprising the record before the United States Patent and Trademark Office for the proceeding of:

| | |
|---|---|
| **Patent Owner:** | **EcoFactor, Inc.** |
| **Reexamination No.:** | **90/014,916** |
| **Filed:** | **December 3, 2021** |
| **Title of Invention:** | **System and Method for Using a Network of Thermostats as Tool to Verify Peak Demand Reduction** |

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE



*/s/ Candice Kilby*

*Certifying Officer*

**Prosecution History for Reexamination Control No. 90/014,916**

| Date | Document Description |
|------|---------------------|
| 12/03/2021 | Transmittal of New Application |
| 12/03/2021 | Fee Worksheet |
| 12/03/2021 | Information Disclosure Statement |
| 12/03/2021 | Request for *Ex Parte* Reexamination |
| 12/03/2021 | Litigation Search Report |
| 12/08/2021 | Bibliographic Data Sheet |
| 12/08/2021 | Title Report |
| 12/09/2021 | Notice of Assignment of Reexamination Request |
| 12/09/2021 | Notice of Reexamination Request Filing Date |
| 12/13/2021 | Examiner Interview Summary Record |
| 01/28/2022 | Order Granting Request for *Ex Parte* Reexamination |
| 01/28/2022 | List of References Cited by Applicant and Considered by Examiner |
| 03/28/2022 | Power of Attorney |
| 03/28/2022 | Notice of Concurrent Proceeding |
| 03/29/2022 | Bibliographic Data Sheet |
| 03/29/2022 | Fee Worksheet |
| 03/30/2022 | Notice Regarding Change of Power of Attorney |
| 03/30/2022 | Notice of Acceptance of Power of Attorney |
| 07/14/2022 | Non-Final Office Action |
| 07/14/2022 | Search Notes |
| 09/13/2022 | Amendment in Response to Non-Final Office Action |
| 10/05/2022 | Final Office Action |
| 10/05/2022 | Search Notes |
| 11/29/2022 | Request for Extension of Time |
| 11/29/2022 | Fee Worksheet |
| 11/30/2022 | Decision - Extension of Time Period for Response Granted |
| 01/05/2023 | Response to Final Office Action |
| 02/02/2023 | Advisory Action |
| 03/03/2023 | Notice of Appeal |

1

| Date | Document Description |
|------|---------------------|
| 03/03/2023 | Fee Worksheet |
| 05/02/2023 | Appeal Brief |
| 11/16/2023 | Examiner's Answer |
| 01/16/2024 | Request for Oral Hearing |
| 01/31/2024 | Appeal Docketing Notice |
| 02/15/2024 | Notification of Appeal Hearing |
| 03/06/2024 | Confirmation of Hearing by Appellant |
| 04/01/2024 | Confirmation of Hearing by Appellant |
| 04/03/2024 | Decision - Granting Video Hearing |
| 05/08/2024 | Oral Hearing Transcript |
| 05/10/2024 | PTAB Decision |
| 07/09/2024 | Appeal to the U.S. Court of Appeals for the Federal Circuit |

2

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465          7590          05/10/2024

Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/10/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* ECOFACTOR, INC.
Patent Owner and Appellant

———————

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2
Technology Center 3900

———————

Before ERIC B. CHEN, SCOTT B. HOWARD, and MICHAEL J. ENGLE,
*Administrative Patent Judges.*

CHEN, *Administrative Patent Judge.*

DECISION ON APPEAL

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Pursuant to 35 U.S.C. §§ 134(b) and 306, Patent Owner[1] appeals from the final rejection of claims 1–16. Independent claims 1 and 9 have been amended during the reexamination proceeding.

A video oral hearing was held on April 18, 2024. The record will include a written transcript of the oral hearing

We AFFIRM.

## STATEMENT OF THE CASE

*Reexamination Proceedings*

A request for *ex parte* reexamination of U.S. Patent No. 8,412,488 B2 ("the '488 patent") was filed on December 3, 2021, and assigned Reexamination Control No. 90/014,916. The '488 patent, entitled "SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION," issued April 2, 2013 to John Douglas Steinberg and Scott Douglas Hublou, based on Application No. 13/409,697, filed March 1, 2012, which is part of a series of multiple continuing applications going back to an application filed on July 31, 2008, based on (1) provisional Application No. 60/963,183, filed on August 3, 2007, and (2) provisional Application No. 60/994,011, filed on September 17, 2007.

---

[1] Patent Owner identifies the real party in interest as EcoFactor, Inc. (Appeal Br. 3.)

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

*Claimed Subject Matter*

The claims are directed to estimating the rate of change in temperature inside of a structure, in particular, using the relationship between the inside temperature and the outside temperature to determine whether the climate control system is "on" or "off." (Abstract.)

*Related Litigation*

The '488 patent has been asserted in at least the following district court proceedings: (i) *EcoFactor, Inc., v. Alarm.com Inc.*, No. 1:20-cv-11007 (D. Mass. May 26, 2020) (dismissed); (ii) *EcoFactor, Inc., v. Google, LLC*, No. 6:20-cv-00075 (W.D. Tex. Jan 31, 2020); (iii) *EcoFactor, Inc., v. Ecobee, Inc.*, No. 6:20-cv-00078 (W.D. Tex. Jan. 31, 2020); (iv) *EcoFactor, Inc., v. Vivint, Inc.*, No. 6:20-cv-00080 (W.D. Tex. Jan. 31, 2020); and (v) *EcoFactor, Inc. v. Alarm.com Inc.*, No. 6:20-cv-00076 (W.D. Tex. Jan. 31, 2020).

The '488 patent was also subject to *inter partes* review in *Google, LLC v. EcoFactor, Inc.*, IPR2021-00409 (PTAB Jan. 11, 2021) (institution denied).

*The Claims*

Claim 1, reproduced below, is illustrative of the claimed subject matter, with disputed limitations in italics and underlining to illustrate claim amendments:

     1.    A system for monitoring the operational status of an HVAC system comprising:

3

Case: 24-2081    Document: 11    Page: 11    Filed: 08/23/2024

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

*wherein said one or more processors compare an <u>actual rate of change in</u> inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.*

REFERENCES

| Name | Reference | Date |
|------|-----------|------|
| Ehlers et al. | US 2004/0117330 A1 | June 17, 2004 |
| Van Ostrand et al. | US 2005/0159846 A1 | July 21, 2005 |
| Rosen | US 6,789,739 B2 | Sept. 14, 2004 |

*The Rejections*

Claims 1–16 stand rejected under 35 U.S.C. § 305 as enlarging the scope of the claims being reexamined.

Claims 1, 3–9, and 11–16 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Ehlers and Van Ostrand.

4

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Claims 2 and 10 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Ehlers, Van Ostrand, and Rosen.[2]

## OPINION

### *§ 305 Rejection*

We are unpersuaded by Patent Owner's arguments (Appeal Br. 11–14) that independent claims 1 and 9, which have been amended from "an inside temperature" to recite "an actual rate of change in inside temperature" does not enlarge the scope of the claims being reexamined.

The Examiner concluded that Patent Owner's amendments to independent claims 1 and 9 enlarge the scope of the claims being reexamined under 35 U.S.C. § 305 because "[c]laims 1 and 9 have been amended such that its scope no longer requires a comparison of the actual inside temperature recorded inside the first structure with the estimation for the rate of change" and "[i]t is therefore improperly broadening in scope." (Final Act. 4.) In particular, the Examiner stated that "the scope of the claimed invention would now encompass systems or methods that could be practiced without using a recorded inside temperature for this comparison, as it would only require a rate of change in the inside temperature, which, although related, is not the same measurement." (Ans. 3.) We agree with the Examiner's conclusions.

Claim 1 of the '488 patent, as issued, recites "compare [i] *an inside temperature recorded* inside the first structure with [ii] *said estimation for*

_____

[2]  Patent Owner does not present any arguments with respect to the rejection of dependent claims 2 and 10 under 35 U.S.C. § 103(a). Thus, any such arguments are deemed to be waived.

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

*the rate of change in inside temperature*" (emphases added). However, during the current reexamination proceeding, claim 1 was amended to recite "compare [i] *an actual rate of change in inside temperature recorded inside the first structure* with [ii] *said estimation for the rate of change in inside temperature*." Accordingly, claim 1 was amended to compare: (i) "an actual rate of change in inside temperature recorded inside the first structure," rather than "an inside temperature recorded" with (ii) the "estimation for the rate of change in inside temperature." Thus, because amended claim 1 changes the scope of the comparison in the measured data—rate of change in temperature, rather than solely temperature—the amended claim "contains within its scope any conceivable apparatus . . . which would not have infringed the original patent." *In re Ruth*, 278 F.2d 729, 730 (CCPA 1960). In other words, independent claim 1 of the '488 patent, as issued, would not necessarily be infringed by comparing: (i) an actual rate of change in inside temperature with (ii) the estimation for the rate of change in inside temperature, whereas the amended claim would.

Patent Owner argues

> Given that the known construction of "a" or "an," as used in the original claim language, i.e., "an inside temperature," is amendable to a construction of "at least one" or "one or more" inside temperature, the original claim language could be infringed by comparing a one or more inside temperature to the estimated rate of change in inside temperature. An "actual rate of change in inside temperature recorded inside the first structure" is necessarily derived from at least two inside temperatures recorded inside the structure. The scope of the amended claims is thus necessarily narrower than the scope of the original claims.

6

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

(Appeal Br. 11–12 (emphasis omitted).)  Even if we adopt Patent Owner's claim construction that "an inside temperature" as recited in claim 1 of '488 patent means "one or more" inside temperatures, comparing one or more *temperatures* to a rate of change is not equivalent to comparing *a rate of change* to a rate of change.

> Patent Owner further argues that
>
> the [Final Office Action] . . . do[es] not appear to make any attempt to address the "scope" of the proposed amended claim feature as opposed to the "scope" of the original claims, as is required, and do not even use the precise claim language from the 488 patent, or of the amendments . . . .  Rather, the [Final Office Action] clearly bases its conclusion on an interpretation of the claim language that is not supported by either the original claim language or the amended claim language, and does not account for the full details of the amendments to claims 1 and 9 that were expressly made to narrow the scope of the claims . . . .

(Appeal Br. 13.)  In particular, Patent Owner argues that "[t]he fact that any such analysis here starts with a misinterpretation of the claim language" and "any analysis as to the scope of the claims is fatally flawed and cannot provide any reasonable basis for the conclusions regarding the application of 35 U.S.C. § 305." (*Id.* at 14.)  Contrary to Patent Owner's arguments, the Examiner stated that amended claim 1 "would only require a rate of change in the inside temperature, which, although related, is not the same measurement" as claim 1 of the '488 patent. (Ans. 3.)  Regardless of the sufficiency of the Examiner's claim construction, the Examiner has provided an adequate explanation as to why Patent Owner's amendment to claim 1 enlarges the scope.  Accordingly, the Examiner has met the burden of a general prima facie notice requirement.  *See In re Jung*, 637 F.3d 1356, 1363 (Fed. Cir. 2011) ("[A]ll that is required of the [Patent] [O]ffice to meet its

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

prima facie burden of production is to set forth the statutory basis of the rejection and the reference or references relied upon in a sufficiently articulate and informative manner as to meet the notice requirement of [section] 132.").

Thus, we agree with the Examiner that independent claims 1 and 9, which have been amended to recite "an actual rate of change in inside temperature," enlarge the scope of the claims being reexamined under 35 U.S.C. § 305.

Accordingly, we sustain the rejection of independent claims 1 and 9 under 35 U.S.C. § 305. Claims 2–8 and 10–16 depend from claims 1 and 9, and Patent Owner has not presented any additional substantive arguments with respect to these claims. Therefore, we sustain the rejection of claims 2–8 and 10–16 under 35 U.S.C. § 305, for the same reasons discussed with respect to independent claims 1 and 9.

### § 103 Rejection—Ehlers and Van Ostrand

We are unpersuaded by Patent Owner's arguments (Appeal Br. 18–23) that the combination of Ehlers and Van Ostrand would not have rendered obvious independent claim 1, which includes the limitation "compare an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off."

The Examiner found that the thermal gain characteristics of home 2.18, as illustrated in Figure 3D of Ehlers, corresponds to the

8

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

limitation "compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature." (Final Act. 5.)  The Examiner further found that central control 12 of Van Ostrand, which monitors the rate of change of a room temperature before and after activation of another stage, as illustrated in Figures 4 and 5, correspond to the limitation "compare an actual rate of change in inside temperature recorded inside the first structure . . . to determine whether the first HVAC system is on or off." (*Id.*; *see also* Ans. 4–5.)  The Examiner concluded that "it would have been obvious . . . to have modified the invention of Ehlers by turning on and off an HVAC system in the case where the expected temperature, based on indoor and outdoor measurements" (Final Act. 6) and in particular, "when modified by the teachings of Van Ostrand, gains the ability to adjust distribution and usage in light of an HVAC system being found to be operating less than optimally" (Ans. 5).  We agree with the Examiner's findings and conclusions.

Ehlers relates to "delivery of energy from a distribution network to one or more sites." (Abstract.)  Figure 3B of Ehlers, reproduced below, illustrates a block diagram for temperature and environmental sensing and control system 3.08. (¶¶ 28, 231.)

9

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2



*Figure 3B illustrates a block diagram for temperature and environmental sensing and control system 3.08.*

In reference to Figure 3B, Ehlers explains the following:

> In a first embodiment of the present invention, the temperature and environmental sensing and control system 3.08 will manage indoor air temperature. In a second embodiment, using the sensor data and/or external information, the temperature and environmental sensing and control system 3.08 will manage the air quality and humidity in the site 1.04 by controlling the operation of the appropriate heating, filtration, conditioning and cooling equipment in conjunction with damper and fresh air input ducts, electrostatic filters and ionization.

(¶ 231.) Figure 3D of Ehlers, reproduced below, illustrates the thermal rate of gain in site 1.04 for different outside temperatures. (¶ 253.)

10

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2



**Figure 3D**

*Figure 3D illustrates a thermal rate of gain in site 1.04 for different outside temperatures.*

In reference to Figure 3D, Ehlers explains that "the system 3.08 tracks the thermal gain rate of the home 2.18 for each set point selected over time by the customer," including: (i) "[t]he first set point for which data is available is 72 degrees F" with "three trends illustrated as lines 3.12A, 3.12B, and 3.12C plot the thermal rate of gain in the site 1.04 for different outside temperatures"; and (ii) "[t]he next set point for which data is illustrated is the set point of 76 degrees F" with "[t]he three trends shown as lines 3.14A, 3.14B, and 3.14C illustrate the thermal rate of gain in the home 2.18." (¶ 253.) Because Figure 3D of Ehlers illustrates the thermal gain rate of home 2.18 for different set points and different outside temperature, Ehlers teaches the limitation "compares the inside temperature of said first structure

11

Appx55

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature."

Van Ostrand relates to "an HVAC system, and more particularly to bypassing a failed HVAC system component and/or stages to assure at least partial system capacity." (¶ 2.) In the "BACKGROUND OF THE INVENTION" section, Van Ostrand acknowledges that "[t]ypical HVAC systems include multiple stages of heating and/or cooling capacity," such that "[a]t the lowest demand, the first (lowest capacity) stage is activated" and "[a]s demand increases past the capacity of the lowest stage, the next higher capacity stage is activated." (¶ 4.)

Figure 4 of Van Ostrand, reproduced below, illustrates a graphical representation of temperature vs. time curve for an operational HVAC component. (¶ 14.)



*Figure 4 illustrates a temperature vs. time curve for an operational HVAC.*

12

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

In reference to Figure 4, in the context of a heat pump, Van Ostrand explains that, "the central control 12 detects the failed stages and/or components by monitoring a temperature of a controlled area to determine if any particular stage is operating properly," in particular, "[a] higher stage, having more capacity, will create a more positive slope to the controlled environment temperature vs. time curve than the stage below it." (¶ 29.)

Figure 5 of Van Ostrand, reproduced below, illustrates a graphical representation of temperature vs. time curve for an HVAC component with a malfunction stage. (¶ 15.)



*Figure 5 illustrates a temperature vs. time curve for an inoperative HVAC.*

In reference to Figure 5, in the context of a heat pump, Van Ostrand explains that "[i]f there is a change in the rate of change of room temperature, it can be inferred that the component is operating" and "[i]f there is no change in the rate of change, the component can be assumed to be inoperative." (¶ 31.) Because Van Ostrand explains that inoperability of an HVAC can be determined by comparing the two rates of change of room temperature, Van

13

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Ostrand teaches the limitation "compare an actual rate of change in inside temperature recorded inside the first structure . . . to determine whether the first HVAC system is on or off."

The combination of Ehlers and Van Ostrand is nothing more than incorporating the known method of Van Ostrand for measuring change of room temperature to determine if the HVAC systems is operable, with the known HVAC thermostat monitoring and control system of Ehlers, to yield predictable results. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). In particular, referring to Figures 4 and 5 of Van Ostrand, one of ordinary skill in the art would have recognized that the rate of change of room temperature can be used to determine inoperability—i.e., an "off" state—of an HVAC system. Moreover, in combining the teachings of Ehlers and Van Ostrand, one of ordinary skill in the art would further recognize that an "on" or "off" state of the HVAC can be determined by comparing: (i) the rate of change of room temperature while the HVAC is "on"; with (ii) the thermal rate of gain for site 1.04, as illustrated in Figure 3D Ehlers—i.e., rate of change of room temperature while the HVAC is "off." Thus, the combination of Ehlers and Van Ostrand teaches the limitation "compare an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off." Therefore, we agree with the Examiner (Final Act. 6) that modifying Ehlers with Van Ostrand would have been obvious.

14

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

> Patent Owner argues the following:
>
> At the cited portion of Van Ostrand, and otherwise throughout
> the entire reference, the disclosed methodology of Van Ostrand
> detects "failed stages and/or components" with a stated objective
> of removing such stages or components from the sequencing of
> an otherwise operating HVAC system. This does not result in a
> determination as to whether the HVAC system is on or off, as is
> required by the claims.

(Appeal Br. 18.) However, as discussed previously in reference to Figure 5,

Van Ostrand explains that "[i]f there is a change in the rate of change of

room temperature, it can be inferred that the component is operating" and

"[i]f there is no change in the rate of change, the component can be assumed

to be inoperative." (¶ 31.) As such, one of ordinary skill in the art would

have recognized that the HVAC of Van Ostrand being "inoperative" teaches

or at least suggests the HVAC being in an "off" state.

    Patent Owner argues that "[n]owhere does Van Ostrand reference

deriving an estimation of a rate of change, or a change in a rate of change,

by referencing the temperatures inside the structure with the outside

temperature of the structure." (Appeal Br. 19 (citations omitted).) However,

the Examiner relied upon Ehlers, rather than Van Ostrand, for teaching the

limitation "compares the inside temperature of said first structure and the

outside temperature over time to derive an estimation for the rate of change

in inside temperature of said first structure in response to outside

temperature." (Final Act. 5.) The rejection of claim 1 is based on the

combination of Ehlers and Van Ostrand, and Patent Owner cannot show

nonobviousness by attacking references individually. *See In re Keller*, 642

F.2d 413, 426 (CCPA 1981).

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Patent Owner further argues that "the [Final Office Action] . . . provide[s] no supportable basis for combining Ehlers and Van Ostrand in a continued effort to render obvious the subject matter of the claims in this Reexam, and as amended, particularly given the express and disparate teachings of the Ehlers and Van Ostrand references." (Appeal Br. 20.) In particular, Patent Owner argues that (i) "[t]he fact that Ehlers and Van Ostrand are generally directed at disparate methodologies for controlling HVAC systems in some manner does not more broadly render those references combinable" (*id.* at 22); and (ii)

> Nowhere does Van Ostrand suggest that its methodology could, or would predictably, be expanded in the manner that appears to be suggested by the [Final Office Action] to incorporate an externally generated estimation of a rate of change in inside air temperature in response to outside air temperature that is derived from comparing the inside temperature of a structure and the outside temperature over time

(*id.* at 23 (emphasis omitted)).  However, as discussed previously, the combination of Ehlers and Van Ostrand is based on combining known elements—i.e., the known method of Van Ostrand for comparing rate of change of room temperature as applied to the known temperature control system 3.08 of Ehlers—to achieve predictable results.

Thus, we agree with the Examiner that the combination of Ehlers and Van Ostrand would have rendered obvious independent claim 1, which includes the limitation "compare an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off."

16

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

Accordingly, we sustain the rejection of independent claim 1 under 35 U.S.C. § 103(a). Claims 3–8 depend from claim 1, and Patent Owner has not presented any additional substantive arguments with respect to these claims. Therefore, we sustain the rejection of claims 3–8 under 35 U.S.C. § 103(a), for the same reasons discussed with respect to independent claim 1.

Independent claim 9 recites limitations similar to those discussed with respect to independent claim 1, and Patent Owner has not presented any additional substantive arguments with respect to this claim. We sustain the rejection of claim 9, as well as dependent claims 11–16 for the same reasons discussed with respect to claim 1.

CONCLUSION

The Examiner's decision rejecting claims 1–16 under 35 U.S.C. § 103(a) is affirmed.

DECISION SUMMARY

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1–16 | 305 | Claim Broadening | 1–16 | |
| 1, 3–9, 11–16 | 103(a) | Ehlers, Van Ostrand | 1, 3–9, 11–16 | |
| 2, 10 | 103(a) | Ehlers, Van Ostrand, Rosen | 2, 10 | |
| **Overall Outcome** | | | 1–16 | |

17

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

## REQUESTS FOR EXTENSIONS OF TIME

Requests for extensions of time in this *ex parte* reexamination proceeding are governed by 37 C.F.R. § 1.550(c) (2022).  *See* 37 C.F.R. § 41.50(f) (2022).

<u>AFFIRMED</u>

18

Appeal 2024-001366
Reexamination Control 90/014,916
Patent 8,412,488 B2

PATENT OWNER:

TANNER IP, PLLC
149 WEST GILPIN AVENUE
NORFOLK, VA 23503

THIRD PARTY REQUESTER:

SMITH BALUCH LLP
376 BOYLSTON ST., SUITE 401
BOSTON, MA 02116

19



US006789739B2

(12) **United States Patent**

Rosen

(10) Patent No.: **US 6,789,739 B2**

(45) Date of Patent: **Sep. 14, 2004**

(54) **THERMOSTAT SYSTEM WITH LOCATION DATA**

(76) Inventor: **Howard Rosen**, 5756 Royalmount Avenue, Montreal, Quebec (CA), H4P 1K5

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/287,677**

(22) Filed: **Nov. 4, 2002**

(65) **Prior Publication Data**

US 2003/0150927 A1 Aug. 14, 2003

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/075,886, filed on Feb. 13, 2002, now Pat. No. 6,619,555.

(51) Int. Cl.[7] ............................. G05D 23/00; F23N 5/20

(52) U.S. Cl. ................ 236/51; 379/102.05; 236/46 R

(58) Field of Search ........................... 236/51, 46 R; 455/420; 379/102.05, 102.5

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,568,385 A | 10/1996 | Shelton | |
| 5,761,083 A | * 6/1998 | Brown, Jr. et al. | 340/825.06 |
| 5,896,443 A | 4/1999 | Dichter | 709/220 |
| 5,915,026 A | * 6/1999 | Mankovitz | 340/49 |
| 5,999,882 A | 12/1999 | Simpson et al. | 702/3 |
| 6,161,133 A | 12/2000 | Kikinis | 379/93.08 |

| | | | |
|---|---|---|---|
| 6,182,113 B1 | 1/2001 | Narayanaswami | 709/203 |
| 6,260,765 B1 | * 7/2001 | Natale et al. | 236/47 |
| 6,336,142 B1 | 1/2002 | Kato et al. | |
| 6,510,212 B2 | * 1/2003 | Ito et al. | 379/102.03 |

* cited by examiner

*Primary Examiner*—Harry B. Tanner

(74) *Attorney, Agent, or Firm*—David T. Bracken

(57) **ABSTRACT**

A thermostat system includes a temperature sensor, an LCD for selectively displaying an alphanumeric message and a processor having a memory for storing program and data information. In one embodiment, the data includes a table storing key terms on a predetermined subject. A communications interface connects the processor and a remote correspondent which is a source of current information. Periodically, communications is established with the remote correspondent to read the current information and parse the current information against the stored key terms. If a match is found, the current information is further searched for a value associated with the matched key term in order to display an alphanumeric message which shows a first message component representative of the connotation of the matched key term and a second message component representative of the associated value. In a variant embodiment, the remote correspondent provides a service periodically sending predetermined information for display on the LCD. In another variant embodiment, the thermostat system can use current information received from the first remote correspondent to send directive information to suitably change the temperature (or other parameter) set point at a second remote site.

**12 Claims, 4 Drawing Sheets**



EXHIBIT 1006



FIG. 1



FIG. 2



FIG. 3

FIG. 4



START
AT PREDETERMINED TIME(S), ESTABLISH COMMUNICATIONS WITH AN REMOTE CORRESPONDENT WHICH IS A SOURCE OF CURRENT INFORMATION
READ INFORMATION FROM THE REMOTE CORRESPONDENT
PARSE TERMS IN THE INFORMATION AGAINST KEY TERMS STORED IN MEMORY
MATCH?
N
Y
ALL KEY TERMS PARSED?
N
Y
SEARCH THE INFORMATION FOR AT LEAST ONE VALUE ASSOCIATED WITH THE MATCHED KEY TERM
VALUE FOUND?
N
Y
DISPLAY AN ALPHANUMERIC MESSAGE INCLUDING A FIRST COMPONENT REPRESENTATIVE OF THE CONNOTATION OF THE MATCHED KEY TERM AND A SECOND COMPONENT REPRESENTATIVE OF THE VALUE ASSOCIATED WITH THE MATCHED KEY TERM

FIG. 5



CURRENT SET POINT: 25C

# 9:27 AM   26C

CURRENT MONTREAL TEMPERATURE: +18C
MONTREAL HIGH TODAY: +24C
MONTREAL LOW TODAY: +9C
CURRENT QUOTE FOR MAGELLAN: 102.75

12

## FIG. 6

START

AT PREDETERMINED TIMES, ESTABLISH
COMMUNICATION BETWEEN THE LOCAL
THERMOSTAT SYSTEM AND A
PREDETERMINED REMOTE
CORRESPONDENT WHICH IS A SOURCE OF
KNOWN CURRENT INFORMATION

READ CURRENT INFORMATION
FROM THE REMOTE CORRESPONDENT

DISPLAY THE
CURRENT INFORMATION

## FIG. 7

US 6,789,739 B2

<div style="text-align:center">1</div>

# THERMOSTAT SYSTEM WITH LOCATION DATA

This application is a continuation in part of Regular Utility patent Ser. No. 10/075,886, filed Feb. 13, 2002 now U.S. Pat. No. 6,619,555.

## FIELD OF THE INVENTION

This invention relates to the art of thermostats and, more particularly, to a thermostat system incorporating a communication interface for receiving and displaying diverse information from a remote correspondent. In an extended version, this invention relates to a thermostat system for receiving and displaying information from a first remote correspondent and selectively issuing an information/directive message to a second remote correspondent.

## BACKGROUND OF THE INVENTION

Thermostats have been used for many years as a temperature sensitive switch which controls heating and/or cooling equipment for conditioning a space in which the thermostat, or a temperature sensor connected to the thermostat, is placed. In the well known manner, a simple thermostat can be adjusted to establish a temperature set point such that, when the temperature in the conditioned space reaches the set point, the thermostat interacts with the heating and/or cooling equipment to take suitable action to heat or cool the conditioned space as may be appropriate for the season.

Modern thermostat systems, which take advantage of the ongoing rapid advances in electronic technology and circuit integration, have many features which provide more precise supervision of the heating and/or cooling equipment to achieve more economical and more comfortable management of the temperature of a conditioned space. Many modern thermostat systems include a real time clock, a memory and a data processor to run a process control program stored in the memory to accurately measure the temperature of a temperature sensor disposed in the conditioned space and to send control signals to the heating and/or cooling equipment to closely control the temperature of the conditioned space. Modern thermostat systems permit anticipating and minimizing hysteresis or overshoot of the temperature in the conditioned space. In addition, the program can specify different set points at different times of the day and week and may also include a "vacation" mode which employs different set points when the conditioned space is not occupied for an extended period.

Many modern thermostat systems are programmable by a user. Typically, prior art programmable thermostat system employ a tactile touch pad with various fixed position buttons to be touched in a precise sequence to program set points (which may vary with the day of the week) for programmable time periods which may include a vacation mode. The programming sequence may be followed on a separate display, typically a liquid crystal display.

Other types of modern thermostat systems may limit, or even make no provision for, user programming. For example, thermostats distributed throughout a large commercial establishment may be programmable only by authorized persons employing special tools or may even have their programs permanently set at the time of manufacturer or installation. These non-programmable thermostat systems do not have a user accessible touch pad (or have no touch pad at all), but may incorporate a user readable display.

The present invention finds use in both programmable and non-programmable thermostat systems which operate under control of a processor.

<div style="text-align:center">2</div>

## SUMMARY OF THE INVENTION

A thermostat system according to the invention includes, a temperature sensor for providing an electrical signal indicative of the temperature of a conditioned space in which the temperature sensor is situated; a liquid crystal display (LCD) for selectively displaying an alphanumeric message; and a processor having: a CPU, real time clock and a memory for storing program and data information. In one embodiment, the data includes a table storing key terms on a predetermined subject (e.g., current and predicted weather conditions in a given locale). A communications interface is adapted to establish bi-directional communications (via the Internet or some other suitable facility) between the processor and a remote correspondent which is a source of current information on the predetermined subject. Periodically, or on demand if provided for, a program stored in the memory causes the CPU to selectively: establish communications with the remote correspondent, read the current information and parse the current information against the stored key terms. If a match is found, the current information is further searched for at least one value associated with the matched key term; and if at least one such value is found, an alphanumeric message is displayed on the LCD to show a first message component representative of the connotation of the matched key term and a second message component representative of the associated value.

In a variant embodiment, the remote correspondent provides a service sending, periodically or on demand, predetermined information for display on the LCD. In this variant, there is no parsing against locally stored key terms. In another variant embodiment, the thermostat system can use current weather information received from the first remote correspondent to determine and act if the received information is such that a second remote correspondent interfacing with a remotely controllable thermostat system should be contacted, and send directive information to suitably change the temperature (or other parameter) set point at the second remote site.

## DESCRIPTION OF THE DRAWING

The subject matter of the invention is particularly pointed out and distinctly claimed in the concluding portion of the specification. The invention, however, both as to organization and method of operation, may best be understood by reference to the following description taken in conjunction with the subjoined claims and the accompanying drawing of which:

FIG. 1 is a block diagram of a first embodiment of a space conditioning system incorporating a thermostat system employing the present invention;

FIG. 2 is a block diagram of a second embodiment of a space conditioning system incorporating a thermostat system employing the present invention;

FIG. 3 is a block diagram of a third embodiment of a space conditioning system incorporating a thermostat system employing the present invention;

FIG. 4 is a block diagram of a first embodiment of a space conditioning system incorporating a thermostat system employing the present invention;

FIG. 5 is a high level process flow chart describing the operation of the invention in a first embodiment;

FIG. 6 is a pictorial of an exemplary display illustrating information presented to a user by the use of the invention; and

FIG. 7 is a high level flow chart describing the operation of the invention in a second embodiment.

US 6,789,739 B2

3

## DESCRIPTION OF THE PREFERRED EMBODIMENT(S)

Referring first to FIG. 1, a thermostat system includes a processor 1 and a temperature sensor 5 which is disposed in a conditioned space 4. The processor 1 and the sensor 5 may be situated in a common housing (not shown) or separated, all as very well known in the art. The common housing is usually, but not necessarily, placed in the conditioned space 4. Thus, those skilled in the art will understand that the block diagram of FIG. 1 is very general in order to best explain the invention.

The processor 1 includes a central processing unit (CPU) 9 in communication with a memory 8 which stores data and program information and also, via an input/output (I/O unit) 10, an optional touch pad 11 and a liquid crystal display (LCD) 12. The liquid crystal display may optionally be backlit by any suitable means (not shown). The memory 8 may include a read-only part which is factory-programmed and a random-access part which stores data subject to change during operation. A settable real time clock 13 is used to keep time in the thermostat system to facilitate diverse operations, such as different temperature set points (desired temperatures), during different periods of the day cycle. The thermostat system may be suitably powered by a battery (not shown) and/or from equipment to which is connected. The I/O unit 10 includes a communications interface 14 for coordinating communications between the CPU 9 and a remote correspondent 15. The communications interface 14 may be, for example, a conventional serial port.

Thus, in the usual manner during normal operation, the temperature sensor 5 sends an electrical signal (e.g., if the sensor 5 is a simple thermistor, a resistance value; several types of temperature sensors are widely used) representative of the temperature within the conditioned space 4 which the processor can compare against a previously entered set point to determine if control signals need to be sent to the space conditioning equipment 3. For example, if the temperature in the conditioned space 4 is found to be too low when operation is in the heating mode, the processor 1 signals the space conditioning equipment 3 circulate, through ducts 6, 7, air from/to the conditioned space 4 which is heated by the space conditioning equipment before return to the conditioned space. This heating phase continues until the sensor 5 indicates that the space is now too hot (or approaching too hot) with reference to the set point such that the processor 1 sends signal(s) to the space conditioning equipment 3 to cease the heating function, all as very well known in the art. In a cooling mode, a counterpart procedure is followed. Those skilled in the art will understand that the control process typically includes such refinements as anticipation, hysteresis accommodation, fan control, etc. which are acknowledged, but are not directly relevant to the invention.

It may be noted that integrated circuit chips including all the processor components with all the necessary interface conditioning circuits are available off-the-shelf and are under constant refinement for increased power. The subject invention usually requires the capabilities of such a processor, and off-the-shelf integrated circuit processor chips may be used to advantage in the subject thermostat system.

Consider now a first embodiment of the invention. Referring to FIG. 5 as well as FIG. 1, there is stored in the memory 8 (typically, in ASCII format) a series of key terms pertaining to a subject of interest such as the local weather. Exemplary key terms for this subject may be "temperature", "relative humidity", "high", "low", "barometric pressure", etc. The key terms may be stored in the memory during the

4

manufacturing process of the thermostat system or, as will be described below, by user entry using the touchpad 11 and LCD 12.

At one or more predetermined times of day (and/or on-demand if provided for in the operating program) which have been previously stored in the memory 8 and established by the clock 13, the CPU 9 starts the process shown in FIG. 5 by issuing signals to the I/O unit 10 to cause the communications interface 14 to establish communications, via link 16, with a remote correspondent 15. The remote correspondent 15 has a known data communications "address" and, in the example, is a source of current information, such as local weather. Such local current weather information sources are widely available and are routinely accessed by, for example, using the Internet.

When the current local weather information is transmitted from the remote correspondent 15 via link 16 to the communications interface 14 and thence to the CPU 9, the CPU parses the information against the key terms stored in memory 8 to determine if there is a match. This is easily achieved because the source code (e.g., HTML if the communication is via the Internet) of the information will typically also be in ASCII format. If the CPU 9 senses a match, the just-received information is searched for the presence of at least one "value" associated with the matched key term. If such a value is found and under control of the CPU 9, a first alphanumeric message component representative of the connotation of the matched key term and a second alphanumeric message component representative of the value associated with the key term are displayed on the LCD 12.

If no value for the present matched term is found, but more key terms in the present set are yet to be compared to information just received from the remote correspondent 15, the same process is repeated until all the key terms in the present set have been parsed and alphanumeric messages, if generated, have been sent to the LCD 12. The immediate session then ends.

As an example, assume that Montreal weather is of interest to an occupant of a conditioned space in the Montreal area which uses the subject thermostat system and that "temperature", "high" and "low" are the key terms for the subject of local weather stored in the memory 8. Periodically, as determined by times stored in the memory 8, the CPU 9 issues signals to access the remote correspondent 15 (a site providing local Montreal weather in the example) and download the current weather information as a data stream. If the CPU finds, by examining and processing the data stream, that the term "temperature" has been received, it looks for the next characters in the data stream which can be a value associated with "temperature"; e.g., it may quickly find "+18° C." With this coupling established, the CPU may access the memory 8 to read the prestored alphanumeric message component "Current Montreal Temperature:" and then concatenate, as a second alphanumeric message component, "18C." and then send the complete message to the LCD 12 which displays: "CURRENT MONTREAL TEMPERATURE: 18° C."

In a similar manner, if the key term "high" and an associated value are sensed, the exemplary message "MONTREAL HIGH TODAY: 26C." may be displayed; and if the key term "low" and an associated value are sensed, the exemplary message "MONTREAL LOW TODAY: 9C." may be displayed.

While an obvious application for using the invention is acquiring and displaying current weather information, other

US 6,789,739 B2

5

types of current information may be obtained and displayed in a like manner. For example, current stock quotations for stock indexes and individual stocks, mutual funds and the like can be automatically acquired, displayed and periodically updated by suitably programming the processor 1 with the address of a site which maintains such information current along with the desired key terms which may, in this example, be NYSE, etc. stock symbols. Thus, the "value" term would be the current stock quote. As an example, if the key term "FMAGX" is matched and an associated value of 102.75 is also found, the alphanumeric message "CURRENT QUOTE FOR MAGELLAN: 102.75" is generated and displayed. To closely track one or more stocks or funds, the remote correspondent can be accessed as often as desired to "refresh" the alphanumeric message showing the current quote. A wide variety of types of information may be programmed, accessed and displayed in a like manner.

It will be understood that the processor 1 can communicate successively or at different times with different remote correspondents. Thus, referring to FIG. 6, the current local weather information and the selected stock market information can be serially received and processed for display together in a manner which appears to be virtually simultaneous to a user. As previously noted, the overall display can be updated throughout the day at various times, as to each remote correspondent accessed, which have previously been entered in the memory 8.

If the thermostat system is programmable, the operating program installed during manufacture may provide for user entry following conventional instructions similar to those used in user-programming the climate control operation of the thermostat system. For example, assuming that the remote correspondent has an Internet address, the address may be entered using the touchpad 11 in any suitable manner as previously set up by a system programmer during software design. Then, various key terms the user wishes to employ with various remote correspondents having various addresses may be entered by a user.

As previously mentioned, the invention is not limited to use in programmable thermostat systems or even to thermostat systems in which correspondent addresses and key terms have previously been entered into memory 8. Still referring to FIG. 1 and also to FIG. 7, in a variant embodiment of the invention, a thermostat system communicates with a remote correspondent 15 which provides a customized service to the user of the thermostat system. In this embodiment of the invention, the user is a subscriber to the customized service in order to receive known current information on a predetermined schedule. At predetermined times (or on demand), data communications is established between the processor 1 and the remote correspondent 15 which, in this case, provides the customized service. The current information is downloaded and displayed. The resulting messages shown and periodically updated on the LCD 12 may be as shown in exemplary FIG. 6 if, for example, Montreal current temperature, daily high and low temperatures and the current quote for Magellan is what the user has subscribed to receive.

When the service is set up, the user and the business which provides the service via the remote correspondent 15 agree as to what current information (typically more than in the example) will be supplied on an agreed schedule. Depending upon the server-client relationship, either the processor 1 or the remote correspondent 15 may institute the current information transfer at the predetermined times or on demand.

While the Internet is not the only facility which the subject thermostat system may use to communicate with a

6

remote correspondent, it is, at the state-of-the-art the most readily widely available and easily accessible. Thus, FIG. 2 show a typical coupling in which the communications interface 14 sends/receives serial data to/from an external (to the thermostat system) modem 20 via serial link 16. The modem conventionally interfaces with an Internet Service Provider (ISP) 21 which completes the communications link to the remote correspondent in the well-known manner. The modem 20 may be dial-up, cable, DSL or any other type suitable for the communications environment in a given installation.

At the state-of-the-art and as shown in FIG. 3, a modem 24 for communicating with the ISP 21 may be integrated into the communications interface 14 of the input/output unit 14 to eliminate the need for an external modem. Thus, when communications is established with the remote correspondent 15 according to a schedule or upon demand, the data transfer takes place via modem 24 and data link 26 as shown.

Attention is now directed to FIG. 4 which illustrates an optional extension of the subject thermostat system. It will be observed that the ISP 21 is not only in communication with the first remote correspondent 15, but also with a second remote correspondent 26. The second remote correspondent 23 may be another thermostat system (controlling another conditioned space (not shown) with other space conditioning equipment (not shown) which can be remotely controlled. In this embodiment, data received from the first remote correspondent 15 as previously described may include specific information which can be interpreted by the processor 1 to require action at the site of the second remote correspondent 23. As an example, assume that the site of the second remote correspondent 23 is a temporarily unoccupied dwelling and that weather data received by the subject thermostat system indicates a predicted significantly low temperature predicted for the region of the site of the second remote correspondent 23. The processor 1 may determine, in response to this new weather information supplied by the first remote correspondent 15, that the heat should be turned on (or the set point raised) at the site of the second remote correspondent 23 in order to protect water pipes against freezing, warm the conditioned space controlled by the second remote correspondent 23 in anticipation of its upcoming occupation, etc.

Those skilled in the art will appreciate that, in a large facility incorporating subdivisions in the conditioned space, each conditioned space having its own thermostat system, each of the thermostat systems may independently employ the invention as previously described.

The invention described above includes additional embodiments. In a specific example of these additional embodiments, a thermostat stores data that establishes its physical location for interaction with remote devices located away from that thermostat. Those other devices may be Internet sites transmitting weather data to the thermostat based on the geographic location of the thermostat. More generally, this embodiment uses location based interactions between an environmental controller (with one or more parts such as transmitter means, a display, data storage means or control means) and a remote device which responds to location data received from the controller.

Control means for an environmental controller, such as a thermostat, include the structure needed to turn HVAC functions on or off or change operation thereof, impose control setpoints or other control parameters, turn lighting on or off, sense and respond to environmental gases or smoke, or other of the several functions which may be

accomplished locally or wirelessly by present day programmable thermostats and their distributed components. Transmitter means for the environmental controller include one or more wireless and/or wired connections to the remote device. In a specific example, transmitter means are a modem with Internet or network connection that receives location data from the environmental controller and transmits the location data to a specific address on the Internet or in the network.

Remote devices for the present invention include, as described above, Internet or computer network nodes or other similar devices that receive location data from the transmitter means. A response in the remote device may be as little as simply recording the fact that an environmental controller is at a physical location. Another form of response is for the remote device to use the location data in an operation or algorithm that creates an output stored at the remote device or transmitted from it.

In the above specific example, location data of a thermostat is transmitted from transmission means (a modem) through the Internet to a website maintained to have access to weather or climate information (the remote device). The weather website (the remote device) receives the location data and associates it with local weather data for the thermostat location, which is then transmitted to the thermostat through the modem (a response of the remote device). The thermostat uses the local weather data for display, stores it in storage means, and/or uses it within control means (a response by the environmental controller). The word "local" with reference to weather data is relative to a desired geographic range and/or time into the future.

The present embodiments of location data are for physical location of an environmental controller, not a specific network address such as an IP address which does not have geographical relevance. Presently, a prior art thermostat may already have stored in it for its network use a unique IP address that identifies the thermostat for control via inputs from the Internet. Location data, unless correlated with that IP address to create a code system, is different from the IP address.

This location data in one form can be as simple as a telephone number or portion thereof, a zip or postal code, longitude and latitude information or other systems or codes that correspond to location information. If location data is a telephone number, which would be easily input into the environmental controller with even a simple user interface, that telephone number can be "looked up" by a server and correlated to a geographical address. In a preferred form of the location data, a first environmental controller will have location data distinguishing it from all other environmental controllers. The way to distinguish between environmental controllers may be with specific codes, such as IP addresses, combined with physical location data which would be used for more than one environmental controller. In, this way, even nearby thermostats can have unique means of receiving geographical information pertaining to its climatic location.

To date, the prior art contains no environmental controllers that have geographical information, such as location data in the form of a zip code or telephone number, stored in them. Location data may take several forms as it is originally input into and through a local environmental controller, output to transmitter means, delivered to and processed by a remote device, and retransmitted by that remote device to the environmental controller or other remote device. Whatever its form, location data correlates in some way to the physical and geographic location of the environmental controller. For example, transmitter means may link the environmental controller to an intervening remote server which has stored in it a correlation between the specific IP address or other specific identifier and the physical location of that environmental controller. In that case, a specific IP address or specific identifier is the functional equivalent of location data and is included in its definition herein. The invention provides for intervening transmission and/or conversion of forms of location data of the environmental controller until the location data reaches a desired remote device.

As contrasted to the form of the location data, the present embodiments include several ways to make use of location data in a response by a remote device or remote correspondent. For example, it is well known that Internet web sites make certain information and/or algorithms available for use by the user linking to that web site, either for free or at a cost to the user. Automated means are preferred for linking the environmental controller to the web site and causing the web site to respond to the location data.

In one such form, an environmental controller links to a web site and transmits location data and an access code. The access code is appropriately received by the web site and identifies the user as one authorized to have transmitted to it information or algorithm results from the web site. The access code may be structured so that location data is a substantial part of that access code, i.e., the access code is the phone number of the physical location of the environmental controller. The access code may be evaluated by the server for the web site to determine if a previously approved access code is still valid, i.e., whether the user has paid their last bill for access to the web site. In a specific example of this type of response, a user of the invention environmental controller pays the operator of a web site with weather data for a period of access. The user is either issued an access code by the web site operator to be input into the environmental controller or the access code is some code specific to the environmental controller, such as the location code, and is accepted by the web site operator. An access code may include credit card numbers for instant acceptance and debiting at linking to the web site.

While the principles of the invention have now been made clear in an illustrative embodiment, there will be immediately obvious to those skilled in the art many modifications of structure, arrangements, proportions, the elements, materials, and components, used in the practice of the invention which are particularly adapted for specific environments and operating requirements without departing from those principles.

What is claimed is:

1. A location response system with an environmental controller located at a single physical location adapted to be an integral part of a system of environmental sensing or control for a local and substantially enclosed space comprising:

A) a physical location of the environmental controller stored as location data in storage means in the controller;

B) transmitter means connected to the controller adapted to transmit location data to a remote device physically remote from the controller, so that a location response is induced at the remote device; and

C) location response is storage of the location data at the remote device and correlation of the physical location to location response data stored at or available to the remote device or created by processing of location data

US 6,789,739 B2

9

at the remote device, whereafter location response data is transmitted from the remote device to the controller.

2. The system of claim 1 in which said transmitter means includes a modem and the remote device is a computer network server.

3. The system of claim 1 in which said location data includes one or more of the group consisting of a local telephone number or portion thereof, a local zip or postal code, and local latitude and longitude of the physical location of the controller or systems correlated thereto.

4. The system of claim 1 in which the controller comprises control means which acts on a response of location data for thermostatic functions including structure needed to turn HVAC functions on or off or change operation thereof, impose control setpoints or other control parameters, turn lighting on or off, or those functions accomplished locally or wirelessly by a system of thermostatic control among distributed components.

5. The system of claim 1 in which the controller comprises means for input of location data by a user at the physical location.

6. The system of claim 1 in which location response is storage of the location data at the remote device.

7. The system of claim 1 in which location response is storage of the location data at the remote device and correlation of the physical location to location response data stored at or available to the remote device or created by processing of location data at the remote device.

10

8. The system of claim 1 in which location response data is stored in the controller storage means.

9. The system of claim 8 in which stored location response data is displayed on a display screen at the controller.

10. The system of claim 8 in which the controller comprises control means for thermostatic functions including structure needed to turn HVAC functions on or off or change operation thereof, impose control setpoints or other control parameters, turn lighting on or off, sense and respond to environmental gases or smoke, or those functions accomplished locally or wirelessly by a system of thermostatic control among distributed components, and the storage means comprise control data for operation of control means and comparison means for comparison of control data to location response data and change of at least some control data in response to that comparison.

11. The system of claim 10 in which control data comprises temperature control setpoints for thermostatic control of the system and comparison means comprises means for changing one or more the temperature control setpoints.

12. The system of claim 10 in which control data comprises sunrise or sunset data for the physical location for control of local lighting and comparison means comprises means for changing one or more of the parameters for turning local lighting on or off.

* * * * *

US 20040117330A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2004/0117330 A1**

Ehlers et al. (43) Pub. Date: **Jun. 17, 2004**

(54) **SYSTEM AND METHOD FOR CONTROLLING USAGE OF A COMMODITY**

(76) Inventors: **Gregory A. Ehlers**, Bradenton, FL (US); **James H. Turner**, Chesterfield, VA (US); **Joseph Beaudet**, Prince George, VA (US); **Ronald Strich**, Pueblo West, CO (US); **George Loughmiller**, Scottsdale, AZ (US)

Correspondence Address:
**HOWARD & HOWARD ATTORNEYS, P.C.**
**THE PINEHURST OFFICE CENTER, SUITE #101**
**39400 WOODWARD AVENUE**
**BLOOMFIELD HILLS, MI 48304-5151 (US)**

(21) Appl. No.: 10/628,644

(22) Filed: **Jul. 28, 2003**

**Related U.S. Application Data**

(63) Continuation of application No. 10/402,370, filed on Mar. 28, 2003, now abandoned.

(60) Provisional application No. 60/368,963, filed on Mar. 28, 2002. Provisional application No. 60/383,027, filed on May 24, 2002.

**Publication Classification**

(51) Int. Cl.[7] .......................................... G06F 17/00
(52) U.S. Cl. .......................................... 705/412

(57) **ABSTRACT**

A system and method manage delivery of energy from a distribution network to one or more sites. Each site has at least one device coupled to the distribution network. The at least one device controllably consumes energy. The system includes a node and a control system. The node is coupled to the at least one device for sensing and controlling energy delivered to the device. A control system is coupled to the node and distribution network for delivering to the node at least one characteristic of the distribution network. The node for controls the supply of energy to the device as a function of the at least one characteristic.



EXHIBIT 1004

Patent Application Publication    Jun. 17, 2004    Sheet 1 of 18    US 2004/0117330 A1



*Figure 1A*

*Figure 1C*

Patent Application Publication    Jun. 17, 2004    Sheet 2 of 18    US 2004/0117330 A1



*Figure 1B*



*Figure 2A*

*Figure 2B*



*Figure 2C*



*Figure 2D*



*Figure 2E*

*Figure 3A*



*Figure 3B*



*Figure 3C*



Figure 3D



Figure 3E



*Figure 3F*



*Figure 3G*



*Figure 4A*



*Figure 4B*



*Figure 4C*

4.24        4.10

**Occupancy Modes**

| Home | Away | Sleep | Vacant | User1 | User2 | User3 | User4 | — 2.26 |

When my home is in Home Mode    ☑ Active

Use the following settings for the areas controlled by the Heating / AC thermostat

Cooling setpoint: [80] °F    use: [Economical Comfo ▽] Economy Profile    4.32

Heating setpoint: [68] °F    ☑ My home is normally OCCUPIED during Home mode

[ Defaults ]    [ Apply ]

4.28                    4.30

*Figure 4D*

**Occupancy Modes**

| Home | Away | Sleep | Vacant | User1 | User2 | User3 | User4 | — 2.26 |

When my home is in Home Mode    ☐ Active

Use the following settings for the areas controlled by the Heating / AC thermostat

Cooling setpoint: [85] °F    use: [Economical Comfo ▽] Economy Profile    4.32

Heating setpoint: [58] °F    My home is normally OCCUPIED during Away mode

[ Defaults ]    [ Apply ]

4.28                    4.30

*Figure 4E*

**Occupancy Modes**

| Home | Away | Sleep | Vacant | User1 | User2 | User3 | User4 | — 2.26 |

When my home is in Home Mode    ☐ Active

Use the following settings for the areas controlled by the Heating / AC thermostat

Cooling setpoint: [90] °F    use: [Economical Comfo ▽] Economy Profile    4.32

Heating setpoint: [45] °F    [Maximum Comfort]    OCCUPIED during Vacant mode

[Balanced Comfort]

[Economical Comfort] [Apply]

*Figure 4F*



*Figure 4G*



*Figure 4H*



*Figure 4I*



Figure 4J



*Figure 4K*



*Figure 4L*



*Figure 4M*



*Figure 4N*



*Figure 4O*



*Figure 4P*

*Figure 4Q*

## Program Participation

—4.96

### Program Listing

| Participate | Product Name | Supply Type | Effective Dates From | To | Effective Daily From | To |
|---|---|---|---|---|---|---|
| ☑ | Emergency AC Curtailment | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☑ | A Group | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☐ | B Group | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☐ | Emergency HVAC Curtailment | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☐ | Emergency Hot Tub/Spa Curtailment | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☐ | Emergency Pool Pump Curtailment | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☐ | Emergency Shut Off | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☐ | Emergency Water Heater Curtailment | On Demand | 01/01 | 12/31 | 12:00am | 11:59pm |
| ☐ | AfternoonPeaker | Scheduled | 04/01 | 10/01 | 12:00am | 6:00pm |
| ☐ | MorningPeaker | Scheduled | 01/01 | 12/31 | 6:00am | 12:00pm |

Apply

4.100    4.98

### *Figure 4R*



*Figure 5A*

016

Appx493



_5.10_   _5.16_   _5.12_   _5.22_   _5.14_   _5.20_   _5.18_

### _Figure 5B_



_5.24_   _5.28_   _5.30_   _5.26_   _5.32_   _5.34_   _5.36_   _5.38_

### _Figure 5C_



*Figure 5D*



*Figure 5E*



*Figure 5F*



Figure 5G

5.70   5.72   5.74



Figure 5H   5.78   5.80



Figure 5I

1

## SYSTEM AND METHOD FOR CONTROLLING USAGE OF A COMMODITY

### RELATED APPLICATIONS

[0001]   The present application claims priority to U.S. patent application Ser. No. 10/402,370 filed Mar. 28, 2003, which claims priority to U.S. Provisional Patent Application Serial No. 60/368,963 filed Mar. 28, 2002 and to U.S. Provisional Patent Application Serial No. 60/383,027 filed on May 24, 2002, all of which are hereby incorporated by reference.

### FIELD OF THE INVENTION

[0002]   The present invention relates generally to the delivery of a commodity, and more particularly, to a system and method for managing the delivery and usage of a commodity such as electricity, natural gas, steam, water, chilled or heated water, or potable or recycled water.

### BACKGROUND OF THE INVENTION

[0003]   Traditionally, utilities have done an excellent job of providing a reliable source of power to their customers. Utilities do this by accurately predicting consumer demand and then ensuring that they have adequate generation resources available to meet that demand. Historically, demand for power increases each year during peak heating and cooling months, resulting in a need for ever increasing amounts of generation capacity. A review of the peak period demand clearly show that the need for a substantial amount of new generation assets could be eliminated if there was a way to shift some of the demand from peak to off peak times.

[0004]   The deregulation of the electric industry has heightened concerns over power outages, price volatility and how the eventual outcome will impact the economy and our way of life.

[0005]   For example, recent events in California have captured the headlines and amplify these concerns. California suffers from 10 years of load growth with no new generation facilities being built to meet the demand. Internet data centers like the one in San Jose represent unanticipated new demands for power 24 hours a day equal to that of 60,000 homes. State mandated deregulation activities forced the major utilities to sell off their generation assets resulting in them having to buy the power they used to self generate from others.

[0006]   Demand reduction programs and more advanced controls have been proposed to assist in reducing demand during peak times.

[0007]   Currently, utilities do offer demand reduction programs to their customers. These programs are designed to shift loads out of peak periods by providing a financial incentive for consumers to move loads to a time when it is less expensive for the utility to produce or obtain power. Time of day rate is an example of such a program.

[0008]   Another type of program offered by utilities is the traditional Demand Side Management (DSM) program. This type of program provides the customer a monthly credit for allowing the utility to interrupt power to major loads in their home during peaks or emergencies.

[0009]   While both of these programs have been shown to work, they each have their problems. Time of day rate programs may be difficult for customers to understand. Therefore these programs have a very low participation rate among the customer base. DSM programs, on the other hand, have a much higher participation rate. However, DSM load sheds are seldom exercised by the utility. And, when the utility does exercise a load shed, the resulting interruption of power tends to affect customer comfort, thereby causing large numbers of customers to drop out of the program. In addition, current DSM programs cannot differentiate between those consumers that contribute to a load control, and those that don't, while providing incentive credits to all who sign up.

[0010]   While both time of day rates and DSM programs can be effective, each have challenges in the area of customer satisfaction that erode their usefulness. In addition, utilities earn little revenue from these types of offerings and therefore look to new generation as a more economically viable option.

[0011]   Thermostats, thermostatic control devices and environmental control systems have been designed, manufactured and placed in use for many years. These devices are primarily designed to sense the temperature inside a site 104 and based on occupant designated setting, activate the heating and/or air conditioning system or systems to maintain a comfort level based on the occupants designated level of comfort. There are two main types of design for these devices: a standard single control device or a dual control system.

[0012]   The standard single control device can be set to activate a heating or cooling system based upon a manual switch to select either system and a degree setting mechanism to select the desired temperature to heat or cool to if the temperature falls or rises below or above the occupant designated set point. A dual control system is attached to both a heating and cooling system which has two set points, one for the heating system activation and one for the cooling system activation. With this type of a control, the user sets a desired minimum temperature, below which the heating system will be activated to raise the temperature during winter seasons, and a maximum temperature, above which the cooling system will be activated to drop the temperature during summer seasons.

[0013]   This type of temperature control device provides the occupant the convenience of not having to manually select either the heating or cooling system, as is the case of the standard single control device, and allows the occupant to define a temperature range between which they are comfortable. Using these two main types of design as a base line, there are many variations, which have been developed over time. Over the years, these sensing and control devices have moved from traditional bi-metal contractors to more sophisticated electronic devices over the years, and have incorporated the ability to be programmed with multiple set points for both heating and cooling as well as having the ability to activate these different set points based on time of day, day of week, and/or externally generated control signals from utility companies indicating a fixed cost tier that is in effect, e.g., low, medium, high & critical, and to interface with an infra-red motion sensor that automatically sets back the temperature to a predetermined point based on the

2

presence of a person in the area. However, most end use consumers do not have the time, experience, and/or access to data to monitor, track, and use these devices.

[0014] The present invention is aimed at one or more of the problems set forth above.

SUMMARY OF THE INVENTION

[0015] In one aspect of the present invention, a system and method manage delivery of energy from a distribution network to one or more sites. Each site has at least one device coupled to the distribution network. The at least one device controllably consumes energy. The system includes a node and a control system. The node is coupled to the at least one device for sensing and controlling energy delivered to the device. A control system is coupled to the node and distribution network for delivering to the node at least one characteristic of the distribution network. The node for controls the supply of energy to the device as a function of the at least one characteristic.

[0016] In another aspect of the present invention, a method of shifting energy requirements from a first period of time is provided. The method includes the steps of measuring energy usage of a controlled device operated by a customer, cutting off energy to the controlled device during the first time period, and providing a rebate to the customer based on actual energy savings as a function of the first time period, the measured energy usage, and known power requirements.

[0017] In still another aspect of the present invention, a thermostat device for controlling a heating and/or cooling system through interaction with a user is provided. The heating and/or cooling system are supplied with energy through a power distribution network. The thermostat includes a control panel for receiving input from the user and a display coupled to the control panel for visually presenting information to the user. The thermostat device is adapted to receive a characteristic of the energy being supplied and for displaying the characteristic on the display.

BRIEF DESCRIPTION OF THE DRAWINGS

[0018] Other advantages of the present invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings wherein:

[0019] FIG. 1A is a block diagram of an energy management system, according to an embodiment of the present invention;

[0020] FIG. 1B is a diagrammatic illustration of one implementation of the energy management system of FIG. 1A;

[0021] FIG. 1C is a flow diagram of a process for managing energy delivery according to an embodiment of the present invention;

[0022] FIG. 2A is a block diagram of a gateway node used in the energy management system of FIG. 1A;

[0023] FIG. 2B is a block diagram of a metering node used in the energy management system of FIG. 1A;

[0024] FIG. 2C is a block diagram of a control node used in the energy management system of FIG. 1A;

[0025] FIG. 2D is a block diagram of a load control node used in the energy management system of FIG. 1A;

[0026] FIG. 2E is a block diagram of an implementation of the energy system of FIG. 1A at a customer site;

[0027] FIG. 3A is an illustration of an advanced thermostat device, according to an embodiment of the present invention;

[0028] FIG. 3B is a block diagram of the advanced thermostat device of FIG. 3A;

[0029] FIGS. 3C-3G are graphs illustrating an exemplary economic and comfort management control strategy, according to an embodiment of the present invention;

[0030] FIG. 4A is a graphical illustration of a customer GUI, according to an embodiment of the present invention;

[0031] FIG. 4B is a graphical illustration of a control panel of the GUI of FIG. 4A;

[0032] FIG. 4C is a graphical illustration of a virtual thermostat of the GUI of FIG. 4A;

[0033] FIG. 4D is a graphical illustration of an occupancy mode screen of the GUI of FIG. 4A;

[0034] FIG. 4E is a second graphical illustration of the occupancy mode screen of FIG. 4D;

[0035] FIG. 4F is a third graphical illustration of the occupancy mode screen of the GUI of FIG. 4D;

[0036] FIG. 4G is a graphical illustration of a thermostat scheduling calendar of the GUI of FIG. 4A;

[0037] FIG. 4H is a graphical illustration of a thermostat scheduling panel of the GUI of FIG. 4A;

[0038] FIG. 4I is a graphical illustration of a select day type drop down list of the GUI of FIG. 4A;

[0039] FIG. 4J is a graphical illustration of a config alert screen of the GUI of FIG. 4A;

[0040] FIG. 4K is a graphical illustration of a report screen of the GUI of FIG. 4A;

[0041] FIG. 4L is a graphical illustration of a daily temperature report pop up screen of the GUI of FIG. 4A;

[0042] FIG. 4M is a graphical illustration of a daily electrical report pop up screen of the GUI of FIG. 4A;

[0043] FIG. 4N is a graphical illustration of a configuration data screen of the GUI of FIG. 4A;

[0044] FIG. 4O is a graphical illustration of a thermostat data screen of the GUI of FIG. 4A;

[0045] FIG. 4P is a graphical illustration of a heating drop down list of the GUI of FIG. 4A;

[0046] FIG. 4Q is a graphical illustration of a cooling drop down list of the GUI of FIG. 4A;

[0047] FIG. 4R is a graphical illustration of a program participation screen of the GUI of FIG. 4A;

[0048] FIG. 5A is a graphical illustration of a utility GUI, according to an embodiment of the present invention;

[0049] FIG. 5B is a graphical illustration of an immediate supply screen of the GUI of FIG. 5A;

[0050] FIG. 5C is a graphical illustration of an available program capacity pop-up of the GUI of FIG. 5A;

[0051] FIG. 5D is a graphical illustration of a scheduled supply screen of the GUI of FIG. 5A;

[0052] FIG. 5E is a graphical illustration of a find eligible program dialog of the GUI of FIG. 5A;

[0053] FIG. 5F is a graphical illustration of program summery table of the GUI of FIG. 5A;

[0054] FIG. 5G is a graphical illustration of a program definition screen of the GUI of FIG. 5A;

[0055] FIG. 5H is a graphical illustration of a reports screen of the GUI of FIG. 5A; and,

[0056] FIG. 5I is a graphical illustration of a portion of the reports screen of FIG. 5H.

## DETAILED DESCRIPTION OF THE INVENTION

[0057] 1. Energy Management System and Methods— Overview

[0058] With reference to the drawings, and in operation, the present invention relates generally to a system 1.02 and method for managing the delivery and usage of a commodity, such as electricity, natural gas, steam, water, chilled or heated water, or potable or recycled water. More specifically, the system 1.02 is adaptable to manage the delivery and usage of energy, e.g., electricity and natural gas. While the below discussion focuses on the management of the delivery and/or usage of electricity, the present invention is not limited to such the delivery and/or usage of electricity.

[0059] In general, the system 1.02 allows at least one customer (or user) located at a customer site (indicated by reference number 1.04) and/or a utility (indicated by reference number 1.06) to manage delivery or usage of the electricity to the customer's site 1.06. The utility 1.06 may include both the generation of the electricity, e.g., via power plants, and/or the transmission of electricity to the customer sites 1.04.

[0060] The customer site 1.04 includes at least one device 1.08 which uses electricity and at least one node 1.10. In the illustrated embodiment, the customer site 1.04 includes three devices: a metered device 1.08A, a controlled device 1.08B, and a metered and controlled device 1.08C. Each device 1.08 may have an associated node 1.10.

[0061] As discussed in more detail below, in the illustrated embodiment, there are four different types of nodes 1.10: a load metering node 1.10A, a control node 1.10B, a load control node 1.10C, and a gateway node 1.10D.

[0062] The gateway node 1.10D provides two way communication between the gateway node 1.10D and each other node 1.10A, 1.10B, 1.10C and between the gateway node 1.10D and a utility control system 1.12. It should be noted that although there are only one of each the devices 1.08A, 1.08B, 1.08C, shown, there may be any number of each type of device 1.08A, 1.08B, 1.08C (including zero).

[0063] The load metering node 1.10A, in general, measures the instantaneous power being delivered (typically, in kWh) to the associated metered device 1.08A. The load metering node 1.10A may also determine the total power delivered to the metered device 1.08A over a predetermined period of time, e.g., every 15 or 20 minutes. Information related to the instantaneous power being delivered and the accumulated power is delivered to utility 1.06 via the gateway control node 1.10D. For example, the metered device 1.08A may be an electricity meter which measures all power being supplied to the customer site 1.04.

[0064] The control node 1.10B, in general, is used to control the controlled device 1.08B. In the simplest form the control node 1.10B may controllably cut off and supply power to the controlled device 1.08B. For example, if the controlled device 1.08B is a pool pump used to filter a pool (not shown), the control node 1.10B may simply turn power to the pool pump on and off. Alternatively, the control node 1.10B may have control over features of the controlled device 1.08B, e.g., start time, end time, duration, etc.

[0065] The load control node 1.10C, in general, is used to both measure the instantaneous power being delivered to the controlled and metered device 1.08C and controls the device 1.08C. The load control node 1.10C may also determine the total power delivered to the metered and controlled device 1.08C over a predetermined period of time, e.g., every 15 or 20 minutes.

[0066] Nodes 1.10 may be utilized with any type of device 1.08 for which it is desirable to control and/or measure its power usage. For example, nodes 1.10 may be associated with the entire customer site 1.04, a pool pump, an HVAC system, a water heater, any appliance, such as a refrigerator, dishwasher, hot tubs, irrigation and well pumps, spas, coffee maker, etc., or other electrical or electronic device, e.g., televisions, stereos, etc.

[0067] The type of node 1.10 which is used with a device 1.08 is dependent upon the device and whether it is desirable to measure the device's power usage, control the device or both. In one aspect of the present invention a node 1.10 may be separate from the device 1.08. For example, in each device 1.08 it may be desirable to measure the energy usage of the entire customer site 1.04. Thus, a load metering node 1.10A may be associated with the site's electric meter.

[0068] Nodes 1.10 may either be integrated with the corresponding device 1.08 or be separate. For example, a load metering node 1.10A may be a separate device which is coupled to an electric meter (for retro-fit purposes). Alternatively, nodes 1.08 may be designed and manufactured to be integral with the devices 1.10.

[0069] The customer may access and control the system 1.02 through a user interface 1.14 (see below). The user interface 1.14 may be incorporated into another device, such as a thermostat (see below). Additionally, the customer may be given access to the system 1.02 through external devices, such as, mobile phones, personal digital assistants (PDA), laptop computers, desktop computers, or other suitable devices. Such devices may be linked to the system 1.02 via the internet, a wireless data network, or other suitable system.

[0070] The system 1.02 may be further accessed and controlled at the utility 1.06 via a utility interface 1.16 (see below).

Appx499

4

[0071] In one aspect of the present invention, the load metering node 1.10A, the control node 1.10B, and the load control node 1.10C communicate with the gateway node 1.10D. In another aspect of the present invention, the load metering node 1.10A, the control node 1.10B, the load control node 1.10C, and the gateway node 1.10D may all communicate with each other. In the illustrated embodiment, the nodes 1.10 are interconnected by a network 1.18. The network 1.18 may be a wired network, such as an ethernet network, or a wireless network.

[0072] An exemplary implementation of the system 1.02 is shown in FIG. 1B. In this illustrated embodiment, the gateway node 1.10D communicates to the utility control system 1.12 via an "always on", secured wired or wireless network 1.20 through a cable modem, DSL modem, or other suitable means (not shown). The utility control system 1.12 may be implemented in software which is stored and executed on a back-end server 1.22 (see below).

[0073] In one aspect of the present invention, utility control system 1.12 and the back-end server 1.22 may be provided by and/or serviced and/or maintained by a third party, i.e., a service provider, 1.24.

[0074] Access to the utility control system 1.12 may be provided at the utility 1.06 through a secure network 1.26 such as a virtual private network (VPN).

[0075] Remote access to the system 1.02 may be provided to the customer through the back-end server 1.22 via the internet 1.28.

[0076] In the illustrated embodiment, the customer site 1.04 includes a metered device 1.30A, shown as an electric meter, a controlled device 1.30B, shown as a pool pump (illustrated graphically as a pool), and a metered and controlled device 1.30C, shown as a water heater. It should be noted, however, that any particular site may include zero, one or more of each type of device. In the illustrated embodiment, the system 1.02 also includes an advanced thermostat device 1.30D. Each device 1.30A, 1.30B, 1.30C, 1.30D communicates with the gateway node or gateway 1.10D.

[0077] As discussed more fully below, the customer has access to the system 1.02 and is able to monitor and control the nodes 1.10 and/or the devices 1.08 through the user interface 1.14.

[0078] The utility 1.06 may also monitor and control the usage of electricity by controlling the nodes 1.10 and/or the devices 1.08. More specifically, the utility 1.08 may define, modify, implement, and engage one or more Power Supply Program (hereinafter PSP or PROGRAM or PROGRAMS) which are designed to alleviate or reduce energy demand during peak periods. A PROGRAM may either be mandatory or optional. The user, through the user interface 1.14, may be able to subscribe or sign up for one or more optional PROGRAMS. A PROGRAM may be either automatically implemented when a predetermined set of conditions occur, such as time of day, or may be engaged, by the utility 1.06, as electricity demands require.

[0079] For example, a PROGRAM may automatically shift discretionary residential loads out of peak demand periods and credit consumers who participate with KWH rebates based on their actual (measured & verified) contri-

butions. In one embodiment, the rebates would be directly related to the cost of the fuel or electricity during the shifted period. This PROGRAM delivers the same results Time Of Day rates were designed to deliver without a variable KWH cost component. Rebates for shifting demand provide the consumer incentive versus higher rates in peak periods. Further, the PROGRAM provides a variable rebate based on a customers actual contribution, instead of a fixed rebate.

[0080] With reference to FIG. 1C, in one embodiment of the present invention, a method of shifting energy requirements from a first period of time, is provided. The method includes the step of measuring energy usage of a device 1.08 operated by a customer (first step 1.32A). The device 1.08 has a known power rating. In a second step 1.32B, energy to the device 1.08 is cut off during the first time period. In a third step 1.32C, a rebate is provided to the customer based on actual energy savings as a function of the first time period, the measured energy usage, and the known power requirements.

[0081] For example, returning to FIG. 1B, a PROGRAM may be defined to include all pool pumps for a given set of customers, e.g., in a geographic location. The PROGRAM may be further defined by not allowing the pool pumps to run during a set period of the day. Customers having a pool pump may sign up or "subscribe" to the PROGRAM. The power rating for a customer's pool pump must be known and is stored within the system 1.02. A load control node 1.10C is either integral with or separate and coupled to the pool pump. The load control node 1.10C receives a signal from the utility control system 1.12 to disable the pool pump during the first time period. The load control node 1.10C further measures energy usage of the pool pump during the first time period to confirm that the pool pump is not running.

[0082] Another PROGRAM may also perform soft load control (control of comfort levels) on HVAC systems by modifying thermostat set points, use of temperature ramping and restricting the use of heat strips and secondary stages of compressors (see below).

[0083] In one aspect of the present invention, the system 1.02 is designed to operate like a power plant, in that it would be dispatched every working day to shift peak loads but would not operate on weekends or holidays. Further, the energy saved through engagement of a PROGRAM may be viewed as capacity in the same manner as the capacity of a power plant.

[0084] In one aspect of the present invention, the system 1.02 records actual interval data for a given entity or customer, and for each device 1.08 within that entity, or subsets thereof, as desired. In the case where the entity is a home, for example, actual energy interval data can be collected for each appliance, or selected appliances. Communications between the gateway node 1.10D and the other nodes 1.10A,1.10B, 1.10C can be via wired or wireless means, including microwave, infrared, Radio Frequency (RF), or other wireless communications method. The actual interval data can be a basis for computing a customer's rebate. The gateway node 1.10D can additionally collect information regarding the health and maintenance of the energy devices to which it communicates. Accordingly, the gateway node 1.10D and the other nodes 1.10A,1.10B, 1.10C, can be equipped to communicate based on the wired

5

or wireless communications channel. Furthermore, the communications can be bi-directional, and can be encoded. The gateway node 1.10D can further communicate with the at least one server, and vice-versa. The gateway node 1.10D can thus include a processor and an Ethernet connection. Communications to the server can be vis cable modem, DSL, power line carrier modem, or another bi-directional wired or wireless secured communications link.

[0085]  In one embodiment, the gateway node 1.10D may include memory (see below) for storing pricing and scheduling information. For example, a gateway node 1.10D may store fifteen days of data when ninety-six readings from devices 1.08 are made per day.

[0086]  Rebates can be provided based on, for example, overall usage. In one illustration, if a water heater is "on" for ⅓ of the time, historically, a consumer can get a ½ rebate for a non-peak period water heater usage based on the water heater being "off" for the entire peak interval.

[0087]  The system 1.02 may also be adapted to receive from the customer a budget goal for a specified time period, e.g., one month. The system 1.02 may then monitor the customer's usage and send an email or other notification to the customer if it is determined that the specified budget goal will be exceeded during the specified time period.

[0088]  As explained above and more fully described below, the system 1.02 may also include an advanced thermostat device 1.30D. The system 1.02 may have the ability to sense the current indoor temperature and could be enhanced to include at a minimum, humidity sensing, outside temperature, UV intensity, wind direction and speed, relative humidity, wet bulb thermometer, dew point and local weather forecast data or encoded signals as well as other analog or digital inputs used in the calculation of and maintenance of occupant comfort. In its basic form, the system 1.02 will manage the indoor air temperature. Using the optional enhanced system inputs, the system 1.02 may also manage the air quality and humidity at the site by controlling the operation of the appropriate heating, filtration, conditioning and cooling equipment in conjunction with damper and fresh air input ducts, electrostatic filters and ionization devices to maximize comfort and indoor air quality. The system 1.02 may manage its operation of the available environmental conditioning resources to maintain the optimum temperature, humidity and air quality conditions based on user defined minimum and maximum values for comfort indices and price of energy indices. In a more elaborate implementation, the system 1.02 may also have the ability to switch energy types e.g., electric versus gas for environment heating and would also have the ability to switch suppliers based on the asking price of the energy supplier serving the location if the services of an energy broker are utilized.

[0089]  In one aspect of the present invention, the system 1.02 balances two primary factors. First, the system 1.02 maintains the environment within occupant defined acceptable minimum and maximum values at least for temperature and could be expanded to handle humidity and air quality. Second, the system 1.02 may vary these acceptable parameters based, on at a minimum, user defined preferences, price points and historical data (the gathering and retention of which is described later) to achieve the optimum environmental conditions. To provide feedback to the customer, the

system 1.02 may also record the number of energy units (energy units as used here include for examples: kilowatt hours, BTU's, Therms, and Jules-but is not so limited) used as a function of time for each of the loads monitored and/or controlled by the system 1.02 and would have the ability to report back detailed consumption data as a function of time and summarize these details to provide, at a minimum, daily averages for any defined period, monthly totals, as well as track the costs of each energy unit consumed per period and provide detailed and average daily cost for any user defined period as well as monthly totals. The system 1.02 may permit the entry of daily, weekly and monthly budget amounts for energy. The system 1.02 may monitor usage and provide visual and audible alerts if these amounts are being exceeded, thereby providing the opportunity to make corrections to system settings to achieve desired economic results. The system 1.02 may be capable of controlling loads beyond its primary management function of the environmental air management systems using the same economic modeling techniques and controls that it uses to manage its primary functions. It may also manage, report and track total site 1.04 energy unit usage and interface with energy unit suppliers via a communications channel. The system controls will be located at the site 1.04, while the processors for modeling and managing the sources and types of energy units to be utilized and committed to will be distributed (at energy brokers, ESP's and utilities) and operate over a communications network without regard to the actual location of or distance from the site 1.04.

[0090]  In summary, and as explained in detail below, the system 1.02 supports and provides a wide array of monitoring and control points including:

[0091]  Whole house interval metering;

[0092]  HVAC thermostat monitoring and control;

[0093]  Sub-metering and control of other major loads (such as pumps and electric water heaters); and,

[0094]  Net metering for effective management of distributed generation assets.

[0095]  In one embodiment, the system 1.02 is designed to provide monitoring and control of major loads, e.g., total electric load, HVAC systems, water heater, and pool pump (if existent). In another embodiment, the system 1.02 provides monitoring of most, if not all, devices which require energy, e.g., electricity or gas.

[0096]  The system 1.02 is "always on", connecting the nodes 1.10 to the utility control system 1.02. This allows the system 1.02 to provide much higher levels of monitoring and management of loads. The 'always on' connectivity allows the utility 1.06 to know exactly how much load is available from each participating load use device 1.08 at a customer site 1.04 and allows the utility 1.06 to aggregate that load up to a circuit, sub station or to any other desired combined total. The utility 1.06 may target specific loads or geographic areas and manage demand more closely by getting verification of control requests as curtailment commands are initiated. The utility 1.06 can then pass detailed load curtailment data on to the back-office billing programs at the utility where credits can be applied to consumer bills commensurate with their contributions.

[0097]  In another aspect of the present invention, the system 1.02 has the ability to monitor and control remote

generating capacity such as photovoltaic systems (not shown) which may be located at a consumer site **1.04**. Just as the system can monitor and verify load control reductions, it is equally capable of monitoring, dispatching and verifying remote generation capacity.

[0098]    In still another aspect of the present invention, the system **1.02** allows the utility **1.06** to respond to requests for additional electrical supply. For example, when the utility **1.06** requires an increase in electrical supply, the utility **1.06** will be able to review current capacity and call upon some or all of that capacity in an Immediate Supply Request. Using the system **1.02**, the utility **1.06** may command one or more customer sites **1.04** that meet the specified criteria, e.g., or enrolled in a specific PROGRAM, to provide their power contribution to the system's power generation supply. The gateway nodes **1.10D** will continuously update the system **1.02** with current demand information in the form of available messages. That information, along with profile data, can be presented to a system operator to help them locate the best supply to call upon.

[0099]    In one embodiment of the present invention, the utility interface **1.16** and the user interface **1.14** may be provided through a web browser (see below), such as Internet Explorer, available from Microsoft Corp. of Redmond, Wash.

[0100]    The utility interface **1.16** may display the capability to define Power Supply Programs (PSP or PROGRAMS) in the system **1.02** and selectively apply substations and circuits that will participate in the PROGRAM when activated. The system **1.02** through the utility interface **1.16** may include the following capabilities.

[0101]    The system **1.02** may allow an operator at the utility **1.06** to selectively assign devices **1.08** that apply to a specific PROGRAM. One or more substations and/or circuits may be included in the PROGRAM.

[0102]    The system **1.02** may receive or generate an Immediate Supply Request (ISR) when additional electrical supply is needed. The Immediate Supply Request may include a start time and the supply request duration.

[0103]    An operator, using the utility interface **1.16**, activates one or more PROGRAMS in response to the ISR. Activation of the one or more PROGRAMS may be immediate or scheduled at a future time. To activate a PROGRAM, a PROGRAM schedule is downloaded to each of the gateway nodes **1.10D** or nodes **1.10** affected. In one embodiment, the PROGRAM schedule may be downloaded to the appropriate gateway nodes **1.10D** or other node **1.10** in advance of the scheduled time of operation.

[0104]    In another aspect of the present invention, the system **1.02** can track, record, store, compute, etc. which customers actually participate in a PSP and how much demand was reduced in the home for the PROGRAM period.

[0105]    The utility interface **1.16** may also display the current load generation available from the existing system **1.02**. For example, a view of the current Power Distribution Network for a utility company including Transmission Substations (TSS), Distribution Substations (DSS), and circuits may be provided. The view may be appropriately annotated with identification information for each branch of the network (TSS, DSS and circuit). The view may display an aggregated capacity for a branch of the network currently available. The view may also indicate whether a PROGRAM is currently active on a branch of the system **1.02**. For an active power supply program, the scheduled completion time may also be indicated.

[0106]    The system **1.02** may also continually aggregate capacity and the current status of the distribution network and provides the updated information for display on the utility interface **1.16**.

[0107]    In a further aspect of the present invention, the utility interface **1.16** may allow the operator to analyze profiles of homes and individual load types. This data can allow the utility **1.06** to assess which loads should be curtailed to achieve the needed demand reduction. The system **1.02** may calculate home load profiles based upon information received from the load metering nodes **1.10A** and/or load control nodes **1.10C**. This may include HVAC profiling. Using this data, site load profile data can be aggregated for the electrical distribution network topology.

[0108]    The network topology load profile may be displayed as a snapshot to the operator. The operator may also review load profiles available in the system **1.02** at a specified time of day.

[0109]    Configuration data is downloaded from the system **1.02** to each of the gateway nodes **1.10D**. For example, this may be done at one or more of the following: at predetermined times, when requested by a gateway node **1.10D**, and/or when a change, such as activation of a PROGRAM, has occurred.

[0110]    For example, configuration data may include, but is not limited to the following: communication parameters for system components, schedules and power supply programs. In one embodiment, each device **1.08** has a unique identifier, such as a MAC address or an RF logical address. The intended device **1.08** for a given message may be included in the message received from the system **1.02**.

[0111]    In one aspect of the present invention, communications to and from the gateway nodes **1.10D** or other nodes **1.10** are secured. For example, the communications may be secured using Secure Sockets Layer (SSL).

[0112]    In another aspect of the present invention, if the system **1.02** loses communications with a gateway node **1.10D** for a predetermined time, the system **1.02** may generate a Service Report.

[0113]    In one aspect of the present invention, a gateway **1.10D** may generate a message when a controlled device **1.08** has a change of state that alters its contributable supply by more than a predetermined range, i.e., a real-time demand range. The system **1.02** may use these updates to keep a live running total of available supply for the entire electrical distribution network and make these values available at the utility interface **1.16**. In another aspect of the present invention, the system maintains a history of the consumption rates as a function fo time to create historical usage by device type and program to aid in planning and forecasting demand by device type. These values are available at the utility interface **1.16**. In one embodiment, the system **1.02** may ignore supply values from a gateway node **1.10D** that are older than a predetermined period of time, such as 30 minutes old.

[0114] The system may also receive messages from a gateway node 1.10D at predetermined time intervals, such as 15 minutes, whether a load changes or not. These messages can include the (a) demands generated for a device 1.08 in a PROGRAM and (b) the total demand generated for devices 1.08 in a PROGRAM. In one embodiment these messages may also include a gateway ID, a utility ID string, time/date stamp, current power draw of every controllable device 1.08, and whole house demand.

[0115] Through the user interface 1.14, the customer may have local and remote access to a rich set of functions and features. Some or all of these functions and features may be accessible through the thermostat 1.30D and/or through the internet 1.28 (via a web browser).

[0116] Using the user interface 1.14, the customer may directly access and control in-home devices 1.08. For example, with regard to the thermostat 1.30D, the customer may view current temperature, view current heating or cooling setpoint(s), override heating or cooling setpoint(s), resume scheduled heating or cooling setpoint(s), view heat/cool/auto mode, change the heat/cool/auto mode.

[0117] With regard to the electric meter 1.30A, the customer may view current electric meter accumulated consumption (kWh), view current electric meter demand (kW), view historical meter data.

[0118] With regard to a metered controlled device 1.08C, such as the water heater 1.30C, the customer may view current equipment load status (on/off data), control the state of output relays (on/off), view and override curtailment conditions of the device 1.08C, and/or view current demand and consumption data of the device 1.08C.

[0119] In one aspect of the present invention, the user interface 1.14 includes a scheduling feature. The scheduling feature allows the customer to customize the devices 1.08 to operate according to personal preferences (rather than a default configuration).

[0120] In one embodiment, the following scheduling features are accessible through the user interface 1.14.

[0121] With regard to the thermostat, the customer may define up to a plurality of occupancy modes, e.g., 8, for use in daily schedules, define daily schedules using an unlimited number of day-types, assign day-types using monthly calendars.

[0122] With regard to a controlled and metered device 1.08C, the customer may, for example, define a run-time operation and/or a desired start time.

[0123] Using the user interface 1.14, the customer may view or generate a variety of reports to view historical information about their homes and the devices 1.08 within. For example, some of the reports which may be available include:

[0124] Daily temperature reports displaying temperature and setpoints in, e.g, 15-minute intervals.

[0125] Monthly temperature reports displaying daily low, high and average temperatures.

[0126] Daily electrical reports displaying electrical consumption hourly and electrical costs in e.g., 15-minute intervals.

[0127] Monthly electrical reports displaying daily low, high and average energy consumption.

[0128] Monthly cost reports displaying daily low, high and average energy costs.

[0129] Monthly consumption reports displaying daily energy consumption and costs.

[0130] Yearly consumption and cost reports displaying monthly energy consumption and cost.

[0131] In another aspect of the present invention, the customer may also view information related to Power Supply Programs. For example, the customer may generate or view a report detailing the PROGRAMS offered by the utility 1.06. Additionally, the customer may select the PROGRAMS in which they choose to participate.

[0132] Using the user interface 1.14, the customer may have access to their account and home attributes. For example, the customer may be able to view and modify various parameters associated with their user profile. Such parameters may include name, address, home, work and mobile phone numbers, primary and secondary E-mail addresses, password (modify only) and password reminder, and/or budget thresholds. Furthermore, the customer may be able to view and modify various parameters associated with the thermostat 1.30D and HVAC system. Such parameters may include thermostat name, heating type and stages, cooling type and stages, and Safety, alarm, heat and cool limits.

[0133] Using the user interface 1.14, the customer may also be able to view and modify various parameters associated with any metered and controlled devices. Such parameters may include, e.g., the device name and description.

[0134] Using the user interface 1.14, the customer may also be able to view and modify various parameters associated with their home. Such parameters may include age and size, construction characteristics, water heater capacity and type(s), and energy related home accessories.

[0135] When the system 1.02 activates a PROGRAM (either automatically or via manual activation), a supply request is broadcast. The supply request may include a Curtailment ID, a Utility ID sub-string, Device Type Identifiers of the devices that are to contribute, a transaction identifier, and time elements indicating start time and duration. In one embodiment, the supply request is sent to all gateway nodes 1.10D and other nodes 1.10 and may be repeated to ensure that all of the gateways 1.10D and other nodes 1.10 will receive the request. Each gateway 1.10D and other nodes 1.10 receive the request and when the start time occurs, begin a Supply Request transaction.

[0136] In one embodiment, the gateway node 1.10D takes a whole-house meter reading (demand and consumption) and reports back to the system 1.02 that it has received the request and is participating. In the illustrated embodiment, every message includes the Curtailment ID so that the system 1.02 can collect all of the responses to the supply request and provide accurate analysis and billing/crediting information for the activated PROGRAM.

[0137] The gateway node 1.10D and other nodes 1.10 then proceeds to control the specified devices 1.08 and report the status of each device 1.08 back to the system 1.02 as they are processed.

8

[0138] Devices 1.08 that are currently drawing power report the total watts contributed and then proceed to open the relay for controlled devices 1.08B and/or controlled and metered device 1.08C. If a controlled device 1.08B is being used, an associated power rating may be used for the contributed power value. A controlled device 1.08 may be either shut-off, i.e., power cut off, or controlled to some predetermined state, e.g., a heating/cooling offset may be set to a maximum value for a HVAC system (see below).

[0139] Devices 1.08 that are not currently drawing power will report zero watts contributed and leave the relay closed. With the relay closed, once the device 1.08 starts to draw power, the gateway node 1.10D will measure its demand and then open the relay and then measure and report its contribution.

[0140] In one embodiment, a device's 1.08 contribution is equal to the power consumption rate prior to activation of the program for the time period of the PROGRAM, i.e., the amount of energy being saved.

[0141] If the device 1.08 is an HVAC system, adjusting the setpoint may not guarantee that the system may not run at all. If the HVAC is not running, its supply contribution message is reported as zero. The setpoints are offset and the temperature is monitored. When the temperature exceeds the appropriate heating or cooling original setpoint (prior to the offset change), the gateway node 1.10D may indicate what the contribution is. This represents when the equipment would have come on without the curtailment. By adjusting the setpoint of the thermostat 1.30D, the actual consumption of the HVAC system should reduce as a result of a higher setpoint for heating or cooling being established. The actual usage for a particular setpoint for a site 1.04 may, over time, be known and/or sampled and the offsets can then be computed and verified as needed to ensure that the reductions that are calculated are correct. The system 1.02 can thus measure the shorter and less frequent cycling of the HVAC system to create an overall energy savings amount. For example, if the unit consumes 5 kwh set at 72 and used 4.6 kwh set at 76 then the savings is 0.4 kwh per hour.

[0142] At the end of the Supply Request period, the gateway node 1.10D will re-enable the devices 1.08 and report a completion message to the system 1.02 that includes the whole house demand data and total consumption data. For the thermostat or thermostat devices, a reverse ramp can initiate to reduce the potential of creating a peak demand at the end of a curtailment or control period. This reverse ramp could include the restriction of secondary compressor stages as well as heat strips depending on the mode (heating or cooling) that the thermostat is in.

[0143] The system 1.02 may also send a supply request cancel message to abort the PROGRAM. When a supply request cancel message is received, the gateway node 1.10D will perform as if the time has expired and performed all necessary clean-up, wrap-up and reporting as described above.

[0144] In addition to reporting individual demand contributed by each device 1.08 during the PROGRAM, the gateway node 1.10D may also send the total demand generated for all devices 1.08 for the PROGRAM to the system 1.02.

[0145] In another aspect of the present invention, the gateway node 1.10D may receive a utility generated sched-

uled supply request. The gateway node 1.10D may be responsible for administering the PROGRAM within customer site 1.04. For example, the gateway node 1.10D may accept or download scheduled PROGRAMS from the system 1.02 in advance of the scheduled operation. The gateway node 1.10D may then monitor and control the affected devices 1.08 to carry out the PROGRAM.

[0146] During the PROGRAM, the gateway node 1.08D may report the electrical demand generated by each device 1.08 in the PROGRAM.

[0147] The gateway node 1.10D may also receive occupant device schedules from the system. Device schedules apply to customer devices 1.08 such as water heater, pool pump, hot tub and spas. The gateway node 1.10D may then be responsible for administering the device schedules within the customer site. The device schedules may be received by the gateway node 1.10D in advance of the scheduled operation. Then the gateway node 1.10D may monitor and control the affected devices 1.08 per the downloaded device schedules.

[0148] In another aspect of the present invention, if the gateway node 1.10D loses communications with the system 1.02 for a predetermined time, the gateway node 1.10D can re-enable devices 1.08 (water heater, pool pump, hot tub and spa). Note that the gateway node may have multiple days, e.g., three days, of schedules available. Water heaters can fall back to an operational mode, however, pool pump, spas, hot tubs and irrigation and well pumps may not. These latter devices may have to be cycled based on some programmed interval like, for example, 8 hours a day. Other devices 1.08 like an irrigation pump could not simply default to "on" or it may start and never stop. The ability to receive and run schedules is not limited to the gateway node 1.10D. Depending on the system implementation requirements, schedules, cycle run times and other operational commands may be downloaded to the control nodes 1.10 which will operate independently their individual schedules. This capability is designed to permit normal operation of the site 1.04 should the gateway node 1.10D fail or communications are lost between the gateway node 1.10D and the control node 1.10.

[0149] With reference to FIG. 3A, the thermostat 1.30D in one embodiment, is a wall mounted device which has a control panel 3.02 with a display screen 3.04 and a plurality of input buttons 3.06. In the illustrated embodiment, the input buttons 3.06 includes a system button 3.06A, a fan button 3.06B, an occupancy button 3.06C, and a hold/resume button 3.06D. The input buttons 3.06 further include an first control button 3.06E and a second control button 30.6F.

[0150] Using the input buttons, the customer can control the HVAC system and other parts of the system 1.02 (see below). The thermostat 1.30D is in communication with the gateway node 1.10D (see above) and the gateway node 1.10D can query the current temperature and setpoint values of the thermostat 1.30D. Further, the gateway node 1.10D can change the heating and cooling setpoint(s) and offset values of the thermostat 1.30D (see below).

[0151] In one aspect of the present invention, the thermostat 1.30D may inform the gateway node 1.10D when its relay outputs or contact inputs change state, or the gateway node 1.10D can poll for this status. When this occurs, the

9

gateway node 1.10D can query the thermostat 1.30D and send the current temperature and corresponding input or output status to the system 1.02.

[0152]   The thermostat 1.30D may operate in a fallback mode upon loss of communication with the gateway node 1.10D. When communication resumes, the gateway node 1.10D can ascertain the state of the thermostat 1.30D and restore the desired functionality.

[0153]   All changes made at the thermostat 1.30D can be communicated to the gateway node 1.10D or be received during a poll of the thermostat 1.30D. In one embodiment, the following functions can be accessible directly from the thermostat 1.30D:

[0154]   View current temperature.

[0155]   View current heating or cooling setpoint.

[0156]   Override heating and cooling setpoints.

[0157]   Resume scheduled heating and cooling setpoints.

[0158]   View Heat/Cool/Auto mode.

[0159]   Change Heat/Cool/Auto mode.

[0160]   Activate/deactivate the fan.

[0161]   As discussed above, load control nodes 1.10C provide two primary functions: 1) measure power consumption and instantaneous demand of an attached load and 2) control the load. In one embodiment, the load control node 1.10C includes a means, e.g., one or more means (see below) to allow the attached load to be connected or disconnected from main power. Alternatively, the load control node 1.10C may be integrated and/or coupled to a controller of the load for control of its functions.

[0162]   In one embodiment, the load control node 1.10C may disconnect the load when a supply request command is received from the gateway node 1.10D and reconnect the load when a cancel supply request command is received from the gateway node 1.10D. The load control node 1.10C may further provide status information, e.g., state of load control means, when a status request command is received from the gateway.

[0163]   In one aspect of the present invention, a load metering node 1.10A is coupled to a site's electric meter 1.30A. The load metering node 1.10A may accumulate time stamped cumulative consumption (kWh) data over a predetermined period, e.g., 15 or 20 minute time periods and be capable of storing up to a predetermined period of time's worth of data, e.g., 10 days.

[0164]   The load metering node 1.10A is in communication with the gateway node 1.10D. The gateway 1.10D may query current accumulated consumption (kWh) from the meter 1.30A and/or "instantaneous" load measurement (kW) from the meter on request. "Instantaneous" can be determined by the capabilities of the meter. The gateway node 1.10D can query the 15-minute interval data. Data values can be returned with a timestamp.

[0165]   2. Nodes

[0166]   With specific reference to FIGS. 2A, 2B, 2C and 2D, the interaction with the devices 1.08 located at the customer site 1.04 is the node 1.10. The nodes 1.10 permit

the system 1.02 to focus on the entire supply chain, from well head production and generation to the end consumption point. The nodes 1.10 are designed to give every energy-consuming device 1.08 the ability to intercommunicate with the entire supply chain if necessary and utilizes supply and demand balancing control logic, to improve the operational efficiency of end point devices 1.08, groups of end-point devices and the entire supply chain. This is accomplished by giving each end-point knowledge about the current demand on the entire supply chain coupled with the ability to alter its operation to assist in managing and balancing the overall demand on the delivery system. This information exchange is accomplished over an always on broadband, high-speed, point-to-point, point to multipoint or mesh network (see above).

[0167]   Energy consuming devices 1.08 within a customer site 1.04 may have varying levels of operational intelligence. Appliances and other utility consuming devices 1.08 range from super energy efficient refrigeration units with embedded micro processor controls to dumb devices like water heaters and pool pumps which simply operate in an on or off state using sensors or timers to control their operational state. The nodes 1.10 provide an entirely new level of intelligence to each end device 1.08 and are designed to be modular in nature so as not to burden the end point control with more features or functions than it needs.

[0168]   Nodes 1.10 may be designed to retrofit existing devices 1.08, as well as be fully integrated into the end point at the time of manufacture of a device 1.08.

[0169]   In one embodiment, there are three types of nodes 1.10: a load metering node 1.10A, a control node 1.10B, and a load control node 1.10C, as well as the gateway node 1.10D. Each type of node 1.10 has common basic features as well as optional sub modules such as Interfaces, Metering or Control modules (see below).

[0170]   The nodes 1.10 are designed to increase the operational efficiency of even the most intelligent end use device 1.08 by giving it knowledge of the entire "utility" supply chain that it is connected to, making it possible for the end use device 1.08 to perform its given function more efficiently and economically.

[0171]   As shown, each node 1.10 includes a node processor 2.02. In one embodiment, the node processor 2.02 is a microprocessor. The node 1.10 also includes a memory device 2.04, such as non-volatile memory, for storing program and other data, as needed. Each node 1.10 also includes a two-way communications 2.06 channel for communicating with other components in the system 1.02. The communications channel 2.06 may be either a hardwired or a wireless system. Any suitable communications means may be used to communicate with the intended device. For example, the two way communications channel 2.06 may provide a means to communicate with other nodes 1.10 or a programming device 2.08. The programming device 2.08 may be used either at the site of manufacturing of the node 1.10 or onsite to configure and/or program the node 1.10. In one embodiment, the programming device 2.08 is coupled to the node 1.10 through a communications port (not shown). The two way communications channel 2.06 may also provide communication to the gateway node 1.10D and/or the other nodes 1.10A,1.10B,1.10C. The nodes 1.10 may be

connected in a network by the two way communications channel 2.06. The network may either be a wired, wireless, or a combined network.

[0172]   In one aspect of the present invention, the nodes 1.10 provide the system 1.02 with the ability to monitor and control the operation of on site distributed generation resources, such as a photovoltaic system (not shown). This permits the system 1.02 to dispatch on site capacity when the demand and economics are favorable or the demand exceeds the supply creating an energy shortage. The system 1.02 may do this in conjunction with any other utility resource such as natural gas or propane that might be used to power the a device 1.08. This ability is further enhanced by a node's 1.10 ability to communicate with a plurality of other similar nodes 1.10 or any other control, monitoring, configuration or management node attached directly or indirectly to the system 1.02 making it possible for individual nodes 1.10 to jointly share the energy management process among many devices 1.08 using a unique set of decision criteria to maintain the operation integrity of the customer site 1.04 or any other sphere of control, e.g., a plurality of nodes 1.10 across multiple sites, while managing total demand, the economics of the operation and the end use devices.

[0173]   In another aspect of the present invention, the system 1.02 permits communications outside the customer site 1.04, permitting individual nodes 1.06 or a plurality of nodes 1.10 in aggregation to intercommunicate with other control points which might include, but are not limited to, utility companies, energy suppliers, other sites or groups of sites, other sites or points of operation under the same ownership, energy and utility brokers, energy and utility service providers, independent power and utility producers, distribution sub stations, transmission sub stations, Gas and Water well operator and any other point of control or management or service organization associated with the site 1.04, the end point device or the "utility" delivery network servicing it.

[0174]   As discussed above, each node 1.10 includes a two way communications channel 2.06, which permits the node 1.10 to intercommunicate with any other point or points within the system 1.02. This intercommunication may occur with any other point within the system 1.02 and may be, but is not limited to, another associated Node 1.10, a control aggregation point or an outside point like an energy or utility supply point associated with the customer site 1.03 or a control configuration, monitoring or management point. The system 1.02 interconnects either directly or indirectly a plurality of nodes 1.10 and related supply, monitoring, configuration and management points to create a secure ubiquitous communications channel over which broadcast, point to point, mesh and point to multipoint communications can occur as well as any other communications necessary to perform the energy management function. Because of the plurality of communications protocols and physical media over which data communications can occur, nodes 1.10 may have multiple Two Way Communications Channels, permitting the best media and protocols to be implemented to achieve the desired end result.

[0175]   With specific reference to FIG. 2B, an exemplary load metering node 1.10A is shown. As discussed above, the load metering node 1.10A measures the instantaneous power being delivered to the metered device 1.08A and may also

determine the total power delivered to the metered device 1.08A over a predetermined time period, e.g., 15 or 20 minutes. The load metering node 1.10A includes a metering module 2.10 which is coupled to the metered device 1.08A for measuring power delivered to the metered device 1.08A. This information is relayed through the gateway node 1.10D over the two way communications channel 2.06 to the utility control system 1.12. In one embodiment, the metering module 2.10 includes a metering processor and memory for calculating and storing power data, such as accumulated power consumption.

[0176]   In one embodiment, the metering module 2.10 includes means, such as one or more current transformers, for measuring power delivered to (or from) the associated device 1.08.

[0177]   With specific reference to FIG. 2C, an exemplary control node 1.10B is shown. As discussed above, the control node 1.10B is used to control the controlled device 1.08. In the illustrated embodiment, the control node 1.10B is coupled to the controlled device 1.08B by a controlled device communications channel 2.12. In one embodiment, the control node 1.10 includes one or more relays (not shown) for connecting and disconnecting the controlled device 1.08B from power. In another embodiment, the control node 1.10 is interconnected to the controlled device's 1.08B onboard controls. In this embodiment, the control node 1.10B directly controls the operation of the controlled device 1.08B.

[0178]   With specific reference to FIG. 2D, an exemplary load control node 1.10C is shown. As discussed above, the load control node 1.10C performs both the metering function of the load metering node 1.10A and the control node 1.10B. Thus, the load control node 1.10C includes both the metering module 2.10 and the controlled device communications channel 2.12.

[0179]   As discussed above, each node 1.10, in its simplest form includes a processor 2.02 and a memory device 2.04 within which control logic resides and runs. This control logic, processor 2.02 and memory 2.04 provide the node 1.10 with the necessary control intelligence to manage its associated load or generation resource as a stand-alone point or in conjunction with a plurality of other nodes 1.10 locations as well as manage communications over the controlled device communications channel 2.12 (for control and load control nodes 1.10B, 1.10C) and over the two way communications channel 2.06.

[0180]   In one aspect of the present invention, the gateway node 1.10D acts as a central control node, providing intercommunications between the other nodes 1.10 at the customer site 1.04.

[0181]   In another aspect of the present invention, a plurality of nodes 1.10, which may be located at a single customer site 1.04 or across multiple sites 1.04, may be grouped for a specific purpose, e.g., control of all pool pumps in a defined geographic region or all pool pumps in a PROGRAM in a defined geographic region. For the plurality of nodes 1.10, a single node, which may be a gateway node 1.10D, may be chosen as the central control node.

[0182]   In one embodiment of the present invention, the processor 2.02 and control logic provide the node 1.10 with

the ability to sense what its current state of operation should be, based on commands received from the central control node or gateway node 1.10D, either within the customer site 1.04 or within the aggregation control sphere of the central control Node, and would manage the associated devices 1.08 based on this control state. Each node 1.10 may also report back the status of the associated device 1.08, their energy usage or other utility consumption rate (based on measurement from the metering module 2.10), to the assigned central control node 1.10.

[0183] Under this configuration, the nodes 1.10 may be cascaded from the central master control point down to the lowest level of control at an end point within the system 1.02 using, but not limited to, a tree and branch or star network, however deep the architecture dictates, to achieve the level of control desired. Each sub level of control would receive control parameters or commands from its subsequent higher level node 1.10 and would either directly control loads attached to it or command nodes 1.10 subordinate to it, to achieve the desired control or management state. Through cascading control functions into a chain of command, higher level nodes 1.10 can more effectively manage a plurality of devices 1.08 without encountering scaling limitations usually associated with automation control systems managing a plurality of loads from a central processor. By the nature of its design, the node 1.10 operating in a cascading control network as described above would not be limited or fixed in its structure and nodes 1.10 could migrate dynamically from one "group" to another or move up or down in the cascade structure to permit different control spheres and algorithms. This unique architecture permits each node 1.10 to have a customized process control program and data collection criteria allowing its level of control and interaction with its associated load or generation capacity to be designed to meet the management control program objectives.

[0184] In addition, the process is further enhanced if the load or generation point under the control of the control or load control node 1.10B, 1.10C has its own operational control processor (not shown) which is interconnected with the node 1.10B,1.10C over the controlled device communications channel 2.12 to provide operational state and control commands, run diagnostics and tests, operational health and performance data, and alarm conditions. Data from the controlled or controlled and metered device 1.08B, 1.08C being accessible to other nodes 1.10 or control or monitoring or measurement nodes associated with the system 1.02 for either direct use or transfer to nodes external to the network, through whatever data transfer means are most suitable for the data type and priority level.

[0185] With reference to FIGS. 2C and 2D, to manage the operation of basic consumption points like pumps, motors or heating elements that are typically thermostatic, valve or relay controlled, the control node or load control node 1.10B, 1.10C may include a mains coupler 2.14 which permits the control node 1.10B or load control node 1.10C to attach or disconnect the load or generation capacity to the mains or distribution network for the "utility" product used or generated by the end device 1.08B, 1.08C.

[0186] In another embodiment of the present invention, the node control logic or program would be capable of receiving and processing data independent of specific controls from a central control point and at a minimum would

monitor and control the operation of its associated load or generation capacity based on, but not limited to: the demand for the utility product, cost of the utility product, congestion levels on the delivery system and/or their associated cost, for electricity it would at a minimum, but not be limited to, monitoring demand, usage, sign wave frequency, voltage, and for other utilities such as, but not limited to, gas, steam or water, it would, but not be limited to, measuring line pressure, ambient temperature and any other factors and determine the best operating mode for its associated load or generation resource. Using parameters from a plurality of measurement, monitoring and control points associated with the utility delivery system, available to all nodes on the network, the node 1.10 would manage its associated consumption or generation demand and load on the "utility" delivery system in accordance with control parameters governing its operation, supplied to it through a control point configuration interface 2.16 and report any and all operational data, status and conditions back to one or multiple associated measurement, monitoring and control points as configured through the control point configuration interface 2.16. One example of a control point configuration interface 2.16 is an input touch screen located on a device 1.08.

[0187] In both the simplest form or the enhanced implementation above or any other combination of nodes 1.10 and control points, the individual nodes 1.10 are capable of controlling the operation of the associated load or generation capacity to shift, reduce or cap demand on the delivery system or in the case of generation to dispatch the available capacity to help meet the demand and ensure the integrity and reliability of the delivery system. Based on triggering parameters, which include but are not limited to: the time of day, the total demand on the delivery system, the real time cost of the utility, the full weighted cost of delivery including congestion charges, the minimum operating characteristics of the associated load or generation source, the total demand for the site 1.04, the total demand for the individual nodes 1.10 within an aggregate group, externalities like weather factors and the historical usage and demand patterns of the individual node 1.10 and/or its aggregate group of nodes 1.10, individual nodes 1.10 will determine their optimum operating characteristics and will operate their associated load or generation resource to improve those operational and performance characteristics.

[0188] As discussed above in one embodiment of the present invention, the load metering, control and load control nodes 1.10A, 1.10B, 1.10C communicate with the gateway node 1.10D through a wireless or radio frequency communications link. With reference to FIG. 1D, when a node 1.10A, 1.10B, 1.10C comes online or powers up, including initial power up when the node 1.10A, 1.10B, 1.10C is being added to the system 1.02, an initialization process 1.32 must be performed. In first step 1.32A, the gateway node 1.10D emits a beaconing signal. Generally, the gateway node 1.10D continually emits the beaconing signal. In a second step 1.32B, the node 1.10A, 1.10B, 1.10C receives the beaconing signal and responsively generates a response signal. In a third step 1.32C, the node being initialized 1.10A, 1.10B, 1.10C joins the network of nodes 1.10A, 1.10B, 1.10C through a handshaking routine between the gateway node 1.10D and the node being initialized 1.10A, 1.10B, 1.10C.

12

[0189]  In another aspect of the present invention, the control and load control nodes 1.10B, 1.10C are connected to the whole distribution channel up to the utility 1.06. The control and load control nodes 1.10B, 1.10C may receive data, control parameters, and PROGRAM schedules through and/or from the gateway node 1.10D. Based on the received data, control parameters and/or schedules, the control and load control nodes 1.10B, 1.10C may control operation of the associated device 1.08.

[0190]  With reference to FIG. 2E, an example of the system 1.02 applied to a specific customer site, i.e., a residence or home 2.18 will be used to illustrate several functions of the system 1.02. In the illustrated embodiment, the home 2.18 includes eight nodes 2.20 coupled to eight devices 2.22.

[0191]  A load metering node 2.20A is coupled to a whole house meter 2.22A. The whole house meter 2.22A could be associated with revenue grade power (electricity), gas or water. However for purposes of illustration, the whole house meter 2.22A is associated with electricity delivered to the home 2.18. The load metering node 2.20A monitors and reports the total house consumption of electricity. The load metering node 2.20A measures and reports total consumption as well as instantaneous demand and records and report consumption in total. Furthermore, the load metering node 2.20A may store time interval data in non-volatile memory (see above) in accordance with industry standards and system management requirements for the entire home to other control nodes 2.20 within the home 2.18 and/or any other node associated with its aggregation group, the delivery supply chain or any other node needing or authorized to receive or access it.

[0192]  In addition, the home 2.18 has first and second load control nodes 2.20B, 2.20C associated with its heating and air conditioning systems one controlling the main living space, i.e., the 1st floor HVAC system 2.22B and the other controlling the second floor bedroom space, i.e., the 2nd floor HVAC system 2.22C.

[0193]  Third, fourth and fifth load control nodes 2.20D, 2.20E, 2.20F are associated with a refrigerator/freezer 2.22D, an electric water heater 2.22E, and a well pump (for yard irrigation) 2.22F, respectively. Sixth and seventh load control nodes 2.20G, 2.20H are associated with a roof mounted photovoltaic system 2.22G (comprised of a storage battery bank and inverter capable of generating 2500 watts of 240 v 60 hz A/C power for up to 12 hours) and a dishwasher 2.22H.

[0194]  While the system 1.02 will work with any "utility" provided product such as, but not limited to, gas, water, electric or steam, for ease of illustration electricity is the only utility product being used in this example. Each node 2.20 in this example has control parameters stored in its associated memory, which the control program for the node 2.20 uses to determine the optimum operating characteristics for the management of its associated load or generation capacity.

[0195]  In one embodiment of the present invention, a gateway node 2.24 may be utilized to aggregate the premise nodes 2.20 and consolidate the communications process and/or control processes with upper level nodes 2.20 or any other nodes directly or indirectly in the system 1.02.

[0196]  The nodes are connected in a network (as described above), but may operate autonomously or require direct commands to change their operational state. In one embodiment, the nodes 2.20 include basic logic so that if the node 2.20 is severed from the network either intentionally or by accident, the node 2.20 will continue to perform their management and monitoring functions to optimize their attached loads performance based on the last known condition of their associated utility supply chain.

[0197]  In its simplest form, the home 2.18 may participate in any number of conservation or demand limiting programs, i.e., Power Saving Programs or PROGRAMS. The following illustrated how the nodes 2.20 may support these PROGRAMS. However, the following should not be interpreted to limit the present invention to any such PROGRAM.

[0198]  By its nature of having a processor 2.02, memory 2.04, metering module 2.10, mains coupler 2.14, controlled device communications channel 2.12, two way communications channels 2.06, control point configuration interface 2.16 and the ability to communicate with and coordinate operational and load management processes among a plurality of end points, the node 2.20 may be programmed and configured to perform a plurality of control and interface functions and is not limited or constrained in its ability.

[0199]  For example, the nodes 2.20 may be configured in a Load Limit or Load Cap Program. The term load limit or load cap may be interpreted in this example to mean a limit or cap on either the KW demand or the total cost of operation making this example either a physical energy usage or economic control process. Because of the optional metering capability of each node 2.20 and its ability to receive economic data from the supply chain serving it, the node 2.20 is capable of making decisions based on its rate of consumption as well as the cost it is incurring at any point in time.

[0200]  Under a Load Limit or Load Cap Program, the customer would commit to maintain their total demand for any "utility" supplied product to a maximum demand level under an agreement with the supplier. Under such a Program the customer would be subject to a billing rate, which increases as the total demand for the product, increases. As a result, the customer that manages to maintain their demand in a flat pattern would have a much lower overall rate per unit of "utility" product consumed than one that had erratic usage patterns of peaks and valleys. The reasoning for such a program is that suppliers of "utility" products must commit to meet all demands on their system and therefore they reward consumers with consistent, managed consumption patterns with lower rates, because to meet their needs they do not have to have maintain large reserve margins. On the opposite side of the scale, they charge higher "demand charges" to those who do not manage their loads. As a result, customers can lower their costs by maintaining a consistent and flat load profile.

[0201]  In our example, it will be assumed that the customer has agreed upon a maximum demand of 5,000 watts or 5 kw with his supplier, the utility. As mentioned earlier, this demand could just as easily have been a financial limit based on the fully loaded cost of delivering the utility product to the point of consumption and may be set by the

owner, customer or any other entity associated with the site **1.04** wishing to maintain cost control over the utility product.

[0202]    The gateway node **2.24** acts as the gatekeeper for usage and monitors and reports on the consumption and demand for energy at the whole premise level. The gateway node **2.24** could be, but is not limited to, a single point node dedicated to just this site **1.04** as part of a tree and branch control configuration or it could be a node which is part of an aggregate group of homes in a star network. By its nature, the gateway node **2.24** will monitor and store consumption and demand information and report it to other nodes **2.20** in the network within the home **2.18**, as well as nodes outside the home **2.18** such as a central control node for the home **2.18** or aggregation group, energy providers, energy brokers, energy service providers, ISO's and other authorized agents. As the total demand for the home **2.18** approaches the agreed upon energy consumption limit of 5 kw, the rate of consumption data flowing from the gateway node **2.24** over the two way communications channels **2.06** would be received at a minimum by either the individual nodes **2.20** within the home **2.18** or by a central aggregation node in more elaborate implementations. Based on parameters provided to each node **2.20** through the control point configuration interface **2.16** or master control node parameters provided to an aggregation control node through the control point configuration interface **2.16** the load reduction, shifting and management process would be initiated. Based on the amount of load reduction needed, different levels of action may be taken to reduce the total demand utilizing priority shedding parameters which would result in the least important load in the group to perform a reduction function if operating and report the results followed by the subsequently higher levels within the group until the total demand for the site **1.04** was reduced to an acceptable level. The reverse process may initiate as the total load of the site **1.04** dropped below known levels of individual load consumption rates permitting previously shed or reduced loads to resume normal operation without exceeding the agreed upon demand cap. In addition, any device **2.22** which was shed due to its low priority in the demand prioritization scheme could increase its priority based on its minimum operating control parameters and cause its priority to increase to a point that it will force a once higher priority load to become subordinate to it and thus swap its shed status with a device **2.22** of equal or greater load value to meet its minimum operational requirements.

[0203]    This simplistic example is only to illustrate how a simple load reduction might be accomplished using the node **2.20**. In this example, the stored energy available in the photovoltaic system's **2.22G** storage batteries would most likely be dispatched first to offset the use of grid provided energy to meet the site's **1.04** energy needs versus shedding load if sufficient stored energy was available. To complete this example, the actions performed at each of the nodes **2.20** in the home **2.18** will now be examined individually. It should be noted that control can exist at the individual node level as illustrated by this example or could exist at the aggregation node level or at any high level in the overall node cascade depending on the deployment architecture and node processor control programming and control parameters chosen by the implementer.

[0204]    The first and second load control nodes **2.20B**, **2.20C** for the HVAC systems **2.22B**,**2.22C** monitor and control the operation of compressors and resistive heating elements to maintain the indoor temperature. It also has the ability to intercommunicate with the HVAC systems **2.22B**, **2.22C** directly and control the temperature settings as well as have direct control over multi speed compressors and emergency heat strip operations using the controlled device communications channel **2.12** if the thermostatic control unit of the home **2.18** has a communications interface. This communications channel **2.12** also permits it to report on the systems' **2.22B**, **2.22C** operational characteristics and contact the customer, outside service providers or the manufacturer if any segment of the HVAC systems **2.22B**, **2.22C** malfunction using the two way communications channels **2.06** either directly or through a cascade of nodes **2.20**. The load control nodes **2.20B**, **2.20C** for the HVAC systems **2.22B**, **2.22C** would utilize the metering modules **2.10** to monitor and report on the systems **2.22B**, **2.22C** rate of consumption of utility energy units but would not need the mains coupler **2.14** if it was managing the systems **2.22B**, **2.22C** operation through the controlled device communications channel **2.12**. Depending on the total demand for energy units of the home **2.18**, the node **2.20** may have the ability to manage the temperature within the home **2.18** based on customer's supplied parameters supplied through the control point configuration interface **2.16** to cause the HVAC systems **2.22B**, **2.22C** to reduce total demand and could based on a priority setting maintain separate control parameter for each HVAC system **2.22B**, **2.22C** depending on the time of day and occupancy status. To further enhance its operation efficiency, the load control node **2.20B**, **2.20C** associated with each HVAC system **2.22B**, **2.22C** may suppress the operation of secondary compressor operating stages and restrict the use of emergency resistive heat strips provided that the temperature recovery within the site **1.04** was progressing at a satisfactory rate. This capability permits the system **1.02** to operate at standard efficiency when the supply and associated cost of energy is low while greatly improving the operational efficiency of the system **2.22B**, **2.22C** when the supply and associated cost of energy is high. Using a plurality of optional parameters supplied by the customer, the energy provider and the gateway node **2.24**, the system **2.22B**, **2.22C** would be capable of determining which mode of operation it should be implementing and control the overall consumption of the HVAC system **2.22B**, **2.22C** to achieve the desired consumption goal. By varying the operational parameter for the control of the system, the load control node **2.20B**, **2.20C** may choose, but not be limited to, selecting a higher level on comfort over cost; vary the rate of temperature change differently based on cost and occupancy status; totally restrict the operation of secondary states of compressor operation or emergency heat strips based on energy supplier critical load level signals or total premise consumption cap level attainment, modify the temperature setting or suspend the systems' **2.22B**, **2.22C** operation for a specified period of time under energy supplier critical load situations or total premise consumption cap level attainment; alternately cycle multiple units in a site **1.04** to avoid multiple units operating simultaneously; perform pre-cooling or pre-heating prior to higher pricing or demand periods being in effect; perform smooth and gradual temperature change setting in periods of moderate increased demand or price and more radical temperature change

14

setting in periods of rapid increased demand or price; over-ride all controls and operate as normal causing other nodes 2.20 to carry the full burden of any load reductions necessary; cease operation until the indoor environmental condition reaches a parameter set maximum critical level or any other action programmed into the node 2.20B, 2.20C. This and other combinations of load curtailment and control negotiated between the nodes 2.20 in the home 2.18 or aggregation control group are monitored and reported by the central control point or the gateway node 2.24 to alert nodes within the home 2.18 or aggregation group of the total load level, demand, cost of energy and delivery, congestion costs and other related control parameter triggers.

[0205]   The third load control node 2.20D for the refrigerator/freezer 2.22D monitors consumption of the refrigerator/freezer 2.22D using the metering module 2.10 and also communicates directly with the processor controls of the refrigerator/freezer 2.22D using the controlled device communications channel 2.12 to determine the operational status of the refrigerator/freezer 2.22D and to provide over-ride controls for normal default functions like defrost cycles when they might be delayed to reduce overall demand. This communications channel 2.12 also permits the third load control node 2.20D to report on the refrigerator/freezer's 2.22D operational characteristics and contact outside service providers or the manufacturer if it malfunctions using the two way communications channels.

[0206]   The fourth load control node 2.20E for the water heater 2.22E monitors and reports on consumption and demand for the water heater 2.22E using the metering module 2.10 and also has the ability to directly control when the water heater 2.22E is connected to the utility supply chain or not through the use of the mains coupler 2.14 which permits the fourth load control node 2.20E to connect or disconnect it from the utility supply. In more elaborate implementations the fourth load control node 2.20E may use the controlled device communications channel 2.12 and the metering module 2.10 to monitor the rate of water usage, the input water temperature and the stored water temperature available within the water heater 2.22E. These advanced features add intelligence to the process of water heating improving the operational efficiency of the water heating process and improving the energy demand pattern for the water heater 2.22E. If so equipped, the water heater 2.22E may be interconnected to a heat recovery system of the HVAC system 2.22B, 2.22C and if demand for heating water can be accomplished through the heat recovery system versus energizing the heating elements within the water heater directly, the nodes 2.20 of these devices 2.22 or a central control node for the home 2.18 would coordinate and execute that collaborative action thus reducing the total demand for the home 2.18

[0207]   At this point it should be noted that water heaters can be recharged in multiple ways using either waste heat from a heat or fuel cell or other on site generation unit. More advanced water heating systems in the south would benefit from using solar panels in conjunction with other forms of regeneration to eliminate any load on the energy delivery system. It is important to note that in the case of solar panels and propane the supply chain is limited to the premise geography but would be effected by the weather in the case of solar and by the market price for propane. In the case of propane other factors like the quantity on hand and the lead

time to schedule a refill by the provider balanced against the projected quantity of propane the site 1.04 will consume between the current time and predicted refill schedule time all must be factored into alternative fuel usage as part of the supply chain balancing logic.

[0208]   The fifth load control node 2.20F for the well pump 2.22F has direct control over the operation of the well pump 2.22F and operates the well pump 2.22F based on parameters supplied to it through the control point configuration interface 2.16. The parameters may include the run time requirements and preferred times of operation, established by the customer as well as network node updates, which could include weather information relating to local precipitation. Sensor input could be present using the local communications channel (controlled device communications channel 2.12), which could provide precipitation input or ground moisture content. It is important to note at this point that the controlled device communications channel 2.12 may be used to not only communicate with other node processor 2.02 embedded into associated loads or generation, but also has the ability to interface with analog to digital processors or devices or any other form of communicating sensor or node to supply inputs to the node 2.20F. This channel 2.12 enhances the operational control logic for items like pumps that have no embedded process controllers or sensors. In a similar fashion however, this communications channel and communicating sensors can be used in conjunction with embedded process controllers to enhance their operation and performance to even greater levels where practical.

[0209]   On site generation, while not prevalent today, is being promoted by State and Federal regulatory agencies, utilities, DOE and others concerned with maintaining a high level of reliability and integrity in the electric delivery systems. In particular, renewable generation resources are being promoted, as they have no environmental impact and do not consume any natural resources. Solar and wind generation are the most common of these power generation resources. Due to the relatively low capacity output of solar and wind generation systems, to be effective in offsetting peak demands for power, they must have an associated storage system into which they can stockpile power in relatively low input quantities and then retrieve it in bulk when necessary. The most common form of bulk power storage today are wet cell, deep cycle, active glass mat, lead acid batteries, which can be connected in parallel and series to create an electric storage facility of virtually any capacity and voltage. Great improvements have been made over the years in battery and inverter/charger technology. Companies like Hart, Signwave, Balmar and Trace are leaders in the battery charger/inverter market. By using embedded processors, sensors and solid state power converters, these companies have systems which can store DC power into battery storage systems at 12, 24, 36 and 48 volts and then retrieve it on demand and convert it to 120 v or 240v AC power at 60 hz with utility quality and reliability. Companies like Trace already manufacture and market Inverter systems that manage photovoltaic arrays attached to battery storage systems that not only can be used to supply or supplement the needs of a residential home, but can safely sync and connect to the utility grid and sell power back to the utility at levels and for time periods specified by the owner.

[0210]   While photovoltaic systems have come a long way in the past 15 years, they are limited in their energy

033

15

management capability and need the addition of the invention to manage the storage and conversion process from DC to AC to make them part of a fully integrated energy management system. The load control node 2.20G with its ability to communicate with other nodes 2.20, sharing load and control data and managing demand within a site 1.04 or other group permits on site generation resources like the Trace power inverter to provide maximum benefit to the customer, the energy industry and the environment.

[0211]    The seventh load control node 2.20H for the dishwasher 2.22H meters and monitors the dishwasher 2.22H and communicate with its embedded control processor through the controlled device communications channel however in most cases would not require the mains coupler 2.14. With the addition of the load control node 2.20H, the dishwasher 2.22H may be capable of performing its designated function at the best time and in the most efficient manner to meet the needs of the customer while interacting with all of the other nodes 2.20 in the home 2.18 to meet the contractual obligations of the energy demand cap under which it must operate. In this example, the node 2.20G may be a retrofit device attached to the embedded controller of the dishwasher 2.22H or may be fully integrated into the embedded processor thus reducing the overall cost of the combined systems by sharing processor and memory components.

[0212]    The system, as described above, is designed to integrate all "utility" consuming and generating resources over a plurality of network media and designs to create dynamically defined and reconfigurable groups of any size and provide them with the ability to collaborate and intercommunicate to manage the demand on the delivery system and supply chain of "utility" providers and their products.

[0213]    As discussed more fully below, alerts or message may be sent to the utility 1.06 and/or the customer (via email or the customer interface 1.14) and/or the service provider and/or a maintenance provider.

[0214]    In one aspect of the present invention the control and/or load control node 1.10B, 1.10C receives information related to a characteristic of the commodity supplied by the utility 1.02, i.e., electricity, and controls operation of the controlled or controlled and metered device 1.08B, 1.08C. In one embodiment, the characteristic is related to the availability of electricity. In another embodiment, the characteristic is related to the cost or relative cost of electricity

[0215]    For example, using the exemplary home 2.18 discussed above, if the refrigerator 2.22D was scheduled or otherwise needed to initiate or perform a defrost cycle, the onboard refrigerator controls may query the associated load control node 2.20D to determine the cost or relative cost of electricity. The cost may be expressed as an actual value, i.e., dollars per unit electricity, or as an relative classification, e.g., high or low or peak vs. non-peak time periods. Based on the received cost or relative cost, the onboard controller of the refrigerator 2.22D may decide to either whether to perform the defrost cycle or to postpone the defrost cycle. In one embodiment, this decision may be based on a simple comparison between the actual cost and a predetermined value which may have been input by the customer. In other words, if the actual cost were above the predetermined value, then the scheduled action would be postponed.

[0216]    In one embodiment of the present invention, each device 1.08 has an integrate node 1.10. By virtue of the node

1.10 being fed information directly from the supply chain, i.e., the utility, regarding the availability and/or cost of energy, the device 1.08 may make decisions based upon this information. For example, functions of the device 1.08 may be delayed and re-scheduled for another time. Or a different more energy efficient mode may be chosen.

[0217]    In another aspect of the present invention, energy consumption for a device 1.08 may be trended or otherwise compared with predetermined threshold to detect and/or predict a failure or need for maintenance. For example, if the door of the refrigerator 2.22D was left open, energy consumption would increase. If energy consumption was increasing, the rate of increase could be compared with a predetermined value and an alert or message generated if the rate met or exceeded a predetermined value. Alternatively, the rate of consumption could be directly compared with a predetermined value to determine if an error or malfunction existed. In another example, if the filter of the pool pump 1.30B becomes clogged, the pool pump 1.30B will begin to work harder. This may also be seen through analysis of the energy consumption of the pool pump 1.30B.

[0218]    In still another aspect of the present invention, a control node 1.10B or load control node 1.10C may be linked to one or more sensors (not shown) which sense parameters of the corresponding device 1.08B, 1.08C. The sensors may currently exist or be a part of the device 1.08B, 1.08C or be added to the device 1.08B, 1.08C. For example, the water heater 1.30C of the above example may have a water temperature sensor. Readings from the water temperature sensor may be received by the control node 1.10B or the load control node 1.10C and used in determined how to control the water heater 1.30C. For example, if the water heater's 1.30C control is instructing the water heater 1.30D to heat the water contained therein (based, at least in part, on the water temperature), the water heater 1.30C may first check with the associated load control node 1.10C to determine if it should proceed. The load control node 1.10C may approve or not approve based on a number of factors, including as indicated above, a characteristic of the electricity supply and/or cost or relative cost of electricity, as well as the energy requirements of other devices 1.08 within the home 2.18 (or devices 1.08 at other sites).

[0219]    In another aspect of the present invention, a device 1.08 may be a storage system or an inverter system. For example, the device 1.08 could include one or more batteries (not shown) coupled to the power transmission network by a load control node 1.10C. When energy is relatively less costly or more available, e.g., during non-peak hours, the load control node 1.10C could control a mains coupler 2.14 to provide energy to the batteries. During peak periods, the load control node 1.10C may then control the mains coupler 2.14 to reverse and direct energy from the batteries to other devices 1.08.

[0220]    In another aspect of the present invention, the system 1.02 allows the devices 1.08 working with their associated nodes 1.10 to make joint decisions based upon the information received from the supply chain. For example, if a curtailment PROGRAM affects a group of pool pumps within a certain geographic region, limiting each pump's run time to 15 minutes per every hour. Each pump and/or corresponding load control nodes 1.10C may determine which pumps will run during each 15 minute segment of each hour.

[0221] In still another aspect of the present invention, the customer may set a limit for the total power demand for the home 2.18 during any given period, e.g., 5000 Watts. The gateway node 1.10D receives the total current demand, i.e., power being used, on a real-time basis. Thus, if another device 1.08 in the home 2.18 wanted to perform a function, the device 1.08 (through the associated node 1.10) may query the gateway node 1.10D for permission. If the requested function would cause total demand to exceed this amount (or come within a predetermined threshold), the gateway node 1.10D may not allow the device 1.08 to perform that function.

[0222] In a further aspect of the present invention, the customer or system 1.12 may set up a desired operating parameter for a particular device 1.08. For example, the customer may indicate that he wants the pool pump 1.30B to operate for a given period of time each day, e.g., eight hours. In one embodiment, the system 1.12 will schedule the operation of the pool pump 1.30B based on the information received from the supply chain, e.g., the cost or availability of electricity.

[0223] 3. Advanced Thermostatic Control Device

[0224] As discussed, in one aspect of the present invention the thermostat 1.30D is an advanced thermostatic control device linked to the power distribution network. The thermostat is also linked to the nodes 1.10 within the customer site 1.04 either directly or through the gateway node 1.10D and receives information from and regarding the power distribution network and the devices 1.08. As a result of the availability of information from up and down the supply chain, the thermostat 1.30D may more efficiently manage and offer additional functionality to the user.

[0225] In one aspect of the present invention, the thermostat device 1.30D receives information related to a characteristic of the energy being supplied and displays the characteristic on the display 3.04. In one embodiment, the characteristic is related to the availability of the energy. For example, the characteristic could be either "peak" or "non-peak" hours. If the power distribution network was operating during peak hours, "PEAK" could be displayed on the display 3.04. Or if the power distribution network was operating during non-peak hours, "NON-PEAK" could be displayed on the display 3.04.

[0226] In another embodiment, the present invention, the characteristic may be related to the cost of the energy or electrical power being supplied. For example, the characteristic could be the actual cost of a specified unit of energy. The actual cost could be displayed on the display 3.04. Alternatively, the characteristic could be a relative cost, i.e., is the actual cost near or about a baseline cost, or above or below the baseline cost.

[0227] With specific reference to FIG. 3A, in the illustrated embodiment, the cost or relative cost may be displayed to the user graphically. In other words, the cost could be displayed using a one or more symbols (shown as "$"). The number of symbols are related to the cost, i.e., the more symbols displayed the greater the actual or relative cost. For example, the thermostat 1.30D may use a scale from 1 to X symbols. X could be any number, e.g., 4 or 10.

[0228] The user, in viewing this information, could make an informed decision on where to set the desired temperature (or setpoints) using the control panel 3.02.

[0229] With particular reference to FIG. 3B, in another aspect of the present invention the thermostat 1.30D forms part of a temperature and environmental sensing and control system 3.08. In this aspect of the present invention, the thermostat 1.30D is a node having a node processor 2.02, memory 2.04 and two-way communications channel 2.06. As shown, in the illustrated embodiment, the thermostat 1.30D is coupled to the nodes 1.10 at the customer site 1.04 through the gateway node 1.10D. The thermostat 1.30D is also coupled to one more sensors 3.10 which are adapted to sense one or more parameters related to indoor or outdoor air quality. Based on the sensed data, the thermostat 1.30D controls other devices 1.08 to manage air quality. The managed devices may include one or more HVAC systems, air cleaners or electro-static filters, fans, humidifiers, dehumidifiers, damper and fresh air input ducts, and ionization devices or al type of device 1.08 which may affect air quality.

[0230] In one embodiment the sensors 3.10 include an indoor air temperature sensor 3.10A and a humidity sensor 3.10B. In another embodiment, the thermostat 1.30D may also include sensors 3.10C for measuring and/or sensing one or more of the following: outside temperature, UV intensity, wind direction and speed, relative humidity, wet bulb thermometer, dew point. In still another embodiment, the thermostat 1.30D may receive external information through the gateway node 1.10D, such as information related to the local weather forecast.

[0231] In a first embodiment of the present invention, the temperature and environmental sensing and control system 3.08 will manage indoor air temperature. In a second embodiment, using the sensor data and/or external information, the temperature and environmental sensing and control system 3.08 will manage the air quality and humidity in the site 1.04 by controlling the operation of the appropriate heating, filtration, conditioning and cooling equipment in conjunction with damper and fresh air input ducts, electrostatic filters and ionization devices to maximize comfort and indoor air quality.

[0232] In one aspect of the invention, the system 3.08 will manage the available environmental conditioning devices 1.08 to maintain the optimum temperature, humidity and air quality conditions based on user defined minimum and maximum values for comfort indices and price of energy indices.

[0233] In another aspect of the present invention, the system would be able to switch between energy types, e.g., electric versus gas for environment heating and would also have the ability to switch suppliers based on the asking price of the energy suppliers or brokers serving the location.

[0234] In still another aspect of the present invention, the system 3.08 would balance two primary factors. First, the system 3.08 would maintain the environment within user defined acceptable minimum and maximum values for one or more air quality parameters, for example, air temperature and/or humidity. Second, the system 3.08 also vary these acceptable parameters based on user defined preferences and/or price points and/or historical data (see below) to achieve the optimum environmental conditions.

[0235] To provide feedback to the user, the system 3.08 may also record the number of energy units (energy units as

used here include for examples: kilowatt hours, BTU's, Therms, and Jules but is not so limited) used as a function of time for each of the devices **1.08** monitored and/or controlled by the system **3.08**. Furthermore, the system **3.08** may report back detailed consumption data as a function of time and summarize these details to provide at a minimum, daily averages for any user defined period, monthly totals, as well as track the costs of each energy unit consumed per period and provide detailed and average daily cost for any user defined period as well as monthly totals.

[0236] In one aspect of the present invention, the system **3.08** may be capable of communicating with the devices **1.08** which have associated control or load control nodes **1.10B**, **1.10C**, beyond its primary management function of the environmental air management systems permitting each control node point within the site **1.04** or other sphere of control up to and including the entire utility supply chain, to use the same economic modeling techniques and controls that it uses to manage their primary functions.

[0237] The thermostat **1.30D** is the customer or user's primary interface with the system **3.08**. As discussed above, the thermostat **1.30D** will be capable of displaying to the user the current cost of energy as well as its relative cost as a graphical or numeric value (1–10) or ($$$$$$$$$) where 1 is low and 10 is high or $ is low and $$$$$$$$ is high.

[0238] In another aspect of the present invention, the system **3.08** may also display on the display screen **3.04**, energy efficiency data. The energy efficiency data may used to indicate, based on control parameters set in the system **3.08**, how energy efficient the management protocol and control parameters capabilities are. This relative efficiency data may relate to the site's **1.04** performance on a stand-lone basis or may be tied to a comparison group against which relative efficiency can be determined or both. This data indicating the relative and actual cost of energy and efficiency can also be communicated to other remote devices **1.08** like TV screens, or other display devices (at the site **1.04** or remote) which are capable of communicating and displaying information. These devices **1.08** may includes but are not limited to appliances with displays or indicator lights to reflect the cost of energy or any other means available at points of consumption or stand along means to inform the customer of the relative and actual cost of energy and their relative energy efficiency level. The system **3.08** may also manage, report and track its energy unit usage and interface with energy unit suppliers via a communications channel. In one embodiment, the system **3.08** controls will be located at the site **1.04**, while the processors for modeling and managing the sources and types of energy units to be utilized and committed to can be local or distributed and operate over a communications network without regard to the actual location of or distance from the site **1.04**.

[0239] In one aspect of the invention, the user may set a temperature setpoint, i.e., a desired temperature and the system **3.08** based on the temperature setpoint, sensed data, as well as the user's historical use of the system **3.08** may determine an effective setpoint. The system **3.08** may then control the devices **1.08** as a function of the effective setpoint.

[0240] The temperature setpoint may have an associated "deadband". For example, a temperature setpoint of 72 degrees may have a deadband of +/–5 degrees. In this

example, the system **3.08** would not initiate cooling until the actual temperature reached 77 degrees or would not initiate heating until the actual temperature reached 67 degrees.

[0241] In another aspect of the present invention, the variable dead band of operation of the system **3.08** may be directly tied to the cost of energy and the customer's willingness to pay. For example, a fixed set point to a cost of energy may be set and an optimal ramp rate based on a time and temperature differential to achieve savings. Alternatively a user defined ramping rate such as 1 degree per 30 minutes to modify the temperature set point of the site **1.04** to reduce the operation of the heating or cooling system during periods of high energy prices may be defined.

[0242] In one aspect of the invention, the system **3.08** manages comfort for the customer site **1.04** by learning from the user's inputs or adjustments to the system **3.08** to change or modify indoor air temperature. This learning process alters the operation of the system **3.08**, freeing the customer from having to make changes to manage the indoor environmental condition. To accomplish this, the system **3.08** must actively monitor and control not only the temperature setting in the home **2.18** but may also monitor and actively control the humidity levels.

[0243] In one embodiment, the system **3.08** determines the effective temperature to accommodate changes in the indoor humidity settings. For example, if the customer initially sets the thermostat at 72 degrees F., the system **3.08** senses the indoor humidity level and maintains a relationship between the temperature and humidity level sensed. As the humidity level of the home **2.18** rises in summer, the set point would remain at 72 degree F., however, the effective setpoint that the system **3.08** must maintain is automatically lowered to maintain a consistent level of comfort. As a default parameter, the system **2.18** may have to lower the effective set point from that established by the customer by 3 degrees F. for every 10% of relative humidity that is sensed to retain the comfort level in the site **1.04**. On the opposite side of the control algorithm, as a default parameter, the effective set point would be raised by 3 degrees F. for every 10% reduction in sensed humidity within the home **2.18** to maintain the desired comfort level in winter. The ratio of 3 degrees F. + or – is a default setting and would be modified as needed based on the user's changes to the set point at the thermostat **1.30D**. Changes to the effective set point as it relates to the sensed humidity therefore may be increased or decreased from the default ratios permitting the control algorithm to learn the user's individual preferences and over time, eliminate the need for the site **1.04** occupant to make any changes.

[0244] In another aspect of the present invention, the system **3.08** allows one or more occupancy modes to be defined and/or modified and/or utilized by the user. The use of different occupancy modes would assist in achieving a reduced level of demand on the energy delivery system as well as reduce the total cost of operation site **1.04**. In one embodiment, the occupancy modes may be defined or modified through the user interface **1.14** (see below) and activated through the thermostat **1.30D** and/or the user interface **1.14**. Examples of possible occupancy modes include: home, away, weekend, weekday, holiday. Specific modes may also be defined for different users.

[0245] The system's **3.08** performance and energy reduction capabilities are further enhanced during all periods by

applying the most energy effective set point or its related off set if the occupancy mode is "vacant" and applying the comfort management off set if the occupancy mode is "home". This occupancy sensitive control is further enhanced by the addition of occupancy sensing devices that communicate with the system 3.08.

[0246] In still another aspect of the present invention, the system 3.08 may determine the time necessary to recover from a one occupancy mode to another mode. In another words, this recovery time at which a transition or recovery process is to be initiated if the system 3.08 is set to a "recover by" time versus the default of "start recovery at" time.

[0247] The system 3.08 may be enhanced by having access to energy pricing data. Energy price information is used by the system 3.08 to predict the total cost of operation at the site 1.04 for maintaining the environmental comfort. Forward projection of pricing enables the system 3.08 to determine the optimal humidity and temperature settings that can be achieved for the site 1.04 and perform humidity level increases in the case of heating or humidity level decreases in the case of cooling so that the effective set point can be either lowered in the case of heating or raised in the case of cooling, permitting the heating or cooling system to run less during periods of higher prices. This ability to precondition the site in anticipation of increased pricing on average will reduce the total energy bill for the site 1.04.

[0248] Energy pricing information may be entered by the customer, be pre-established as part of an energy supplier program or be set to a default value designed to create a balance of comfort and savings.

[0249] With reference to FIGS. 3C-3G, one implementation of the above described system 3.08 will now be explained. The graph of FIG. 3C, depicts how, as energy prices rise, the ability of the system 3.08 to manage the indoor air temperature may be managed. In the graph of FIG. 3C, three scenarios are presented, however the present invention is not limited in the number or type of scenarios that might be offered or exist with any given implementation. In the illustrated embodiment, the three scenarios are maximum savings, balanced savings and comfort, and maximum comfort. For each user selected scenario, the system 3.08 has a predetermined default offset (which defines the deadband). Additionally, the offset may vary as a function of a characteristic of the supplied energy, e.g., availability and/or price. In the illustrated embodiment, different offsets are defined for energy supply classifications of low, medium, high, and critical.

[0250] Because some energy suppliers offer what is known as time-of-day pricing in their tariffs, the illustrated price points could be tied directly to the tariff structure for the energy supplier. If real time pricing is offered by the energy supplier serving the site 1.04, this same temperature allowed variance could be utilized to generate savings and reduce supply chain demand. Another load management program offered by energy supplier utilizes price tiers which the utility manages dynamically to reflect the total cost of energy delivery to its customers. These tiers provide the customer a relative indicator of the price of energy and are usually defined as being LOW, MEDIUM, HIGH and CRITICAL. These 4 tiers are superimposed in the graph of

FIG. 3C to illustrate how the tiers would be used by a energy supplier to signal the customer and the system about the relative cost of energy.

[0251] This feature is applicable to the systems 3.08 described above when either a fixed set point is used or can further improve the ability of the system that utilizes the programmable set point feature to expand the operating efficiency of the heating and/or cooling systems while reducing the total demand on the energy delivery system. By combining the price data with preconditioning of the site temperature and humidity levels and further applying the occupancy mode of the site, additional savings as described above can be achieved. As a direct result, if deployed in sufficient quantities in a geographic area, price volatility in energy prices can be reduced.

[0252] In one aspect, the system 3.08 manages comfort by balancing humidity and temperature based on its learned preference setting using customer inputs or using system defaults. This ability to manage temperatures is enhanced by including a economic management system built into the system 3.08 which will direct the operation of the devices 1.08 system to achieve customer desired economic goals. This example of how the system can manage costs and comfort should not be construed as limiting or constraining the ability of the system 3.08 to deliver additional benefits of comfort or cost management.

[0253] To begin the process the system 3.08 tracks and learns about the thermal gain characteristics of the home 2.18. To do this, the system 3.08 tracks the thermal gain rate of the home 2.18 for each set point selected over time by the customer. With reference to FIG. 3D, a thermal gain table for two set points is illustrated. FIG. 3d shows two set points for the home 2.18 that the thermostat 1.30D has recorded. The first set point for which data is available is 72 degrees F. The three trends illustrated as lines 3.12A, 3.12B, and 3.12C plot the thermal rate of gain in the site 1.04 for different outside temperatures. On the day represented by line 3.12A the outside temperature was 99 degrees F. On the day represented by line 3.12B, the outside temperature was 90 degrees F. On the day represented by line 3.12C, the outside temperature was 77 degrees F. The next set point for which data is illustrated is the set point of 76 degrees F. The three trends shown as lines 3.14A, 3.14B, and 3.14C illustrate the thermal rate of gain in the home 2.18 for the same outside temperatures plotted in the 3.12A, 3.12B, 3.12C data points. This illustration is used to show the impact the set point versus outside temperature differential has over the thermal gain rate in the home 2.18. While these graphs are drawn to illustrate the rate of thermal gain, they do not depict the rapid initial gain when the differential is large and the slower rate of thermal gain, which occurs as the indoor temperature reaches the outside temperature. This rate if thermal gain change is illustrated in FIG. 3D as plot line 3.16 which shows the thermal gain for a set point of 74 degree F. and an outside temperature of 90 degrees F.

[0254] The second step is to learn the operational run characteristics of the HVAC system as a function of the thermal gain. Since the outside temperature varies continuously during a typical day, the rate of thermal gain and the HVAC run times also vary in accordance with these changes. FIG. 1E illustrates a typical day showing plot lines for the thermal gain rate and the associated HVAC run time. It

should be noted here that the set point of the system **3.08** was set at a fixed point for the entire day and the use of humidity sensing and control of humidity levels were not introduced into the illustration so that the graphical plots depict a normal home with a normal HVAC control thermostat. Here again, the illustration depicts that as the outside temperature rises and the differential between the indoor set point and the outside temperature increase, the thermal gain causes the HVAC system to cycle more frequently. At some point, in extremely hot weather or more importantly in periods of high humidity, with the set point at a low setting, the thermal gain would exceed the HVAC units' ability to recover the indoor air temperature to the set point. When this occurs, the HVAC run time plot would plateau at 100% of operation and the indoor air temperature would rise above the set point, until the outside temperature dropped to a level where the thermal gain did not exceed the HVAC units ability to recover the indoor temperature setting or the indoor humidity level dropped to the point where the occupant began to feel cold and adjusted the set point higher, permitting the unit to resume a more normal cyclical pattern.

**[0255]** The third step is for the user to pick from a plurality of economic options offered by the system **3.08**. These options range from 100% comfort management without any regard for cost to 100% economic management without any regard to comfort. This choice at a high level, for example, would be but is not limited to a selection scheme from 1 to 10 which the user would select from, where 1 is pure comfort management and 10 is pure economic management. While this example would in its simplest from provide a selection of 10 options, the underlying control options used by the system **3.08** could be modified and expanded to provide an infinite number of options. To illustrate how the options in this example would drive the control logic we will now review the control parameters effected and illustrate the resulting controls. The primary control parameter would be tied to the number of degrees from the set point that the customer would make available to the system **3.08** to achieve economic benefits. This parameter would start with the set point established by the CUSTOMER (for this example 72 degrees F.) and at the maximum comfort setting would not move off of this set point (see **FIG. 3F**). In the maximum savings setting, the set point offset would be 4 degrees F. which would permit the system in this example to vary the temperature in the home form the normal set point of 72 F by the 4 degree offset making the acceptable temperature range 72 F to 76 F within which the system **3.08** would manage the environment. The next parameter that would be used to achieve economic goals would be the ramping rate at which the system **3.08** would permit the temperature to rise within the site **1.04** as it moved from one set point to a higher or lower one to achieve economic benefit. Here again, for the maximum comfort setting, since the allowable offset is zero, the ramping rate has no effect. In this case however, another parameter that regulates the offset from the set point used by the system **3.08** to trigger recovery back to the set point (the dead band of operation) would be an alternative control parameter. In this case, if the normal dead band was 2 degrees F., for the maximum comfort range this might be lowered to 1 degree. In the maximum savings setting where the allowable temperature range has a 4 degree variable, the ramping rate would be capable of being controlled through a combination of varying the dead band range and the thermal gain rate in the site **1.04**. For the maximum savings setting, the dead band in this example would be raised to 3 degrees F. and the rate of thermal gain per hour would be set at 3 degrees F. per hour. The results of this example are illustrated in **FIG. 3F**. The examples here are only used to illustrate how the system **3.08** using the inputs from the customer would vary the operation of individual parameters as described to either maintain an optimum comfort or optimum savings control algorithm and are not meant to limit the number of control parameters that the system **3.08** might use of the way in which these different levels of comfort or savings are achieved. Additional parameters and controls could also be in more elaborate implementations of the system. The following paragraphs disclose these additional control parameters and control modes but should not be construed as limiting the system's capabilities to these examples.

**[0256]** In another aspect of the present invention, the system **3.08** uses the learned thermal gain characteristics of the site **1.04** along with the customer selected allowable temperature variation range to maintain a flat level of demand and consumption. Under this control program, the system **3.08** uses the thermal gain rate of the home **2.18** and its associated HVAC system run time to produce a base line of consumption. Using this base line the system **3.08** can be instructed to manage the demand and consumption rate at either a flat level or at some reduced level by varying the indoor air temperature within the allowable range. The following illustrates how this control program works, but should not be construed to limit the capabilities of the system **3.08** to perform these functions using different control logic or additional sensing devices to improve the process. For this example, the set point of the thermostat is 72 degrees F. and the allowed variation selected by the customer is 4 degrees F. making the acceptable range for indoor temperature from 72 degrees F. to 76 degrees F. Since the time, when the base line is set can be triggered by a plurality of conditions, such as a user or program defined time of day, percentage level of operating run time, energy consumption rate for a give period of time or any other measurable on sensed event, for this example it is assumed that the customer has set the base line trigger to be set when the HVAC units run time reaches 33%. In the early morning when it is cool, the system **3.08** in this example will be operating at a cycle rate of 10%. As the outside temperature rises, the thermal gain on the home **2.18** is monitored along with the HVAC cycle rate on a continuous basis. The rise in the outside temperature causes the HVAC cycle time to increase as illustrated in **FIG. 3E**. As the system **3.08** reaches the trigger level of 33% cycle run time, the base line is established and the system **3.08** using its computed thermal gain rate and the corresponding HVAC cycle run time projections, computes the required effective set point offset needed to keep the HVAC cycle run time at the specified trigger level of 33%. By adjusting the effective set point upward, the system **3.08** is able to maintain the HVAC run time at the predetermined trigger level up to the point that the thermal gain rise rate exhausts the allowed temperature variant allowed for the site **1.04**. At this point, the system will have the option, based on control parameters set in the system by the customer or user or any other controlling entity, to exceed the cycle run time trigger level or exceed the allowed temperature depending on whether comfort or economic requirements are the primary drivers for the site **1.04**, the energy supply chain or a combination of both.

20

FIG. 3G illustrates this scenario, assuming that the thermal gain of the site **1.04** does not exhaust the allowed temperature variant for the site **1.04**.

[0257] It should be noted that the setting of this trigger point and the control of the system **3.08** may be for this example, or for any example, or for the entire system, under the control of a party other than the customer and therefore is not be limited in its scope as a residential or commercial control system. In a large-scale deployment, the system **3.08** can be under the control of an energy supplier and can be used to manage a plurality of environmental control devices attached to the energy supply chain. It should also be noted that the control of the system **3.08** may be shared by a plurality of sources each having a defined level of authority and control over an individual control point or group of points as needed to manage, monitor and balance the demand of the delivery supply chain.

[0258] As discussed above, another feature of the system **3.08** is its ability to receive the cost of energy from the energy supply chain. Price signals could take the form of tiers or actual prices. In either case, the customer would be capable of specifying to the system **3.08** their willingness to pay for comfort or their desire to save by inputting into the system **3.08** a plurality of offsets from the set point that the system **3.08** could use to manage the environmental air comfort range. In FIG. 3C several scenarios are illustrated. In the first scenario, the customer can specify using levels of comfort or savings their willingness to provide additional temperature variants based on the cost of energy from the supply chain. Three lines are depicted, one is for maximum comfort, one for balance comfort and savings and the third for maximum savings. In the maximum comfort setting the customer is indicating that they will not give up anything based on the price of energy and therefore will not generate any savings. In the balanced comfort and savings setting, the customer is willing to give up 4 degrees of comfort to achieve savings. In the maximum savings setting the customer is indicating that they will give up 8 degrees of comfort to achieve savings over comfort. These setting are specified as being set by the customer, however they may be controlled by other means such as the energy supplier or other outside management entities. An example of this might be a utility or other energy services company that offers a customer a flat rate per month for energy but under that agreement the customer would relinquish control of their heating and cooling system to the provide.

[0259] Under this example the entity managing the system **3.08** would provide pricing commensurate with their ability to control the home and the premise, occupant or customer would pay less for their energy as that level of control by the supplier increased. In this example as in all other examples it should be noted that these features of the system **3.08** are not separate and can be used in a plurality of combinations to create control systems capable of delivering benefits to all parties associated with the generation, delivery and consumption of energy. In our example above, where the customer wanted to achieve maximum savings to was willing to give up 8 degrees of comfort to achieve that goal, if the site **1.04** is equipped to manage humidity levels, and the humidity level could be managed so as to reduce it by 20%, the actual temperature variant available to the system **3.08** to

achieve the customers goals would increase from 8 degrees to 14 degrees giving the system **3.08** a lot of latitude to manage within.

[0260] Another feature of the system **3.08** that improves both comfort and energy efficiency is its ability to determine the optimal fan extended run time that can be applied to forced air HVAC systems to gain additional cooling and heating benefit from residual cooling and heating absorbed into the duct system during the thermal recovery process. Traditionally, heating and cooling systems upon reaching the desired set point shut down the heating or cooling generation unit and enter a state of non-operation. In the case of heating, a sensor in the plenum unit will force the fan to continue to operate, for safety reasons, until the plenum temperature drops to a safe level. At this point the fan and system cease to operate. When in cooling mode, the entire system **3.08**, including the fan, typically cease operation as soon as the set point is achieved. In both of these cases, there is residual thermal benefit stored in the ductwork that is lost to the site **1.04**. The system **3.08**, using sensors, will continue to operate the fan to extract this residual thermal benefit from the duct system and transfer it into the conditioned space of the site **1.04**. In the case of heating, the fan will continue to operate until the duct temperature lowers to the point of being equal to that of the sensed temperature of the conditioned space. In the case of cooling, the fan will continue to operate until the duct temperature rises to the point of being equal to or some offset greater than that of the sensed temperature of the conditioned space.

[0261] In a more elaborate implementation of the system **3.08**, the environmental control system would utilize additional sensors, controls and in some cases ancillary humidity control devices to maximize savings for the customer and reduce the impacts on the environment. This is accomplished by making the system **3.08** overall more energy efficient, thus permitting power generators to reduce the operation of their power generation facilities, resulting in a reduction in air pollution and the consumption of our limited natural resources. Energy efficiency improvements through a combination of balancing thermal gain and sensed humidity can be performed in a plurality of ways. For illustration purposes, several will be discussed here but should not be considered as limiting the ways that improvements in energy consumption rates and comfort can be achieved.

[0262] The two primary factors effecting comfort in conditioned air space are temperature and humidity. As stated earlier, humidity plays a large factor in comfort and by controlling humidity levels, temperatures can be raised and traditional HVAC systems will run less thus saving energy. Traditional HVAC systems, by their design, remove humidity in the air as a function of moving air through a cooling coil. This humidity remove creates a more comfortable environment but typically, the removal of the humidity is purely a byproduct of the cooling process and is not controlled. The system **3.08** may offer the ability to modify existing HVAC systems to make them humidity control systems by the addition of humidity sensing communicating nodes. These nodes sense humidity levels in the conditioned space and provide the input to the system **3.08** so that it can manage not only the temperature but the humidity levels in the site **1.04**. Sensors alone however cannot perform the humidity control process. In addition, the system **3.08** supports a plurality of communicating control switching, moni-

21

toring and metering sensors to complete the process. The following example of humidity control, that can be incorporated into new HVAC systems or as a modification to existing HVAC systems, is designed to illustrate how the system **3.08** can significantly improve on the operating efficiency and the associated cost of operation of HVAC units. Through improved operating efficiency the systems will reduce the total energy they consume, improving the economy, reducing emissions and preserving natural energy resources.

[0263]  A traditional HVAC forced air system consists of a heating unit, a cooling unit, a fan and air filtration system. Air is drawn from the conditioned space through a return air duct system and is filtered and then passes through the fan chamber where it is then directed through a heating chamber followed by a cooling chamber. In the case of a heat pump, the heating and cooling are performed by the same chamber using a common coil, and may be supplemented by a resistive heating strip chamber in climates where heat pump operation may be marginal during periods of extreme cold weather. Air them is passed into the supply duct system where it is transported back to the conditioned space through a series of ducts and registers. In a cooling scenario, the heating chamber is inoperative and only the cooling process is active. As air passes through the cooling coil, the cooling coil reducing the ambient air temperature by absorbing heat. At the same time, moisture in the air condenses on the cooling coil and flows down the coil as a result of gravitational forces and is collected into a drip pan at the bottom of the chamber from there the moisture is piped to a suitable point of disposal. By default, as mentioned earlier, this process removes humidity from the air. Another important point is that traditional HVAC units have a multi speed fan. This fan is designed to operate a several speeds depending on its design and operates at a low speed setting when the heating process is active and at a high speed when the cooling process is active. It does this because heated air is lighter and moves easily through the duct system requiring less force to move sufficient air into the conditioned space to recover the temperature to the designated set point. Cooled air because it is denser requires greater force to move it through the duct system and therefore requires a higher fan speed to move an equivalent amount of air through the system **3.08**. As a result, traditional HVAC systems have multi speed fans built in but are solely used to compensate for the air density. The system **3.08** takes advantage of this capability to utilize the lower speed fan settings to reduce the humidity levels in the home. It accomplishes this task by using a two-way communicating control node capable of modifying the fan speed settings to operate it in its normal high setting when recovery of the ambient air temperature is required and in the low speed setting to reduce the humidity levels in the home. To dehumidify the home **2.18**, the system **3.08** would operate the air conditioning compressor to cause the cooling coil to drop in temperature and would operate the fan at a low speed causing more humidity to be removed from the air as it passes through the cooling coil at a slower rate allowing more moisture to be removed. The cooled air would follow its normal path through the supply duct system and would pass the dryer and colder air into the conditioned space. Through a learning process, the system **3.08** would be able to determine and record in its memory, the rate of dehumidification its associated HVAC unit is capable of delivering. HVAC units equipped with multi speed com-

pressors would operate more efficiently in this scenario than standard single speed compressor units. For dehumidification in a home with a multi speed compressor, the low speed compressor setting would be used to reduce the amount of energy the system **3.08** uses. To complete the dehumidification control process, one of two additional two way communicating sensors or a combination of both would be needed. Because the cooling coil as it removes humidity from the air might become over loaded with condensation and begin to freeze up, sensors to detect either airflow or the presence of icing of the compressor coil would be needed. The system **3.08** is capable of utilizing inputs from these sensors to either increase the fan speed to cause the coil to defrost or cycle the compressor while operating the fan in either a low or high speed to force warm air through it thus defrosting the coil. In heating season, as the outside temperature drops so do the humidity levels, resulting in low relative humidity levels. Just as humidity removal in summer makes the air feel colder, removal of humidity in winter has the same effect. The major difference is that in winter, the resulting cold feeling creates an indoor air comfort level that is undesirable and customers raise the temperature as the humidity levels drop to maintain a more comfortable environment. This condition dries out wood doors and floors as well as human sinuses resulting in shrinking of wood products and bloody noses. By increasing the humidity levels in the site **1.04**, the temperature can be maintained at a lower level while retaining the same relative level of comfort. In addition, by increase the humidity level, wood products will not tend to shrink as much and sinus conditions will not plague the customer. To accomplish humidity control during the heating season, the addition of a humidifier in the supply air duct system **3.08**, boosts the humidity levels of the conditioned air space allowing a lower temperature setting to be maintained thus reducing the amount of energy required to maintain a satisfactory comfort level. The system **3.08** is capable of managing the humidity levels using the humidity-sensing node described earlier in the cooling section but does not require the additional freeze and defrost sensors. Unfortunately, traditional humidification systems are designed to only work when the heating process is active. This is because they depend on the heated air exiting the heating chamber to pass through a series of mesh grids or membrane that is soaked with water. As the heater air passes through these grids or membranes, they pickup moisture through the process of evaporation and transport it through the supply duct system into the conditioned air space. To improve on this process, the system **3.08** incorporates a modified duct humidification process which heats this grid or membrane to permit unheated air passing through it to transport moisture into the conditioned space, not requiring the main heating process to be active to accomplish its task. In addition, the system **3.08** is capable of controlling remote, distributed humidification units throughout the site **1.04**, like the units available for sale today in a number of retail stores, which are specially equipped with a two way communications node controller integrated into them. A less elaborate adaptation of this fully integrated solution that the system **3.08** supports, is a wall plug adapter with an integrated two way communicating control node, relay contactor and optional humidity sensor. This unit can be used to adapt traditional humidification units or vaporizers and make them an integral part of the humidity control system. An additional sensor device is used

US 2004/0117330 A1

22

Jun. 17, 2004

to measure moisture content on surfaces, which are exposed directly to the outside like glass windows. As the humidity level rises in the site **1.04**, excess moisture may gather on these cold surfaces resulting in condensation accumulation. To manage this condition, optional communicating sensors to detect moisture accumulation are included with the system **3.08**.

[0264] Another method of controlling humidity levels in the site **1.04** during the cooling season which the system **3.08** supports is the modification of the cooling chamber coil to incorporate heat pipe technology to increase the units dehumidification capabilities on average by 2 times. Communicating sensors as described above would still be needed if low speed fan operation was used, however with heat pipe cooling coil retrofit devices, often times humidity levels can be maintained without the need to perform additional dehumidification. The amount of humidity reduction and the ability of the system **3.08** to perform the process efficiently all must be balanced to achieve savings and comfort. Cooling coil heat pipe retrofit devices are available from numerous companies throughout the world like Heat Pipe Technology Inc. of Gainesville, Fla. Companies like Heat Pipe Technology also make stand alone retrofit dehumidification units that can feed directly into the existing residential HVAC system, permitting the dehumidification process to use the existing duct work in the home to distributed dehumidified air without the need to operate the existing air conditioning compressor. This process is much more energy efficient as the compressor used in the retrofit add-on dehumidification unit uses considerably less energy than the whole house compressor but does require a capital investment on the front front end which might make it less appealing to some customers. The system **3.08** also supports other forms of dehumidification like desiccant systems and other forms of humidity absorption technology.

[0265] Dehumidification control in more elaborate implementations of the system **3.08** can be used to precondition the site **1.04** in anticipation of events that would call for or require demand reductions on the energy supply chain. An example would be a simply energy supplier program where time of day rates are used to encourage the reduction of system demand during peak periods. In anticipation of such events, the system **3.08** is capable of preconditioning the home to reduce the humidity levels in summer or increase them in winter thus permitting comfort levels to be maintained while raising the ambient air temperature to reduce demand and total consumption. This preconditioning process while described here and supported by the system **3.08** as a "on demand" or "on request" type of program, could be used as the system default, resulting in a permanent reduction of demand on the system **3.08** and a total reduction in energy usage. The capital investment to manage humidity levels in the site **1.04**, represent about 20% of the annual energy bill but can be easily recovered by managing humidity, which in tropical climate conditions would result in an annual energy usage decrease of up to 14%. On the reverse side of this scenario, is the heating load reduction, which would impact a number of different energy supply chains and natural resources. Here again, the equipment to humidify the site **1.04** to increase humidity levels during heating seasons would be capable of being recovered within 18 to 24 months assuming that they were managed by the system **3.08** to achieve lower humidity set points as a function of relative humidity levels.

[0266] Additional two-way communicating sensors will also improve the operational capabilities of the system **3.08** by providing additional input data. Occupancy sensors as an example would provide the system **3.08** with knowledge of if there were people present in the site **1.04**. The system **3.08** is capable of receiving authorization from any authorized entity to perform items like ramping, set point modifications or dehumidification differently depending on the presence or absence of the occupant. If unoccupied, the system **3.08** can be directed to take more savings related actions and defer comfort control options. This ability increases its ability to deliver savings and reduce demand on the supply chain without affecting the occupants' level of comfort.

[0267] Additional two-way communicating sensors are supported by the system **3.08** to support indoor air quality as well. Examples of such sensors are CO2, NOX, Radon, Gas, Formaldehyde and CO detectors. These sensors would supply input to the system **3.08** and if so equipped, would trigger the operation of air exchange systems to lower levels of such gases in the site **1.04** or trigger an alarm condition. Other communicating sensors to detect smoke or fire are also supported and permit the system **3.08** to perform emergency shut down of the air handler and other equipment should such a condition be detected. With such safety and security features, the system **3.08**, as a direct result of its communications capabilities, has the ability to interface with and report alarm conditions to a plurality of end points. Examples of such points include but are not limited to cell phones, pagers, monitoring centers, local and remote alarm horns, bells and lights as well as digital display devices like PC's, in premise kiosks, TV screens and personal radios with digital display screen capabilities like XM Radio and Sirius Radio. The system **3.08** also supports traditional air filtration filter monitoring as well as more sophisticated electro static filtration systems and UVG bacteria and virus air cleansing systems. In all cases the system **3.08** uses its two-way communicating senor node technology to control and monitor the performance of these units.

[0268] In one aspect of the invention data various data elements are stored within the system **1.02**. In one embodiment, the data may be stored in gateway node **1.10D**. However, each node **1.10** in the system **1.02** includes a node processor **2.02** and memory **2.04**. Therefore, any node **1.10** in the system may assume the processing and/or the control of one or more devices and/or the storage of system data **1.02** in the event the gateway node **1.10D** becomes disabled. In one embodiment, the following data may be maintained or stored by the system **1.02**.

[0269] 1. The current supplier of energy units, the current price per energy unit including delivery.

[0270] 2. The current operating cost per hour based on the rate and cost of energy units being used.

[0271] 3. The total energy units used and their cost for today, this week, and this billing period and the past 14 billing periods by supplier and energy type if multiple types are available.

[0272] 4. The total energy units used by type and their associated cost for the day, week and billing period for the past 14 billing periods.

[0273] 5. The balance of available credit per energy unit supplier and an estimate of the available hours and days of

23

energy unit purchases that represents if a debit system **3.08** for prepaid energy is being used.

[0274]   6. A computed average cost per energy unit by supplier and a percentage of the total energy unit requirement being purchased from that supplier including delivery costs.

[0275]   7. A breakdown of energy units consumed and their cost and supplier by individual appliances if multiple appliance control and metering is activated.

[0276]   8. A projected total billing period cost for each energy type and source.

[0277]   9. An aggregated total by type and source of energy unit.

[0278]   10. A history of temperature set points for the day.

[0279]   11. An average of temperature set points for the week and billing period

[0280]   12. Historical totals of energy units usage and cost for this month, last 14 months and year to date.

[0281]   13. The current temperature set point both user set and fixed.

[0282]   14. The current dead-band high and low degree spread both user set and fixed.

[0283]   15. The average temperature maintained for the day, week and billing period.

[0284]   16. The average thermal degree gain or loss per unit of time for the site **1.04** for a rolling 30, 60 and 90 day period by hour of the day.

[0285]   17. The average thermal recovery time per degree when heating and cooling systems are operational for a rolling 30, 60, and 90 day period by hour of the day.

[0286]   18. The projected annual cost of operation for each of the appliances being monitored.

[0287]   19. The operational efficiency factor of each appliance being monitored based on historical consumption patterns and current operating statistics.

[0288]   20. The current and historical settings for minimum and maximum dead-band temperature and cost settings.

[0289]   21. Warning indicators of operational irregularities in monitored appliance consumption patterns.

[0290]   22. Warning indicators for low balances in debit accounts if prepaid energy unit accounts are present.

[0291]   23. Average daily cost of operation of whole site **1.04** and individual appliances on a 30, 60 and 90 day rolling average and same period last year.

[0292]   24. Data, text and billing messages from energy unit suppliers and information sources.

[0293]   25. Weather information and history data including at a minimum outside temperature lows and highs, humidity, chance of precipitation wind speed and direction, solar exposure time and angle and UV indexes by day, by week, by billing period.

[0294]   26. Total heating and cooling degree days and other statistical data needed to normalize consumption and usage data.

[0295]   27. Computed thermal recovery time for heating and cooling adjusted to compensate for the external temperature, wind speed, direction, UV index, humidity and cooling or heating degree day factors. This computed factor is used to more accurately compute the recovery time for thermal gain or loss when combined with the average normalized thermal gain or loss for the site **1.04**. This factor may also be computed centrally and transmitted, frequently enough to permit adequate factoring of recovery times to maximize efficiency and reduce operating costs. Transmitting centrally computer factors will eliminate the need for external sensors at each location thus lowering the cost of installation and ongoing maintenance.

[0296]   28. A Table of available energy suppliers and user defined preference indicators by supplier and type of energy units provided to be used in choosing the supplier of choice if price points and terms of sale are equal during a given time period.

[0297]   29. A table used to compute supplier parity when option 28 above is not entered which contains at a minimum, the available suppliers, the type of energy units available and the number and cost of energy units purchase this billing period.

[0298]   30. An optional user supplied preferred energy unit type indicator.

[0299]   31. User selected temperature ramping option indicator with default 1 degree per hour ramping and optional user defined ramping time frames and degree settings.

[0300]   32. Low and high temperature alarm settings to protect against heating and cooling system failures. This alarm trigger point is user defined, and if not entered, defaults to + or −5 degrees above and below the maximum dead-band comfort range entered by the user. This feature is defeated if the system **3.08** is placed in the off position, but will be overridden if the user elects to activate the temperature alarm mode capability of the system **3.08**.

[0301]   33. Alarm activation indicator which is user selected to permit the automatic alarming and notification of a monitoring service if one is available and subscribed to by the occupant, owner or system provider. Alarm points and settings are user defined or can be allowed to default to system **3.08** defined default points based on the users, owners or operators preference.

[0302]   34. Communications channel interface parameters and data including types and routing information necessary to perform communications activities on the attached network or networks available. These parameters include all information required to perform password verification and encryption as needed or deemed necessary by the owner, operator or communications system provider. These parameters also include the necessary routing and identification data for alarm trigger reporting points and services used by or subscribed for or available to the site **1.04**.

[0303]   35. Consumption rates and consumption signature and weather related normalization factors for major appliances in the site **1.04** under the control of the system **3.08** for which a direct form of metering consumption is not available. Estimated consumption rates for major appliances in the site **1.04** under the control of the system **3.08** for which a direct form of metering consumption is not available.

24

[0304] 36. Centralized load aggregation and computational service providers interface information.

[0305] 37. Computed normalization factor for the site 1.04 based on historical consumption and external factors.

[0306] 38. Energy efficiency factors derived from modeling the site 1.04 using a model such as the DOE-2.1 modeling system for comparison of operational efficiency.

[0307] 39. Minimum requirements dead-band range definitions to be used when the site 1.04 if vacant or unoccupied.

[0308] 40. Set point pattern change tracking tables to reflect specific day, time and day type setting changes to be used with "follow my lead" artificial intelligence learning and execution routines.

[0309] 41. Set point pattern change tracking tables to reflect specific outside weather conditions in relationship to set point changes implemented by the occupant for use with the "follow my lead" artificial intelligence learning and execution routines.

[0310] 4. Customer Control Node Management System and Methods

[0311] With references to FIGS. 4A through 4R, the user interface 1.14 may be implemented as a web page or graphical user interface ("GUI") 4.02. The GUI 4.02 may be accessible from remote locations, as discussed above. In one embodiment, the customer may access the GUI 4.02 through a web browser or other display device like a television. In another embodiment, the customer may access the GUI 4.02 through a remote device, such as a mobile phone and/or personal digital assistant. By entering a user I.D. and password, the customer may access his or her account.

[0312] With reference to FIG. 4A, after the customer logs on to the system 3.08, a system home page 4.04 may be displayed. The system home page 4.04, includes an information section 4.05, a navigation buttons section 4.06, a navigation menu 4.08, and a control panel 4.10.

[0313] In the illustrated embodiment, the information section 4.05 for an exemplary customer, Earl Minum is shown. The information section 4.05 includes a greeting, the time and date, as well as several links. Actuation of the links may, for example, redirect the customer to the home page, the help screen, an e-mail contact section, frequently asked questions, or may log the customer off of the web site.

[0314] The plurality of navigation buttons 4.06 includes a device management button 4.06A, a configure alerts button 4.06B, a systems data button 4.06C, a cancel curtailment button 4.06D and a device status button 4.06E. The navigation menu 4.08 includes links to several areas of the GUI 4.02 as described below.

[0315] When initialized, the GUI 4.02 displays a homeowner control center 4.12 in the control panel. In the illustrated embodiment, the homeowner control center 4.12 includes a plurality of hyperlinked icons 4.14. In the illustrated embodiment, the hyperlinked icons 4.14 include a direct access icon 4.14A, a scheduling icon 4.14B, a my reports icon 4.14C, an alerts icon 4.14D, a configuration data icon 4.14E and a user help icon 4.14F. Selection of a home link within the information section 4.05 will return the GUI 4.02 to the homeowner control center 4.12.

[0316] With reference to FIG. 4B, when the customer selects the direct access icon 4.14Aa, a plurality of direct access icons 4.16 will be displayed in the control panel 4.10. In the illustrated embodiment, the customer has direct access of the HVAC system and the whole house meter. Correspondingly, a heating/AC icon 4.16a and a whole house meter 4.16B are displayed within the control panel 4.10. In another embodiment, all devices 1.08 to which the customer may have access are accessible here, e.g., a second thermostat or the water heater. With reference to FIG. 4C, selection of the heating/AC icon 4.16A, displays a virtual thermostat 4.18 within the control panel 4.10. The virtual thermostat 4.18 contains an information section or display 4.20 and a plurality of thermostat buttons 4.22. The display section 4.20 includes information related to the actual or real time conditions at the site 1.04. In the illustrated embodiment as shown, the current temperature within the customer site 1.04 is 67° Fahrenheit. The heating and cooling set points are set to 58° and 85°, respectively. The system 3.08 is in an automatic mode and the heating and cooling systems are in an off condition. Furthermore, as indicated, the occupancy mode is set to "Away". As discussed below, the occupancy mode 3.08 allows the customer to program the HVAC systems use the virtual thermostat 4.18 and according to occupancy modes using heating and cooling set points. By using the thermostat buttons 4.22, the customer can change the current operating parameters of the thermostat. For example, selection of a change system mode thermostat button 4.22A allows the customer to select between automatic and a manual modes. Selection of a change fan mode button 4.22B allows the customer to change the fan mode from "on" to "automatic". Furthermore, selection of an override temperature button 4.22C or an override occupancy button 4.22D allow the customer to override the current temperature and occupancy schedules as defined below. Selection of a cancel override button 4.22E allows the customer to cancel a temperature or occupancy change which was input using the override temperature button 4.22C or the override occupancy button 4.22D. A cancel curtailment button 4.22F allows a customer to cancel any curtailment program (where permissible).

[0317] Returning to FIG. 4B, selection of the whole house meter icon 4.16B displays information within the control panel 4.10 related to the current power being delivered or utilized by the customer site 1.04. Additionally, information related to the accumulated power draw over a predetermined period of time may also be displayed. This information may be displayed graphically and/or numerically.

[0318] Returning to FIG. 4A, selection of some of the menu items within the navigation menu 4.08 are redundant with the icons 4.14 in the homeowner control center 4.12. For example, selection of a direct access button 4.08A displays the direct access icons 4.16 within the control panel 4.10.

[0319] Selection of the scheduling icon 4.14B or a scheduling menu item 4.08B, displays icons for each thermostat within the customer site 1.04 or an occupancy mode icon (not shown). With reference to FIGS. 4D, 4E, and 4F, selection of the thermostat scheduling icon or the thermostat menu item underneath the scheduling menu item 4.08B, displays an occupancy mode screen 4.24 within the control panel 4.10. In one embodiment, the system 3.08 allows the customer to define one or more occupancy modes (see above). Within each occupancy mode, the customer may set

US 2004/0117330 A1

25

Jun. 17, 2004

one or more parameters which control one or more devices **1.08**, such as the HVAC system(s) while the occupancy mode is active.

[0320] For example, in one embodiment, the customer may set a cooling set point, a heating set point, and may also set an economy profile.

[0321] In the illustrated embodiment, the customer has eight occupancy modes. For example, the system **3.08** may include a home occupancy mode, an away occupancy mode, a sleep occupancy mode, and a vacant occupancy mode, as well as four user-defined occupancy modes. Each of these modes is indicated with a respective tab **2.26** along the top of the occupancy mode screen **4.24**. As shown in FIG. 4D, selection of a tab **2.26** allows the customer to set the parameters for each mode.

[0322] For example, in the illustrated embodiment under the home occupancy mode, the cooling set point is set to 80° Fahrenheit, the heating set point is set to 68° Fahrenheit, and the economy profile is set to economical comfort. The economy profile may be used to control the HVAC system and/or other devices **1.08** based on characteristics of the supply chain, e.g., cost or availability of power. In one embodiment, each profile has an associated setpoint offset, e.g., +/−5 degrees. The parameters for each mode may be set to a set of default parameters by selection of a default button. Any changes made within the occupancy mode screen may be applied to the respective mode through selection of an apply button **4.30**. In a further example, with reference to FIG. 4E in the away mode, the cooling set point is set to 85°, and the heating set point is set to 58° Fahrenheit.

[0323] In the illustrated embodiment, the economy profile is set through an economy profile drop down list **4.32**. With reference to FIG. 4F, in the illustrated embodiment, the economy profile may be set to one of three profiles: maximum comfort, balance comfort, and economical comfort.

[0324] With reference to FIG. 4G, selection of the thermostat scheduling icon or the thermostat menu item under the scheduling menu **4.08B**, displays a thermostat scheduling calendar **4.34** within the control panel **4.10**. In the illustrated embodiment, the thermostat scheduling calendar **4.34** displays the month corresponding to the current date. However, the thermostat scheduling calendar **4.34** may be navigated using a navigation bar **4.36**. Each day on the calendar **4.34** may be defined as a type of day, for example, any day may be defined as a weekday, a weekend, or a holiday. In the illustrated embodiment, all Saturdays and Sundays have been defined as weekends, and all Mondays, Tuesdays, Wednesdays, Thursdays and Fridays have been defined as weekdays. However, it should be noted that any day may be defined as any type of day. Each day within the calendar **4.34** is a hyperlink. Selection of the hyperlink for any particular day on the calendar **4.34** displays a thermostat scheduling panel **4.36** as shown in FIG. 4H. The thermostat scheduling panel **4.36** includes a thermostat dropdown list **4.38** and a select date drop down list **4.40**. The thermostat drop down list **4.38** allows the customer to select between one or more thermostats which may be present within the customer site **1.04**. The select day type drop down list **4.40** allows the customer to select between various pre-defined day types as well as to define a new day type.

[0325] The thermostat scheduling panel **4.36** permits the customer to select the occupancy mode which will be used for various time periods during the day.

[0326] For example, in the illustrated embodiment, at midnight of the selected day, the thermostat will be in the sleep occupancy mode. Beginning at 4.30 a.m., the thermostat will be in the user 1 occupancy mode and so forth as shown. The thermostat scheduling panel **4.36** also includes an apply button **4.42**, an apply to current day button **4.42**, an apply to all button **4.44**, and a back to calendar button **4.46**. Selection of the apply to current day button **4.42** will apply the start times and defined occupancy modes in the thermostat scheduling panel **4.36** to the selected day in the thermostat scheduling calendar **4.34**. Selection of the apply to all button **4.44** will apply the scheduled start times and occupancy modes defined in the thermostat scheduling panel **4.36** to all of the day types which are selected in the select day type drop down list **4.40**. As shown in FIG. 4I, the select day type drop down list **4.40** may include a number of pre-defined day types such as weekday, weekend, or holiday as well as a number of user-defined day types.

[0327] With reference to FIGS. 4A and 4J, selection of the alerts menu item **4.08D** displays a configure alert screen **4.48** within the control panel **4.10**. The system **3.08** includes a number of pre-defined alerts, for example, thermostat temperature out of range control, gateway node not responding, budget limit alarm, device malfunctions, communication failure, ramping recovery failure, or duplicate IP address. For each alert, the customer may select or designate the destination, i.e., who gets notified for each alert, and how they are notified. In the illustrated embodiment, the configure alert screen **4.48** includes a destination drop down list **4.50** for each alert. The destination drop down list **4.50** allows the customer to select who gets notified when the alert occurs. For example, in the illustrated embodiment, the drop down list may include the home occupant, the service provider or the energy provider. The configure alert screen **4.48** also includes one or more check boxes **4.52** to indicate how the communication of the alert is to occur, for example, whether or not it is to occur by e-mail or through the customer or utility interfaces **1.14**, **1.16**. The configure alert screen **4.48** may also include a check box **4.54** for each alert to indicate whether or not the alert is configurable. The configure alert screen **4.48** may also include an entry box **4.56** for each alert which allows the customer to indicate what priority the alert should have. However in the another embodiment, the priority may be used to, e.g., provide a different delivery system based on the priority. In the illustrated embodiment, this is primarily for information purposes. Furthermore, the configure alert screen **4.48** may also include an alert type drop down list **4.58** which allows the customer to indicate whether or not a single alert should be sent or whether an alert should be sent each time an alert condition occurs. For example, if over a pre-determined amount of time, for example an hour, a thermostat temperature is out of range, the system **3.08** may be set to deliver a single alert or to send an alert each time the temperature is out of bounds.

[0328] The configure alert screen **4.48** also includes a submit button **4.60** and a reset button **4.62** for updating the system **3.08** with any input changes or resetting the alerts to default values.

[0329] The configure alert screen **4.48** may also include a personal data update link **4.64**. Activation of the personal data update link **4.64** will display a personal data screen (not shown) within the control panel **4.10** which allows the

26

customer to update its personal information such as address, telephone and e-mail information as well as user name and passwords. The personal data screen may also allow the customer to enter or update a budget threshold, e.g., a monthly budget threshold. As discussed above, the system 3.08 may be set to send an alert when the monthly budget threshold has been reached and/or is likely to be reached based on current usage.

[0330] With reference to FIGS. 4A and 4K through 4M, selection of the my reports icon 4.14C or the reports menu item 4.08C, will display a report screen 4.66 in the control panel 4.10. The report screen 4.66 includes a plurality of reports icons 4.68. Selection of a reports icon 4.68 will display a pop-up screen within the control panel 4.10. For example, selection of a daily temperature icon 4.68A will display a daily temperature report pop-up screen 4.70 as shown in FIG. 4L. Likewise, selection of a monthly temperature icon 4.68B will display a monthly temperature report pop-up screen (not shown). The daily temperature report pop-up screen 4.70 may allow the customer to select between multiple thermostats using a thermostat drop down list 4.72. The daily temperature report pop-up screen 4.70 may also include a plurality of drop down lists and/or buttons 4.74 which allow the customer to change the date or dates of the information being displayed in the report screen 4.70. For example, the customer may designate a specific date or navigate through the calendar by days or months.

[0331] The report screen 4.66 may also include a daily electrical usage icon 4.68C. With reference to FIG. 4M, selection of the daily electrical usage icon 4.68C will display a daily electrical report pop up screen 4.72. As with the temperature report pop up screen 4.70, the daily electrical report pop up screen 4.76 includes a service device drop down list 4.78, which allows the customer to select the device 1.08 for which data is being displayed. The daily electrical report pop up screen 4.76 also includes a plurality of navigation buttons 4.80 which allow the customer to navigate through the calendar as well as to display electrical usage information on a monthly or a yearly basis. A refresh button 4.82 updates the electrical report pop up screen 4.76 based on any changes made within the service device drop down list 4.78 or the navigation buttons 4.80. Selection of a close button 4.84 closes the daily electrical report pop up report 4.76.

[0332] With reference to FIG. 4N, selection of a config data menu item 4.08E displays a configuration data screen 4.86 within the control panel 4.10. The configuration data screen 4.86 includes a number of configuration data icons 4.88. Selection of a personal data icon 4.88A displays a personal data screen described above. Selection of a thermostat data icon 4.88C displays a list of the thermostats within the customer site 1.04. Each thermostat may be selected and a thermostat data screen 4.90 will be displayed within the control panel 4.10, as shown in FIG. 4O. The thermostat data screen includes a first section for defining the heating section of the corresponding HVAC system and a cooling section for defining the corresponding cooling section of the HVAC system. The heating section includes a heating drop down list 4.92 which allows the customer to select the type of heating which corresponds to the current thermostat as shown in FIG. 4P. A cooling drop down list 4.94 allows the customer to set the type of cooling corresponding to the current thermostat as shown in FIG. 4Q. As

shown in FIG. 4P, the thermostat data screen 4.90 allows the customer to set a plurality of high and low limits. For example, in the illustrated embodiment, the customer may set safety, alert, heat, and cool high and low limits. These limits may be used in controlling the corresponding HVAC system, as well as setting or delivering alert messages.

[0333] Selection of a home data icon 4.88C on the configuration data screen 4.86 displays a home data screen (not shown) within the control panel 4.10. The home data screen allows the customer to define various parameters regarding their home or the customer site 1.04 including details about the construction as well as defining water heaters and other devices which may be found at the customer site such as swimming pools, whirlpool baths, hot tubs, heated ponds, saunas, fountains, decorative lighting systems, auxiliary heat systems, and/or irrigation systems.

[0334] Selection of an energy switch icon 4.88D on the configuration data screen 4.86 displays information and allows the customer to modify parameters related to any energy management switches at the customer site 1.04.

[0335] With reference to FIGS. 4N and 4R, selection of the program icon 4.88E on the configuration data screen 4.86 displays a program participation screen 4.96 in the control panel 4.10. The program participation screen 4.96 provides a list 4.98 of all available power supply programs ("PSP") or PROGRAMS. The program participation screen 4.96 also includes a plurality of corresponding check boxes 4.100 which allow the customer to designate which PROGRAMS the customer desires to participate. The program participation screen 4.96 may also include other information regarding the listed PROGRAMS, including supply type, effective dates, and effective times. Each PROGRAM listed on the program participation screen 4.96 may be a hyperlink which, when selected, displays additional information related to the selected PROGRAM.

[0336] As discussed above, the customer GUI 4.02 allows the customer to view, configure and/or modify various parameters of the system 3.08. Generally, the type and nature of parameters which may be viewed or modified will be defined by the utility 1.06. As shown above, some of these parameters may be configured and/or modified using various drop down boxes, check boxes and/or entry boxes. However, it should be noted that some of these entry boxes, drop down lists and/or check boxes may be used to display certain parameters; however the utility may designate that the customer cannot modify these parameters.

[0337] 5. Utility Control Node Management System and Method

[0338] With reference to FIGS. 5A through 5I, as discussed above, the utility interface 1.16 may be accessible through a web browser. With specific reference to FIG. 5A, after an authorized user at the utility 1.06 logs onto the system 1.02, a utility graphic user interface 5.02 is displayed. The utility GUI 5.02 includes a plurality of navigation links 5.04 on a utility display panel 5.06.

[0339] In the illustrated embodiment, the navigation links 5.04 include an immediate supply link, a scheduled supply link, a program definitions link, an active supply link, a supply history link, and a reports link. The navigation links also include a link to the utility GUI 5.02 home page and a

27

link to log off the system. The utility display panel **5.08** includes a plurality of utility icons **5.08**.

[0340]  In the illustrated embodiment, the utility icons include an immediate supply icon **5.08A**, a scheduled supply icon **5.08B**, a program definitions icon **5.08C**, and active supply icon **5.08D**, a supply history icon **5.08E** and a reports icon **5.08F**. As discussed above, the utility interface **1.16** may be used to define or modify PROGRAMS, to display information regarding the current active supply of electricity over an electrical distribution network, provide information relating to the capacity of electricity available through implementation of one or more of the PROGRAMS, to supply historical data related to the distribution of electricity and to generate one or more reports.

[0341]  With reference to FIG. 5B, when the immediate supply icon **5.08A** is selected, an immediate supply screen **5.10** is displayed within the utility display panel **5.06**. The immediate supply screen **5.10** includes a power distribution network section **5.12** and an information section **5.14**. In the illustrated embodiment, the power distribution network section **5.12** includes a meter **5.16** which provides an indication of the immediate capacity in watts (in real time) for the power distribution network.

[0342]  In the illustrated embodiment, the power distribution network includes a single transmission substation, designated tss1, and a single distribution substation, designated dss1. Under the distribution substation, the following nodes are available: Phoenix, Richmond, Philadelphia and Philly non-curtailed, as shown. Within the system **1.02**, one or more PROGRAMS may be defined which when activated may curtail one or more devices **1.08** across one or more customer sites **1.04** (see above). The meter **5.16** gives a graphical indication of the immediate power supply which is available from the PROGRAMS defined in the power distribution network.

[0343]  Underneath the meter **5.16**, a collapsible/expandable tree **5.18** is displayed. Each of the levels in the tree **5.18** are selectable. When a particular level within the tree **5.18** is selected, information regarding that level and the power distribution network above it are displayed within the information section **5.14**. For example, as shown in FIG. 5B, when the distribution substation dss1 is selected, information regarding the station tss1 and the distribution substation dss1 are displayed.

[0344]  In the information section **5.14** for each level of the distribution network, the immediate capacity and the total capacity are displayed. Immediate capacity is the real time instantaneous capacity available for the given level based on the defined PROGRAMS and the current status of all devices within those PROGRAMS. For example, for substation dss1 for all devices currently in a defined PROGRAM, those devices are drawing 1,040 watts. If the defined PROGRAMS were implemented, those devices would make available or supply 1,040 watts. The total capacity is the average for the current hour over a predetermined period, for example, the last fourteen weeks.

[0345]  The information section **5.14** also includes a refresh button **5.20** which, when activated, refreshes or updates the information within the information section **5.14**. Information related to each node, i.e., Phoenix, Richmond, Philadelphia or Philly non-curtail, may also be displayed in the information section by selection of the corresponding level within the power distribution network section **5.12**. The information section **5.14** may also include a review/ request supply link **5.22** for each component listed in the information section **5.14**.

[0346]  With reference to FIG. 5C, selection of the review request link **5.22** for a given node or station displays an available program capacity pop-up **5.24**. The available program capacity pop-up **5.24** lists all defined PROGRAMS that are available for the given node at the current time. Each PROGRAM includes a corresponding checkbox **5.26** which enables the utility to activate a given PROGRAM. For each PROGRAM listed, the instantaneous, real time available power is listed in a box **5.28** for each PROGRAM. The total capacity **5.30** is also listed for each PROGRAM, i.e., if all defined devices **1.08** within a given PROGRAM were currently drawing power. The available power refers to the instantaneous power which would be available if the respective or corresponding PROGRAM were activated. The available program capacity pop-up **5.24** also includes a duration drop-down list **5.32**. The available program capacity pop-up **5.24** may be utilized to immediately activate one or more PROGRAMS to free up capacity for selected duration. For example, in the illustrated embodiment if the emergency HVAC curtailment program and the emergency shut-off program were activated, the instantaneous available power would be 1,200 watts. The available program capacity pop-up **5.24** also includes a submit button **5.34**, a closed button **5.36** and a refresh button **5.38**. If one or more of the checkboxes **5.26** were activated, and the submit button **5.34** were selected, the utility control system **1.12** would broadcast a curtailment signal to the gateway nodes **1.10D** to shut down the affected devices **1.08** or otherwise curtail those devices **1.08**. Activation of the closed button **5.36** closes the available program capacity pop-up **5.24**. Activation of the refresh button **5.38** updates the available power available for each PROGRAM.

[0347]  With reference to FIG. 5D, selection of the scheduled supply button **5.08B** displays a scheduled supply screen **5.40** in the utility display panel **5.06**. The scheduled supply screen **5.40** includes a power distribution network tree **5.42** and an information section **5.44**. As in the immediate supply screen **5.10**, the tree **5.42** displays the stations, substations and nodes within the power distribution network. Each of the stations, substations and/or nodes may be selectable within the tree **5.42**. Information related to the capacity available at the selected level within the tree **5.42** is displayed within the information section **5.44**. In the illustrated embodiment, the power available at the given level during predetermined time periods of the current day are shown. This information is reflective of the capacity or power available from the scheduled PROGRAMS. For example, based on the activated programs, between military time 0000 and 0600, the scheduled programs in Philadelphia have a capacity of 832 watts. For each station, substation or node within the network, the utility **1.06** may review scheduled programs or create a new schedule for programs. The scheduled supply screen **5.40** also includes a refresh button **5.46** which when actuated updates the information in the information section **5.44**.

[0348]  Within the create schedules section of the GUI **5.02**, a find eligible programs pop-up dialog **5.48** as shown in FIG. 5E is available. This dialog **5.48** allows the user at

28

the utility to enter some or all information regarding a desired program or criteria for a program and search for any available program that fits that program criteria.

[0349] With reference to FIG. 5F, activation of the program definition button 5.08C displays a program summary table 5.50 in the utility display panel 5.10. The program summary table 5.50 lists and describes all available PROGRAMS. In the illustrated embodiment, each listed program may include a link 5.52 which leads to additional specific PROGRAM details. The program summary table 5.50 may also include a new button 5.54.

[0350] With reference to FIG. 5G, selection of the new button 5.54 displays a program definition screen 5.56 in the utility control panel 5.10. The program definition screen 5.56 creates a new PROGRAM (see below). In one embodiment, the new PROGRAM may be broadcast to the gateway node 1.10D at each customer site 1.04. The customer may view the new PROGRAM along with the other available PROGRAM and subscribe to the new PROGRAM or any other available PROGRAM (see above).

[0351] In the illustrated embodiment, the program definition screen 5.56 includes a program name entry box 5.58 and a description entry box 5.60, both of which allow the user to enter appropriate text information.

[0352] The program definition screen 5.56 further includes a set of mutually exclusive supply type buttons 5.62 which allow the user to define a type associated with the PROGRAM. In the illustrated embodiment, the type may be one of "on demand" or "scheduled". An on demand PROGRAM can be implemented at any time, as needed, by the utility. However, an on demand PROGRAM may be limited to specific time periods. A scheduled PROGRAM is generally scheduled for specific days during specific time periods.

[0353] The program definition screen 5.56 also includes a set of drop down lists 5.64 which may be used to set PROGRAM available dates and times.

[0354] The PROGRAM may also be identified as "optional" or "overrideable" using one or more checkboxes 5.66. An optional PROGRAM may be opted into or subscribed to by the user. An overrideable PROGRAM means that once subscribed, the user may override the PROGRAM while it is running.

[0355] The program definition screen 5.56 may also include a plurality of checkboxes to 5.68 which is used to identify the types of devices 1.08 which may be included in the PROGRAM. In the illustrated embodiment, the system 3.08 includes HVAC systems, water heaters, pool pump and hot tubs/spas. A PROGRAM may be defined to include all devices 1.08 or one or more types of devices 1.08. The program definition screen 5.56 includes back button 5.70, a save button 5.72, and a reset button 5.74. Activation of the back button 5.70 returns the GUI 5.02 to the previous screen without saving the PROGRAM. Activation of the save button 5.72 save the current PROGRAM and returns the GUI 5.02 to the previous screen. Activation of the reset button 5.74 sets the values in the program definition screen 5.56 to default values.

[0356] Selection of the active supply button 5.08D displays a screen within the utility display panel 5.06 which provides detail regarding any active PROGRAMS. This screen may include a tree similar to the trees described above which details the power distribution network. The screen will also provide information related to all of the active PROGRAMS for any selected station, substation or node within the power distribution network. For example, for a given active PROGRAM, the following information may be provided: based on real time data received from the nodes 1.10, how many customers have signed up for the given program, how many customers are actively contributing to the given PROGRAM, and how many customers have opted out of the program. Furthermore, each device which may be affected by the program may be viewed.

[0357] Selection of the supply history button 5.08E displays a screen within the utility display panel 5.06 which provides historical data regarding any active program. The same type of information available for the active PROGRAMS (see above) may be available for any past time or time period.

[0358] With reference to FIGS. 5H and 5I, selection of the report button 5.08F displays a reports screen 5.76 within the utility display panel 5.06 which provides a graph of energy consumption for a given period of time for a given device or set of devices. In the illustrated reports screen 5.76, the total hourly energy consumption for Mar. 18, 2003 (as measured by the electric meters) is shown. The reports screen 5.76 includes an input section 5.78 which allows the user to select the device, e.g., electric meter, thermostat, water heater, pool pump or hot tub/spa, or the time period, e.g., daily, hourly, or monthly. The input section 5.78 also allows the user to change the time and/or date for which data is shown. The reports screen 5.76 also includes a refresh chart button 5.80 which may be used to update the graph to show updated real-time data and/or to reflect any changes made in the input section 5.78.

[0359] Obviously, many modifications and variations of the present invention are possible in light of the above teachings. The invention may be practiced otherwise than as specifically described within the scope of the appended claims.

1. A method for providing at least one program to a customer of a utility of a commodity, the program aimed at managing demand for the commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, including the steps of:

defining a program having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program;

allowing the customer to subscribe to the program;

delivering the commodity to the subset of devices;

measuring the instantaneous rate at which the commodity is being delivered to the subset of devices;

sending the instantaneous rate for each device within the subset to the utility.

2. A method, as set forth in claim 1, including the steps of:

activating the program; and,

subsequently measuring at least one of a rate and a change in a rate at which the commodity is being delivered to the subset of the devices.

**3.** A method, as set forth in claim 2, including the step of determining an actual change in a rate of consumption of the commodity and recording the rate of change in a memory.

**4.** A method, as set forth in claim 3, including the step of providing at least one of an alternative rate and a billing adjustment to the customer as a function of the actual capacity saved at the related customer site by the program.

**5.** A method, as set forth in claim 4, wherein the at least one of an alternative rate and a billing adjustment is also a function of historical usage information.

**6.** A method, as set forth in claim 4, wherein the at least one of an alternative rate and a billing adjustment is a function of an actual cost related to the commodity while the program is activated.

**7.** A method, as set forth in claim 2, including the step of verifying management of the devices within the subset of the devices.

**8.** A method, as set forth in claim 1, including the step of providing a user interface for interaction with the customer.

**9.** A method, as set forth in claim 8, wherein the user interface is accessible through a web browser.

**10.** A method, as set forth in claim 1, wherein each device has an associated node, and the method includes the step of allowing the customer to control one or more of the devices through the associated node.

**11.** A method, as set forth in claim 1, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices and the step of defining the program includes the step of including within the program all devices of a similar type at each customer site.

**12.** A method, as set forth in claim 1, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices and the step of defining at least one program includes the step of defining a plurality of programs, each program having a respective subset of the devices.

**13.** A method, as set forth in claim 1, including the steps of:

activating the program; and,

allowing the customer to cancel the program when activated.

**14.** A method, as set forth in claim 1, including the steps of:

setting a budget goal; and,

monitoring an aspect of usage of the commodity related to the budget goal.

**15.** A method, as set forth in claim 14, wherein the budget goal is defined in terms of usage of the commodity.

**16.** A method, as set forth in claim 14, wherein the budget goal is defined in terms of cost of actual amount of commodity used.

**17.** A method, as set forth in claim 14, wherein the budget goal is defined relative to a predetermined time period and the method includes the step of generating an alert if actual usage will exceed the budget goal in the predetermined time period.

**18.** A method, as set forth in claim 17, wherein the alert is sent to the customer.

**19.** A method, as set forth in claim 17, wherein the alert is sent to the utility.

**20.** A method, as set forth in claim 1, wherein the commodity is electrical power.

**21.** A method, as set forth in claim 1, wherein the commodity is water.

**22.** A method, as set forth in claim 1, wherein the commodity is gas.

**23.** A method, as set forth in claim 1, including the step of automatically activating the program under a predetermined set of conditions.

**24.** A method, as set forth in claim 23, wherein the predetermined set of conditions includes at least one of a time of day and a day.

**25.** A method, as set forth in claim 1, including the step of manually activating the program as a function of an actual demand of the commodity.

**26.** A method, as set forth in claim 1, wherein the program at least one of shifts demand away from a first time period and eliminates demand for the first period.

**27.** A method, as set forth in claim 1, including the step of controlling the subset of devices in response to activation of the program.

**28.** A method, as set forth in claim 27, wherein the step of controlling the subset of devices includes the step of at least one of preventing and limiting usage of the commodity during a predetermined period of time.

**29.** A method, as set forth in claim 27, wherein at least one of the devices has an operating setpoint, and wherein the step of controlling the subset of devices includes the step of modifying the setpoint.

**30.** A method, as set forth in claim 1, wherein each device has an associated node, and the method includes the step of downloading to each node, a program schedule containing scheduling information for the program.

**31.** A method for providing at least one program to a customer of a utility of a commodity, the program aimed at managing demand for the commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, including the steps of:

defining a program having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program;

allowing the customer to subscribe to the program;

delivering the commodity to the subset of devices;

measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices;

sending the instantaneous rate for each device within the subset to the utility;

activating the program;

determining an actual rate of change in consumption of the commodity induced by activating of the program; and,

providing a at least one of an alternative rate and billing adjustment to at least one customer as a function of the actual capacity saved at the related customer site by the program.

**32.** A method for providing at least one program to a customer of a utility of a commodity, the program aimed at managing demand for the commodity, the utility delivering

30

the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, including the steps of:

defining a program having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program;

allowing the customer to subscribe to the program;

delivering the commodity to the subset of devices;

measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices;

sending the instantaneous rate for each device within the subset to the utility;

activating the program; and,

verifying management of the devices within the subset of the devices.

33. A system for providing a program to a customer of a utility of a commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, the program aimed at managing demand for the commodity and having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program, comprising:

a user interface for allowing the customer to subscribe to the program;

a distribution network coupled to the subset of devices for delivering the commodity to the subset of devices; and,

at least one node coupled to the subset of devices for measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices and for sending the instantaneous rate for each device within the subset to the utility.

34. A system, as set forth in claim 33, further comprising a control system coupled to the distribution network for controlling delivery of the commodity and activating the program, the at least one node adapted to subsequently measure the rate at which the commodity is being delivered to the subset of the devices.

35. A system, as set forth in claim 34, wherein the control system determines an actual rate of change in the rate of consumption induced by activating the program.

36. A system, as set forth in claim 35, wherein the control system determines at least one of an alternative rate and billing adjustment to the customer as a function of the actual capacity saved at the related customer site by the program.

37. A system, as set forth in claim 36, wherein the at least one of an alternative rate and billing adjustment is also a function of historical program information.

38. A system, as set forth in claim 36, wherein the at least one of an alternative rate and billing adjustment is a function of an actual cost related to the commodity while the program is activated.

39. A system, as set forth in claim 34, wherein the control system including verifies curtailment of the devices within the subset of the devices.

40. A system, as set forth in claim 33, wherein the user interface is accessible through a web browser.

41. A system, as set forth in claim 33, wherein each device has an associated node for allowing the customer to control one or more of the devices through the associated node.

42. A system, as set forth in claim 33, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices and the program includes all devices of a similar type at each customer site.

43. A system, as set forth in claim 33, wherein the utility delivers the commodity to a plurality of customer sites, each customer site having a plurality of devices, wherein a plurality of programs are defined, each program having a respective subset of the devices.

44. A system, as set forth in claim 33, wherein the user interface allows the customer to cancel the program after it has been activated.

45. A system, as set forth in claim 33, wherein the user interface allows the customer to set a budget goal and the at least one node monitors an aspect of usage of the commodity related to the budget goal.

46. A system, as set forth in claim 45, wherein the budget goal is defined in terms of usage of the commodity.

47. A system, as set forth in claim 45, wherein the budget goal is defined in terms of cost of actual amount of commodity used.

48. A system, as set forth in claim 45, wherein the budget goal is defined relative to a predetermined time period and the at least one node generates an alert if actual usage will exceed the budget goal in the predetermined time period.

49. A system, as set forth in claim 48, wherein the alert is sent to the customer.

50. A system, as set forth in claim 48, wherein the alert is sent to the utility.

51. A system, as set forth in claim 33, wherein the commodity is electrical power.

52. A system, as set forth in claim 33, wherein the commodity is water.

53. A system, as set forth in claim 33, wherein the commodity is gas.

54. A system, as set forth in claim 34, wherein the control system automatically activates the program under a predetermined set of conditions.

55. A system, as set forth in claim 54, wherein the predetermined set of conditions includes at least one of a time of day and a day.

56. A system, as set forth in claim 34, wherein the control system allows the program to be manually activated as a function of an actual demand of the commodity.

57. A system, as set forth in claim 33, wherein the program at least one of shifts demand away from a first time period and eliminates demand from the first time period.

58. A system, as set forth in claim 34, wherein the control system controls the subset of devices in response to activation of the program.

59. A system, as set forth in claim 58, wherein the control system at least one of prevents and limits usage of the commodity during a predetermined period of time.

60. A system, as set forth in claim 34, wherein at least one of the devices has an operating setpoint, and wherein control system the subset of devices by modifying the setpoint.

61. A system, as set forth in claim 34, wherein the control system downloads a program schedule containing scheduling information for the program to the at least one node.

62. A system for providing at least one program to a customer of a utility of a commodity, the utility delivering

31

the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, the program aimed at managing reducing demand for the commodity and having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program, comprising:

   a user interface for allowing the customer to subscribe to the program;

   a distribution network coupled to the subset of devices for delivering the commodity to the subset of devices;

   at least one node coupled to the subset of the devices for measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices and for sending the instantaneous rate for each device within the subset to the utility;

   a control system coupled to the user interface, the distribution network and the at least one node for controlling delivery of the commodity, for activating the program, for determining at least one of an actual rate of consumption of the commodity and a change in the rate of consumption by activating of the program, and for providing at least one of an alternative rate and a billing adjustment to at least one customer as a function of the actual rate of consumption saved at the related customer site by the program.

63. A system for providing at least one program to a customer of a utility of a commodity, the utility delivering the commodity to at least one customer site, the customer site having a plurality of devices which use the commodity, the program aimed at managing demand for the commodity and having a subset of the plurality of devices for which usage of the commodity may be managed by activating the program, comprising:

   a user interface for allowing the customer to subscribe to the program;

   a distribution network coupled to the subset of devices for delivering the commodity to the subset of devices;

   at least one node coupled to the subset of the devices for measuring the instantaneous rate at which the commodity is being delivered to the subset of the devices and for sending the instantaneous rate for each device within the subset to the utility; and,

   a control system for activating the program and verifying management of the devices within the subset of the devices.

* * * * *

US 20050159846A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2005/0159846 A1
Van Ostrand et al. (43) Pub. Date: **Jul. 21, 2005**

(54) **FAILURE MODE FOR HVAC SYSTEM**

(76) Inventors: William F. Van Ostrand, Indianapolis, IN (US); Rajendra K. Shah, Indianapolis, IN (US)

Correspondence Address:
**CARLSON, GASKEY & OLDS, P.C.
400 WEST MAPLE ROAD
SUITE 350
BIRMINGHAM, MI 48009 (US)**

(21) Appl. No.: 10/824,098

(22) Filed: Apr. 14, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/537,694, filed on Jan. 20, 2004.

**Publication Classification**

(51) Int. Cl.⁷ ................................................ G05B 13/00
(52) U.S. Cl. ................................................ 700/276

(57) **ABSTRACT**

A HVAC system provides a central control which detects failed stage(s), removes the failed stage(s) from the staging sequence used by the controller, and later checks the failed stage periodically to see if the failed stage has become functional so that the no properly operational stage is returned to a staging sequence. The central control detects the failed stages and/or components by direct communication with the failed stages and/or components and/or by monitoring a temperature of a controlled area to determine if any particular stage is operating properly.



EXHIBIT 1005

Appx545



FIG.1



FIG.2

Patent Application Publication   Jul. 21, 2005   Sheet 2 of 2       US 2005/0159846 A1

DETECT THE FAILED STAGE(S).

    A) DIRECT COMMUNICATION OR NO COMMUNICATION WITH THE FAILED EQUIPMENT; AND/OR

    B) MONITORING OF THE CONTROLLED AREA TEMPERATURE.

REMOVE THE FAILED STAGE(S) FROM THE STAGING SEQUENCE USED BY THE CONTROLLER.

CHECK THE FAILED STAGE PERIODICALLY TO SEE IF IT HAS BECOME FUNCTIONAL AND RETURN IT TO USE IF IT HAS.

FIG.3



FIG.4



FIG.5

US 2005/0159846 A1

1

Jul. 21, 2005

## FAILURE MODE FOR HVAC SYSTEM

[0001]  The present application claims priority to U.S. Provisional Patent Application Ser. No. 60/537,694, filed 20 Jan. 2004.

### BACKGROUND OF THE INVENTION

[0002]  The present invention relates to an HVAC system, and more particularly to bypassing a failed HVAC system component and/or stages to assure at least partial system capacity.

[0003]  A heating, ventilating, and air conditioning (HVAC) system includes multiple components that function together in a coordinated manner. Typically, an HVAC system includes an indoor unit such as a gas furnace or fan coil, an outdoor unit such as an A/C or heat pump, and a thermostat. More sophisticated systems may include a multizone system with zone control and zone dampers. HVAC systems also frequently include subsystems such as filters, humidifiers, and ventilators.

[0004]  Typical HVAC systems include multiple stages of heating and/or cooling capacity. At the lowest demand, the first (lowest capacity) stage is activated. As demand increases past the capacity of the lowest stage, the next higher capacity stage is activated. If a lower capacity stage has failed, the component will "stage up" past the failed stage until enough capacity is brought on to satisfy the load. However, this may not be optimal as staging delays and temperature drop occur during the time in which the conventional component stages through the failed stage. Moreover, conventional controllers are unaware of failed stages within the remote HVAC components. If the highest capacity stage is the non-functional stage, the control will maintain operation of the system at this highest stage that has failed while providing no conditioning as conditioning demand continues to increase. The result may be complete loss of system capacity.

[0005]  Accordingly, it is desirable to provide an HVAC system control that identifies and isolates a failed HVAC system and/or stages on a system wide level to assure at least partial system capacity while minimizing delays within a staging sequence by monitoring a temperature of a controlled area. It is further desirable for an HVAC system to learn component and stage capacities such that the specific system performance information is incorporated into the system control algorithm to optimize control over a wide range of system capacities.

### SUMMARY OF THE INVENTION

[0006]  The HVAC system according to the present invention provides a central control which detects the failed stage(s); removes the failed stage(s) from the staging sequence used by the controller; and later checks the failed stage periodically to see if the failed stage has become functional so that the not properly operational stage is returned to a staging sequence.

[0007]  The central control detects the failed stages and/or components by direct communication with the failed stages and/or components. Alternatively, the central control detects the failed stages and/or components by monitoring the temperature of a controlled area to determine if any particular stage is operating properly. A higher stage having more

capacity will create a more positive slope to the controlled environment temperature vs. time curve than a lower stage if the higher stage is properly operating.

[0008]  The controller also permits the system to automatically determine the HVAC components contained within the system such that capacity information is incorporated into the thermostat's control algorithm to optimize control over a wide range of system capacities, minimizing the requirement for an installer to make gain adjustments.

[0009]  The present invention therefore provides an HVAC system control that identifies and isolates a failed HVAC system and/or stages on a system wide level to assure at least partial system capacity while minimizing delays within a staging sequence by monitoring a temperature of a controlled area. The present invention also provides an HVAC system which learns component and stage capacities such that the specific system performance information is incorporated into the system control algorithm to optimize control over a wide range of system capacities.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0010]  The various features and advantages of this invention will become apparent to those skilled in the art from the following detailed description of the currently preferred embodiment. The drawings that accompany the detailed description can be briefly described as follows:

[0011]  FIG. 1 is a general schematic view of an HVAC system for use with the present invention.

[0012]  FIG. 2 is a block diagram of a central controller;

[0013]  FIG. 3 is a flowchart illustrating operation of the present invention;

[0014]  FIG. 4 is a graphical representation of a controlled environment temperature vs. time curve for an operational HVAC component; and

[0015]  FIG. 5 is a graphical representation of a controlled environment temperature vs. time curve for an HVAC component with a malfunction stage.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0016]  FIG. 1 illustrates a general schematic view of an HVAC system 10. The system 10 generally includes a central controller 12 that communicates with a zone control 14, an indoor unit 16, and an outdoor unit 18. The central controller 12 communicates over a digital communication bus 20. The bus 20 preferably includes four communication paths, such as four wires 22 or the like, which communicate data and power. It should be understood that other communication systems will likewise benefit from the present invention.

[0017]  The zone control 14 preferably provides thermostat controls for each of several zones and a damper control for dampers associated with each of the zones as generally understood.

[0018]  The zone control 14 includes a microprocessor controller 24 that communicates with the central controller 12 over the bus 20.

[0019] The indoor unit 16 includes an indoor unit microprocessor controller 26, which communicates with the central controller 12 over the bus 20. The indoor unit 16 typically includes a furnace, fan coil, or the like. The indoor unit 16 includes a multiple of indoor stages 16A, 16B. The indoor stages 16A, 16B include for example only, a high stage and a low stage. It should be understood that any number of stages will benefit from the present invention.

[0020] The outdoor unit 18, such as an A/C unit or a heat pump, includes an outdoor unit microprocessor control 26, which communicates to the central control 12 over the bus 20. The outdoor unit 18 includes a multiple of outdoor stages 18A, 18B. The outdoor stages 18A, 18B include for example only, a high stage and a low stage. It should be understood that any number of stages will benefit from the present invention.

[0021] It should be understood that although a particular component arrangement and communication bus layout is disclosed in the illustrated embodiment, other arrangements will benefit from the instant invention.

[0022] The central control 12 includes a display 30, such as a LCD or flat panel display, and input devices 32, such as a plurality of buttons, directional keypad, but alternatively including a mouse, keyboard, keypad, remote device, or microphone. Alternatively, the display 30 can be a touch screen display.

[0023] Each HVAC system component includes a dedicated microprocessor control 24, 26, 28 which communicates with the central control 12 over the data bus 20. Through the bus 20, the conditioning components communicate to the controller 12 system information such as the state of health of the component including any stages which have failed.

[0024] The central control 12 preferably operates as a thermostat for the HVAC system 10 and further includes a computer module 33 connected to the display 30 and input devices 32. The computer module 32 generally includes a CPU 34 and a storage device 36 connected to the CPU 34 (FIG. 2). The storage device 36 may include a hard drive, CD ROM, DVD, RAM, ROM or other optically readable storage, magnetic storage, or integrated circuit. The software to control the HVAC system 10 including thermostat control algorithms and the instruction for the display 30 and user interface may also be stored in storage device 36 or alternatively in ROM, RAM or flash memory.

[0025] Referring to FIG. 3, the central control 12 determines if a capacity producing component in the system 10 has failed to operate satisfactorily when it is turned on by the central control 12. The central control 12 makes this determination. In a dual fuel HVAC system 10, which for example, includes both a furnace and a heat pump, the heat pump is utilized to provide some capacity to the system should the furnace fail or vice versa. With a dual fuel system, the lowest stage (or two stages in the case of a dual capacity heat pump) are normally followed by two furnace stages, each having higher capacity than the heat pump stage(s). If either the heat pump or the furnace fails, this is communicated to the controller 12 and the controller 12 removes the failed stages from its staging sequence, leaving only the working stages.

[0026] Occasionally, there may be internal failures which will result in one of the indoor stages 16A, 16B failing while the other remains operable. When this occurs, the central control 12 identifies the failure and utilizes the operable stage to supply conditioning, and removes the other stage from attempted operation thereby bypassing stage timers and the like so that extended delays common to conventional component "stage-up" systems are overridden. Staging delays and some temperature droop occur as the failed stage is attempted to be used in conventional components. The present invention removes the failed stage from the sequence of available stages, closing the gap and leaving only those that are functional.

[0027] Generally, the central control 12 detects the failed stage(s), removes the failed stage(s) from the staging sequence used by the controller; and later checks the failed stage periodically to see if the failed stage has become functional so that the now properly operational stage is returned to a staging sequence.

[0028] The central control 12 detects the failed stages and/or components by direct communication or no communication with the failed stages and/or components through communication between the microprocessor controller 24, 26, 28 and the central control 12 over the data bus 20. Alternatively, the central control 12 queries the microprocessor controller 24, 26, 28 and in response to a failure to reply from the microprocessor controller 24, 26, 28, the central control 12 will infer that the stages and/or components as failed.

[0029] Alternatively, the central control 12 detects the failed stages and/or components by monitoring a temperature of a controlled area to determine if any particular stage is operating properly. A higher stage, having more capacity, will create a more positive slope to the controlled environment temperature vs. time curve than the stage below it (FIG. 4). If such a response is not identified by the controller 12, the stage is classified as having failed. Once a stage is determined to be inoperable, it is removed from the staging sequence by the controller 12. At the next opportunity for this deleted stage to be used or on a periodic schedule, its "health" is checked again to see if it is available. If it is found to be "healthy," it is returned to the staging sequence. By this means, "self-healing" is detected and the stage will again be utilized if it is available.

[0030] It should be understood that an entire component of the system 10 may have failed (example: an entire heat pump) or a stage of that piece of equipment (example: low speed on a two speed heat pump). In either case, only the failed stage or stages are removed from the staging sequence. The process is applied between any successive output states that exist for controller 12, i.e., stages of electric heat or a multi-capacity compressor. This permits a failure in any one of several capacity producing components in a system to be found and identified. Any successive stage that should produce added capacity, but does not, may be deemed to have failed.

[0031] The central control 12 monitors the rate of change of a room temperature before and after it turns on the stage. If there is a change in the rate of change of room temperature, it can be inferred that the component is operating. If there is no change in the rate of change, the component can be assumed to be inoperative (FIG. 5). The measurements of rate of change are preferably filtered and timed so that noise and equipment capacity delays do not provide false information.

3

[0032]  The amount of change in the rate of change of a room temperature is generally proportional to the amount of added capacity to be brought on by the next stage and the heat loss of the structure. This amount could be determined by storing the designated value into the controller 12 as a fixed value or later programming of the designated value into the controller 12 by a technician during installation.

[0033]  Alternatively, or in addition, the amount of change in the rate of change is learned by the controller 12 from monitoring the system 10 responses to its outputs over a number of cycles. That is, the controller 12 after a number of cycles "learns" the capacity of each state of the system. When the system does not respond with the learned capacity, the controller 12 infers that there has been a failure. To avoid false indications that might arise (by, for example only, a door being opened at the same time a next stage is turned on), two successive failures are preferably required before an alert is provided.

[0034]  The "learning" of the system 10 by the controller also permits the system 10 to automatically determine the HVAC components contained within the system 10. For example only, a system 10 will "learn" if it has a single or two speed compressor, single, or multiple stages of electric heat or even if it is a heat pump or an air conditioner in response to monitoring the rate of change of a room temperature and break-points contained therein. This permits a dealer to stock fewer controllers and minimize factory or field selection jumpers thereby simplifying a technician's service call, as the system 10 will essentially configure itself.

[0035]  Once the equipment capacity has been learned by the controller 12, the capacity information is incorporated into the thermostat's control algorithm to optimize control over a wide range of system capacities, minimizing the requirement for an installer to make gain adjustments. In addition, the system equipment capacity is utilized to optimize the system response to recovery such as from night setback by bringing on the correct capacity at the right time to provide optimum comfort and efficiency. That is, the learned equipment may be utilized by the controller 12 to modify the recovery time for a system component and/or stage which functions sub-optimally or decreases the recovery time for an efficient component to achieve a designated temperature at a desired time. For example only, a failed stage would be "learned" when the controller 12 "learns" the capacity of each state of the system such that the recovery time will be accordingly increased to account for the failed stage to thereby achieve a designated temperature at a desired time. Other time periods may be user input such as the longest time ahead of the setback recovery time at which the equipment should start the recovery.

[0036]  Although particular step sequences are shown, described, and claimed, it should be understood that steps may be performed in any order, separated or combined unless otherwise indicated and will still benefit from the present invention.

[0037]  The foregoing description is exemplary rather than defined by the limitations within. Many modifications and variations of the present invention are possible in light of the above teachings. The preferred embodiments of this invention have been disclosed, however, one of ordinary skill in the art would recognize that certain modifications would come within the scope of this invention. It is, therefore, to

be understood that within the scope of the appended claims, the invention may be practiced otherwise than as specifically described. For that reason the following claims should be studied to determine the true scope and content of this invention.

What is claimed is:

1. A method of controlling an HVAC system comprising the steps of:

(1) detecting whether a stage of an HVAC component is a failed stage; and

(2) removing the failed stage detected in said step (1) from a staging sequence.

2. A method as recited in claim 1, wherein said step (1) further comprises the step of:

communicating a health status of the HVAC component to a controller.

3. A method as recited in claim 1, wherein said step (1) further comprises the step of:

determining whether a communication link exists between the HVAC component and a controller.

4. A method as recited in claim 1, wherein said step (1) further comprises the step of:

communicating a temperature of a controlled area to a controller.

5. A method as recited in claim 1, wherein said step (1) further comprises the step of:

(a) monitoring a temperature of a controlled area;

(b) inferring whether the stage has failed from a relationship between the temperature of the controlled area and a time period.

6. A method as recited in claim 5, wherein said step (b) further comprises the step of:

(a) monitoring a slope of the relationship between the temperature of the controlled area and the time period.

7. A method as recited in claim 5, wherein said step (b) further comprises the step of:

(a) monitoring a rate of change of a relationship between the temperature of the controlled area and the time period.

8. A method as recited in claim 1, further comprising the steps of:

(a) periodically attempting communication with the failed stage;

(b) identifying whether the failed stage has become functional; and

(c) returning the failed stage to the staging sequence in response to said step (b).

9. A method as recited in claim 8, wherein said step (b) further comprising the step of:

(i) identifying a positive communication with the failed stage.

10. A method of controlling an HVAC system comprising the steps of:

(1) monitoring a rate of change of a relationship between a temperature of a controlled area and a time period for a first stage of an HVAC component;

US 2005/0159846 A1                                                                                    Jul. 21, 2005

4

(2) determining whether the first stage is a failed stage in response to said step (1); and

(3) removing the failed stage determined in said step (2) from a staging sequence.

**11.** A method as recited in claim 10, wherein said step (1) further comprises the step of:

determining whether the rate of change is greater than a prior rate of change of a prior stage of the HVAC component.

**12.** A method as recited in claim 10, wherein said step (1) further comprises the step of:

comparing the rate of change to a stored rate of change for the first stage.

**13.** A method as recited in claim 12, further comprises the step of:

inputting the stored rate of change into a controller which communicates with the HVAC component.

**14.** A method as recited in claim 12, further comprises the step of:

learning the stored rate of change over a multiple of cycles of the first stage.

**15.** A method as recited in claim 14, further comprises the step of:

determining a configuration of the HVAC component in response to learning the stored rate of change of a multiple of stages comprising the first stage.

**16.** A method as recited in claim 14, further comprises the step of:

incorporating a gain into a control algorithm for the first stage in response to the stored rate of change to obtain a desired rate of change.

**17.** A method as recited in claim 14, further comprises the step of:

relating a recovery time period to the stored rate of change to achieve a designated temperature at a desired time.

**18.** A method of controlling an HVAC system comprising the steps of:

(1) monitoring a first rate of change of a first relationship between a temperature of a controlled area and a first time period for a first stage of an HVAC component;

(2) monitoring a second rate of change of a second relationship between the temperature of the controlled area and a second time period for a second stage of the HVAC component;

(3) determining whether the second stage is a failed stage in response to said steps (1) and (2); and

(4) removing the failed stage determined in said step (3) from a staging sequence.

**19.** A method as recited in claim 18, further comprises the step of:

determining a configuration of the HVAC component in response to said steps (1) and (2).

**20.** A method as recited in claim 18, wherein said step (3) further comprises the step of:

determining if the second rate of change is less than the first rate of change; and

determining that the second stage is a failed stage.

* * * * *

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| REEXAM CONTROL NUMBER | FILING OR 371 (c) DATE | PATENT NUMBER |
|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 |

SMITH BALUCH LLP
376 BOYLSTON ST
STE 401
BOSTON, MA 02116

**CONFIRMATION NO. 2353**
**REEXAMINATION REQUEST**
**NOTICE**

*OC000000130341082*

Date Mailed: 12/09/2021

## NOTICE OF REEXAMINATION REQUEST FILING DATE

### *(Third Party Requester)*

Requester is hereby notified that the filing date of the request for reexamination is 12/03/2021, the date that the filing requirements of 37 CFR § 1.510 were received.

A decision on the request for reexamination will be mailed within three months from the filing date of the request for reexamination. (See 37 CFR 1.515(a)).

A copy of the Notice is being sent to the person identified by the requester as the patent owner. Further patent owner correspondence will be the latest attorney or agent of record in the patent file. (See 37 CFR 1.33). Any paper filed should include a reference to the present request for reexamination (by Reexamination Control Number).

cc: Patent Owner
20995
KNOBBE MARTENS OLSON & BEAR LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

/pavolpe/
_____

Legal Instruments Examiner
Central Reexamination Unit 571-272-7705; FAX No. 571-273-9900

page 1 of 1

Appx631

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

20995        7590        01/28/2022

KNOBBE MARTENS OLSON & BEAR LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/28/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

SMITH BALUCH LLP
376 BOYLSTON ST
STE 401
BOSTON, MA 02116

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,916* .

PATENT UNDER REEXAMINATION *8412488* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| ***Order Granting Request For Ex Parte Reexamination*** | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/014,916 | 8412488 |
| | Examiner | Art Unit | AIA (FITF) Status |
| | MATTHEW E HENEGHAN | 3992 | No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed 12/03/2021 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐  PTO-892,      b)☑  PTO/SB/08,      c)☐  Other: _____

1. ☑    The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

| | | /MATTHEW E HENEGHAN/ |
|---|---|---|
| | | Primary Examiner, Art Unit 3992 |

cc:Requester ( if third party requester )

Application/Control Number: 90/014,916                                    Page 2
Art Unit: 3992

### Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent

provisions.

### Ex Parte Reexamination

A Third Party Requester, Andrew S. Baluch, on behalf of Google LLC, has

requested ex parte reexamination of claims 1-16 of U.S. Patent No. 8,412,488 to

Steinberg et al.

A substantial new question of patentability affecting claims 1-16 of United States

Patent Number U.S. Patent No. 8,412,488 is raised by the request for *ex parte*

reexamination.

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 8,412,488 (hereinafter the '488 patent) throughout the

course of this reexamination proceeding.  The third party requester is also reminded of

the ability to similarly apprise the Office of any such activity or proceeding throughout

the course of this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465     7590     07/14/2022
Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/14/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

SMITH BALUCH LLP
376 BOYLSTON ST
STE 401
BOSTON, MA 02116

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,916* .

PATENT UNDER REEXAMINATION *8412488* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/014,916 | Patent Under Reexamination<br>8412488 | |
|---|---|---|---|
| | Examiner<br>MATTHEW E HENEGHAN | Art Unit<br>3992 | AIA (FITF) Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a. ☐ Responsive to the communication(s) filed on _____.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

b. ☐ This action is made FINAL.

c. ☑ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:
  1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.
  2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____.

Part II    SUMMARY OF ACTION

  1a. ☑ Claims <u>1-16</u> are subject to reexamination.

  1b. ☐ Claims _____ are not subject to reexamination.

  2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

  3. ☐ Claims _____ are patentable and/or confirmed.

  4. ☑ Claims <u>1-16</u> are rejected.

  5. ☐ Claims _____ are objected to.

  6. ☐ The drawings, filed on _____ are acceptable.

  7. ☐ The proposed drawing correction, filed on _____ has been (7a) ☐ approved (7b) ☐ disapproved.

  8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. 119(a)-(d) or (f).

    a) ☐ All b) ☐ Some* c) ☐ None    of the certified copies have

    1 ☐ been received.

    2 ☐ not been received.

    3 ☐ been filed in Application No. _____.

    4 ☐ been filed in reexamination Control No. _____.

    5 ☐ been received by the International Bureau in PCT application No. _____.

    * See the attached detailed Office action for a list of the certified copies not received.

  9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
    matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D.
    11, 453 O.G. 213.

  10. ☐ Other: _____

cc: Requester (if third party requester)

U.S. Patent and Trademark Office
PTOL-466 (Rev. 08-13)        **Office Action in Ex Parte Reexamination**        Part of Paper No.   20220630

### Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent

provisions.

### Ex Parte Reexamination

*Ex Parte* Reexamination has been granted in response to a request by a third

party, Andrew S. Baluch, on behalf of Google LLC. Claims 1-16 of U.S. Patent No.

8,412,488 to Steinberg et al. are being reexamined.

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 8,412,488 (hereinafter the '488 patent) throughout the

course of this reexamination proceeding.  The third party requester is also reminded of

the ability to similarly apprise the Office of any such activity or proceeding throughout

the course of this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).

Application/Control Number: 90/014,916                                    Page 3
Art Unit: 3992

In the event the determination of the status of the application as subject to AIA 35
U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any
correction of the statutory basis for the rejection will not be considered a new ground of
rejection if the prior art relied upon, and the rationale supporting the rejection, would be
the same under either status.

In order to ensure full consideration of any amendments, affidavits or
declarations, or other documents as evidence of patentability, such documents must be
submitted in response to this Office action.  Submissions after the next Office action,
which is intended to be a final action, will be governed by the requirements of 37
CFR 1.116, after final rejection and 37 CFR 41.33 after appeal, which will be strictly
enforced.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis
for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set
forth in section 102, if the differences between the subject matter sought to be patented and the
prior art are such that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which the invention was made.

Claims 1, 3-9, and 11-16 are rejected under pre-AIA 35 U.S.C. 103(a) as being
unpatentable over U.S. Patent Application Publication No. 2004/0117330 to Ehlers et al.

(hereinafter Ehlers) in view of U.S. Patent Application Publication No. 2005/0159846 to
Van Ostrand et al. (hereinafter Van Ostrand).

Regarding claim 1, Ehlers discloses a system for monitoring the operational status of an
HVAC system (see paragraphs 90, 92, and 95) comprising:

at least one HVAC control system associated with a first structure (the system is used at
a site having an occupant, see paragraph 11; moreover, HVAC is known in the art as
commonly related to the heating and air conditioning of a particular structure. Ehler's
gateway node 1.10D is associated with a particular structure being maintained, see
paragraph 91) that receives temperature measurements from at least a first structure
conditioned by at least one HVAC system (see paragraphs 92, 93, 137, 230, and 231);
one or more processors that receive measurements of outside temperatures from at
least one source other than said HVAC system (see paragraphs 88 and 229-231),
wherein said one or more processors compares the inside temperature of said first
structure and the outside temperature over time to derive an estimation for the rate of
change in inside temperature of said first structure in response to outside temperature
(the indoor thermal gain rate for different outside temperatures is calculated, see
paragraph 253 and figure 3D).

Although Ehlers' HVAC system collects measurements and determines rate of change
estimates for indoor temperatures, Ehlers does not disclose that said one or more
processors compare an inside temperature recorded inside the first structure with said
estimation for the rate of change in inside temperature of said first structure to
determine whether the first HVAC system is on or off.

Application/Control Number: 90/014,916            Page 5
Art Unit: 3992

Van Ostrand discloses a comparing of the estimated rate of change of temperature in

an HVAC system, derived via a learning process that may involve using both indoor and

outdoor temperatures, to the actual measured temperature, in order to detect failed

stages of an HVAC system. Van Ostrand discloses that if a temperature response is not

identified as being the expected value, the stage is removed from the staging sequence

(i.e. turned off) by the controller. It may be later reactivated if found to be correct (see

paragraphs 29-33). Van Ostrand further discloses that this ensures that an HVAC

system can still partially operate in the event of a failure (see paragraphs 4-5).

Therefore it would have been obvious to one of ordinary skill in the art at the time the

invention was made to have modified the invention of Ehlers by turning on and off an

HVAC system in the case where the expected temperature, based on indoor and

outdoor measurements, was unexpected, as per Van Ostrand, as that this ensures that

an HVAC system can still partially operate in the event of a failure.

Regarding claim 3, Ehlers discloses the system may be in a single building (such as a

whole house, see paragraph 91).

Regarding claim 4, Ehlers disclose the use of a programmable thermostat (see

paragraph 132).

Regarding claim 5, insofar as the term "mesh networking" is described in the '488

patent's disclosure, it is not precluded that most common wireless LAN protocols are

useable in the context of a mesh network and would teach to this limitation. Ehlers

discloses the use of such wireless arrangements (see paragraphs 69-72, 84, 171, and

174).

Regarding claim 6, Ehlers discloses a programmable thermostat in communication with

a network (see paragraph 174).

Regarding claim 7, the HVAC in communication with the network may include an

electricity meter (see paragraphs 63 and 76).

Regarding claim 8, Ehlers discloses that the system uses an estimation of the future

rate of change that is inferred from the history of indoor and outdoor thermal gains (see

paragraph 253), which is subsequently use to detect failures, as per Van Ostrand.


Regarding claim 9, Ehlers discloses a method for monitoring the operation of an HVAC

system (see paragraphs 90, 92, and 95) comprising:

receiving temperature measurements from at least one HVAC control system

associated with a first structure (the system is used at a site having an occupant, see

paragraph 11; moreover, HVAC is known in the art as commonly related to the heating

and air conditioning of a particular structure. Ehler's gateway node 1.10D is associated

with a particular structure being maintained, see paragraph 91) conditioned by at least

one HVAC system (see paragraphs 92, 93, 137, 230, and 231);

receiving at one or more processors, measurements of outside temperatures from at

least one source other than said HVAC system (see paragraphs 88 and 229-231);

comparing with said one or more processors the inside temperature of said first

structure and the outside temperature over time to derive an estimation for the rate of

change in inside temperature of said first structure in response to outside temperature

(the indoor thermal gain rate for different outside temperatures is calculated, see

paragraph 253 and figure 3D).

Although Ehlers' HVAC system collects measurements and determines rate of change estimates for indoor temperatures, Ehlers does not disclose comparing with said one or more processors, an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

Van Ostrand discloses a comparing of the estimated rate of change of temperature in an HVAC system, derived via a learning process that may involve using both indoor and outdoor temperatures, to the actual measured temperature, in order to detect failed stages of an HVAC system. Van Ostrand discloses that if a temperature response is not identified as being the expected value, the stage is removed from the staging sequence (i.e. turned off) by the controller. It may be later reactivated if found to be correct (see paragraphs 29-33). Van Ostrand further discloses that this ensures that an HVAC system can still partially operate in the event of a failure (see paragraphs 4-5).

Therefore it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the invention of Ehlers by turning on and off an HVAC system in the case where the expected temperature, based on indoor and outdoor measurements, was unexpected, as per Van Ostrand, as that this ensures that an HVAC system can still partially operate in the event of a failure.

Regarding claim 11, Ehlers discloses the system may be in a single building (such as a whole house, see paragraph 91).

Regarding claim 12, Ehlers disclose the use of a programmable thermostat (see paragraph 132).

Regarding claim 13, insofar as the term "mesh networking" is described in the '488

patent's disclosure, it is not precluded that most common wireless LAN protocols are

useable in the context of a mesh network and would teach to this limitation. Ehlers

discloses the use of such wireless arrangements (see paragraphs 69-72, 84, 171, and

174).

Regarding claim 14, Ehlers discloses a programmable thermostat in communication

with a network (see paragraph 174).

Regarding claim 15, the HVAC in communication with the network may include an

electricity meter (see paragraphs 63 and 76).

Regarding claim 16, Ehlers discloses that the system uses an estimation of the future

rate of change that is inferred from the history of indoor and outdoor thermal gains (see

paragraph 253), which is subsequently use to detect failures, as per Van Ostrand.


Claims 2 and 10 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable

over Ehlers in view of Van Ostrand as applied to claims 1 and 9 above, and further in

view of U.S. Patent No. 6,789,739 to Rosen (hereinafter Rosen).

NOTE: For the purposes of claim construction, it is being presumed that the scope of

the claim encompasses any specific geographical data that would suggest a particular

local area.

Ehlers and Van Ostrand disclose the use of local sensors to determine outside

temperature and can retrieve local weather forecasts for use in analysis (see paragraph

88), but do not explicitly recite the manner in which in the local forecast would be

retrieved.

Rosen discloses an analogous HVAC system including the retrieval of local weather

information, such as by using a zip code, for a control system (see column 7, lines 19-

57).

Therefore it would have been obvious to one of ordinary skill in the art at the time the

invention was made to have implemented the invention of Ehlers and Van Ostrand by

using zip codes, as disclosed by Rosen, to specify the local weather information to be

retrieved.

### Conclusion

**All** correspondence relating to this ex parte reexamination proceeding should be

directed:

By Mail to:        Mail Stop *Ex Parte* Reexam
                   Central Reexamination Unit
                   Commissioner for Patents
                   United States Patent & Trademark Office
                   P.O. Box 1450
                   Alexandria, VA 22313-1450

By FAX to:         (571) 273-9900
                   Central Reexamination Unit

By hand:           Customer Service Window
                   Randolph Building
                   401 Dulany Street
                   Alexandria, VA 22314

Any inquiry concerning this communication should be directed to Examiner

Matthew Heneghan at telephone number (571)272-3834.

Application/Control Number: 90/014,916                                          Page 10
Art Unit: 3992

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MATTHEW E HENEGHAN whose telephone number is

(571)272-3834. The examiner can normally be reached M-F 8-5.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Michael Fuelling can be reached on (571)270-1367. The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/MATTHEW E HENEGHAN/
Primary Examiner, Art Unit 3992

Conferees:

/DEANDRA M HUGHES/
Reexamination Specialist, Art Unit 3992
/MICHAEL FUELLING/
Supervisory Patent Examiner, Art Unit 3992

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re *Ex Parte* Reexamination of: | : | |
| | : | |
| **U.S. Patent No. 8,412,488** | : | Reexam Control No.: **90/014,916** |
| | : | |
| Patent Issued: **April 2, 2013** | : | Reexam Filed: **December 3, 2021** |
| | : | |
| Application No.: **13/409,697** | : | Reexam Ordered: **January 28, 2022** |
| | : | |
| Application Filing Date: **March 1. 2012** | : | Examiner: **Matthew E. HENEGHAN** |
| | : | |
| Inventors: **Steinberg et al.** | : | Group Art Unit: **3992** |
| | : | |
| Assignee: **EcoFactor Inc.** | : | Confirmation No.: **2353** |
| | : | |

For:  **SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION**

### RESPONSE TO NON-FINAL OFFICE ACTION IN REEXAMINATION

**MAIL STOP:  REEXAMINATION**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

Commissioner:

In reply to the July 14, 2022 non-Final Office Action in the above-identified *Ex Parte*

Reexamination (Third Party Requested), kindly enter and consider the following Patent Owner's

Response.

**Listing of Claims** begins on page 2 of this paper.

**Support for Claim Amendments** begins on page 5 of this paper.

**Remarks** begin on page 6 of this paper.

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## LISTING OF CLAIMS

For the ease of examination, this listing of claims is provided in the conduct of this *Ex Parte* Reexamination. This listing of claims includes amendments to the issued claims in U.S. Patent No. 8,412,488 at issue in this *Ex Parte* Reexamination:

1. (Amended) A system for monitoring the operational status of an HVAC system comprising:

at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

wherein said one or more processors compare an <u>actual rate of change in</u> inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

2. (Original) A system as in claim 1 in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

3. (Original) A system as in claim 1 in which said HVAC system is located within a single family dwelling.

2

Ex Parte Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

4.    (Original)  A system as in claim 1 in which said HVAC system comprises a
programmable thermostat.

5.    (Original)  A system as in claim 1 in which said HVAC system comprises a
programmable thermostat that communicates with a mesh networking protocol.

6.    (Original)  A system as in claim 1 in which said HVAC system comprises a
programmable thermostat that communicates with a network.

7.    (Original)  A system as in claim 1 in which said one or more processors communicate
with said HVAC system using a network that includes an electricity meter.

8.    (Original)  A system as in claim 1 in which said estimation is a prediction about the
future rate of change in temperature inside said structure.

9.    (Amended)  A method for monitoring the operation of an HVAC system comprising:

receiving temperature measurements from at least one HVAC control system associated
with a first structure conditioned by at least one HVAC system;

receiving at one or more processors, measurements of outside temperatures from at least
one source other than said HVAC system;

comparing with said one or more processors the inside temperature of said first structure
and the outside temperature over time to derive an estimation for the rate of change in inside
temperature of said first structure in response to outside temperature, and

comparing with said one or more processors, an <u>actual rate of change in </u>inside
temperature recorded inside the first structure with said estimation for the rate of change in
inside temperature of said first structure to determine whether the first HVAC system is on or
off.

3

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

10.     (Original)  A method as in claim 9 in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

11.     (Original)  A method as in claim 9 in which said HVAC system is located within a single family dwelling.

12.     (Original)  A method as in claim 9 in which said HVAC system comprises a programmable thermostat.

13.     (Original)  A method as in claim 9 in which said HVAC system comprises a programmable thermostat that communicates with a mesh networking protocol.

14.     (Original)  A method as in claim 9 in which said HVAC system comprises a programmable thermostat that communicates with a network.

15.     (Original)  A method as in claim 9 in which said one or more processors communicate with said HVAC system using a network that includes an electricity meter.

16.     (Original)  A method as in claim 9 in which said estimation is a prediction about the future rate of change in temperature inside said structure.

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## SUPPORT FOR CLAIM AMENDMENTS

In view of the rejections of the Office Action, claims 1 and 9 are amended as indicated above.  Support for the amendments to claims 1 and 9 are found in the specification of U.S. Patent No. 8,412,488 ("488 Patent") at Column 7, Lines 57-64 (hereinafter C#/L#).

Specifically, the 488 Patent discloses that "[i]f the server determines that ***the temperature inside the house is rising at the rate predicted*** if the air conditioning is shut off, then the server confirms [] that the air conditioning has been shut off."  488 Patent, C7/L57-60 (emphasis added). Conversely, "[i]f the temperature reading from the thermostat shows ***no increase, or significantly less increase*** than predicted by the model, then the server concludes [] that the air conditioning was not switched off, and that no contribution to the demand response request was made."  488 Patent, C7/L60-64.

5

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## REMARKS

Claims 1-16 of the 488 Patent are the claims under reexamination, and the claims that stand rejected by the pending Office Action. Reconsideration of the claims under reexamination, which stand rejected, and issue of a Notice of Intent to Issue a Reexamination Certificate in view of the above amendments and the following Patent Owner's remarks are respectfully requested.

The Office Action, on page 3, rejects claims 1, 3-9, and 11-16 under pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over U.S. Patent Application Publication No. 2004/0117330 to Ehlers et al. ("Ehlers") in view of U.S. Patent Application Publication No. 2005/0159846 to Van Ostrand et al. ("Van Ostrand"). The Office Action, on page 8, rejects claims 2 and 10 under pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over Ehlers in view of Van Ostrand, as applied respectively to claims 1 and 9, and further in view of U.S. Patent No. 6,789,739 to Rosen. These rejections are respectfully traversed.

Claims 1 and 9 are amended in response to the prior art rejections of the Office Action in a manner that clearly distinguishes those claims, and the claims depending therefrom, over the combination of Ehlers with Van Ostrand. Patent Owner believes that the Office Action overreads at least Van Ostrand for what the reference can reasonably be considered to teach, or otherwise to have suggested, with respect to the subject matter the claims under reexamination, but amends the claims in an effort to further distinguish those claims based on the assertions set forth in the Office Action. Patent Owner also believes that the Office Action provides an unsupportable basis for combining Ehlers and Van Ostrand to render obvious the subject matter of the claims under reexamination, and as amended, given the express teachings of the references. The Patent Owner's assertions in this regard are fully detailed below.

6

Appx688

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## A.    The 488 Patent Claims

The 488 Patent claims are generally directed to systems and methods for estimating the rate of change in temperature inside a structure, and to use such estimate ultimately "to determine whether the climate control system [in the structure] is 'on' or 'off'." *See* the Abstract of the 488 Patent, and claims 1 and 9. In this regard, the 488 Patent claims generally encompass an explicit use of thermostatic HVAC controls connected to a computer network as a part of a system for offering demand reduction to electric utilities. Claims 1 and 9, and the claims depending therefrom, are directed more explicitly and specifically to "use of communicating thermostat[s] combined with a computer network to ***verify*** that demand reduction has occurred." *See* the 488 Patent, C1/L22-27 (emphasis added).

In the Background of the Invention ("Background") section, the 488 Patent acknowledges the then-emerging existence of agreements between utilities and their customers to reduce demand (or energy uses by the customers) during typically higher use periods, often in exchange for certain incentives from the utilities to their customers. *See generally* the 488 Patent, C2/L15-23. Dubbed "peak demand reduction (PDR) contracts," the Background of the 488 Patent further acknowledges that residential PDR implementations had suffered from certain shortfalls, deemed "technical complications," including a lack of feedback, and a customer's capacity to "tamper" with legacy systems, thereby circumventing the advantages of the residential PDR scheme. *See generally* the 488 Patent, C2/L42-59. In this regard, the 488 Patent claims are intended to provide systems and methods to detect, for example, customer non-compliance with, or circumvention of, the PDR schemes. The Background of the 488 Patent acknowledges finally that there are certain apparently cumbersome means by which utilities have attempted to ascertain evidence of customer

7

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

circumvention or non-compliance in residential PDR implementations. *See generally* the 488

Patent, C2/L60 – C3/L17.

Claim 1 of the 488 Patent, as amended, expressly requires:

wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

wherein said one or more processors compare ***an actual rate of change in inside temperature*** recorded inside the first structure with ***said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.***

Claim 1 of the 488 Patent, as amended (emphasis added).

Claim 9 of the 488 Patent, as amended, expressly requires:

comparing with said one or more processors the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

comparing with said one or more processors ***an actual rate of change in inside temperature*** recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure ***to determine whether the first HVAC system is on or off.***

Claim 9 of the 488 Patent, as amended (emphasis added).

The claimed comparisons are described according to the details regarding support for the

claim amendments *supra*. *See generally* 488 Patent, C7/L57-64.

Any reference(s) applied to reject the features of these claims must show that the systems

or methods disclosed in the reference(s) include the express comparison of the inside temperature

of said first structure and the outside temperature to derive an estimation for the rate of change in

inside temperature for said first structure. *See* Claims 1 and 9, as amended, above. The

reference(s) must then further show another express comparison of an actual rate of change in

8

inside temperature recorded inside said first structure with said estimation for the rate of change

in inside temperature of said first structure to determine whether the first HVAC system is **on or**

**off.** *See* Claims 1 and 9, as amended, above (emphasis added).

Neither Ehlers nor Van Ostrand, alone or in combination, discloses, or reasonably would

have suggested to one of skill in the art, this express combination of features for reasons that will

be discussed in greater detail below.

**B.    Ehlers**

At the outset, it should be recognized that the applied Ehlers reference is one of a broad

family of related Ehlers references, some of which were identified to the U.S. Patent and

Trademark Office ("USPTO") in the prosecution of the 488 patent.[1]

Ehlers is generally directed to "a system and method for managing the ***delivery and usage***

of a commodity such as electricity, natural gas, steam, water, chilled or heated water, or potable

or recycled water. *See* Ehlers at ¶[0002] (emphasis added). The systems and methods of Ehlers

are, in embodiments, directed to: (a) providing a node and a control system, with the node being

coupled to at least one device "sensing and controlling energy delivered to the device" (*see, e.g.,*

¶[0015]); (b) providing a method of "time shifting energy requirements" by for example, cutting

off energy to a control device during a particular time period and providing customer incentives

based on a number of parameters (*see, e.g.,* ¶[0016]); and (c) providing a user-interactive

---

[1]    Related Ehlers references are listed on the face of the 488 Patent as U.S. Patent No. 5,572,438;
U.S. Patent No. 7,130,719; and U.S. Patent Application Publication No. 2007/0043477. Each of
these Ehlers references was cited by the Patent Owner (then Applicant) to the USPTO in an
Information Disclosure Statement ("IDS") dated March 30, 2012. In fact, the Third Party Request
for *Ex Parte* Reexamination in this matter, dated December 3, 2021, at page 2, concedes that the
applied Ehlers reference "itself was not of record, but a publication ***in the same family*** (U.S. Pat.
App. Pub. 2007 /0043477)('Ehlers '477') was made of record in an IDS." (emphasis added).

9

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

thermostat device, which gives a user a visual display of "a characteristic of the energy supplied" (*see, e.g.,* ¶[0017]).

Ehlers expressly describes controlling devices via its gateway node, and reporting a status of each device based on its control inputs. *See generally* Ehlers at ¶¶[0137] – [0139].

To any extent that Ehlers can reasonably be deemed to teach a system and method that makes any calculations or comparisons based on inputs available from the connected nodes via an advanced thermostatic control device linked to a power distribution network (*see, e.g.,* ¶[0224]), the outputs of such calculations or comparisons, as may be broadly described in Ehlers, are expressly indicated as providing a user, in viewing those outputs locally, for example, an ability to "make an informed decision on where to set the desired temperature (or setpoints)." *See* Ehlers at ¶[0228]; *see also* Ehlers at ¶[0255] (noting that after providing output to a user regarding calculations such as those depicted, for example, in Fig. 3D of Ehlers, a step in the Ehlers process is "***for the user to pick*** from a plurality of economic options offered by the system 3.08 [ranging] from 100% comfort management without any regard for cost to 100% economic management without any regard to comfort." (emphasis added)), and Ehlers at ¶[0118] (expressly affording options for a customer, among other things, to "control the state of output relays (on/off)" or "view ***and override*** curtailment conditions" of a meter controlled device. (emphasis added)).

In this regard, Ehlers makes no attempt to verify, for example, user compliance or avoidance of tampering based on any calculations or comparisons. Ehlers confirms, for example, that only an amount of electrical power used is referenced to inform the monitoring and control functions that the Ehlers systems or methods undertake by communication among the nodes for turning on and off certain devices. *See generally* Ehlers at ¶¶[0064] and [0066].

10

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

Notably, Ehlers uses variations of the term "monitor" in excess of fifty (50) times throughout its disclosure. In this regard, it is reasonable to conclude that Ehlers covers all aspects of the parameters that the disclosed systems and methods are intended to "monitor." Nowhere does Ehlers suggest any need for supplementation of its monitoring schemes by, for example, applying other parameters to determine internal failures within Ehlers monitored and controlled devices, and specifically the disclosed and described HVAC devices.

Recognizing this, the Office Action concedes, at pages 4 and 7 with regard to the rejections of claims 1 and 9 respectively that "Ehlers does not disclose that said one or more processors compare [or comparing with said one or more processors] an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off." Rather, the Office Action relies on Van Ostrand as allegedly disclosing such a feature in a manner that the Office Action alleges would have made the teachings of Van Ostrand combinable with Ehlers to have rendered obvious the subject matter of at least claims 1 and 9 under reexamination.

The conclusions of the Office Action that: (a) Van Ostrand makes up for the identified deficiency in Ehlers with respect to the subject matter of the claims under reexamination, particularly as those claims have been amended in view of the rejections; and (b) Ehlers and Van Ostrand are combinable at all, including in the manner set forth in the Office Action to have rendered obvious the combinations of all of the features recited in claims 1 and 9, as amended, fail for the reasons discussed in greater detail below.

## C.    Van Ostrand

Van Ostrand is generally directed to "to an HVAC system, and more particularly to ***bypassing a failed HVAC system component and/or stages*** to assure at least partial system

11

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

capacity[,]" *i.e.*, to maintain the HVAC system with which Van Ostrand is associated in an "on" condition. *See* Van Ostrand at ¶[0002] (emphasis added). With more detail and according to specific considerations outlined in the reference, Van Ostrand expressly discloses that "it is desirable to provide an HVAC system control that ***identifies and isolates a failed HVAC system and/or stages*** on a system wide level ***to assure at least partial system capacity*** while minimizing delays within a staging sequence by monitoring a temperature of a controlled area." *See* Van Ostrand at ¶[0005] (emphasis added). Van Ostrand explicitly differentiates between a *failure* of a component in the disclosed HVAC system to "operate satisfactorily" and the component in the disclosed HVAC system being *turned on* by the central control. *See, e.g.*, Van Ostrand at ¶[0025] (with the controller "*remov[ing]* the failed stages from its staging sequence, leaving only the working stages" available and operating).

There is no suggestion in Van Ostrand that any analysis is undertaken of any parameters to determine whether the disclosed HVAC system of Van Ostrand is "on or off." Rather, Van Ostrand's controller modifies operation of the disclosed HVAC system to account for *on, but failed*, HVAC system components. *See, e.g.*, Van Ostrand at ¶¶[0027] – [0030].

The Office Action broadly alleges that Van Ostrand, at least at ¶¶[0029] – [0033], in its disclosure of a methodology for detecting and isolating "failed stages [components] of an HVAC system" can reasonably be considered to correspond to the requirement in the claims regarding using a particular comparison to determine whether an HVAC system is on or off. *See* pages 5 and 7 of the Office Action. The conclusion of the Office Action regarding what Van Ostrand can be considered to teach, or to have suggested, with regard to the subject matter of the claims under reexamination, and the express features recited therein, particularly as those claims have now been amended to distance them from any even broad interpretation of Van Ostrand, is unreasonable as

12

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

the objective of the systems and methods disclosed in Van Ostrand is *not* to differentiate between an "on" and an "off" condition of the HVAC system using any comparison. Rather, Van Ostrand modifies the operating conditions of the HVAC system (in an "on" condition) in a manner that explicitly "ensures that an HVAC system **can still partially operate** in the event of a failure" of one or more of the stages of disclosed HVAC system, *i.e.,* remain "on." *See, e.g.,* pages 5 and 7 of the Office Action (conceding this point, emphasis added). Referencing "paragraphs 4-5" of Van Ostrand, the Office Action concedes that this is what Van Ostrand teaches. *See id.*

Regardless, and for the sake of additional differentiation of the claimed subject matter in this regard, claims 1 and 9 are amended, as indicated above. No reasonable reading of Van Ostrand discloses that the reference makes any comparison of "an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure for any reason, including to determine whether the first HVAC system is on or off[,]" as is required by the claims, as amended.

For at least the above-indicated reason, Van Ostrand does not make up for the identified shortfall in the application of Ehlers to the features recited in at least claims 1 and 9 under reexamination, and as amended. Despite the assertion to the contrary in the Office Action, and as otherwise admitted by the Office Action, Van Ostrand does not teach the features:

wherein said one or more processors compare an **actual rate of change in** inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure **to determine whether the first HVAC system is on or off**, required by claim 1 (as amended, emphasis added); or

comparing with said one or more processors an **actual rate of change in** inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature

of said first structure *to determine whether the first HVAC system is on or off*, required by claim

9, as amended (emphasis added).

### D.     Combinability of Ehlers and Van Ostrand

The asserted rationale for combining Ehlers and Van Ostrand fails for a number of

reasons.

First, at pages 5 and 7, the Office Action extends its interpretation of Van Ostrand to the

subject matter of claims 1 and 9 to state that:

> Therefore it would have been obvious to one of ordinary skill in the art at the time
> the invention was made to have modified the invention of Ehlers by turning on and
> off an HVAC system in the case where the expected temperature, based on indoor
> and outdoor measurements, was unexpected, as per Van Ostrand, as that this
> ensures that an HVAC system can still partially operate in the event of a failure.

To any extent that this reflects what Van Ostrand teaches, which for the reasons detailed above

Patent Owner does not concede, this conclusion regarding combinability fails to address the

express features recited in claims 1 and 9, as quoted above, regarding applying a particular

comparison to determine whether an HVAC system is on or off. The amendments to claims 1 and

9 make the distinctions expressly clearer in distancing the subject matter of the pending claims

from the currently applied combination of references.

Second, there is no reasonably discernable suggestion in either Ehlers or Van Ostrand that

the specific monitoring and control systems and methods disclosed in these disparate references

are either inadequate to their stated purposes or are even combinable in the manner suggested by

the Office Action. It is difficult to see how the monitoring and control scheme of Ehlers, for

example, could reasonably be supplemented by a system or method to identify failed components

in an HVAC system. Ehlers already makes an evaluation of system (and device) efficiency based

on known parameters. *See, e.g.,* Ehlers at ¶[0204]; *see also* Ehlers at ¶[0238] (evaluating relative

14

efficiencies) and Ehlers at ¶[0306] (describing providing "[e]nergy efficiency factors derived from modeling the site 1.04 using a model such as the DOE-2.1 modeling system for comparison of operational efficiency.").

Third, it appears that, as best understood, the rationale for combining Ehlers and Van Ostrand is grounded in the inventive step that the inventors determined, and that the Patent Owner chose to include in the claims. It is well understood that claims are not rendered obvious simply by showing that all elements are present in the prior art. Patent Owner's position is here that has not even been shown, for the reasons outlined above. None of the alleged teachings, suggestions or motivations specified by the Office Action as being described in Van Ostrand (quoted above) would necessarily have caused one of skill in the art to modify any alleged inventive concept taught by Ehlers in the manner suggested with any degree of predictability, and for the reasons stated immediately above.

Patent Owner respectfully does not accept what appears to be the conclusion of the Office Action that, because Van Ostrand allegedly discloses what the Office Action indicates, any modification of Ehlers with Van Ostrand would have been made for any purpose, much less to have rendered obvious the express features recited in at least claims 1 and 9, as amended.

Patent Owner believes that the Office Action must do more than state that, based on Van Ostrand's description of a particular methodology for accounting for failed components or stages in HVAC systems as beneficial, such modification, even if possible, would be applicable to virtually any HVAC monitoring and control system such as that disclosed in Ehlers to render the features recited in claims 1 and 9 obvious.

Patent Owner notes that the Federal Circuit has consistently reaffirmed its holdings regarding the necessary showings, and the U.S. Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*,

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

550 U.S. 398, 127 S. Ct. 1727 (2007) confirmed, that "rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) (quoting *In re Lee*, 277 F.3d 1338, 1343-46 (Fed. Cir. 2002), and *In re Rouffet*, 149 F.3d 1350, 1355-59 (Fed. Cir. 1998)). This standard is not met here as the allegedly articulated reasoning, as best understood, lacks any rational underpinning based on the teachings of the references, and any alleged applicability to the express features recited in at least claims 1 and 9. There is nothing, for example, in either of Ehlers or Van Ostrand, even when combined with the knowledge of one of ordinary skill in the HVAC monitor and control arts, to support such a conclusion without the 488 Patent claims as a guide or a recipe to arrive at such a conclusion.

MPEP §2143.01 instructs that "[t]he mere fact that references can be combined or modified does not render the resultant combination obvious unless the results would have been predictable to one of ordinary skill in the art." *Id.*, (citing *KSR Int'l Co.*, 550 U.S. at 417). The Patent Owner respectfully submits that the rejection of the Office Action regarding at least claims 1 and 9 is improper in view of at least MPEP §2143.01, because the Office Action lacks the required specific evidence of "predictab[ility] to one of ordinary skill in the art," notwithstanding the conclusory statements in the Office Action for the reasons noted above.

For at least these reasons, no prima facie showing that the teachings of Van Ostrand would have been combinable with Ehlers in the manner suggested by the Office Action to render obvious the combinations of all of the features recited in claims 1 and 9 can be sustained on this record.

\*     \*     \*     \*     \*

16

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

For all of the reasons set forth above, the rejections of claims 1 and 9 in reexamination, and as amended, as allegedly being unpatentable over a combination of Ehlers and Van Ostrand, are overcome, and should respectfully be withdrawn. Moreover, because claims 3-8 depend directly from claim 1, and claims 11-16 depend directly from claim 9, and inherit all of the features and limitations of claims 1 and 9, respectively, the rejections of claims 3-8 and 11-16 in reexamination as allegedly being unpatentable over the combination of Ehlers and Van Ostrand are overcome, and should respectfully be withdrawn. Finally, because claim 2 depends directly from claim 1, and claim 10 depends directly from claim 9, and these claims inherit all of the features and limitations of claims 1 and 9, respectively, and Rosen is not applied by the Office Action in a manner that would overcome the shortfalls in the application of Ehlers and Van Ostrand to reject claims 1 and 9, the rejection of claims 2 and 10 in reexamination as allegedly being unpatentable over a combination of Ehlers with Van Ostrand and Rosen are overcome, and should respectfully be withdrawn.

17

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## CONCLUSION

Having addressed all of the rejections of the Office Action, Patent Owner respectfully submits that claims 1-16 under reexamination are allowable, and a Notice of Intent to Issue a Reexamination Certificate is earnestly solicited. Should any questions arise regarding this Response, all inquiries may be directed to Patent Owner's undersigned representative at the telephone number set forth below.

Respectfully submitted,

September 13, 2022        By:    /Daniel A. Tanner, III/
                                 Daniel A. Tanner, III

Correspondence Address:         Attorney of Record
Customer No. 144465            Registration No. 54,734
*TannerIP PLLC*                 Telephone No. 703-232-1160 (Ext. 101)
                                 Facsimile No. 571-393-3610

Attachment:
       Certificate of Service

| | | Multipart Description/PDF files in .zip description | | |
|---|---|---|---|---|
| | | Document Description | Start | End |
| | | Amendment/Request for Reconsideration-After Non-Final Rejection | 1 | 1 |
| | | Claims | 2 | 4 |
| | | Applicant Arguments/Remarks Made in an Amendment | 5 | 18 |

| | | | | | |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Reexam Certificate of Service | CerificateOfService.pdf | 144405<br><br>5abe32997 5aabe5o776b1a679cc59d93f07<br>88701 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | | 383753 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

 UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465    7590    10/05/2022

Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/05/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

SMITH BALUCH LLP
376 BOYLSTON ST
STE 401
BOSTON, MA 02116

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,916* .

PATENT UNDER REEXAMINATION  *8412488* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

Application/Control Number: 90/014,916                                                      Page 2
Art Unit: 3992

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Ex Parte Reexamination*

*Ex Parte* Reexamination has been granted in response to a request by a third

party, Andrew S. Baluch, on behalf of Google LLC. Claims 1-16 of U.S. Patent No.

8,412,488 to Steinberg et al. are being reexamined.

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 8,412,488 (hereinafter the '488 patent) throughout the

course of this reexamination proceeding. The third party requester is also reminded of

the ability to similarly apprise the Office of any such activity or proceeding throughout

the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).

In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

In response to the previous Office Action, claim 1 has been amended. Claims 1-16 have been examined.

## *Claim Rejections - 35 USC § 305*

Claims 1-16 are rejected under 35 U.S.C. 305 as enlarging the scope of the claims of the patent being reexamined. In 35 U.S.C. 305, it is stated that "[n]o proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding...." A claim presented in a reexamination "enlarges the scope" of the patent claim(s) where the claim is broader than each and every claim of the patent. A claim is broader in scope than the original claims if it contains within its scope any conceivable product or process which would not have infringed the original patent. A claim is broadened if it is broader in any one respect, even though it may be narrower in other respects.

Claims 1 and 9 have been amended such that its scope no longer requires a comparison of the actual inside temperature recorded inside the first structure with the estimation for the rate of change. It is therefore improperly broadening in scope.

Claims 2-8 and 10-16 are dependent upon claims 1 and 9 and fully incorporate their limitations, rendering them likewise broadening in scope.

## Claim Rejections - 35 USC § 103

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Claims 1, 3-9, and 11-16 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Patent Application Publication No. 2004/0117330 to Ehlers et al. (hereinafter Ehlers) in view of U.S. Patent Application Publication No. 2005/0159846 to Van Ostrand et al. (hereinafter Van Ostrand).

Regarding claim 1, Ehlers discloses a system for monitoring the operational status of an HVAC system (see paragraphs 90, 92, and 95) comprising:

at least one HVAC control system associated with a first structure (the system is used at a site having an occupant, see paragraph 11; moreover, HVAC is known in the art as commonly related to the heating and air conditioning of a particular structure. Ehler's gateway node 1.10D is associated with a particular structure being maintained, see

paragraph 91) that receives temperature measurements from at least a first structure

conditioned by at least one HVAC system (see paragraphs 92, 93, 137, 230, and 231);

one or more processors that receive measurements of outside temperatures from at

least one source other than said HVAC system (see paragraphs 88 and 229-231),

wherein said one or more processors compares the inside temperature of said first

structure and the outside temperature over time to derive an estimation for the rate of

change in inside temperature of said first structure in response to outside temperature

(the indoor thermal gain rate for different outside temperatures is calculated, see

paragraph 253 and figure 3D).

Although Ehlers' HVAC system collects measurements and determines rate of change

estimates for indoor temperatures, Ehlers does not disclose that said one or more

processors compare an actual rate of change in inside temperature recorded inside the

first structure with said estimation for the rate of change in inside temperature of said

first structure to determine whether the first HVAC system is on or off.

Van Ostrand discloses a comparing of the estimated rate of change of temperature in

an HVAC system, derived via a learning process that may involve using both indoor and

outdoor temperatures, to the actual rate of change in temperature, in order to detect

failed stages of an HVAC system. Van Ostrand discloses that if a temperature response

is not identified as being the expected value, the stage is removed from the staging

sequence (i.e. turned off) by the controller. It may be later reactivated if found to be

correct (see paragraphs 29-33). Van Ostrand further discloses that this ensures that an

HVAC system can still partially operate in the event of a failure (see paragraphs 4-5).

Therefore it would have been obvious to one of ordinary skill in the art at the time the

invention was made to have modified the invention of Ehlers by turning on and off an

HVAC system in the case where the expected temperature, based on indoor and

outdoor measurements, was unexpected, as per Van Ostrand, as that this ensures that

an HVAC system can still partially operate in the event of a failure.

Regarding claim 3, Ehlers discloses the system may be in a single building (such as a

whole house, see paragraph 91).

Regarding claim 4, Ehlers disclose the use of a programmable thermostat (see

paragraph 132).

Regarding claim 5, insofar as the term "mesh networking" is described in the '488

patent's disclosure, it is not precluded that most common wireless LAN protocols are

useable in the context of a mesh network and would teach to this limitation. Ehlers

discloses the use of such wireless arrangements (see paragraphs 69-72, 84, 171, and

174).

Regarding claim 6, Ehlers discloses a programmable thermostat in communication with

a network (see paragraph 174).

Regarding claim 7, the HVAC in communication with the network may include an

electricity meter (see paragraphs 63 and 76).

Regarding claim 8, Ehlers discloses that the system uses an estimation of the future

rate of change that is inferred from the history of indoor and outdoor thermal gains (see

paragraph 253), which is subsequently use to detect failures, as per Van Ostrand.


Regarding claim 9, Ehlers discloses a method for monitoring the operation of an HVAC

system (see paragraphs 90, 92, and 95) comprising:

receiving temperature measurements from at least one HVAC control system

associated with a first structure (the system is used at a site having an occupant, see

paragraph 11; moreover, HVAC is known in the art as commonly related to the heating

and air conditioning of a particular structure. Ehler's gateway node 1.10D is associated

with a particular structure being maintained, see paragraph 91) conditioned by at least

one HVAC system (see paragraphs 92, 93, 137, 230, and 231);

receiving at one or more processors, measurements of outside temperatures from at

least one source other than said HVAC system (see paragraphs 88 and 229-231);

comparing with said one or more processors the inside temperature of said first

structure and the outside temperature over time to derive an estimation for the rate of

change in inside temperature of said first structure in response to outside temperature

(the indoor thermal gain rate for different outside temperatures is calculated, see

paragraph 253 and figure 3D).

Although Ehlers' HVAC system collects measurements and determines rate of change

estimates for indoor temperatures, Ehlers does not disclose comparing with said one or

more processors, an actual rate of change in inside temperature recorded inside the

first structure with said estimation for the rate of change in inside temperature of said

first structure to determine whether the first HVAC system is on or off.

Van Ostrand discloses a comparing of the estimated rate of change of temperature in

an HVAC system, derived via a learning process that may involve using both indoor and

outdoor temperatures, to the actual rate of change in temperature, in order to detect

failed stages of an HVAC system. Van Ostrand discloses that if a temperature response

is not identified as being the expected value, the stage is removed from the staging

sequence (i.e. turned off) by the controller. It may be later reactivated if found to be

correct (see paragraphs 29-33). Van Ostrand further discloses that this ensures that an

HVAC system can still partially operate in the event of a failure (see paragraphs 4-5).

Therefore it would have been obvious to one of ordinary skill in the art at the time the

invention was made to have modified the invention of Ehlers by turning on and off an

HVAC system in the case where the expected temperature, based on indoor and

outdoor measurements, was unexpected, as per Van Ostrand, as that this ensures that

an HVAC system can still partially operate in the event of a failure.

Regarding claim 11, Ehlers discloses the system may be in a single building (such as a

whole house, see paragraph 91).

Regarding claim 12, Ehlers disclose the use of a programmable thermostat (see

paragraph 132).

Regarding claim 13, insofar as the term "mesh networking" is described in the '488

patent's disclosure, it is not precluded that most common wireless LAN protocols are

useable in the context of a mesh network and would teach to this limitation. Ehlers

discloses the use of such wireless arrangements (see paragraphs 69-72, 84, 171, and

174).

Regarding claim 14, Ehlers discloses a programmable thermostat in communication

with a network (see paragraph 174).

Regarding claim 15, the HVAC in communication with the network may include an

electricity meter (see paragraphs 63 and 76).

Regarding claim 16, Ehlers discloses that the system uses an estimation of the future rate of change that is inferred from the history of indoor and outdoor thermal gains (see paragraph 253), which is subsequently use to detect failures, as per Van Ostrand.


Claims 2 and 10 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Ehlers in view of Van Ostrand as applied to claims 1 and 9 above, and further in view of U.S. Patent No. 6,789,739 to Rosen (hereinafter Rosen).

NOTE: For the purposes of claim construction, it is being presumed that the scope of the claim encompasses any specific geographical data that would suggest a particular local area.

Ehlers and Van Ostrand disclose the use of local sensors to determine outside temperature and can retrieve local weather forecasts for use in analysis (see paragraph 88), but do not explicitly recite the manner in which in the local forecast would be retrieved.

Rosen discloses an analogous HVAC system including the retrieval of local weather information, such as by using a zip code, for a control system (see column 7, lines 19-57).

Therefore it would have been obvious to one of ordinary skill in the art at the time the invention was made to have implemented the invention of Ehlers and Van Ostrand by using zip codes, as disclosed by Rosen, to specify the local weather information to be retrieved.

### Response to Arguments

Applicant's arguments filed 13 September 2022 have been fully considered but they are not persuasive.

Regarding the argument that Van Ostrand only detects failures, rather than whether a system is on or off, it is noted that an inoperative unit is, by definition, off. Van Ostrand uses the temperature change comparison to make such an analysis ("If there is no change in the rate of change, the component can be assumed to be inoperative", see paragraph 31).

Regarding the argument that Van Ostrand does not disclose a comparison of an actual rate of change in the inside temperature with an estimation for the rate of change, the cited portion of Van Ostrand clearly does show this new limitation ("A higher stage, having more capacity, will create a more positive slope to the controlled environment temperature vs. time curve than the stage below it (FIG. 4). If such a response is not identified by the controller 12, the stage is classified as having failed", see paragraph 29), and the grounds of rejection have been modified accordingly.

Regarding the argument that it would be improper to combine the teachings of Ehlers and Van Ostrand, Ehlers discloses a comprehensive system for delivering and managing energy usage, based on a large number of factors, noting that "most end use consumers do not have the time, experience, and/or access to data to monitor, track, and use these devices (see paragraph 13). Ehlers, when modified by the teachings of Van Ostrand, gains the ability to adjust distribution and usage in light of an HVAC

system being found to be operating less than optimally. As stated above, one skilled in

the would find such a feature to be advantageous.

### *Conclusion*

Patent owner's amendment filed 13 September 2022 necessitated the new

grounds of rejection presented in this Office action. Accordingly, **THIS ACTION IS**

**MADE FINAL**. See MPEP § 706.07(a).

A shortened statutory period for response to this action is set to expire 2

MONTHS from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination**

**proceedings.** The provisions of 37 CFR 1.136 apply only to "an applicant" and not to

parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR

1.550(a), it is required that reexamination proceedings "will be conducted with special

dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37**

**CFR 1.550(c).** A request for extension of time must specify the requested period of

extension and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g).

Any request for an extension in a third party requested ex parte reexamination must be

filed on or before the day on which action by the patent owner is due, and the mere

filing of a request will not effect any extension of time. A request for an extension of time

in a third party requested ex parte reexamination will be granted only for sufficient

cause, and for a reasonable time specified. Any request for extension in a patent owner

Application/Control Number: 90/014,916                                      Page 12
Art Unit: 3992

requested ex parte reexamination (including reexamination ordered under 35 U.S.C.

257) for up to two months from the time period set in the Office action must be filed no

later than two months from the expiration of the time period set in the Office action.  A

request for an extension in a patent owner requested ex parte reexamination for more

than two months from the time period set in the Office action must be filed on or before

the day on which action by the patent owner is due, and the mere filing of a request for

an extension for more than two months will not effect the extension.  The time for taking

action in a patent owner requested ex parte reexamination will not be extended for more

than two months from the time period set in the Office action in the absence of sufficient

cause or for more than a reasonable time.

The filing of a timely first response to this final rejection will be construed as

including a request to extend the shortened statutory period for an additional two

months. In no event, however, will the statutory period for response expire later than

SIX MONTHS from the mailing date of the final action. See MPEP § 2265.

All correspondence relating to this ex parte reexamination proceeding should be

directed:

By Mail to:      Mail Stop *Ex Parte* Reexam
                 Central Reexamination Unit
                 Commissioner for Patents
                 United States Patent & Trademark Office
                 P.O. Box 1450
                 Alexandria, VA 22313-1450

By FAX to:       (571) 273-9900
                 Central Reexamination Unit

Application/Control Number: 90/014,916                                    Page 13
Art Unit: 3992

By hand:         Customer Service Window
                 Randolph Building
                 401 Dulany Street
                 Alexandria, VA 22314

Any inquiry concerning this communication should be directed to Examiner

Matthew Heneghan at telephone number (571)272-3834.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to MATTHEW E HENEGHAN whose telephone number is

(571)272-3834. The examiner can normally be reached M-F 8-5.

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Michael Fuelling can be reached on (571)270-1367. The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.


Information regarding the status of published or unpublished applications may be

obtained from Patent Center. Unpublished application information in Patent Center is

available to registered users. To file and manage patent submissions in Patent Center,

visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-

center for more information about Patent Center and

https://www.uspto.gov/patents/docx for information about filing in DOCX format. For

additional questions, contact the Electronic Business Center (EBC) at 866-217-9197

Application/Control Number: 90/014,916                                    Page 14
Art Unit: 3992

(toll-free). If you would like assistance from a USPTO Customer Service

Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/MATTHEW E HENEGHAN/
Primary Examiner, Art Unit 3992

Conferees:

/DEANDRA M HUGHES/
Reexamination Specialist, Art Unit 3992
/MICHAEL FUELLING/
Supervisory Patent Examiner, Art Unit 3992

| *Office Action in Ex Parte Reexamination* | **Control No.** 90/014,916 | **Patent Under Reexamination** 8412488 |
|---|---|---|
| | **Examiner** MATTHEW E HENEGHAN | **Art Unit** 3992 / **AIA (FITF) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a. ☑ Responsive to the communication(s) filed on <u>13 September 2022</u>.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

b. ☑ This action is made FINAL.

c. ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

  1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.

  2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____.

Part II    SUMMARY OF ACTION

  1a. ☑ Claims <u>1-16</u> are subject to reexamination.

  1b. ☐ Claims _____ are not subject to reexamination.

  2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

  3. ☐ Claims _____ are patentable and/or confirmed.

  4. ☑ Claims <u>1-16</u> are rejected.

  5. ☐ Claims _____ are objected to.

  6. ☐ The drawings, filed on _____ are acceptable.

  7. ☐ The proposed drawing correction, filed on _____ has been (7a) ☐ approved (7b) ☐ disapproved.

  8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. 119(a)-(d) or (f).

      a) ☐ All  b) ☐ Some* c) ☐ None    of the certified copies have

      1 ☐ been received.

      2 ☐ not been received.

      3 ☐ been filed in Application No. _____.

      4 ☐ been filed in reexamination Control No. _____.

      5 ☐ been received by the International Bureau in PCT application No. _____.

      * See the attached detailed Office action for a list of the certified copies not received.

  9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

  10. ☐ Other: _____

cc: Requester (if third party requester)

| *Reexamination* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 90/014,916 | 8412488 |
| | **Certificate Date** | **Certificate Number** |
| | | |

| **Requester Correspondence Address:** ☐  **Patent Owner** ☑  **Third Party** |
|---|
| SMITH BALUCH LLP<br>376 BOYLSTON ST<br>STE 401<br>BOSTON, MA 02116 |

| **LITIGATION REVIEW** ☑ | /MH/<br>(examiner initials) | 29 September 2022<br>(date) |
|---|---|---|
| Case Name | | Director Initials |
| 6:20cv76 (CLOSED) | | |
| 1:20cv11007, 6:20cv00075, 6:20cv00078, 5:20cv00080 (OPEN) | | |

| COPENDING OFFICE PROCEEDINGS | |
|---|---|
| **TYPE OF PROCEEDING** | **NUMBER** |
| None. | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office                                                                DOC. CODE **RXFILJKT**

| *Search Notes* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 90/014,916 | 8412488 |
| | Examiner | Art Unit |
| | MATTHEW E HENEGHAN | 3992 |

| CPC - Searched* | | |
|---|---|---|
| Symbol | Date | Examiner |
| | | |

| CPC Combination Sets - Searched* | | |
|---|---|---|
| Symbol | Date | Examiner |
| | | |

| US Classification - Searched* | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |

\* See search history printout included with this form or the SEARCH NOTES box below to determine the scope of the search.

| Search Notes | | |
|---|---|---|
| Search Notes | Date | Examiner |
| Review of Prosecution History | 07/07/2022 | MH |
| Reevaluation of references, PTAB search | 09/29/2022 | MH |

| Interference Search | | | |
|---|---|---|---|
| US Class/CPC Symbol | US Subclass/CPC Group | Date | Examiner |
| | | | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office

Page 1 of 1

Part of Paper No.: 20220929

Appx721

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re *Ex Parte* Reexamination of: | : | |
| | : | |
| **U.S. Patent No. 8,412,488** | : | Reexam Control No.: **90/014,916** |
| | : | |
| Patent Issued: **April 2, 2013** | : | Reexam Filed: **December 3, 2021** |
| | : | |
| Application No.: **13/409,697** | : | Reexam Ordered: **January 28, 2022** |
| | : | |
| Application Filing Date: **March 1. 2012** | : | Examiner: **Matthew E. HENEGHAN** |
| | : | |
| Inventors: **Steinberg et al.** | : | Group Art Unit: **3992** |
| | : | |
| Assignee: **EcoFactor Inc.** | : | Confirmation No.: **2353** |
| | : | |

For: **SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION**

<u>**RESPONSE TO FINAL OFFICE ACTION IN REEXAMINATION**</u>

**MAIL STOP: REEXAMINATION**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

Commissioner:

In reply to the October 5, 2022, Final Office Action in the above-identified *Ex Parte*

Reexamination (Third Party Requested), kindly enter and consider the following Patent Owner's

Response.

**Listing of Claims** begins on page 2 of this paper.

**Support for Claim Amendments** begins on page 5 of this paper.

**Remarks** begin on page 6 of this paper.

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## **LISTING OF CLAIMS**

For the ease of examination, this listing of claims is provided in the conduct of this *Ex Parte* Reexamination. This listing of claims includes further amendments to the issued claims in U.S. Patent No. 8,412,488 at issue in this *Ex Parte* Reexamination over those proposed in Patent Owner's September 13, 2022, Response to Non-Final Office Action in Reexamination ("September 13 Response").

1.     (Amended)  A system for monitoring the operational status of an HVAC system comprising:

at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

wherein said one or more processors compare an <u>actual rate of change in </u>inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

2.     (Original)  A system as in claim 1 in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

2

Appx741

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

3.      (Original)  A system as in claim 1 in which said HVAC system is located within a single

family dwelling.

4.      (Original)  A system as in claim 1 in which said HVAC system comprises a

programmable thermostat.

5.      (Original)  A system as in claim 1 in which said HVAC system comprises a

programmable thermostat that communicates with a mesh networking protocol.

6.      (Original)  A system as in claim 1 in which said HVAC system comprises a

programmable thermostat that communicates with a network.

7.      (Original)  A system as in claim 1 in which said one or more processors communicate

with said HVAC system using a network that includes an electricity meter.

8.      (Original)  A system as in claim 1 in which said estimation is a prediction about the

future rate of change in temperature inside said structure.

9.      (Twice Amended)  A method for monitoring the operation of an HVAC system

comprising:

receiving temperature measurements from at least one HVAC control system associated

with a first structure conditioned by at least one HVAC system;

receiving at one or more processors, measurements of outside temperatures from at least

one source other than said HVAC system;

comparing with said one or more processors the inside temperature of said first structure

and the outside temperature over time to derive an estimation for the rate of change in inside

temperature of said first structure in response to outside temperature, and

comparing with said one or more processors, an inside temperature recorded inside the

first structure with said estimation for the rate of change in inside temperature of said first

3

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

structure <u>by comparing an actual rate of change in the inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature</u> to determine whether the first HVAC system is on or off.

10.     (Original)  A method as in claim 9 in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

11.     (Original)  A method as in claim 9 in which said HVAC system is located within a single family dwelling.

12.     (Original)  A method as in claim 9 in which said HVAC system comprises a programmable thermostat.

13.     (Original)  A method as in claim 9 in which said HVAC system comprises a programmable thermostat that communicates with a mesh networking protocol.

14.     (Original)  A method as in claim 9 in which said HVAC system comprises a programmable thermostat that communicates with a network.

15.     (Original)  A method as in claim 9 in which said one or more processors communicate with said HVAC system using a network that includes an electricity meter.

16.     (Original)  A method as in claim 9 in which said estimation is a prediction about the future rate of change in temperature inside said structure.

4

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## SUPPORT FOR CLAIM AMENDMENTS

In view of the rejections of the Final Office Action, and without conceding the propriety of those rejections, Patent Owner further amends claim 9 as indicated above.  Support for the proposed amendment to claim 9 can be found in the specification of U.S. Patent No. 8,412,488 ("488 Patent") at Column 7, Lines 57-64 (hereinafter C#/L#), and specifically as follows:

> Specifically, the 488 Patent discloses that "[i]f the server determines that ***the temperature inside the house is rising at the rate predicted*** if the air conditioning is shut off, then the server confirms [] that the air conditioning has been shut off." 488 Patent, C7/L57-60 (emphasis added).  Conversely, "[i]f the temperature reading from the thermostat shows ***no increase, or significantly less increase*** than predicted by the model, then the server concludes [] that the air conditioning was not switched off, and that no contribution to the demand response request was made." 488 Patent, C7/L60-64.

5

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## REMARKS

Claims 1-16 of the 488 Patent are the claims under reexamination, and the claims (as amended by Patent Owner's September 13 Response) that remain rejected by the pending Final Office Action. Reconsideration of the claims under reexamination, which stand rejected, and issue of a Notice of Intent to Issue a Reexamination Certificate, in view of the claim amendments and the following Patent Owner's remarks, are respectfully requested.

## I.    SUPPORT FOR ENTRY OF THE AMENDMENT TO CLAIM 9

Patent Owner respectfully requests entry and consideration of the amendment to claim 9 under the provisions of 37 C.F.R. §1.116(b)(2)-(3) for at least the following reasons. The amendment of claim 9 presents rejected claims 9-16 in better form for consideration on appeal, should appeal become necessary. *See* 37 C.F.R. §1.116(b)(2). The amendment touches the merits of the patent under reexamination, and Patent Owner presents the following statements as a showing of good and sufficient reasons why the amendment is necessary and was not earlier presented. *See* 37 C.F.R. §1.116(b)(3). The amendment to claim 9 is necessary to address the unforeseen and unforeseeable issues raised in the Final Office Action rejecting the claims under 35 U.S.C. §305, and to account for the potential that the Examiners may disagree with the Patent Owner's well-made arguments presented below regarding the unreasonableness of the rejection of the pending claims under 35 U.S.C. §305. The amendment to claim 9 was not earlier presented because, for all the reasons argued below regarding the scope of the claims, Patent Owner reasonably understood that the previously-amended claim language, even as retained in claim 1, did not raise issues of any alleged broadening of the scope of the claims in violation of 35 U.S.C. §305. Patent Owner's position in this regard remains unchanged based on the totality of the arguments set forth below. Patent Owner nonetheless amends claim 1 to cover any potential loss

6

in patent rights. Patent Owner believes that the above statements provide good and sufficient reasons for entry and consideration of the newly-presented amendment to claim 9.

## II    REJECTION OF THE AMENDED CLAIMS UNDER 35 U.S.C. §305

The Final Office Action, on page 3, rejects amended claims 1-16 under 35 U.S.C. §305 as allegedly "enlarging the scope of the claims of the patent being reexamined." This rejection is respectfully traversed.

The Final Office Action, further on page 3, sets forth the standard for determining whether a claim, as amended, is considered to have been enlarged in scope, as will be discussed in further detail below. Without presenting any evidence that the stated standard for determining the scope of the claims has been applied in review of the previously proposed claim amendments, the Final Office Action, in a conclusory manner, states "[c]laims 1 and 9 have been amended such that its scope no longer requires a comparison of *the actual inside temperature* recorded inside the first structure with the estimation for the rate of change." Final Office Action, p. 4 (emphasis added). The Final Office Action continues by concluding, without evidentiary support, that "[i]t is therefore improperly broadening in scope." *Id.* Importantly here, the Final Office Action mischaracterizes the specific language of the proposed claim amendments, and separately fails to identify "any conceivable product or process" that is contained within the scope of the proposed amended claims that "would not have infringed the original patent," as is required to find that the claim has been broadened in scope. *See id.*, p. 3. Notwithstanding, Patent Owner's strict disagreement with the conclusions of the Final Office Action, and for the reasons set forth in detail in Section I. *supra.*, Patent Owner proposes to newly amend claim 9 in a manner that cannot conceivably be alleged to broaden the scope of the claim.

7

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

For the reasons discussed below, Patent Owner respectfully asserts that the conclusions of the Final Office Action are improper with respect to the basic conclusion that claim 1 (and previously amended claim 9) have been improperly broadened by the amendment to those claims proposed in Patent Owner's September 13 Response. Further, Patent Owner respectfully requests that the rejection of the pending claims under 35 U.S.C. §305 should be withdrawn. If the rejection of the pending claims under 35 U.S.C. §305 is maintained, a separate Final Office Action must be issued that sets forth, with particular specificity, the basis for the assertion that the claims have been improperly broadened by the Patent Owner's earlier proposed amendments.

The Final Office Action does not address the full scope of the proposed amended claim feature, and does not use the claim language from the 488 Patent or the amended claim language as proposed in Patent Owner's September 13 Response as the basis for the rejection set forth in the Final Office Action. Rather, the Final Office Action appears to base its conclusion on an interpretation of the claim language that is not supported by either the original claim language or the proposed amended claim language, and does not account for the full details of the proposed amendment that was made to narrow the scope of the claims in addressing the previously-asserted prior art rejections of the first Office Action.

By way of review, the language in claim 1 of the 488 Patent reads:

wherein said one or more processors compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

Nowhere does the above claim language use the phrase "actual inside temperature," as is indicated by the Final Office Action. The proposed amended claim language for claim 1 in Patent Owner's September 13 Response reads:

8

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

> wherein said one or more processors compare an <u>actual rate of change in</u> inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

As indicated above, the Final Office Action states that claim 1 (and previously amended claim 9) are amended such that the scope of these claims "no longer requires a comparison of the *actual* inside temperature recorded inside the first structure with the estimation for the rate of change." As noted above, the claims of the 488 Patent did not recite an "actual inside temperature." The claim term "actual" only appears in the proposed amended claim language to differentiate the proposed narrower parameter regarding an *actual* rate of change in inside air temperature with the claimed *estimation for the* rate of change in inside temperature. The "actual rate of change" language was expressly amended into the claims specifically to overcome the asserted prior art rejections in the first Office Action. In this regard, the language of the rejection in the Final Office Action, as it can best be interpreted by the Patent Owner, does not provide any basis for rejecting the claims under 35 U.S.C. §305. It is the precise language of the claims that needs to be interpreted and/or construed, and that does not appear to have been done here.

The rejection in the Final Office Action does not account for the fact that the full claim phrase that is proposed to be amended into the claims, which is "an *actual rate of change in* inside temperature," represents a parameter that is narrower than "an inside temperature," as recited in the claims of the 488 Patent. The Final Office Action does not even mention this proposed amended claim language in its entirety. Therefore, the Final Office Action cannot be reasonably deemed to support the stated rejection. There is no record of any attempt in the Final Office Action to compare any scope of the proposed amended claim term, and the claimed comparison deriving

9

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

therefrom, with the scope of the original claim language and the comparison deriving therefrom according to the original claims.

The conclusory statements in the Final Office Action fail to provide any evidence of the steps taken in the requisite broadening inquiry according to Federal Circuit precedent, and as interpreted by the Manual of Patent Examining Procedure ("MPEP"), even as quoted by the Final Office Action. *See id.*, p. 3. It is well settled under Federal Circuit case law that the broadening inquiry under 35 U.S.C. §305 involves two steps. *See, e.g. ,Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002). First, the inquiry requires an analysis of the scope of the claim prior to reexamination. *See id.* Then, the inquiry requires a comparison of that scope with the scope of the claim as amended in reexamination. *See id.* As broadly quoted by the Final Office Action, Federal Circuit precedent directs that a claim "is broader in scope than the original claims if it contains within its scope any conceivable apparatus or process which would not have infringed the original patent." *See also Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298, 1303 (Fed. Cir. 2008).

With regard to *ex parte* reexamination proceedings, MPEP §2258 III., entitled "Claims in Proceeding Must Not Enlarge Scope of the Claims of the Patent" provides:

> Where new or amended claims are presented [], the claims of the reexamination proceeding should be examined under 35 U.S.C. 305, to determine whether they enlarge the scope of the original claims. 35 U.S.C. 305 states that "no proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding...."

MPEP §2258 III. A., entitled "Criteria for Enlargement of the Scope of the Claims" provides:

> A claim presented in a reexamination proceeding "enlarges the scope" of the claims of the patent being reexamined where the claim is broader than each and every claim of the patent. *See* MPEP §1412.03 for guidance as to when the presented

10

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

claim is considered to be a broadening claim as compared with the claims of the patent, *i.e.*, what is broadening and what is not. If a claim is considered to be a broadening claim for purposes of reissue, it is likewise considered to be a broadening claim in reexamination.

MPEP §1412.03, as referenced above, provides in pertinent part:

A claim in the reissue application which includes subject matter not covered by the patent claims enlarges the scope of the patent claims. For example, if any amended or newly added claim in the reissue contains within its scope any conceivable product or process which would not have infringed the patent, then that reissue claim would be broader than the patent claims. *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1037 n.2 [] (Fed. Cir. 1987); *In re Ruth*, 278 F.2d 729, 730 [] (CCPA 1960); *In re Rogoff*, 261 F.2d 601, 603 [].

This language comports with, and applies, the Federal Circuit precedent cited above in the manner generally stated in the Final Office Action.

The Final Office Action, however, fails to provide any evidence to demonstrate that the above analysis was undertaken. Patent Owner proposed amendments to its claims under reexamination in an effort to address the prior art rejections set forth in the first Office Action. In so doing, Patent Owner narrowed a particular feature in its patented claims and did not, for example, commensurately broaden any other feature in those claims. *See, e.g.*, MPEP §1412.03 (stating "[a] claim of a reissue application enlarges the scope of the claims of the patent if it is broader in at least one respect, even though it may be narrower in other respects."); and the Final Office Action, p. 3.

The Final Office Action, in its silence on the issue, accepts Patent Owner's showing of support for the proposed amendments to the claims. Other than in its conclusory statements regarding the scope of the claims, the Final Office Action then provides no evidence to support its

11

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

conclusion of improper broadening. The Final Office Action, for example, fails to point to "any conceivable product or process" that would fall within the scope of the proposed amended claim 1 (and previously amended claim 9) set forth in Patent Owner's September 13 Response that would not have infringed claims 1 or 9 of the 488 Patent.

As best understood, the Final Office Action must assume that there is a "conceivable product or process" (System A or Process A) that could compare the actual rate of change in inside temperature, which must necessarily be derived from one or more inside temperatures, "with said estimation for the rate of change in inside temperature" *without* having compared "an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature." Put another way, although it is not shown, the Final Office Action must conclude that System A or Process A would infringe the amended claims, but not infringe the original claims because, as stated, the amended claims no longer require comparing "an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature."

Such a conclusion is unsupportable based on the language from the specification of the 488 Patent provided as support for the proposed claim amendments. Rather, it is clear that any "rate of change" in temperature must be based on a series of discreet temperatures. As such, System A or Process A *would* infringe the broader original claim, because there is an inherent consideration of one or more inside temperatures, *i.e.*, "an inside temperature," in any comparing of the actual rate of change in inside temperature with the estimation for the rate of change in inside temperature.

There is no other reasonable manner by which to read the original claim language of the 488 Patent in light of the specification, or simply based on a plain meaning of the claim terms according to Federal Circuit precedent, to find any conceivable product or process that would

12

infringe the amended claims, but that would not also infringe the original claims.  Particularly relevant here is that the Federal Circuit has long emphasized that, absent some affirmative disclaimer in the specification, which does not exist here, an indefinite article "a" or "an" (such as in the claim term "an inside temperature") carries the meaning of "at least one" or "one or more." *See, e.g., KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999); *AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997); and *North Am. Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1575-76 (Fed. Cir. 1993).  In this regard, System A or Process A infringing the amended claim term would necessarily infringe the original claim term.  As such, the amended claim language has not been shown, and could not be shown under the above analysis, to broaden the scope of the original patent claim

Because the Final Office Action inaccurately, and overly broadly, paraphrases the true language of claims 1 and 9 of the 488 Patent, and does not address the full language of the claim term sought to be amended into those claims, the rejection of the pending claims under 35 U.S.C. §305 necessarily fails.

Moreover, because the Final Office Action provides no evidence that the analysis required for the broadening inquiry according to Federal Circuit precedent and MPEP guidance, even as quoted in the Final Office Action, was undertaken to arrive at the conclusion of the Final Office Action, the rejection of the pending claims under 35 U.S.C. §305 further necessarily fails.

For all of the reasons set forth above, the rejection of claims 1 and 9 in reexamination, and as amended, and of all of the claims depending respectively therefrom, under 35 U.S.C. §305, as allegedly being improperly broadened in reexamination, are overcome, and should respectfully be withdrawn.

13

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## II.    REJECTION OF THE AMENDED CLAIMS UNDER PRE-AIA 35 U.S.C. §103(a)

The Office Action, on page 4, maintains the previously asserted rejection of claims 1, 3-9,

and 11-16 under pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over the combination

of U.S. Patent Application Publication No. 2004/0117330 to Ehlers et al. ("Ehlers") in view of

U.S. Patent Application Publication No. 2005/0159846 to Van Ostrand et al. ("Van Ostrand").

The Office Action, on page 9, maintains the previously-asserted rejection of claims 2 and 10 under

pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over Ehlers in view of Van Ostrand, as

applied respectively to claims 1 and 9, and further in view of U.S. Patent No. 6,789,739 to Rosen.

These rejections are respectfully traversed.

Claims 1 and 9 were previously amended in response to the prior art rejections of the first

Office Action in a manner that Patent Owner believed clearly distinguishes those claims, and the

claims depending therefrom, over the combination of Ehlers with Van Ostrand.  In maintaining

the previously asserted prior art rejections over the combination of Ehlers and Van Ostrand, Patent

Owner continues to believe that the Final Office Action provides an unsupportable basis for

combining Ehlers and Van Ostrand in a continued effort to render obvious the subject matter of

the claims under reexamination, and as amended, particularly given the express and disparate

teachings of the references.  The Patent Owner's assertion in this regard is fully detailed below.

In reply to Patent Owner's previously well-made arguments regarding the non-

combinability of Ehlers with Van Ostrand, the Final Office Action, summarily, and in a conclusory

manner states:

> Regarding the argument that it would be improper to combine the teachings of
> Ehlers and Van Ostrand, Ehlers discloses a comprehensive system for delivering
> and managing energy usage, based on a large number of factors, noting that "most
> end use consumers do not have the time, experience, and/or access to data to

14

> monitor, track, and use these devices" (see paragraph 13). Ehlers, when modified
> by the teachings of Van Ostrand, gains the ability to adjust distribution and usage
> in light of an HVAC system being found to be operating less than optimally. As
> stated above, one skilled in the would find such a feature to be advantageous.

*Id.*, p. 10-11.

The above statement discounts the full substance of Patent Owner's previous arguments

citing the required standard, and specifically requiring the showing of some level of predictability

as to the asserted combination of references based on the teachings of the references themselves.

The complete assertion of the Final Office Action regarding the combinability of the

references is word-for-word identical to the assertion regarding combinability in the first Office

Action. After admitting that Ehlers does not disclose the particular "comparing" of the claims, as

amended, the Final Office Action alleges that Van Ostrand discloses certain features that do not

reasonably correspond to the amended claims. *See id.*, p. 5. As did the first Office Action, the

Final Office Action admits (with identical language) that the comparing in Van Ostrand is directed

(and thus limited) to applying the disclosed comparing "detect[ing] failed stages of an HVAC

system." *Id.* The Final Office Action continues its verbatim representations from the first Office

Action as follows:

> Van Ostrand discloses that if a temperature response is not identified as being the
> expected value, the stage is removed from the staging sequence (i.e. turned off) by
> the controller. It may be later reactivated if found to be correct (see paragraphs
> 29-33). Van Ostrand further discloses that this ensures that an HVAC system can
> still partially operate in the event of a failure (see paragraphs 4-5).

*Id.*

The above represents the full analysis of the Final Office Action regarding what Van

Ostrand allegedly teaches. It is important to note that Van Ostrand, even as the Final Office Action

15

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

asserts above with reference to "paragraphs 29-33," is limited to an internal comparison of an expected temperature response, once an additional stage is brought on line, with a measured temperature response (*compare* FIG. 4 *with* FIG. 5 of the reference). Nowhere does Van Ostrand suggest that its methodology could, or would predictably, be expanded in the manner that appears to be suggested by the Final Office Action to incorporate an externally generated estimation of a rate of change in inside air temperature *in response to outside air temperature* that is derived from comparing the inside temperature of a structure and the outside temperature over time, as is required by the claims. Emphasis added.

It should be noted that the totality of the assertion regarding the combinability of the references based on the above, again using verbatim language to that used in the first Office Action, is as follows:

> Therefore it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the invention of Ehlers by turning on and off an HVAC system in the case where the expected temperature, based on indoor and outdoor measurements, was unexpected, as per Van Ostrand, as that this ensures that an HVAC system can still partially operate in the event of a failure.

*Id.*, p. 6.

The difficulty with the above analysis is clear on its face. It combines a description of well-attenuated alleged teachings from two widely disparate references that share, if anything, only their markedly different approaches to "controlling" HVAC systems in some manner that the Final Office Action ultimately asserts, again in a conclusory manner, that "[t]herefore it would have been obvious" to combine the references.

Reiterating the substance of the arguments presented in Patent Owner's September 13 Response, Ehlers, in its twenty-seven and a half pages of disclosure and eighteen sheets of

16

drawings, is generally directed to "a system and method for managing the ***delivery and usage*** of a commodity such as electricity, natural gas, steam, water, chilled or heated water, or potable or recycled water." *See* Ehlers at ¶[0002] (emphasis added). With some specificity and in great detail, the systems and methods of Ehlers are, in embodiments, directed to: (a) providing a node and a control system, with the node being coupled to at least one device "sensing and controlling energy delivered to the device" (*see, e.g.,* ¶[0015]); (b) providing a method of "time shifting energy requirements" by for example, cutting off energy to a control device during a particular time period and providing customer incentives based on a number of parameters (*see, e.g.,* ¶[0016]); and (c) providing a user-interactive thermostat device, which gives a user a visual display of "a characteristic of the energy supplied" (*see, e.g.,* ¶[0017]). Ehlers' detailed disclosure covers all aspects of its invention in expressly describing controlling devices via its gateway node and reporting a status of each device based on Ehlers control inputs. *See generally* Ehlers at ¶¶[0137] – [0139].

To any extent that Ehlers can reasonably be deemed to teach a system and method that makes any calculations or comparisons based on inputs available from the connected nodes via an advanced thermostatic control device linked to a power distribution network (*see, e.g.,* ¶[0224]), the outputs of such calculations or comparisons, as may be broadly described in Ehlers, are expressly indicated as providing a user, in viewing those outputs locally, for example, an ability to "make an informed decision on where to set the desired temperature (or setpoints)." *See* Ehlers at ¶[0228]; *see also* Ehlers at ¶[0255] (noting that after providing output to a user regarding calculations such as those depicted, for example, in Fig. 3D of Ehlers, a step in the Ehlers process is "***for the user to pick*** from a plurality of economic options offered by the system 3.08 [ranging] from 100% comfort management without any regard for cost to 100% economic management

without any regard to comfort." (emphasis added)), and Ehlers at ¶[0118] (expressly affording options for a customer, among other things, to "control the state of output relays (on/off)" or "view **and override** curtailment conditions" of a meter controlled device. (emphasis added)).

As noted previously, Ehlers makes no attempt to verify, for example, user compliance or avoidance of tampering based on any calculations or comparisons. Ehlers confirms, for example, that only an amount of electrical power used is referenced to inform the monitoring and control functions that the Ehlers systems or methods undertake by communication among the nodes for turning on and off certain devices. *See generally* Ehlers at ¶¶[0064] and [0066].

Patent Owner previously pointed out that Ehlers uses variations of the term "monitor" more than fifty times throughout its disclosure. In this regard, it is reasonable to conclude that Ehlers covers all aspects of the parameters that the disclosed systems and methods are intended to "monitor."

Addressing the particular assertions made in the Final Office Action discounting Patent Owner's previous arguments in this regard, Patent Owner reiterates that nowhere in its detailed and extensive disclosure does Ehlers suggest any shortfall in its disclosed monitoring schemes that may need to be supplemented by any form of additional monitoring. And, there is no manner by which Ehlers can be shown to predictably benefit by, for example, applying "other" parameters to determine internal failures within Ehlers' monitored and controlled devices, and specifically the disclosed and described HVAC devices of Ehlers. As such, the conclusory statement in the Final Office Action regarding the obviousness of "modif[ying] the invention of Ehlers by turning on and off an HVAC system in the case where the expected temperature, based on indoor and outdoor measurements, was unexpected, as per Van Ostrand, as that this ensures that an HVAC system can

18

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

still partially operate in the event of a failure" is without evidentiary support at least given consideration of the full disclosure of Ehlers.

More broadly, there is no reasonably discernable suggestion in either Ehlers or Van Ostrand that the specific monitoring and control systems and methods disclosed in these disparate references are either inadequate to their stated or intended purposes, or are even combinable in the manner suggested by the Final Office Action. The putative rationale for combining Ehlers and Van Ostrand is grounded in the very inventive step that the inventors of the 488 Patent determined, and that the Patent Owner chose to include in the claims, suggesting that the asserted combination is arrived at by hindsight reconstruction, not by the teachings of the references, or any demonstrated predictability of combining the references in the manner suggested.

The Final Office Action fails to provide any indicia of predictability in making the asserted combination, as is required. It is well understood that claims are not rendered obvious simply by showing that all elements of those claims are arguably present in separate prior art references. As was the case in the first Office Action, and as argued in Patent Owner's September 13 Response, the Final Office Action simply reiterates the earlier assertions regarding combinability without addressing the full scope of Patent Owner's arguments. None of the alleged teachings, suggestions or motivations specified by the Final Office Action as allegedly being supported, even broadly, by the disclosure of Van Ostrand (as quoted above) can be viewed as reasonably causing one of skill in the art to modify any alleged inventive concept taught by Ehlers in the manner suggested *with any degree of predictability*.

Patent Owner respectfully does not accept the now-repeated conclusion of the Final Office Action that, because Van Ostrand allegedly discloses what the Final Office Action indicates, any modification of Ehlers with Van Ostrand would have been made for any purpose, much less to

Ex Parte Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

have rendered obvious the express features recited in the claims, as amended. Patent Owner's September 13 Response expressed Patent Owner's disagreement with the conclusions regarding combinability set forth in the first Office Action. As indicated above, the Final Office Action makes no attempt to address the identified shortfalls in the requisite showing of *predictable* combinability of the references. The Final Office Action restates the substance of the earlier assertions regarding combinability of the references verbatim from the first Office Action, while apparently discounting the full scope of Patent Owner's arguments with the language quoted above. The position taken in the Final Office Action is unreasonable, and likely improper.

Patent Owner reiterates its belief that the Final Office Action must do more than state that, based on Van Ostrand's description of a particular methodology for accounting for failed components or stages in HVAC systems as beneficial, such modification, even if possible, would be applicable to virtually any HVAC monitoring and control system, and particularly broadly to "a system and method for managing the *delivery and usage* of a commodity such as electricity, natural gas, steam, water, chilled or heated water, or potable or recycled water," as disclosed in Ehlers, to render the features recited in the claims, as amended, obvious.

The Final Office Action fails to even address Patent Owner's earlier arguments regarding the required showings to support assertions of combinability of references. Patent Owner renews the unchallenged assertions of Patent Owner's September 13 Response, at pages 15 and 16, which stated the following:

> [T]he Federal Circuit has consistently reaffirmed its holdings regarding the necessary showings, and the U.S. Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727 (2007) confirmed, that "rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006) (quoting *In*

20

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

*re Lee*, 277 F.3d 1338, 1343-46 (Fed. Cir. 2002), and *In re Rouffet*, 149 F.3d 1350, 1355-59 (Fed. Cir. 1998)). This standard is not met here as the allegedly articulated reasoning, as best understood, lacks any rational underpinning based on the teachings of the references, and any alleged applicability to the express features recited in at least claims 1 and 9. There is nothing, for example, in either of Ehlers or Van Ostrand, even when combined with the knowledge of one of ordinary skill in the HVAC monitor and control arts, to support such a conclusion without the 488 Patent claims as a guide or a recipe to arrive at such a conclusion.

MPEP §2143.01 instructs that "[t]he mere fact that references can be combined or modified does not render the resultant combination obvious unless the results would have been predictable to one of ordinary skill in the art." *Id.*, (citing *KSR Int'l Co.*, 550 U.S. at 417). The Patent Owner respectfully submits that the rejection of the Office Action regarding at least claims 1 and 9 is improper in view of at least MPEP §2143.01, because the Office Action lacks the required specific evidence of "predictab[ility] to one of ordinary skill in the art," notwithstanding the conclusory statements in the Office Action for the reasons noted above.

For at least these reasons, no prima facie showing that the teachings of Van Ostrand would have been combinable with Ehlers in the manner suggested by the Office Action to render obvious the combinations of all of the features recited in claims 1 and 9 can be sustained on this record.

The Final Office Action fails to address how, with verbatim assertions as to the motivation to combine the asserted references, it has met the above standards as argued in Patent Owner's September 13 Response.

For at least these reasons, the Final Office Action does not overcome the shortfalls in the first Office Action in presenting a *prima facie* case that the teachings of Van Ostrand would have been combinable with Ehlers in any manner, much less in the specific manner suggested by the Final Office Action, with any degree of predictability as must be shown, to render obvious the combinations of all of the features recited in the claims, as amended.

<div align="center">21</div>

For all of the reasons set forth above, the rejection of claims 1 and 9 in reexamination, and as amended, under 35 U.S.C. §103(a) as allegedly being unpatentable over a combination of Ehlers and Van Ostrand, is overcome, and should respectfully be withdrawn. Moreover, because claims 3-8 depend directly from claim 1, and claims 11-16 depend directly from claim 9, and inherit all of the features and limitations of claims 1 and 9, respectively, the rejections of claims 3-8 and 11-16 in reexamination under 35 U.S.C. §103(a) as allegedly being unpatentable over the combination of Ehlers and Van Ostrand are overcome, and should respectfully be withdrawn. Finally, because claim 2 depends directly from claim 1, and claim 10 depends directly from claim 9, and these claims inherit all of the features and limitations of claims 1 and 9, respectively, and Rosen is not applied by the Final Office Action in a manner that would overcome the shortfalls in the application of Ehlers and Van Ostrand to reject claims 1 and 9, the rejection of claims 2 and 10 in reexamination under 35 U.S.C. §103(a) as allegedly being unpatentable over a combination of Ehlers with Van Ostrand and Rosen are overcome, and should respectfully be withdrawn.

Ex Parte Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## **CONCLUSION**

Having addressed all of the rejections of the Office Action, Patent Owner respectfully submits that claims 1-16 under reexamination are allowable, and a Notice of Intent to Issue a Reexamination Certificate is earnestly solicited.   Should any questions arise regarding this Response, all inquiries may be directed to Patent Owner's undersigned representative at the telephone number set forth below.

Respectfully submitted,

January 5, 2023                    By:   /Daniel A. Tanner, III/
                                        Daniel A. Tanner, III
Correspondence Address:                 Attorney of Record
Customer No. 144465                     Registration No. 54,734
*TannerIP PLLC*                         Telephone No.  703-232-1160 (Ext. 101)
                                        Facsimile No.   571-393-3610

Attachment:
        Certificate of Service

23



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465     7590     02/02/2023

Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/02/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

SMITH BALUCH LLP
376 BOYLSTON ST
STE 401
BOSTON, MA 02116

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,916* .

PATENT UNDER REEXAMINATION *8412488* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Ex Parte Reexamination* *Advisory Action* *Before the Filing of an Appeal Brief* | Control No. 90/014,916 | Patent Under Reexamination 8412488 |
|---|---|---|
| | Examiner MATTHEW E HENEGHAN | Art Unit 3992 | AIA (FITF) Status No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

THE PROPOSED RESPONSE FILED 05 January 2023 FAILS TO OVERCOME ALL OF THE REJECTIONS IN THE FINAL REJECTION MAILED 05 October 2022.

1. ☑ Unless a timely appeal is filed, or other appropriate action by the patent owner is taken to overcome all of the outstanding rejection(s), this prosecution of the present *ex parte* reexamination proceeding WILL BE TERMINATED and a Notice of Intent to Issue *Ex Parte* Reexamination Certificate will be mailed in due course. Any finally rejected claims, or claims objected to, will be CANCELLED.
   THE PERIOD FOR RESPONSE IS EXTENDED TO RUN 5 MONTHS FROM THE MAILING DATE OF THE FINAL REJECTION. Extensions of time are governed by 37 CFR 1.550(c).

NOTICE OF APPEAL

2. ☐ An Appeal Brief is due two months from the date of the Notice of Appeal filed on _____ to avoid dismissal of the appeal. See 37 CFR 41.37(a). Extensions of time are governed by 37 CFR 1.550(c). See 37 CFR 41.37(e).

AMENDMENTS

3. ☑ The proposed amendment(s) filed after a final action, but prior to the date of filing a brief, will not be entered because:
   (a) ☐ They raise new issues that would require further consideration and/or search (see NOTE below);
   (b) ☐ They raise the issue of new matter (see NOTE below);
   (c) ☑ They are not deemed to place the proceeding in better form for appeal by materially reducing or simplifying the issues for appeal; and/or
   (d) ☐ They present additional claims without canceling a corresponding number of finally rejected claims.
      NOTE: _____ (See 37 CFR 1.116 and 41.33(a)).

4. ☐ Patent owner's proposed response filed _____ has overcome the following rejection(s): _____

5. ☐ The proposed new or amended claim(s) _____ would be allowable if submitted in a separate, timely filed amendment canceling the non-allowable claim(s).

6. ☑ For purposes of appeal, the proposed amendment(s) a) ☑ will not be entered, or b) ☐ will be entered and an explanation of how the new or amended claim(s) would be rejected is provided below or appended. The status of the claim(s) is (or will be) as follows:
   Claim(s) patentable and/or confirmed: _____
   Claim(s) objected to: _____
   Claim(s) rejected: _____
   Claim(s) not subject to reexamination: _____

AFFIDAVIT OR OTHER EVIDENCE

7. ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____ .

8. ☐ The affidavit or other evidence filed after a final action, but before or on the date of filing a Notice of Appeal will not be entered because patent owner failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented. See 37 CFR 1.116(e).

9. ☐ The affidavit or other evidence filed after the date of filing a Notice of Appeal, but prior to the date of filing a brief, will not be entered because the affidavit or other evidence fails to overcome all rejections under appeal and/or appellant failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented. See 37 CFR 41.33(d)(1).

10. ☐ The affidavit or other evidence is entered. An explanation of the status of the claims after entry is below or attached.

REQUEST FOR RECONSIDERATION/OTHER

11. ☐ The request for reconsideration has been considered but does NOT place the application in condition for allowance because: _____ .

12. ☐ Note the attached Information Disclosure Statement(s), PTO/SB/08, Paper No(s) _____ .

13. ☑ Other: See Continuation Sheet .

| /MATTHEW E HENEGHAN/ Primary Examiner, Art Unit 3992 | /DEANDRA M HUGHES/ Reexamination Specialist, Art Unit 399 | /MICHAEL FUELLING/ Supervisory Patent Examiner, Art Unit 3992 |
|---|---|---|

cc: Requester (if third party requester)

U.S. Patent and Trademark Office    *Ex Parte* Reexamination Advisory Action Before the Filing of an Appeal Brief    Part of Paper No. 20230127
PTOL-467 (Rev. 08-13)

Appx765

Continuation of REQUEST FOR RECONSIDERATION/OTHER 13. Other: Regarding the rejection under 35 U.S.C. 305 and the non-entry of the proposed amendment, the scopes of claims 1 and 9 as patented do not encompass any system/method that do not perform a comparison of "an inside temperature recorded inside the first structure with" an "estimation of the rate of change in inside temperature of said first structure." Any proposed claim amendment that does not have this specific comparison is therefore broadening in scope. Claim 1 as amended does not compare an inside temperature in this context; rather it compares of change of such temperature, which is not the same. The scope of the amended claim would encompass a system/method that would not make the comparison as recited in the patented claims, one that did not include a specific recorded inside temperature. As such, it is broadening in scope. The newly proposed amendment to claim 9 would attempt to overcome this by expanding the definition of "an inside temperature recorded" to encompass "a rate of change of the inside temperature." This new construction would go beyond the broadest reasonable interpretation of the original claim terminology and therefore is likewise broadening in scope . For this reason, the proposed claim amendment has not been entered.
Regarding the argument that a rate of change in temperature is derived from one or more inside temperatures, the original claims recite "an inside temperature" for the recited comparison, which is not the same as a value derived form a series of temperatures.

Regarding the rejections under 35 U.S.C. 103, the claimed subject matter is to algorithms concerning computer usage in the monitoring and controlling of HVAC systems according to various measurements , which one skilled in the art would consider to highly predictable. There is no reason to believe that Ehlers, as modified by Van Ostrand by one of ordinary skill in the art, would not act in the manner of the claimed invention. Regarding the argument that Ehlers repeatedly discloses the monitoring of a system, but does not note the type of deficiency that is addressed by Van Ostrand, it is not necessary for an inventor to see shortfalls in their own inventions for others to point out problems and solutions to such shortfalls. It is reasonable for one skilled in the art, upon seeing Van Ostrand's additional teachings, as apply them to as aspect of Ehler's invention that Ehlers et al. did not themselves realized existed. Although the reason to incorporate Van Ostrand's teachings to incorporate functionality is not the same reason as that of the Patent Owner's invention, the motivation that is specifically pointed out by Van Ostrand (the need for an HVAC system to continue operating, despite a failure) is reasonable in the context of Ehler's invention. It is predictable in nature and does not reflect hindsight reasoning.

PTO/AIA/31 (12-22)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **NOTICE OF APPEAL** FROM THE EXAMINER TO THE PATENT TRIAL AND APPEAL BOARD | Docket Number (Optional) |
|---|---|

| I hereby certify that this correspondence is being facsimile transmitted to the USPTO, transmitted via the USPTO's patent electronic filing system, or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)] on _____.<br><br>Signature _____<br><br>Typed or printed name _____ | First Named Inventor<br>John D. Steinberg  (Assignee -- ECOFACTOR, INC.) |
|---|---|
| | Application Number<br>90/014,916     Filed<br>2021-12-03 |
| | For<br>System and Method for Using a Network of Thermostats as Tool to Verify... |
| | Art Unit<br>3992     Examiner<br>MATTHEW E HENEGHAN |

Applicant hereby **appeals** to the Patent Trial and Appeal Board from the last decision of the examiner.

The fee for this Notice of Appeal is (37 CFR 41.20(b)(1))  $ 840.00 _____

☐ Applicant asserts small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by 60%, and the resulting fee is:  $ _____

☐ Applicant certifies micro entity status. See 37 CFR 1.29. Therefore, the fee shown above is reduced by 80%, and the resulting fee is:  $ _____
Form PTO/SB/15A or B or equivalent must either be enclosed or have been submitted previously.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☑ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. 602792 _____.

☑ Payment made via USPTO's patent electronic filing system (Patent Center or EFS-Web).

☐ A petition for an extension of time under 37 CFR 1.136(a) (PTO/AIA/22 or equivalent) is enclosed.
For extensions of time in reexamination proceedings, see 37 CFR 1.550.

**WARNING:  Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant ☑ attorney or agent of record ☐ attorney or agent acting under 37 CFR 1.34
Registration number 54734     Registration number _____

Signature /Daniel A. Tanner, III/ _____

Typed or printed name  Daniel A. Tanner, III

Telephone Number 703-232-1160 Ext. 101

Date 2023-03-03

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☑ * Total of 1 _____ forms are submitted.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to: 1) law enforcement, in the event that the system of records indicates a violation or potential violation of law; 2) a Federal, state, local, or international agency, in response to its request; 3) a contractor of the USPTO having need for the information in order to perform a contract; 4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record; 5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record; 6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations; 7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals; 8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)); 9) the Office of Personnel Management (OPM) for personnel research purposes; and 9) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.

**Additional Uses**

Additional USPTO uses of the information in this record may include disclosure to: 1) the International Bureau of the World Intellectual Property Organization, if the record is related to an international application filed under the Patent Cooperation Treaty;  2) the public i) after publication of the application pursuant to 35 U.S.C. 122(b), ii) after issuance of a patent pursuant to 35 U.S.C. 151, iii) if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections, or an issued patent, or iv) without publication of the application or patent under the specific circumstances provided for by 37 CFR 1.14(a)(1)(v)-(vii); and/or 3) the National Archives and Records Administration, for inspection of records.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re *Ex Parte* Reexamination of: | : | |
| | : | |
| **U.S. Patent No. 8,412,488** | : | Reexam Control No.: **90/014,916** |
| | : | |
| Patent Issued: **April 2, 2013** | : | Reexam Filed: **December 3, 2021** |
| | : | |
| Application No.: **13/409,697** | : | Reexam Ordered: **January 28, 2022** |
| | : | |
| Application Filing Date: **March 1. 2012** | : | Examiner: **Matthew E. HENEGHAN** |
| | : | |
| Inventors: **Steinberg et al.** | : | Group Art Unit: **3992** |
| | : | |
| Assignee: **EcoFactor Inc.** | : | Confirmation No.: **2353** |
| | : | |

For: **SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION**

## <u>BRIEF ON APPEAL</u>

**MAIL STOP: REEXAMINATION**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

Commissioner:

In consideration of the October 5, 2022, Final Office Action (FOA), the Patent Owner's January 5, 2023 Response to the FOA (January 5 Response), the February 2, 2023 Advisory Action and the Patent Owner's March 3, 2023 Notice of Appeal in the above-identified *Ex Parte* Reexamination (Third Party Requested) (Reexam) of U.S. Patent No. 8,412,488 (the 488 patent), Patent Owner respectfully appeals the from the rejections of the patented claims set forth in the FOA, as amended in this Reexam, for the reasons set forth, in detail, in this Patent Owner's Brief on Appeal (Brief).

section 301, or in response to a decision adverse to the patentability of a claim of a patent. *No proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under this chapter.* All reexamination proceedings under this section, including any appeal to the Patent Trial and Appeal Board, will be conducted with special dispatch within the Office.

Emphasis added.

MPEP §2250 is entitled "Amendment by Patent Owner," and provides, in pertinent part:

The test for when an amended or "new claim enlarges the scope of an original claim under 35 U.S.C. 305 is the same as that under the 2-year limitation for reissue applications adding enlarging claims under 35 U.S.C. 251, last paragraph." *In re Freeman*, 30 F.3d 1459, 1464, 31 USPQ2d 1444, 1447 (Fed. Cir. 1994). See MPEP §2258 for a discussion of enlargement of claim scope.

MPEP §2258.III.A. is entitled "Criteria for Enlargement of the Scope of the Claims," and

provides, in pertinent part:

A claim presented in a reexamination proceeding "enlarges the scope" of the claims of the patent being reexamined where the claim is broader than each and every claim of the patent. See MPEP § 1412.03 for guidance as to when the presented claim is considered to be a broadening claim as compared with the claims of the patent, i.e., what is broadening and what is not. If a claim is considered to be a broadening claim for purposes of reissue, it is likewise considered to be a broadening claim in reexamination.

MPEP §1412.03.I. is entitled "Meaning of 'Broadened Reissue Claim'," and provides, in

pertinent part:

A claim of a reissue application enlarges the scope of the claims of the patent if it is broader in at least one respect, even though it may be narrower in other respects. See, e.g., 37 CFR 1.175(b). A claim in the reissue application which includes subject matter not covered by the patent claims enlarges the scope of the patent claims. For example, if any amended or newly added claim in the reissue *contains within its scope any conceivable product or process which would not have infringed the patent*, then that reissue claim would be broader than the patent claims. *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1037 n.2, 4 USPQ2d 1450, 1453 n.2 (Fed. Cir. 1987); *In re Ruth*, 278 F.2d 729, 730, 126 USPQ 155, 156 (CCPA 1960); *In re Rogoff*, 261 F.2d 601, 603, 120 USPQ 185, 186 (CCPA 1958).

Emphasis added.

8

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

### B.    Pre-AIA 35 U.S.C. §103(a)

35 U.S.C. §103 (pre-AIA) is entitled "Conditions for patentability; non-obvious subject

matter," and at subpart (a) provides:

> (a) A patent may not be obtained though the invention is not identically disclosed
> or described as set forth in section 102 , if the differences between the subject matter
> sought to be patented and the prior art are such that the subject matter as a whole
> would have been obvious at the time the invention was made to a person having
> ordinary skill in the art to which said subject matter pertains.  Patentability shall not
> be negatived by the manner in which the invention was made.

MPEP §2143 is entitled "Examples of Basic Requirements of a *Prima Facie* Case of

Obviousness," and at Subsection 2143.01, entitled "Suggestion or Motivation To Modify the

References" (paragraphs III. and IV.) provides, in pertinent part:

> The mere fact that references <u>can</u> be combined or modified does not render the
> resultant combination obvious unless the results would have been predictable to
> one of ordinary skill in the art.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417,
> 82 USPQ2d 1385, 1396 (2007) ("If a person of ordinary skill can implement a
> predictable variation, § 103 likely bars its patentability.  For the same reason, if a
> technique has been used to improve one device, and a person of ordinary skill in
> the art would recognize that it would improve similar devices in the same way,
> using the technique is obvious unless its actual application is beyond his or her
> skill.").
>
> …
>
> "[R]ejections on obviousness cannot be sustained by mere conclusory statements;
> instead, there must be some articulated reasoning with some rational underpinning
> to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418, 82 USPQ2d
> at 1396 (quoting *In re Kahn*, 441 F.3d 977, 988, 78 USPQ2d 1329, 1336 (Fed. Cir.
> 2006)).

### 8.    Patent Owner Arguments

#### A.    The FOA Fails To Properly Show That Patent Owner's Amendments To Claims 1 and 9 In Reexam Improperly Broaden Its Claims.

The FOA, on page 3, rejects amended claims 1-16 under 35 U.S.C. §305 as allegedly

"enlarging the scope of the claims of the patent being reexamined."  In its January 5 Response,

Patent Owner respectfully traversed this rejection.

9

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

The January 5 Response acknowledged that the FOA "sets forth the standard for determining whether a claim, as amended, is considered to have been enlarged in scope." *See id.*, p. 7. The January 5 Response continued that the FOA presented no evidence that the above-quoted standard for determining the scope of the claims was applied in review of the Patent Owner's amendments to claims 1 and 9, as presented in the September 13 Response. *See id.* Rather, the January 5 Response noted that the FOA, "in a conclusory manner, states '[c]laims 1 and 9 have been amended such that its scope no longer requires a comparison of *the actual inside temperature* recorded inside the first structure with the estimation for the rate of change'" and concludes "without evidentiary support, that '[i]t is therefore improperly broadening in scope.'" *Id.* At pages 7-13, the January 5 Response presented extensive arguments traversing the §305 rejections of the FOA substantially based on the explicit failures of the FOA to address the scope of the claim language as presented, and to show, at all, that the amended claims contain within their scope any conceivable product or process that would not have infringed the original claims according to the standards quoted in Section 7.A. of this Brief *supra*. In this regard, the January 5 Response concluded:

> Because the Final Office Action inaccurately, and overly broadly, paraphrases the true language of claims 1 and 9 of the 488 Patent, and does not address the full language of the claim term sought to be amended into those claims, the rejection of the pending claims under 35 U.S.C. §305 necessarily fails.

> Moreover, because the Final Office Action provides no evidence that the analysis required for the broadening inquiry according to Federal Circuit precedent and MPEP guidance, even as quoted in the Final Office Action, was undertaken to arrive at the conclusion of the Final Office Action, the rejection of the pending claims under 35 U.S.C. §305 further necessarily fails.

> For all of the reasons set forth above, the rejection of claims 1 and 9 in reexamination, and as amended, and of all of the claims depending respectively therefrom, under 35 U.S.C. §305, as allegedly being improperly broadened in reexamination, are overcome, and should respectfully be withdrawn.

10

Appx785

Surprisingly, and despite the detailed arguments provided in the January 5 Response, the

Advisory Action, on the Continuation Sheet, states:

> Regarding the rejection under 35 U.S.C. 305 and the non-entry of the proposed amendment, the scopes of claims 1 and 9 as patented do not encompass any system/method that do not perform a comparison of "an inside temperature recorded inside the first structure with" an "estimation of the rate of change in inside temperature of said first structure." Any proposed claim amendment that does not have this specific comparison is therefore broadening in scope. Claim 1 as amended does not compare an inside temperature in this context; rather it compares of change of such temperature, which is not the same. The scope of the amended claim would encompass a system/method that would not make the comparison as recited in the patented claims, one that did not include a specific recorded inside temperature. As such, it is broadening in scope.

These statements of the Advisory Action, in a first instance, do not address the errors noted

in the FOA in "inaccurately, and overly broadly, paraphras[ing] the true language of claims 1 and

9 of the 488 Patent." Moreover, these statements, as best understood, appear to turn the required

broadening analysis upside down. The Advisory Action states that "[a]ny proposed claim

amendment that does not have this specific comparison is therefore broadening in scope." It is

absolutely improper to focus solely on the language of any particular feature of the claims, while

ignoring the potential scope of that particular feature, in the manner that the Advisory Action does

to arrive at a conclusion of broadening.

Rather, and as asserted in the detailed arguments presented in the January 5 Response, the

substance of which are appropriately reiterated below, the required analysis is to show that there

is some conceivable product or process that would (1) infringe the claim language, as amended,

*i.e.*, "compare an *actual rate of change in inside temperature* recorded inside the first structure with

said estimation for the rate of change in inside temperature," which the Advisory Action again

interestingly paraphrases or truncates, and (2) not infringe the claim language of the patent,

*i.e.*, "compare an inside temperature recorded inside the first structure with said estimation for the rate

of change in inside temperature." Given that the known construction of "a" or "an," as used in the

11

original claim language, *i.e.*, "*an* inside temperature," is amendable to a construction of "at least one" or "one or more" inside temperature, the original claim language could be infringed by comparing a *one* or more inside temperature to the estimated rate of change in inside temperature.[3] An "actual rate of change *in inside temperature* recorded inside the first structure" is necessarily derived from *at least two* inside temperatures recorded inside the structure. The scope of the amended claims is thus necessarily narrower than the scope of the original claims. Put another way, as previously argued in detail, and as appropriately reiterated below, there is no manner by which a product or process according to the amended claim language could be construed that would not infringe the original claim language. Thus, the amended claim language, evaluated according to the proper standard, cannot be shown or construed as broadening the scope of the claims in which it is included and the claims depending therefrom.

Patent Owner renews its arguments here that, importantly, the FOA and now even the Advisory Action first mischaracterize the specific language of the proposed claim amendments, and separately, and equally as importantly, the FOA and the Advisory Action fail to identify "any conceivable product or process" that is contained within the scope of the proposed amended claims that "would not have infringed the original patent," as is required to find that the claim has been broadened in scope. For at least the reasons briefly stated above and as fully explored below, the required standard for such a showing cannot be met regarding these particularly-amended claims.

---

[3] As noted at page 13 of Patent Owner's January 5 Response:

> Particularly relevant here is that the Federal Circuit has long emphasized that, absent some affirmative disclaimer in the specification, which does not exist here, an indefinite article "a" or "an" (such as in the claim term "an inside temperature") carries the meaning of "at least one" or "one or more." *See, e.g., KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999); *AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997); and *North Am. Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1575-76 (Fed. Cir. 1993).

12

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

Patent Owner respectfully asserts that the conclusions of the FOA, and the Advisory Action, are improper with respect to the basic assertion that claims 1 and 9, and the claims depending respectively therefrom, have been improperly broadened by the amendments to claims 1 and 9 in the September 13 Response, and as shown in the Claims Appendix *infra*. Patent Owner respectfully requests that the rejection of the pending claims under 35 U.S.C. §305 should be withdrawn.

As noted briefly above, the FOA and the Advisory Action do not appear to make any attempt to address the "scope" of the proposed amended claim feature as opposed to the "scope" of the original claims, as is required, and do not even use the precise claim language from the 488 patent, or of the amendments from the September 13 Response, as the basis for the rejection set forth in the FOA, and as ratified in the Advisory Action. Rather, the FOA clearly bases its conclusion on an interpretation of the claim language that is not supported by either the original claim language or the amended claim language, and does not account for the full details of the amendments to claims 1 and 9 that were expressly made to narrow the scope of the claims in addressing the asserted prior art rejections of the first OA.

By way of review, the language in claim 1 of the 488 patent reads:

wherein said one or more processors compare an inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

Nowhere does the above claim language use the phrase "actual inside temperature," as is indicated by the FOA. The amended claim language for claim 1 in the September 13 Response reads:

wherein said one or more processors compare an <u>actual rate of change in</u> inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

13

Similar amendments were made to claim 9.  As indicated above, the FOA states that claims 1 and 9 are allegedly amended such that the scope of these claims "no longer requires a comparison of the *actual* inside temperature recorded inside the first structure with the estimation for the rate of change."  As argued, the claims of the 488 patent did not recite an "actual inside temperature."  The claim term "actual" only appears in the amended claim language to differentiate the narrower parameter regarding an *actual* rate of change in inside air temperature with the claimed *estimation for the* rate of change in inside temperature.  The "actual rate of change" language was expressly amended into the claims specifically to overcome the asserted prior art rejections in the first OA.  In this regard, the language of the rejection in the FOA, as it was best interpreted by Patent Owner, and its counsel, prior to filing the January 5 Response, does not provide any basis for rejecting the claims under 35 U.S.C. §305.  It is the precise language of the claims that needs to be interpreted, and the scope of the claim coverage represented by that precise claim language construed to arrive at the proper analysis of improper broadening according to the express guidance quoted above.  The fact that any such analysis here starts with a misinterpretation of the claim language, both in the FOA and the Advisory Action, provides evidence that any analysis as to the scope of the claims is fatally flawed and cannot provide any reasonable basis for the conclusions regarding the application of 35 U.S.C. §305, as set forth in the FOA.

    Once the full claim phrase that was amended into claims 1 and 9, which is "an *actual rate of change in* inside temperature," is addressed and a construction of which is properly undertaken in the manner outlined above, and as argued in the January 5 Response, the conclusion is unquestionable as to the scope of the amended claim feature representing a parameter that is

14

narrower than "an inside temperature," as recited in the claims of the 488 patent. Again, it bears

noting here that neither the FOA, nor the Advisory Action, address the amended claim language

in its entirety. Therefore, Patent Owner respectfully asserts that neither the FOA, nor the Advisory

Action, can reasonably be deemed to support the stated rejection under 35 U.S.C. §305. This

incorrect interpretation of the claims, by itself, is enough to support reconsideration and

withdrawal of the rejection on the available record, even before proceeding with any analysis that

there is no record of any attempt in the FOA to compare any scope of the amended claim language,

and the claimed comparison deriving therefrom, with the scope of the original claim language, and

the comparison deriving therefrom according to the original claims.

    The conclusory statements in the FOA and the Advisory Action in the above regard fail to

provide any evidence of the steps taken in the requisite broadening inquiry according to Federal

Circuit precedent, and as interpreted by MPEP, even as quoted by the FOA at page 3, and as set

forth in Section 7.A. *supra.* As cited above, it is well settled under Federal Circuit case law that

the broadening inquiry under 35 U.S.C. §305 involves two steps. *See, e.g. ,Creo Prods., Inc. v.*

*Presstek, Inc.*, 305 F.3d 1337, 1344 (Fed. Cir. 2002). First, the inquiry requires an analysis of the

*scope* of the claim prior to reexamination. *See id.* (emphasis added). Then, the inquiry requires a

comparison of that *scope* with the *scope* of the claim as amended in reexamination. *See id.*

(emphasis added). As broadly quoted by the FOA, relied-upon Federal Circuit precedent directs

that a claim "is broader in scope than the original claims if it contains *within its scope* any

conceivable apparatus or process which would not have infringed the original patent." *See* the

FOA, p. 3; *see also Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298, 1303 (Fed.

Cir. 2008). The language of the relevant legal standards presented at Section 7.A. *supra* comports

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

with, and applies, the settled Federal Circuit precedent cited above in the manner generally stated in the FOA.

The FOA, and now the Advisory Action, fail to provide any evidence to demonstrate that the above required "scope" analysis was undertaken. To reiterate, Patent Owner amended its claims in this Reexam, aware of the requirements imposed by §305, in an effort to address the prior art rejections set forth in the first OA. In so doing, Patent Owner particularly narrowed a specific feature in its patented claims and did not, for example, commensurately broaden any other feature in those, or any other of its, claims. *See, e.g.*, MPEP §1412.03 (stating "[a] claim of a reissue application enlarges the scope of the claims of the patent if it is broader in at least one respect, even though it may be narrower in other respects."); *see also* the FOA, p. 3.

The FOA, and the Advisory Action, in their respective silence on the issue, can reasonable be interpreted to accept Patent Owner's showing of support for the amendments to the claims as reflected in the September 13 Response. Other than the mention of the word "scope" in its conclusory statements regarding the alleged improper broadening, the FOA provides no evidence to support its conclusion of improper broadening by comparing the conceivable scope of the amended claims with the conceivable scope of the original patented claims. As indicated above, neither the FOA nor the Advisory Action point to "any conceivable product or process" that would fall within the scope of amended claims 1 and 9 set forth from the September 13 Response that would not have infringed claims 1 or 9 of the 488 patent.

In its January 5 Response, at page 12, Patent Owner proposed a hypothetical scope analysis that could have been undertaken, but there is no evidence in the record presented for review in this Appeal that such an analysis was actually undertaken within the context of the FOA, or in

16

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

reconsideration of the issue subsequent to the January 5 Response, as may have been, but was not, reflected in the Advisory Action.

For at least the above reasons, and for any additional arguments set forth in the January 5 Response that are not expressly reiterated here, Patent Owner respectfully asserts that the rejection of pending claims 1-16 under 35 U.S.C. §305 necessarily fails. Patent Owner further respectfully requests that, upon a finding that claims 1 and 9 in Reexam, and as amended, and of all of the claims depending respectively therefrom, are not improperly broadened in this Reexam, the Honorable Board reconsider and withdraw the rejection of the claims pending in this Reexam under 35 U.S.C. §305.

**B.    The FOA Fails To Properly Show The Claims Are Obvious Over
The Asserted Combinations Of Currently-Applied References.**

The FOA, and now the Advisory Action, maintain the previously asserted rejections of claims 1, 3-9, and 11-16 under pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over Ehlers in view of Van Ostrand, and of claims 2 and 10 under pre-AIA 35 U.S.C. 103(a) as allegedly being unpatentable over Ehlers in view of Van Ostrand, and further in view of Rosen.

Patent Owner believes that, generally guided by its conclusions regarding the improper broadening of the claims in Reexam, as detailed and substantially rebutted above, the FOA unreasonably truncates its analysis regarding what Van Ostrand can reasonably be considered to teach, or to have suggested, with respect to the subject matter of claims 1 and 9, and the claims depending respectively therefrom. The FOA simply substitutes the phrase "the actual rate of change in temperature" for its previous use of the phrase "the actual measured temperature" in the first OA in an otherwise identical analysis of what Van Ostrand can allegedly be considered to disclose with respect to the features recited in the pending claims, as amended. These are the features that are conceded in both the first OA and the FOA "Ehlers does not disclose."

17

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

Claims 1 and 9 were amended in response to the prior art rejections of the first OA in a

manner that Patent Owner believed clearly distinguished those claims, and the claims depending

therefrom, over the combination of Ehlers and Van Ostrand.

The FOA, on page 5, acknowledges that:

> Although Ehlers' HVAC system collects measurements and determines rate of change estimates for indoor temperatures, Ehlers does not disclose that said one or more processors compare an actual rate of change in inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

Rather, the FOA, further on page 5, asserts that:

> Van Ostrand discloses a comparing of the estimated rate of change of temperature in an HVAC system, derived via a learning process that may involve using both indoor and outdoor temperatures, to the actual rate of change in temperature, in order to detect failed stages of an HVAC system. Van Ostrand discloses that if a temperature response is not identified as being the expected value, the stage is removed from the staging sequence (i.e. turned off) by the controller. It may be later reactivated if found to be correct (see paragraphs 29-33). Van Ostrand further discloses that this ensures that an HVAC system can still partially operate in the event of a failure (see paragraphs 4-5).[4]

Regardless of the assertion above, Van Ostrand does not make the "comparison" expressly

asserted in the FOA. At the cited portion of Van Ostrand, and otherwise throughout the entire

reference, the disclosed methodology of Van Ostrand detects "failed stages and/or components"

with a stated objective of removing such stages or components from the sequencing of an otherwise

operating HVAC system. This does not result in a determination as to whether the HVAC system

is on or off, as is required by the claims. Rather, it is a methodology directed at ensuring that the

---

[4] As indicated above, and although the claims were amended, this language in the FOA regarding the alleged applicability of Van Ostrand to the subject matter of the claims, as amended in response to the first OA, is identical to the language in the first OA regarding the alleged applicability of Van Ostrand to the subject matter of the then-pending claims but for the simple substitution of the phrase "the actual rate of change in temperature," in the third line of the above-quoted text from the FOA, for the phrase "the actual measured temperature" in the first OA.

18

HVAC system remains on.  To any extent that Van Ostrand could even broadly be considered to inherently disclosed the expressly claimed comparison, which is not explicitly taught by the reference, the resulting determination required by the claims is not made.  Moreover, any "rate of change" comparison in Van Ostrand is not between an actual rate of change, and a previously derived estimation for a rate of change as required by the claims.  Van Ostrand expressly describes the following that "[i]f there is a change in the rate of change of room temperature, it can be inferred that the component is operating [and if] there is no change in the rate of change, the component can be assumed to be inoperative."  *Id.*, ¶[0031].  In the immediately succeeding paragraphs cited by the FOA, Van Ostrand teaches that the referenced "change in the rate of change of a room temperature" could be determined by storing what Van Ostrand explicitly refers to as "the designated value" in the controller of Van Ostrand *as a fixed value*, or by later *programming the designated value* into the controller by a technician during installation.  *See id.*, ¶[0032].  Nowhere does Van Ostrand reference deriving an estimation of a rate of change, or a change in a rate of change, by referencing the temperatures inside the structure with the outside temperature of the structure.  As such, Van Ostrand fails to teach, or to have suggested, the features expressly recited in Patent Owner's claims, as amended, which the FOA concedes Ehlers does not teach, for at least two separate and distinct reasons.

For at least the failure of the FOA in overreading Van Ostrand for what the reference can reasonably be considered to teach with respect to the features expressly recited in Patent Owner's claims, the obviousness rejections of those claims, which are all predicated on the combination of Ehlers and Van Ostrand necessarily fail.  Patent Owner respectfully requests that, upon a finding that claims 1 and 9 in Reexam, and as amended, and of all of the claims depending respectively therefrom, are not obvious in view of the express teachings of Van Ostrand, even if combinable

with Ehlers (which Patent Owner addresses in further detail below), and because Rosen is not applied in a manner that would overcome the identified shortfalls in the application of Van Ostrand to the subject matter of the pending claims, this Honorable Board reconsider and withdraw the rejections of the claims pending in this Reexam under pre-AIA 35 U.S.C. §103(a).

> **C.**     **The FOA Fails To Properly Show The Currently-Applied References Are Combinable In The Manner Stated In The FOA.**

In maintaining the previously asserted prior art rejections over the combination of Ehlers and Van Ostrand, Patent Owner continues to assert that the FOA, and now the Advisory Action, provide no supportable basis for combining Ehlers and Van Ostrand in a continued effort to render obvious the subject matter of the claims in this Reexam, and as amended, particularly given the express and disparate teachings of the Ehlers and Van Ostrand references.   Patent Owner's assertions in this regard were fully briefed in its January 5 Response at pages 14-21.[5]

In reply to Patent Owner's previously well-made arguments regarding the non-combinability of Ehlers with Van Ostrand as set forth in the September 13 Response, the FOA at pages 10-11, summarily, and in a conclusory manner, states:

> Regarding the argument that it would be improper to combine the teachings of Ehlers and Van Ostrand, Ehlers discloses a comprehensive system for delivering and managing energy usage, based on a large number of factors, noting that "most end use consumers do not have the time, experience, and/or access to data to monitor, track, and use these devices" (see paragraph 13).  Ehlers, when modified by the teachings of Van Ostrand, gains the ability to adjust distribution and usage in light of an HVAC system being found to be operating less than optimally.  As stated above, one skilled in the would find such a feature to be advantageous.

---

[5]  Much of the substance of Patent Owner's position regarding the non-combinability of the Ehlers and Van Ostrand references had been set forth in Patent Owner's September 13 Response.  The substance of the non-combinability arguments, as set forth in each of Patent Owner's previous Responses, are hereby incorporated by reference in this Brief.

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

The above statements discounted the full substance of Patent Owner's previous arguments citing the required standard, and specifically requiring the showing of some level of predictability as to the asserted combination of references based on the teachings of the references themselves.

The complete assertion of the FOA rebutting the arguments made in Patent Owner's September 13 Response regarding the combinability of the references was word-for-word identical to the assertion regarding combinability in the first OA. After admitting that Ehlers does not disclose the particular "comparing" of the claims, as amended, the FOA alleged that Van Ostrand discloses certain features that do not reasonably correspond to the features expressly recited in the amended claims, as detailed above. As did the first OA, the FOA concedes (with substantially identical language as indicated above) that the comparing in Van Ostrand is directed (and thus limited) to applying the disclosed comparing "detect[ing] failed stages of an HVAC system."

The Advisory Action continues this trend where, on the Continuation Sheet, it states:

> [T]he claimed subject matter is to algorithms concerning computer usage in the monitoring and controlling of HVAC systems according to various measurements, which one skilled in the art would consider to highly predictable. There is no reason to believe that Ehlers, as modified by Van Ostrand by one of ordinary skill in the art, would not act in the manner of the claimed invention. Regarding the argument that Ehlers repeatedly discloses the monitoring of a system, but does not note the type of deficiency that is addressed by Van Ostrand, it is not necessary for an inventor to see shortfalls in their own inventions for others to point out problems and solutions to such shortfalls. It is reasonable for one skilled in the art, upon seeing Van Ostrand's additional teachings, as [sic] apply them to as aspect of Ehler's invention that Ehlers et al. did not themselves realized existed. Although the reason to incorporate Van Ostrand's teachings to incorporate functionality is not the same reason as that of the Patent Owner's invention, the motivation that is specifically pointed out by Van Ostrand (the need for an HVAC system to continue operating, despite a failure) is reasonable in the context of Ehler's invention. It is predictable in nature and does not reflect hindsight reasoning.

Patent Owner respectfully disagrees with these ongoing erroneous conclusions, which by their very nature apply what the Advisory Action discounts as "not reflect[ing] hindsight reasoning." That is precisely what is occurring here. The teachings of Ehlers and Van Ostrand

21

are disparate for reasons argued previously, and as will be appropriately reiterated below. It is unreasonable for the conclusion of the Advisory Action to assert, as a part of its rationale, that "it is not necessary for an inventor to see shortfalls in their own inventions for others to point out problems and solutions to such shortfalls." To the extent that this is a correct statement generally regarding any innovation in any particular area of endeavor, it does not provide any rationale for combining references, and particularly not the Ehlers and Van Ostrand references as they have been combined in this Reexam. The background section of the 488 patent identifies shortfalls in prior art HVAC control and monitoring systems in being generally applicable to detecting and verifying compliance with PDR schemes for HVAC systems more broadly to residential customers. *See* Section 4 *supra*. The fact that Ehlers and Van Ostrand are generally directed at disparate methodologies for controlling HVAC systems in some manner does not more broadly render those references combinable in the manner suggested by the FOA to render obvious the unique and non-obvious solution captured within the particular features recited in the claims of the 488 patent, as now amended, and which are under Reexam. The statements made in the Advisory Action uniquely sidestep the guidance regarding combinability set forth in the MPEP, which is intended to apply settled Court precedent in this regard. *See* the quoted references to *KSR* at Section 7.B. *supra*.

The language quoted in Section 8.B. above from page 5 of the FOA regarding the applicability of Van Ostrand to the subject matter of the claims, which for the reasons stated in the preceding section of this Brief are considered to be misapplied on their face, represents the full analysis of the FOA regarding what Van Ostrand allegedly teaches. It is important to note that Van Ostrand, even as the FOA asserts above with reference to "paragraphs 29-33," is limited, at best, to an internal comparison of an expected temperature response, once an additional stage is

22

brought on line, with a measured temperature response. *Compare* FIG. 4 *with* FIG. 5 of Van

Ostrand. Nowhere does Van Ostrand suggest that its methodology could, or would predictably,

be expanded in the manner that appears to be suggested by the FOA to incorporate an externally

generated estimation of a rate of change in inside air temperature *in response to outside air

temperature* that is derived from comparing the inside temperature of a structure and the outside

temperature over time, as is required by the claims. Emphasis added. Patent Owner made

substantially the same argument in the January 5 Response, and the particulars of that argument

are certainly not addressed in the pronouncements of the Advisory Action quoted above. Rather,

it appears as though specific and reasonable arguments are rebutted by the Advisory Action in a

manner that is not consistent with the precedent and guidance cited in Section 7.B. *supra* regarding

combinability of the references and what must be shown, without the benefit of the roadmap

provided by the Patent Owner's claims as to its unique solution to a specified shortfall in the prior

art..

In the FOA, which Patent Owner addresses in the January 5 Response, the totality of the

assertion regarding the combinability of the references, which again, despite the claims having

been amended in the September 13 Response, used substantially verbatim language to the first OA

as follows:

> Therefore it would have been obvious to one of ordinary skill in the art at the time
> the invention was made to have modified the invention of Ehlers by turning on and
> off an HVAC system in the case where the expected temperature, based on indoor
> and outdoor measurements, was unexpected, as per Van Ostrand, as that this
> ensures that an HVAC system can still partially operate in the event of a failure.

The difficulties with that conclusion, and even with the purported rationales set forth in the

Advisory Action, as quoted above, are clear on their face. It combines a description of well-

attenuated alleged teachings from two widely disparate references that share, if anything, only

23

their markedly different approaches to "controlling" HVAC systems in some manner that the FOA

ultimately asserts, again in a conclusory manner, that "[t]herefore it would have been obvious" to

combine."

As Patent Owner has argued twice before, Ehlers, in its twenty-seven and a half pages of

disclosure and eighteen sheets of drawings, is generally directed to "a system and method for

managing the *delivery and usage* of a commodity such as electricity, natural gas, steam, water,

chilled or heated water, or potable or recycled water." *See id.*, ¶[0002] (emphasis added). With

some specificity and in great detail, the systems and methods of Ehlers are, in embodiments,

directed to: (a) providing a node and a control system, with the node being coupled to at least one

device "sensing and controlling energy delivered to the device" (*see, e.g., id.*, ¶[0015]); (b)

providing a method of "time shifting energy requirements" by for example, cutting off energy to

a control device during a particular time period and providing customer incentives based on a

number of parameters (*see, e.g., id.*, ¶[0016]); and (c) providing a user-interactive thermostat

device, which gives a user a visual display of "a characteristic of the energy supplied" (*see, e.g.,

id.*, ¶[0017]). Ehlers' detailed disclosure covers all aspects of its invention in expressly describing

controlling devices via its gateway node and reporting a status of each device based on Ehlers

control inputs. *See generally id.*, ¶¶[0137] – [0139].

To any extent that Ehlers can reasonably be deemed to teach a system and method that

makes any calculations or comparisons based on inputs available from the connected nodes via an

advanced thermostatic control device linked to a power distribution network (*see, e.g., id.*,

¶[0224]), the outputs of such calculations or comparisons, as may be broadly described in Ehlers,

are expressly indicated as providing a user, in viewing those outputs locally, for example, an ability

to "make an informed decision on where to set the desired temperature (or setpoints)." *Id.*,

24

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

¶[0228]; *see also id.*, ¶[0255] (noting that after providing output to a user regarding calculations such as those depicted, for example, in Fig. 3D of Ehlers, a step in the Ehlers process is "*for the user to pick* from a plurality of economic options offered by the system 3.08 [ranging] from 100% comfort management without any regard for cost to 100% economic management without any regard to comfort." (emphasis added)), and ¶[0118] (expressly affording options for a customer, among other things, to "control the state of output relays (on/off)" or "view *and override* curtailment conditions" of a meter controlled device. (emphasis added)).

Ehlers makes no attempt to verify, for example, user compliance or avoidance of tampering based on any calculations or comparisons. And, nor does Van Ostrand for that matter. Ehlers confirms, for example, that only an amount of electrical power used is referenced to inform the monitoring and control functions that the Ehlers systems or methods undertake by communication among the nodes for turning on and off certain devices. *See generally id.*, ¶¶[0064] and [0066].

Patent Owner previously pointed out that Ehlers uses variations of the term "monitor" more than fifty times throughout its disclosure. In this regard, it is reasonable to conclude that Ehlers covers all aspects of the parameters that the Ehlers disclosed systems and methods are intended to "monitor."

In its January 5 Response addressing the particular assertions made in the FOA discounting the arguments made in the September 13 Response, Patent Owner reiterated that "nowhere in its detailed and extensive disclosure does Ehlers suggest any shortfall in its disclosed monitoring schemes that may need to be supplemented by any form of additional monitoring." *See* January 5 Response, p. 18. Patent Owner noted that "there is no manner by which Ehlers can be shown to predictably benefit by, for example, applying 'other' parameters to determine internal failures within Ehlers' monitored and controlled devices, and specifically the disclosed and described

25

HVAC devices of Ehlers." *Id.* If it is this colloquy that the Advisory Action now addresses with the above-quoted statement regarding "shortfalls in their own inventions" that inventors may not see, this does not render any solution based on a combination of widely disparate references *per se* predictable in the manner that the Advisory Action now suggests. It is for this reason, at least, that the January 5 Response argued, and Patent Owner explicitly reasserts here, that the conclusory statement in the FOA regarding the obviousness of "modif[ying] the invention of Ehlers by turning on and off an HVAC system in the case where the expected temperature, based on indoor and outdoor measurements, was unexpected, as per Van Ostrand, as that this ensures that an HVAC system can still partially operate in the event of a failure" is without evidentiary support, and provides no basis to sustain the assertion that the references are, in any way, combinable, much less to render obvious the subject matter of the claims in Reexam. This is at least true given consideration of the full disclosure of Ehlers. Moreover, the statement does not meet the requirements for showing any predictability in combining Van Ostrand with Ehlers to arrive at the subject matter of the claims in this Reexam.

More broadly, there remains no reasonably discernible suggestion in either Ehlers or Van Ostrand, even given the knowledge of those of ordinary skill in the art, that the specific monitoring and control systems and methods disclosed in these widely disparate references are either inadequate to their stated or intended purposes, or are even combinable in the manner suggested by the FOA. The putative rationale for combining Ehlers and Van Ostrand is grounded in the very inventive step that the inventors of the 488 patent determined, and chose to include in their claims. This further indicates that the combination of applied references to attempt to render obvious the subject matter of the claims in this Reexam was indeed arrived at through improper hindsight reconstruction, not by the teachings of the references, or any demonstrated predictability of

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

combining the Ehlers and Van Ostrand references in the manner suggested.  Even as the Advisory

Action ultimately states in the last sentence that this is not the case, the evidence available in this

Reexam, and the other express statements/rationales provided in the Advisory Action, point to a

different conclusion.

The FOA fails to provide any indicia of predictability in making the asserted combination,

as is required by the guidance set forth in Section 7.B. *supra*, and nothing in the rationales set forth

in the Advisory Action remedies these shortfalls in the FOA.  According to precedent and the

guidance cited above, it is well understood that claims are not rendered obvious simply by showing

that all elements of those claims are arguably present in separate prior art references, which is not

even the case here.  As has been the situation throughout this Reexam, and as argued in both of

Patent Owner's previous Responses, the FOA simply reiterated the earlier assertions regarding

combinability without addressing the full scope of Patent Owner's arguments, which remain

unaddressed to date.  More directly, none of the alleged teachings, suggestions or motivations

specified by the FOA as being supported, even broadly, by the disclosure of Van Ostrand (as

quoted above) can be viewed as reasonably causing one of skill in the art to modify any alleged

inventive concept taught by Ehlers in the manner suggested *with any degree of predictability*.

Patent Owner respectfully does not accept twice-stated conclusions of the first OA and the

FOA that, because Van Ostrand allegedly discloses what the FOA indicates (which Patent Owner

explicitly disputes for the reasons set forth in the previous Section of this Brief), any modification

of Ehlers with Van Ostrand would have been made for any purpose, much less to have rendered

obvious the express features recited in the claims in this Reexam, as amended.  Patent Owner has

maintained and supplemented its express disagreement with the conclusions regarding

combinability set forth in the first OA and the FOA throughout this Reexam and restates that

27

disagreement for the record before this Honorable Board in this Brief. The FOA and the Advisory

Action makes no attempt to address the identified shortfalls in the requisite showing of *predictable*

combinability of the references that Patent Owner set out as early as the September 13 Response

and has substantially maintained, and supplemented in each successive opportunity to respond,

including in this Brief. Just as was the position taken in the FOA in this regard, Patent Owner

respectfully asserts that the position taken in the Advisory Action, as best understood, is

unreasonable and incorrect.

Patent Owner reiterates its belief that the FOA must do more than state that, based on Van

Ostrand's description of a particular methodology for accounting for failed components or stages

in HVAC systems as beneficial, such modification, even if possible, would be applicable to

virtually any HVAC monitoring and control system, and particularly broadly to "a system and

method for managing the *delivery and usage* of a commodity such as electricity, natural gas, steam,

water, chilled or heated water, or potable or recycled water," as disclosed in Ehlers, to render the

features recited in the claims under Reexam and as amended obvious.

For at least these additional reasons, the FOA does not presenting a *prima facie* case that

the teachings of Van Ostrand would have been combinable with Ehlers in any manner, much less

in the specific manner suggested by the Final Office Action, with any degree of predictability as

must be shown, to render obvious the combinations of all of the features recited in the claims, as

amended.

<div align="center">*      *      *      *      *</div>

For all of the reasons set forth above, the rejection of claims 1 and 9 in this Reexam, and

as amended, under 35 U.S.C. §103(a) as allegedly being unpatentable over a combination of Ehlers

and Van Ostrand, is overcome. Patent Owner respectfully requests that the Honorable Board

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

reconsider and withdraw the obviousness rejections as to these claims in Reexam. Moreover, because claims 3-8 depend directly from claim 1, and claims 11-16 depend directly from claim 9, and inherit all of the features and limitations of claims 1 and 9, respectively, Patent Owner respectfully requests that the Honorable Board reconsider and withdraw the obviousness rejections as to these claims in Reexam. Finally, because claim 2 depends directly from claim 1, and claim 10 depends directly from claim 9, and these claims inherit all of the features and limitations of claims 1 and 9, respectively, and Rosen is not applied by the FOA in a manner that would overcome the above-identified shortfalls in the application of Ehlers and Van Ostrand to reject claims 1 and 9, Patent Owner respectfully requests that the Honorable Board reconsider and withdraw the obviousness rejections as to these claims as well in Reexam.

## 9.    Conclusion

Having addressed all of the rejections of the FOA, Patent Owner respectfully submits that claims 1-16 under Reexam, as amended, are allowable. Patent Owner respectfully requests that the Honorable Board reconsider the claims at issue in this Reexam and in this Appeal and find those claims allowable for the reasons set forth in this Brief. Should any questions arise regarding this Brief, all inquiries may be directed to Patent Owner's undersigned representative at the telephone number set forth below.

Respectfully submitted,

May 2, 2023

By:    /Daniel A. Tanner, III/
Daniel A. Tanner, III

Correspondence Address:
Customer No. 144465
*TannerIP PLLC*

Attorney of Record
Registration No. 54,734
Telephone No. 703-232-1160 (Ext. 101)
Facsimile No. 571-393-3610

Attachment:
Certificate of Service

29

*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488
Art Unit: 3992

## Claims Appendix

1.     (Amended)  A system for monitoring the operational status of an HVAC system comprising:

at least one HVAC control system associated with a first structure that receives temperature measurements from at least a first structure conditioned by at least one HVAC system;

one or more processors that receive measurements of outside temperatures from at least one source other than said HVAC system,

wherein said one or more processors compares the inside temperature of said first structure and the outside temperature over time to derive an estimation for the rate of change in inside temperature of said first structure in response to outside temperature, and

wherein said one or more processors compare an <u>actual rate of change in</u> inside temperature recorded inside the first structure with said estimation for the rate of change in inside temperature of said first structure to determine whether the first HVAC system is on or off.

2.     (Original)  A system as in claim 1 in which said one or more processors receive measurements of outside temperatures for geographic regions such as ZIP codes from sources other than said HVAC system.

3.     (Original)  A system as in claim 1 in which said HVAC system is located within a single family dwelling.

4.     (Original)  A system as in claim 1 in which said HVAC system comprises a programmable thermostat.

30



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465          7590          11/16/2023

Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/16/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

SMITH BALUCH LLP
376 BOYLSTON ST
STE 401
BOSTON, MA 02116

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/014,916* .

PATENT UNDER REEXAMINATION *8412488* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

Application Number: 90/014,916
Filing Date: 3 Dec 2021
Appellant(s): Steinberg et al.

———————————————
Daniel A. Tanner, III
Registration No. 54,734
For Appellant

**EXAMINER'S ANSWER**

This is in response to the appeal brief filed 2 May 2023.

**(1) Grounds of Rejection to be Reviewed on Appeal**

Every ground of rejection set forth in the Office action dated October 5, 2022
from which the appeal is taken is being maintained by the examiner except for the
grounds of rejection (if any) listed under the subheading "WITHDRAWN REJECTIONS."
New grounds of rejection (if any) are provided under the subheading "NEW GROUNDS
OF REJECTION."

**(2) Response to Argument**

Regarding the argument that the rejections under 35 U.S.C. 305 were improper
because the claims were paraphrased in the rejection, claims under reexamination are
being reexamined using the broadest reasonable interpretation in light of the patent's
specification.

In the present case, Appellant stated that the amendment to claims 1 and 9 is
supported by column 7, lines 57-64 of the '488 patent. See Remarks, filed 13
September 2022. In the amendment the claims are modified to recite a comparison of
an *actual rate of change in inside temperature* to an estimation, rather than the originally
claimed comparison of an *inside temperature* to that estimation. As such, the scope of
the claimed invention would now encompass systems or methods that could be
practiced without using a recorded inside temperature for this comparison, as it would
only require a rate of change in the inside temperature, which, although related, is not
the same measurement. It is noted that other limitations in these claims do recite the

collection of temperature information; however, the amended claim language does not
dictate that these are the temperatures to be used in the comparison. This could
reasonably be a rate of change reading from another source that is not otherwise
recited in the claim. The statement of rejection reflects a reasonable interpretation of the
claim language in differentiating the amended claims against those of the original
patent.

Regarding the argument that the original claim did not recite "an *actual* inside
temperature," the word "actual" was used to help clarify the differentiation between the
original and amended claim languages and would not modify the scope of the original
claim. Its usage in the responses to the Attorney's previous arguments was therefore
proper.

Regarding Appellant's argument that no evidence was provided to demonstrate
that a proper analysis was made to determine the scopes of the inventions, the stated
grounds of rejections clearly point out the nature of the broadening in scope of the
claimed inventions. As stated in the rejections, the amended invention can be practiced
without a comparison that includes the inside temperature recorded inside the first
structure.

Regarding Appellant's argument that Van Ostrand does not disclose the claimed
comparison of an actual rate of change in inside temperature recorded inside the first
structure with said estimation for the rate of change in inside temperature of said first
structure, the final rejection correctly points to this comparison in paragraphs 29-33 of

Van Ostrand, and further uses this comparison to determine if a system is on or inoperative (i.e. off).

"The central control 12 monitors the rate of change of a room temperature before and after it turns on the stage. If there is a change in the rate of change of room temperature, it can be inferred that the component is operating. If there is no change in the rate of change, the component can be assumed to be inoperative (FIG. 5)."

See paragraph 31.

Moreover, the second rate of change being used by Van Ostrand in this comparison is the actual rate of change, as of the most recent reading. Its comparison to previous data from which an estimated rate of change is determined, is sufficient to establish obviousness when used to modify the invention of Ehlers, which already discloses the other factors used to determine this estimated rate of change.


Regarding the argument that it would be improper to combine the teachings of Ehlers and Van Ostrand, Ehlers discloses a comprehensive system for delivering and managing energy usage, based on a large number of factors, noting that "most end use consumers do not have the time, experience, and/or access to data to monitor, track, and use these devices" (see paragraph 13). Ehlers, when modified by the teachings of Van Ostrand, gains the ability to adjust distribution and usage in light of an HVAC system being found to be operating less than optimally. As stated above, one skilled in the would find such a feature to be advantageous.

It is also important to note that the art, computerized process control, is highly predictable in nature and the Appellant has offered no evidence to suggest that the

Application/Control Number: 90/014,916                                          Page 6
Art Unit: 3992

combination of Ehlers and Van Ostrand would not be reasonably expected to produce

the claimed invention. Given this predictability, as well as a rationale for combining the

references provide the teaching, suggestion, motivation for doing so, *prime facie*

obviousness clearly is established by Ehlers in view of Van Ostrand.

   Regarding Appellant's argument that Ehlers' teachings are also directed to other

aspects beyond those of the claimed invention, other functionalities in Ehlers are not

being relied upon in the stating of the stated rejections and are not relevant.

Additionally, Ehlers' repeated use of variations of "monitoring "do not teach away from

the claimed invention, which is literally directed to "A system (or method) for monitoring

the operational status of an HVAC system," as recited in the preambles of claims 1 and

9.

   Regarding Appellant's argument that Ehlers makes no attempt to verify user

compliance or avoidance of tampering, these safeguards are not recited in the claimed

invention.


   For the above reasons, it is believed that the rejections should be sustained.


Respectfully submitted,

/MATTHEW E HENEGHAN/
Primary Examiner, Art Unit 3992

Conferees:

/DEANDRA M HUGHES/
Reexamination Specialist, Art Unit 3992
/MICHAEL FUELLING/
Supervisory Patent Examiner, Art Unit 3992

**Requirement to pay appeal forwarding fee.**  In order to avoid dismissal of the instant

appeal in any application or ex parte reexamination proceeding, 37 CFR 41.45 requires

payment of an appeal forwarding fee within the time permitted by 37 CFR 41.45(a),

unless appellant had timely paid the fee for filing a brief required by 37 CFR 41.20(b) in

effect on March 18, 2013.

| *Reexamination* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 90/014,916 | 8412488 |
| | Certificate Date | Certificate Number |

| Requester Correspondence Address: ☐ Patent Owner ☑ Third Party |
|---|
| SMITH BALUCH LLP<br>376 BOYLSTON ST<br>STE 401<br>BOSTON, MA 02116 |

| LITIGATION REVIEW ☑ | /MH/<br>(examiner initials) | 14 November 2023<br>(date) |
|---|---|---|
| Case Name | | Director Initials |
| 6:20cv76 (CLOSED) | | |
| 1:20cv11007, 6:20cv00075, 6:20cv00078, 5:20cv00080 (OPEN) | | |
| IPR2021-00409 (DENIED) | | |

| COPENDING OFFICE PROCEEDINGS | |
|---|---|
| TYPE OF PROCEEDING | NUMBER |
| None. | |

| | |
|---|---|
| | |

U.S. Patent and Trademark Office                                          DOC. CODE **RXFILJKT**

PTO/AIA/32 (11-23)
Approved for use through 05/31/2024. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## REQUEST FOR ORAL HEARING BEFORE
## THE PATENT TRIAL AND APPEAL BOARD

Docket Number (Optional)

I hereby certify that this correspondence is being being transmitted by the USPTO patent electronic filing system or facsimile to the USPTO, or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450" [37 CFR 1.8(a)] on _____.

Signature _____

Typed or printed name _____

| | |
|---|---|
| First Named Inventor John D. Steinberg  (Assignee -- ECOFACTOR, INC.) | |
| Application Number 90/014.916 | Filed 2021-12-03 |
| For System and Method for Using a Network of Thermostats as Tool to Verify... | |
| Art Unit 3992 | Examiner MATTHEW E HENEGHAN |

Applicant hereby **requests an oral hearing** before the Patent Trial and Appeal Board in the appeal of the above-identified application.

The fee for this Request for Oral Hearing is (37 CFR 41.20(b)(3))    $ 1360.00

☐ Applicant asserts small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by 60%, and the resulting fee is:    $ _____

☐ Applicant certifies micro entity status. See 37 CFR 1.29. Therefore, the fee shown above is reduced by 80%, and the resulting fee is:    $ _____
Form PTO/SB/15A or B or equivalent must either be enclosed or have been submitted previously.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☑ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. 602792 _____.

☑ Payment made via USPTO patent electronic filing system.

☐ A petition for an extension of time under 37 CFR 1.136(b) (PTO/SB/23 or equivalent) is enclosed.
For extensions of time in reexamination proceedings, see 37 CFR 1.550.

**WARNING:  Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant    ☑ attorney or agent of record    ☐ attorney or agent acting under 37 CFR 1.34
                Registration number 54734              Registration number _____

Signature /Daniel A. Tanner, III/

Typed or printed name  Daniel A. Tanner, III

Telephone Number 703-232-1160 Ext. 101

Date 2024-01-16

NOTE: This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

☑ * Total of ___1___ forms are submitted.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with an information collection subject to the requirements of the Paperwork Reduction Act of 1995, unless the information collection has a currently valid OMB Control Number. The OMB Control Number for this information collection is 0651-0031. Public burden for this form is estimated to average 12 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the information collection. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the Chief Administrative Officer, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450 or email InformationCollection@uspto.gov. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. The United States Patent and Trademark Office (USPTO) collects the information in this record under authority of 35 U.S.C. 2. The USPTO's system of records is used to manage all applicant and owner information including name, citizenship, residence, post office address, and other information with respect to inventors and their legal representatives pertaining to the applicant's/owner's activities in connection with the invention for which a patent is sought or has been granted. The applicable Privacy Act System of Records Notice for the information collected in this form is COMMERCE/PAT-TM-7 Patent Application Files, available in the Federal Register at 78 FR 19243 (March 29, 2013). https://www.govinfo.gov/content/pkg/FR-2013-03-29/pdf/2013-07341.pdf

Routine uses of the information in this record may include disclosure to:

1) law enforcement, in the event that the system of records indicates a violation or potential violation of law;

2) a federal, state, local, or international agency, in response to its request;

3) a contractor of the USPTO having need for the information in order to perform a contract;

4) the Department of Justice for determination of whether the Freedom of Information Act (FOIA) requires disclosure of the record;

5) a Member of Congress submitting a request involving an individual to whom the record pertains, when the individual has requested the Member's assistance with respect to the subject matter of the record;

6) a court, magistrate, or administrative tribunal, in the course of presenting evidence, including disclosures to opposing counsel in the course of settlement negotiations;

7) the Administrator, General Services Administration (GSA), or their designee, during an inspection of records conducted by GSA under authority of 44 U.S.C. 2904 and 2906, in accordance with the GSA regulations and any other relevant (i.e., GSA or Commerce) directive, where such disclosure shall not be used to make determinations about individuals;

8) another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c));

9) the Office of Personnel Management (OPM) for personnel research purposes; and

10) the Office of Management and Budget (OMB) for legislative coordination and clearance.

If you do not furnish the information requested on this form, the USPTO may not be able to process and/or examine your submission, which may result in termination of proceedings, abandonment of the application, and/or expiration of the patent.



### UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465          7590          02/15/2024

Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/15/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



**The United States Patent and Trademark Office**
# PATENT TRIAL AND APPEAL BOARD

| | | |
|---|---|---|
| Tanner IP, PLLC | Appeal No: | 2024-001366 |
| 149 West Gilpin | Appellant: | ECOFACTOR, INC. |
| Avenue | | (ASSIGNEE) et al. |
| Norfolk, VIRGINIA | Reexamination | 90/014,916 |
| 23503 | Control No: | |
| | Hearing Room: | San Jose: Room 322 |
| | Hearing Docket: | Electrical |
| | Hearing Date: | Thursday, April 18, 2024 |
| | Hearing Time: | 10:00 AM PT |
| | Location: | **USPTO** |
| | | **Hearing Room 322** |
| | | **26 Fourth Street** |
| | | **San Jose, California 92113** |



## NOTICE OF HEARING - SAN JOSE, CALIFORNIA
## RESPONSE REQUIRED WITHIN 21 DAYS

The Patent Trial and Appeal Board (PTAB) will hear the above-identified appeal on the date indicated. The hearing will commence at the time set, and as soon as the argument in one appeal concludes, the succeeding appeal will be taken up. The time allowed for argument is 20 minutes, unless additional time is requested and approved before the argument commences. If the application involved in this appeal has been published, the hearing will be open to the public.

### *Hearing Attendance Confirmation or Waiver*

Appellant is required to confirm attendance at the hearing or waive the hearing within 21 days of the mailing date of this notice. Appellant may confirm or waive attendance by completing the "APPELLANT RESPONSE TO NOTICE OF HEARING" and returning it to the PTAB.

### *Options for Hearing Attendance*

If Appellant opts to attend the hearing, Appellant may appear in-person, by video, or by telephone. In Appellant's response to the NOTICE OF HEARING, Appellant should indicate the manner in which Appellant will appear for the hearing.

If Appellant is no longer interested in having a hearing, then Appellant must file a waiver of the hearing with the PTAB. This allows the panel of Administrative Patent Judges assigned to the appeal to act promptly on the appeal without waiting for the hearing date.

If Appellant fails to respond to this NOTICE OF HEARING, the PTAB will issue a decision on the briefs based on the written record.



## UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/014,916 | 12/03/2021 | 8412488 | | 2353 |

144465        7590        05/08/2024

Tanner IP, PLLC
149 West Gilpin Avenue
Norfolk, VA 23503

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/08/2024 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

RECORD OF ORAL HEARING

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* ECOFACTOR, INC.

———————

Appeal 2024-001366
Application 90/014,916
Technology Center 3700

———————

Oral Hearing Held:  April 18, 2024

———————

Before ERIC B. CHEN, SCOTT B. HOWARD, and MICHAEL J. ENGLE,
*Administrative Patent Judges.*

APPEARANCES:

ON BEHALF OF THE APPELLANT:

    DANIEL A TANNER, III, ESQ.
    Tanner IP, PLLC
    149 West Gilpin Avenue
    Norfolk, VA 23503

        The above-entitled matter came on for hearing on Thursday, April 18,
2024, commencing at 1:00 p.m., at the U.S. Patent and Trademark Office,
600 Dulany Street, Alexandria, Virginia.

Appeal 2024-001366
Application 90/014,916

1               P R O C E E D I N G S

2                      - - - - -

3       JUDGE CHEN:  Hello, Mr. Tanner, welcome to the Board.  This is

4   appeal number 2024-001366.  With me today are Judges Engle and Howard.

5   Before we begin, just a few administrative matters.  Number one, when

6   you're not speaking, please mute yourself.  Number two, please identify

7   yourself each time you speak.  This helps the court reporter prepare an

8   accurate transcript.  Number three, we have the entire record before us,

9   including demonstratives.  If you are identifying a demonstrative by page

10  number, please provide us a few seconds to access that document.  And last,

11  please be aware that members of the public may be listening in on this oral

12  hearing.  With that being said, please state your name and law firm for the

13  record, please.

14      MR. TANNER:  Thank you, Your Honor.  I'm Daniel A. Tanner, III

15  from the law firm of Tanner IP, PLLC.  And my registration number is

16  54,734.

17      JUDGE CHEN:  Okay, thank you, Mr. Tanner, this is Judge Chen.

18  You have 20 minutes and you may begin.  And we're quite flexible here.  If

19  we ask a lot of questions, we're willing to extend you a few minutes at the

20  end.  So, you may begin.

21      MR. TANNER:  I appreciate of the that, Your Honor, and I'd like to

22  take this opportunity to reserve three minutes for rebuttal.  The three issues

23  raised in this appeal, as indicated on page seven of our brief on appeal, are

24  before the Panel at this point, and I'd like to take just briefly each one of

25  those issues in order and review what we believe are the particular highlights

26  in our arguments.

2

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| In re *Ex Parte* Reexamination of: | : |
| | : |
| **U.S. Patent No. 8,412,488** | : Reexam Control No.: **90/014,916** |
| | : |
| Patent Issued: **April 2, 2013** | : Reexam Filed: **December 3, 2021** |
| | : |
| Application No.: **13/409,697** | : Reexam Ordered: **January 28, 2022** |
| | : |
| Application Filing Date: **March 1. 2012** | : Examiner: **Matthew E. HENEGHAN** |
| | : |
| Inventors: **Steinberg et al.** | : Appeal No.: **2024/001366** |
| | : |
| Assignee/Appellant: **EcoFactor Inc.** | : Confirmation No.: **2353** |
| | : |

For:  **SYSTEM AND METHOD FOR USING A NETWORK OF THERMOSTATS AS TOOL TO VERIFY PEAK DEMAND REDUCTION**

**NOTICE OF APPEAL FROM A DECISION OF THE PATENT TRIAL AND APPEAL BOARD TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**Director of the United States Patent
  and Trademark Office
Attn:  Office of the General Counsel
P.O. Box 1450
Alexandria, VA 22314-5793**

Pursuant to 35 U.S.C. §§ 141(b) and 142, and 37 C.F.R. §§ 90.2 and 104.2(a), Patent Owner, EcoFactor Inc., hereby appeals the May 10, 2024 Decision on Appeal from the Patent Trial and Appeal Board (Appeal No. 2024-001366), in the above-referenced *Ex Parte* Reexamination (Reexam), which Decision affirmed the Examiners' final rejection of claims 1-16 of U.S. Patent No. 8,412,488 (488 Patent) under 35 U.S.C §§ 305 and 103(a), and from all adverse orders, decisions, rulings, and opinions in the Reexam, whether relied upon in the Decision or not.  A copy of the Decision on Appeal is attached to this Notice.

The Appellant in this Appeal is the Patent Owner of record, EcoFactor Inc.  The Appellee is the Director of the U.S. Patent and Trademark Office.

Appeal No. 2024-001366
Appellant:  EcoFactor, Inc.
*Ex Parte* Reexamination Control No. 90/014,916
Re U.S. Patent No. 8,412,488

Appellant (Patent Owner) further indicates that the issues on Appeal include, but are not limited to, (a) claims 1-16 of the 488 Patent were improperly rejected under 35 U.S.C. § 305 as allegedly having been enlarged in scope in Reexam based on Appellant's amendments; (b) claims 1, 3-9, and 11-16 of the 488 Patent are patentable over Ehlers and Van Ostrand; and (c) claims 2 and 10 of the 488 Patent are patentable over Ehlers, Van Ostrand, and Rosen, and any finding or determination supporting or related to those issues, as well as all other issues decided adversely to Patent Owner in any orders, decisions, rulings, and opinions.

Pursuant to Federal Circuit Rule 15(a)(l), a copy of this Notice of Appeal, and the $605.00 fee required by 28 U.S.C. § 1913 and Federal Circuit Rule 52(a)(3)(A), are simultaneously being filed today with the U.S. Court of Appeals for the Federal Circuit.

Pursuant to 37 C.F.R. § 90.2, a copy of this Notice of Appeal is also being electronically filed via EFS-Web with the Patent Trial and Appeal Board.

Should any questions arise regarding this Notice of Appeal, all inquiries may be directed to Appellant's undersigned representative at the telephone number set forth below.

Respectfully submitted,

July 9, 2024

Correspondence Address:
Customer No. 144465
*TannerIP PLLC*

By:    /Daniel A. Tanner, III/
       Daniel A. Tanner, III
       Attorney of Record
       Registration No. 54,734
       Telephone No.  703-232-1160 (Ext. 101)
       Facsimile No.   571-393-3610

Attachments:
       Decision on Appeal (Appeal No. 2024-001366)
       Certificate of Service

2